UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

YOLANDA DELGADO,

     *Plaintiff,*

v.                            Case No. 6:23-cv-1288-RBD-NWH

THE EVANGELICAL LUTHERAN
 GOOD SAMARITAN SOCIETY, a
 foreign not-for-profit corporation,
 d/b/a GOOD SAMARITAN
 SOCIETY – KISSIMMEE VILLAGE;
 SANFORD a/k/a SANFORD HEALTH,
a foreign not-for-profit corporation.

     *Defendants.*
_____ /

## JOINT PRE-TRIAL STATEMENT

Plaintiff, Yolanda Delgado ("Plaintiff" or "Ms. Delgado"), and Defendants, The
Evangelical Lutheran Good Samaritan Society and Sanford, by and through their
respective undersigned attorneys, pursuant to the Case Management and Scheduling
Order (CMSO) (ECF 30) and Local Rule 3.06(b), respectfully provide this Joint Pre-trial
Statement.

## I.   JURISDICTION

This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 3613
because this lawsuit is brought under the Fair Housing Act, 42 U.S.C. §3601 et seq. ("the

1

FHA") and under 28 U.S.C. § 2201 for declaratory relief.  This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. §1367.

Venue is proper in the Middle District of Florida, Orlando Division, under 28 U.S.C. § 1391(b) because the claim arose in Osceola County, which is in this Court's judicial district.

Plaintiff YOLANDA DELGADO is a resident of the State of Florida and is otherwise sui juris. DELGADO currently resides in Osceola County, Florida.

Defendant, THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY, is a not-for-profit corporation which owns and operates a senior living community operating under the fictious name of GOOD SAMARITAN SOCIETY– KISSIMMEE VILLAGE ("GOOD SAM") with a business address of 1543 Aldersgate Drive, Kissimmee, Florida 34746. Defendant, SANFORD a/k/a SANFORD HEALTH ("SANFORD"), is a not-for-profit corporation operating in South Dakota located at 1305 W. 18th Street, Sioux Falls, SD 57105.

## II.    BRIEF STATEMENT OF ACTION

This case centers around the Plaintiff's and Good Sam's execution of the termination of Plaintiff's November 2018 "Senior Living Occupancy Agreement" ("Occupancy Agreement") at the Kissimmee Village complex owned and operated by Good Sam after Defendants' determination that Plaintiff's unit was rendered uninhabitable by flooding resulting from Hurricane Ian. Specifically, after learning that

2

her unit was flooded, Plaintiff was provided the "Termination of Occupancy Agreement and Abandonment of Personal Property Agreement" ("Termination Agreement") on October 15, 2022 which she signed. In addition to terminating the Occupancy Agreement without 30 days notice (which allowed for the expedited return of the security deposit), the Termination Agreement authorized Good Sam to dispose of Plaintiff's personal property at its own expense, and "released" Good Sam and its affiliates "from all claims…arising out of or related to the Property, disposal of the Property, the Unit, Occupancy Agreement, fees, security deposits, or Resident's use of the Unit."

Plaintiff subsequently filed this lawsuit against Good Sam and its parent Sanford for (1) alleged violations of the FHA in Count 1, (2) declaratory relief seeking declaration that the Termination Agreement is void ab initio in Count 2, and (3) "exploiting" her status as a "vulnerable adult" under Chapter 415, Florida Statutes, in Count 3. Specifically, Plaintiff seeks to prove Defendants, the owners, managers, and/or employees of a residential campus, discriminated against Plaintiff by wrongfully requiring her to surrender her housing rights through coercion and interfered with Plaintiff's exercise and enjoyment of her Fair Housing rights. Plaintiff also alleges that Defendants discriminated against Plaintiff, a Limited English Proficient person, by failing to provide appropriate language translation services in violation of the federal Fair Housing Act.

The parties have moved for the entry of summary judgment on these claims, which remain pending before the Court. In addition to adopting Good Sam's summary judgment arguments, Sanford has separately moved for summary judgment on the basis that it does not own Kissimmee Village, employ any of the complex's employees, or have any relationship with Plaintiff. Plaintiff's claims are premised on the alleged conduct of Good Sam, the subsidiary of Sanford, and Plaintiff seeks to prove both that Sanford exerts direct control over Good Sam and that, as a result of that direct control, is liable as Good Sam's parent company for the actions of Good Sam's employees.

## III.   PLAINTIFF'S POSITION STATEMENT

Ms. Delgado is a senior from Puerto Rico whose primary language is Spanish and is limited English proficient ("LEP"). Ms. Delgado resided at 4163 Northgate Drive, Unit 11, Kissimmee, FL 34746, within the Defendants' campus of Kissimmee Village from on or about November of 2019 until she evacuated the Property on or about September 27, 2022, in preparation for Hurricane Ian making landfall.

Plaintiff alleges that Defendants discriminated against her on October 15, 2022, in violation of the Federal Fair Housing Act by failing to provide her necessary translation services during the signing of the Termination of Occupancy Agreement and Abandonment of Personal Property Agreement dated October 15, 2022 ("Termination

Agreement")[1]. As a result of this failure to ensure Plaintiff was able to read and understand this Termination Agreement, Plaintiff has also alleged Defendants treated her differently than similarly situated residents based on her LEP status. Good Sam staff failed to provide translation services or interpretation services to Ms. Delgado when seeking to have Ms. Delgado sign a document written in English terminating her tenancy and releasing Good Sam, and its affiliates, of any and all future claims in the aftermath of Hurricane Ian[2]. By so doing, Defendants engaged in coercive, intimidating, and threatening conduct violative of the Federal Fair Housing Act, by misrepresenting the nature of Ms. Delgado's legal rights to her housing and to her security deposit, and by allegedly coercing her signature during a time of heightened stress and vulnerability for Ms. Delgado[3]. Finally, Plaintiff asserts that she is a "vulnerable adult" within the meaning of Chapter 415, Florida Statutes, and that Defendants knowingly exploited her in obtaining her execution of the Termination Agreement in violation of Florida Statutes 415.102(28). Plaintiff claims that as a direct result of Defendants' alleged failure to provide these translation services in combination with their alleged deceptive tactics on

---

[1] *Jackson v. Okaloosa Cnty., Fla.,* 21 F.3d 1531,1543 (11th Cir. 1994) ("[w]e have held that the Fair Housing Act prohibits "not only direct discrimination but practices with racially discouraging effects ..."; thus, a showing of a significant discriminatory effect suffices to demonstrate a violation of the Fair Housing Act."); Defendants' rely on *Warner v. Sch. Bd. of Hillsborough Cnty., Florida,* No. 8:23-CV-181-SDM-JSS, 2024 WL 3315627*6 (M.D. Fla. Feb. 29, 2024) which finds the "expansive view of services covered by § 3604(b)" and instead holds that "a service within the meaning of § 3604(b) must be a housing-related service that is directly connected to the sale or rental of a dwelling," as admitted herein Defendants are housing providers.
[2] *Mcad and Josue and Clara Garcia, Et Al., Complainants v. David Zak, Zak Law Offices, PC, and Loan Modification Group Inc.* Respondents, 2015 WL 2179841* 14. (finding in some case discrimination consists of unfair language practices such as failing to explain untranslated documents or translating them inaccurately).
[3] Defendants' inappropriately rely on *Gourlay v. Forest Lake Ests. Civic Ass'n fo Port Richey, Inc.,* 276 F. Supp. 2d 1222, 1234-36(M.D.Fla. 2003) which is distinguish as Plaintiff has not alleged a hostile environment created by Defendants.

October 15, 2022, she is entitled to declaratory relief that the Termination Agreement is *void ab initio*. Plaintiffs asserts that the action and inaction by Good Sam staff was done in direct conflict with their own policies requiring staff to identify language services needed by residents and offer those services to residents.

Defendant Sanford has been identified as the parent company of Good Sam. Sanford uses the tradename Sanford Health and by affiliation agreement has direct oversight responsibility of Good Sam. As a result, Plaintiff claims that Sanford is vicariously liable for the actions of Good Sam and the Good Sam employees on October 15, 2022.

## IV.    DEFENDANTS' POSITION STATEMENT

Defendants do not agree with Plaintiff's characterization or description of her claims – from a factual or legal standpoint – and offer Defendants' Position Statement instead.

Plaintiff, a native of Puerto Rico, alleges in Count 1 that Good Sam discriminated against her on the basis of national origin under §§ 3604(b) and 3717 of the FHA by (i) purportedly coercing her to sign the Termination Agreement in return for an expedited refund of her security deposit, and by (ii) failing to provide translation services in connection with her execution of the contract. Defendants submit that Plaintiff's FHA claims are contradicted by her own testimony, and also fail as a matter of law.

Specifically, Plaintiff has testified she was treated well by Good Sam and was not treated differently because she is Hispanic; that she did not ask for or need translation services because her college-educated, bilingual daughter served as her translator in connection with her execution of the Termination Agreement; and that she was not forced or coerced into signing the Termination Agreement.

Under the FHA, moreover, an alleged failure to provide translation services is not an "essential" service related to the "availability" of housing as required to assert a claim under § 3604(b). Plaintiff also has no evidence of any "discriminatory animus" on the part of Good Sam, much less rising to the level of "violence or threats of violence," as required to assert a claim under § 3617.

Finally, Plaintiff waived her right to assert a claim of discrimination by failing to request translation services from Good Sam (either for an interpreter or to have the Termination Agreement translated into Spanish) and by utilizing her daughter as her translator when discussing and ultimately signing the Termination Agreement.

In Count 2, Plaintiff seeks declaratory relief for rescission of the Termination Agreement, alleging that the contract is void *ab initio* for (i) lack of consideration and (ii) because her signature was purportedly obtained through coercion by misrepresenting that her execution of the contract was a condition precedent to a return of her security deposit.

Count 2, however, is defeated by Plaintiff's admission that she was not coerced into signing the Termination Agreement, and by her daughter's testimony that signing the contract was required for an expedited return of the security deposit, not a condition precedent to Plaintiff's receipt of the deposit. Indeed, Plaintiff has alleged in her Complaint that Good Sam advised that Plaintiff would receive her security deposit at a later date if she did not sign the contract.

Count 2 also fails as a matter of law because (i) the contract does not violate public policy (as required to declare a contract void *ab initio*); (ii) Plaintiff has not offered to restore the benefits of the contract (by returning the security deposit) as required to assert a claim for rescission; (iii) offering an expedited return of the security deposit in return for executing the Termination Agreement was not a "false" representation or a ground for rescission; (iv) a failure to read and to understand a contract is not a defense against its application; and (v) an alleged failure of consideration (which in any event existed in this case) is not a basis for rescission of a contract as a matter of law.

In Count 3, Plaintiff alleges that Good Sam "exploited" her "vulnerability" under Florida's "Adult Protective Services Act" (the "Act"), Chapter 415, Florida Statutes, by purportedly coercing her into signing the Termination Agreement under the false premise that signing the contract was required for Plaintiff to receive her security deposit. Plaintiff, however, denied in her deposition that she was coerced or forced to

8

sign the Termination Agreement. She has also testified that she was told she would receive her security deposit at a later date even if she didn't sign the contract.

Count 3 also fails as a matter of law. Specifically, Plaintiff has no evidence that she is or was ever in need of "protective services." Plaintiff has no evidence demonstrating that she meets the statutory definition of a "vulnerable adult," as there is no evidence that she suffers from an impairment of her ability to "perform the normal activities of daily living or to provide for [her] own care or protection" due to a "mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging." Plaintiff also has no evidence that Good Sam ever occupied a "fiduciary" relationship with responsibility over the "use or management of" her "funds, assets or property" as required to assert a claim for "exploitation" within the meaning of the Act. Further, based on Plaintiff's own testimony, Defendants did not engage in "deception" or "intimidation" as narrowly defined by the Act, and did not "obtain or use" her property as narrowly defined by the Act.

Finally, Defendant Sanford submits that it does not bear liability for the additional reason that (i) Sanford (Good Sam's parent company) is a separate entity from Good Sam which has no relationship to the property or the Plaintiff, and (ii) Sanford did not employ the agents/employees who interacted with Plaintiff in connection with the execution of the Termination Agreement—the event underlying all of Plaintiff's claims. Simply because Sanford and Good Sam are part of the same corporate structure in which Sanford

9

is Good Sam's parent entity does not make Sanford vicariously liable for the actions or

inactions of Good Sam or its employees.

## V.    <u>TRIAL EXHIBITS</u>

The Parties' Joint Exhibit List is attached hereto as Exhibit "A".

Plaintiff's list of trial exhibits is attached hereto as Exhibit "B".

Defendants' list of trial exhibits is attached hereto as Exhibit "C".

The parties agree that certain objections to some of the exhibits may be

unnecessary or moot depending on the Court's rulings with regard to the outstanding

summary judgment motions and motions in limine.

## VI.    <u>TRIAL WITNESSES</u>

Plaintiff's list of trial witnesses is attached hereto as Exhibit "D".

Defendants' list of trial witnesses is attached hereto as Exhibit "E".

## VII.    <u>EXPERT WITNESSES</u>

Plaintiff's list of trial expert witnesses is attached hereto as Exhibit "F".

Defendants' list of trial expert witnesses is attached hereto as Exhibit "G".

## VIII.    <u>DAMAGES</u>

<u>Plaintiff's Position</u>

Plaintiff is entitled to both compensatory and punitive damages based on

Defendants' discriminatory, coercive, and exploitative conduct. Plaintiff suffered:

- Anxiety when she learned that all of her possessions and cherished mementos, including treasured family photo albums, had been destroyed.

- Embarrassment and humiliation when she was instructed in a language she didn't understand to sign a document written in a language she didn't understand.

- Anger when she was not afforded an opportunity to inquire further into the Termination by use of a translator offered by Defendants to better understand her situation.

Plaintiff will request a jury award her $200,000.00 to compensate for replacement housing costs, lost housing opportunity, and emotional distress. Plaintiff will also request a jury award her punitive damages, calculated at four time the value of her compensatory damages, or another $800,000.00.

Plaintiff will further request an award of attorneys' fees and costs, currently totaled at $161,737.50 inclusive of pre-suit investigation and communications to counsel.

Defendant's Position

Defendants do not agree with Plaintiff's characterization or description above and offer the following position instead.

Plaintiff is seeking monetary damages in Count 1 (alleging FHA violations) and Count 3 (alleging a claim under Florida's Adult Protective Services Act). She is not

seeking monetary damages in Count 2, but rather, declaratory relief for rescission of the Termination Agreement.

Plaintiff's Count 1 FHA claim alleges a violation of §§ 3604(b) and 3617 of the FHA. Section 3604(b) of the FHA makes it unlawful, in relevant part, to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of…national origin." Plaintiff's §3604(b) claim is principally based on Good Sam's alleged failure to provide "translation services" in connection with her execution of the Termination Agreement. A "service" within the meaning of §3604(b) is one that is "essential" to the "availability of housing." *See Warner v. School Bd. of Hills. Cnty., Fla.,* Case No.: 8:23-cv-181-SDM-JSS, 2024 WL 3315627, at *8 (M.D. Fla. 2024)(citation omitted). Defendants submit that Plaintiff cannot establish an FHA violation under this section and that she is not entitled to damages because (i) her testimony negates her claim of discrimination or that she required or requested translation services from Good Sam (because her bilingual daughter interpreted for her), and (ii) an alleged failure to provide translation services in connection with a contract terminating a tenancy in any event is not an "essential" service related to the "availability of housing."

Section 3617 of the FHA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed…any right granted or protected by 3603, 3604, 3605, or 3606 of this

title." Where a plaintiff alleges a violation of §3617 independently of a violation of sections 3603-3606, the plaintiff must allege and prove "discriminatory" conduct "so severe or pervasive," such as "violence or threats of violence," that have the effect of "causing a protected person to abandon the exercise of his or her housing rights." *Gourlay v. Forest Lake Estates Civic Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1234 (M.D.Fla. 2003), *vacated by settlement*, No.: 8:02-CV-19-55T30TGW, 2003 WL 22149660 (M.D. Fla. 2003)(citing *Sofarelli v. Pin. Cnty.*, 931 F. 2d 718, 721-23 (11th Cir. 1991)). Defendants submit that Plaintiff cannot establish liability under this section and that she is not entitled to damages because (i) her testimony negates that she was coerced into signing the Termination Agreement or was subject to discrimination by Good Sam; (ii) she was not forced to abandon her housing rights by Good Sam but because of flooding resulting from Hurricane Ian; and (iii) she has not alleged or presented evidence of "violence or threats of violence" having the effect of causing her to "abandon the exercise of [her] housing rights" on the part of Good Sam.

Plaintiff's Count 3 claim for violation of Florida's "Adult Protective Services Act" alleges that Good Sam "exploited" Plaintiff's "vulnerability" by coercing her into signing the Termination Agreement based on the false premise that signing the contract was necessary for Plaintiff to receive her security deposit. Good Sam submits that Plaintiff cannot satisfy the elements of her claim and therefore is not entitled to damages because her testimony and Complaint contradict her Count 3 claim. Specifically, Plaintiff has

denied that she was coerced into signing the Termination Agreement, and she has alleged that Good Sam advised that she would receive her security deposit at a later date if she did not sign the contract. Good Sam further submits that Plaintiff's Count 3 claim would fail even without these admissions because Plaintiff has not alleged or offered proof (i) that she was ever in need of "protective" services; (ii) that she falls within the statutory definition of a "vulnerable" adult; or (iii) that Good Sam was ever entrusted with responsibility over the "use of management of [Plaintiff's] funds, assets, or property" as required to assert a claim of "exploitation" under the Act.

Assuming Plaintiff were able to satisfy the elements of her Count 1 and 3 FHA and "vulnerable adult" claims (and Defendants submit she cannot for the reasons stated herein), Plaintiff would be entitled to actual damages (if any) caused by Plaintiff's signing the Termination Agreement and reasonable attorneys' fees and costs, and to pursue a claim for punitive damages, under 42 U.S.C. §3613(c) and §415.1111, Florida Statutes. However, Plaintiff would not be entitled to damages for the loss of her property or increased expenses for having to replace lost property; the loss of her residence at Kissimmee Village; emotional distress resulting from the Hurricane Ian flooding (including loss of personal property and her residence); higher housing costs; inconvenience; loss of transportation services; or social isolation after she had to vacate her unit at Kissimmee Village – all of which were caused by the flooding from Hurricane Ian, not by Plaintiff signing the Termination Agreement. Notably, Plaintiff has filed a

separate lawsuit in state court seeking monetary damages for property loss and other

damages caused by the flooding—damages elements she is not seeking in this case.

## IX.    DEPOSITIONS OFFERED IN LIEU OF LIVE TESTIMONY

Plaintiff's Witnesses

Rhona Snyder, Senior Living Consultant, Good Sam

Shane Knutson, Operations Director, Senior Living, Good Sam

Chad Jungman, Senior Vice President, Legal, Sanford

Joel Fluit, Chief Financial Officer, Good Sam

Tamara Lund, Nursing and Clinical Services Consultant for Senior Living, Good

Sam

Defendant's Witnesses

Defendants may seek to offer portions of the depositions of Plaintiff and her

daughter, Magaly Delgado, in their case.

No others are anticipated, subject to witnesses being unavailable to testify at trial

under unforeseeable circumstances.

## X.    ADMITTED FACTS

1.    The parties stipulate that Plaintiff is Puerto Rican and that national origin is

a protected category under the Fair Housing Act.

2.    Delgado is a native Spanish speaker with limited English proficiency.

3.    Delgado signed a Senior Living Occupancy Agreement (Occupancy Agreement) with Good Samaritan on November 18, 2018. She paid a security deposit at, or around, the time she entered said agreement.

4.    The Occupancy Agreement required 30-days notice by either party to terminate the agreement.

5.    The Occupancy Agreement provided for a return of a resident's security deposit at the end of the tenancy according to the agreement's refund formula.

6.    The Occupancy Agreement provided that "free language services" would be provided upon request, and instructed the resident to contact the "Senior Living Manager" if the resident were in need of such services.

7.    Plaintiff did not request that the Occupancy Agreement or Termination Agreement presented to her by Good Sam be translated from English into Spanish.

8.    Plaintiff's daughter, Magaly Gutierrez, is bilingual (fluent in English and Spanish), and accompanied Plaintiff in connection with her execution of the Occupancy Agreement, the Termination Agreement, and other documents at Kissimmee Village.

9.    Plaintiff did not file a grievance based on discrimination during her 4-year tenancy at Kissimmee Village.

10.  Many Hispanic individuals resided at Kissimmee Village during Plaintiff's tenancy.

11.  Defendant Good Samaritan is a non-profit corporation formed in North Dakota, has its principal office in South Dakota, and is authorized to do business in Florida.

12.  Good Samaritan owns and operates Good Samaritan Society – Kissimmee Village (Kissimmee Village) in Osceola County, FL.  Kissimmee Village is a dwelling.

13.  Defendant Sanford is a non-profit corporation and the parent company of Good Samaritan.  Sanford is the controlling Class A Corporate Member of Good Samaritan with the power to appoint Good Samaritan's Board of Directors.

14.  Sanford, as the parent company and controlling Class A Corporate Member of Good Samaritan, exercises oversight over Good Samaritan's annual and long-term strategic plans, budgets, and assets.

15.  Good Samaritan's President acts as CEO, overseeing administration of Good Samaritan, appointing executive leadership, and preparing agendas for Board Meetings.

16.  On or about September 28, 2022, Hurricane Ian caused widespread flooding to the Kissimmee Village property.

17

17.   In late September 2022, Osceola County officials issued an evacuation order that covered Kissimmee Village due to the Hurricane.

18.   Delgado evacuated her apartment, located at Kissimmee Village at 4163 Northgate Dr, 11, Kissimmee, FL 34746, in advance of the storm on September 27, 2022.

19.   Hurricane Ian resulted in such significant flood damage to Delgado's apartment that she could not move back into her unit after the Hurricane passed as it was "unsafe for occupancy."

20.   Delgado met with Good Samaritan representative Rhona Snyder, whose only language is English, on October 15, 2022, where she signed the Termination Agreement.

21.   As a result of the damage to her unit caused by Hurricane Ian, Plaintiff and her daughter met with Good Sam employee Rhona Snyder to discuss Plaintiff's options.

22.   During the October 15, 2022 meeting, Plaintiff was notified that her unit would not be repaired, at that time she was notified of the Termination Agreement, which would be utilized to receive an expedited return of her security deposit.

23.   Delgado was accompanied by her daughter, Magaly Gutierrez (Gutierrez), during the October 15, 2022, meeting in the Friendship Room.

24.  Neither Plaintiff nor her daughter asked for a translator in connection with Plaintiff's review and execution of the Termination Agreement because Plaintiff's daughter is bilingual (speaking English and Spanish) and was able to and did communicate what was said by Rhona Snyder and Plaintiff during the meeting.

25.  Plaintiff signed the Termination Agreement on October 15, 2022.

26.  The Termination Agreement Plaintiff signed on October 15, 2022, included a "Release" of "all claims … arising out of or relating to the Property, the Unit, Occupancy Agreement, fees, security deposits, or Resident's use of the Unit."

27.  Plaintiff was told and understood that she was entitled to receive her security deposit pursuant to the terms of the Occupancy Agreement, even if she didn't sign the Termination Agreement, and would simply receive the deposit sooner if she signed the contract.

28.  Good Sam offered Plaintiff another unit in Kissimmee Village weeks after she signed the Termination Agreement.

29.  Plaintiff turned down Good Sam's offer and chose instead to secure alternate housing and to sign a mortgage on a new residence.

30.  Plaintiff has never received a diagnosis of any mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain

damage, or the infirmities of aging, which would impair her ability to perform the normal activities of daily living or to provide for her own care or protection.Travis Staples, Joel Fluit, Tamara Lund, Rhona Snyder, Dylan Spader, Shane Knutson, Claudia Espinosa, Mireya Rodil, and Carmen Rivera are employees of The Evangelical Lutheran Good Samaritan Society.

## XI.   AGREED PRINCIPLE OF LAW

1.    For purposes of this action brought under the Federal Fair Housing Act, 42 U.S.C. §§ 3601–3619, the parties stipulate that Plaintiff is a member of a protected class based on national origin. This stipulation is entered solely for the purposes of this litigation and shall not be construed as an admission for any other purpose outside this proceeding. Nothing in this stipulation shall be construed to waive any party's position or argument as to the remaining elements of Plaintiff's claim(s) or Defendant's defenses.

2. Defendant The Evangelical Luther Good Samaritan Society (Good Sam) is a housing provider within the meaning of the Federal Fair Housing Act, 42 U.S.C. §§ 3601–3619. Specifically, Defendant Good Sam owns, manages, operates, rents, and sells residential dwelling units located at 1543 Aldersgate Drive, Kissimmee, Florida 34746, and is engaged in the business of providing housing as defined by the Act. The parties stipulate that Defendant is subject to the provisions and obligations of the Federal Fair Housing Act. This stipulation is entered solely for purposes of this litigation and shall not be construed as an admission for any purpose outside this proceeding. Nothing in

20

this stipulation shall be construed to waive any party's position or argument as to the remaining elements of Plaintiff's claim(s) or Defendant's defenses.

3.    Plaintiff has the burden of proving by a preponderance of the evidence that Good Sam discriminated against her on the basis of national origin to prevail on her Count 1 FHA claims.

4.    Plaintiff is required to prove that Good Sam coerced her into signing the Termination Agreement and that she abandoned her housing rights as a result to prevail on her §3617 FHA claim.

5.    Plaintiff is required to prove that she falls within the statutory definition of a "vulnerable adult" to prevail on her Count 3 "Exploitation of a Vulnerable Adult" claim.

6.    Plaintiff is required to prove that Good Sam occupied a position of "trust and confidence" with Plaintiff, was entrusted with responsibility over the "use or management of [her] funds, assets, or property," and "exploited" Plaintiff by obtaining or using Plaintiff's funds, assets, or property, with the intent to temporarily or permanently deprive her of the use, benefit, or possession of the funds, assets, or property, to prevail on her Count 3 "Exploitation of a Vulnerable Adult" claim.

## XII.    ISSUES OF FACT

1.    Whether Plaintiff was forced to sign the Termination Agreement.

2.      Whether, when offering Plaintiff another unit at Kissimmee Village weeks
after she signed the Termination Agreement, Defendants did not allow her
to see the unit and/or only provided 24 hours to deny or accept the unit.

3.      Whether, when offering other displaced residents another unit at
Kissimmee Village weeks after they signed their Termination Agreements,
Defendants did not allow them to see the unit and/or only provided 24
hours to deny or accept the unit.

4.      Plaintiff, along with other residents (Hispanic and non-Hispanic, Puerto
Rican and non-Puerto Rican, and LEP and non-LEP) who received similar
offers, was provided 24 hours to deny or accept the unit.

5.      Good Sam had an internal policy Language Assistance or Access for Limited
English Proficient (LEP) Persons – Senior Living and AH, which states in
relevant part:

> The senior living manager or other designated employee will identify the language
> and communication needs of the person with limited English proficiency. If
> necessary, employees will use a language identification card (or "I speak cards,"
> available online at www.lep.gov) or posters to determine the language. Record the
> language needs of the resident in the resident file.
>
> The senior living manager or other designated employee will ensure residents are
> informed in a language they can understand of the right to language assistance and
> the availability of such assistance free of charge.

Defendants dispute that this is a relevant fact and have filed a Motion in Limine
to preclude this policy and evidence relating to it.  To the extent that this
portion of the LEP policy is admitted into evidence, then the entire policy
should be admitted into evidence.  It is Plaintiff's position that Defendants did

not follow the LEP policy as it relates to Plaintiff's signing the Termination

Agreement, and it is Defendants' position that the policy was followed as it

relates to Plaintiff's signing the Termination Agreement.

## XIII.  <u>ISSUES OF LAW</u>

1.      Whether Good Sam intentionally discriminated against Plaintiff in violation

of §§ 3604(b) and 3617 of the FHA.  The parties disagree whether the FHA requires

Plaintiff to prove that any claimed discrimination against her was "intentional" by the

Defendants.   Plaintiff submits that the FHA does not require proof of intentional

discrimination whereas Defendants submit that the FHA requires proof of intentional

discrimination.

2.      Whether the provision of translation services in connection with the

execution of the Termination Agreement constitutes a "service within the meaning of §

3604(b)" of the FHA – specifically, "a housing-related service" that is "essential to the

habitability of" a dwelling or to the "availability of housing."

3.      Whether Good Sam "coerced, intimidated, threatened, or interfered" with

Plaintiff's "exercise of a right under sections 3603-3606" of the FHA  or Plaintiff's

"enjoyment of a housing right after exercise of that right."  The parties disagree whether

the FHA requires Plaintiff to prove that any claimed discrimination against her was

"intentional" by the Defendants.  Plaintiff submits that the FHA does not require proof

of intentional discrimination whereas Defendants submit that the FHA requires proof of intentional discrimination.

4.    Whether, absent a violation of sections 3603-3606, whether Good Sam engaged in "discriminatory" conduct so "severe or pervasive," such as "violence or threats of violence," that had the effect of causing Plaintiff to "abandon the exercise of [her] housing rights."   The parties dispute the legal standard for this standalone 3617 claim.  Defendants submit that Plaintiff must prove that the claimed discriminatory conduct was so "severe or pervasive" that it amounted to acts of violence or threats of violence.  Plaintiff submits that that is an incorrect legal standard.

5.    Whether the Termination Agreement violates Florida law or public policy and is therefore void ab initio as a matter of law.

6.    Whether Plaintiff was forced or coerced into signing the Termination Agreement and thereby deprived of exercising her free will in electing to sign the contract.

7    Whether Plaintiff was had an opportunity to read the Termination Agreement and its incorporated release.

8.    Whether a failure of consideration is a basis for declaring the Termination Agreement void ab initio.

9.    Whether Plaintiff's execution of the Termination Agreement was supported by consideration.

10.    Whether Plaintiff falls within the definition of a "vulnerable adult" under Florida's Adult Protective Services Act, section 415.102(28).

11.    Whether Good Sam stood "in a position of trust and confidence with [Plaintiff as] a vulnerable adult and knowingly, by deception or intimidation, obtain[ed] or use[d], or endeavor[ed] to obtain or use, [Plaintiff's] funds, assets, or property with the intent to temporarily or permanently deprive [her as] a vulnerable adult of the use, benefit, or possession of the funds, assets, or property" as required to prove a claim of "exploitation" under Florida's Adult Protective Services Act, § 415.102(8)(a)(1) and (19).

12.    Whether Plaintiff's claims are barred by her execution of the Termination Agreement incorporating a broad release of "all claims…arising out of or related to the Property, disposal of the Property, the Unit, the Occupancy Agreement, fees, security deposit, or Resident's use of the unit."

13.    Whether Sanford has any relationship with Kissimmee Village, its employees, or Plaintiff, apart from its role as Good Sam's parent.

## XIV.  PENDING MOTIONS OR OTHER UNRESOLVED ISSUES

Plaintiff's Motion for Summary Judgment (ECF 56)

Defendant Good Sam Motion for Summary Judgment (ECF 54)

Defendant Sanford Motion for Summary Judgment (ECF 55)

Plaintiff's Daubert Motion – Bruce Adelson (ECF 53)

Defendants' Daubert Motion – Jillian Baez (ECF 57)

Defendants' Daubert Motion – Sara Pratt (ECF 58)

Plaintiff's Motion *in Limine* (ECF 73)

Defendants' Motion *in Limine* (ECF 74)

## XV.    <u>SETTLEMENT</u>

The Parties disagree whether a Settlement Conference or other further settlement
discussions will be useful.  Plaintiff is open to a Settlement Conference or other further
settlement discussions.  Defendants do not believe that a Settlement Conference or other
further settlement discussions will be useful.

## XVI.   <u>STIPULATIONS</u>

1.    For purposes of trial testimony, any current or former employee, agent, or
representative of Defendant who is called to testify by Plaintiff shall be deemed a hostile
witness pursuant to Fed. R. Evid. 611(c), such that Plaintiff may examine such witnesses
using leading questions.  This stipulation applies to, but is not limited to, the following
individuals:

- Rhona Snyder

- Shane Knutson

- Chad Jungman

This stipulation does not waive any objections by either party to the admissibility of any
testimony or evidence offered through such witnesses, nor does it waive any privilege,

confidentiality, or other applicable legal protections.  The parties respectfully request
that the Court approve this stipulation and enter it as an order of the Court.

2.    For purposes of trial testimony, Plaintiff and her daughter, Magaly
Gutierrez, who is called to testify by Defendants shall be deemed a hostile witness
pursuant to Fed. R. Evid. 611(c), such that Defendants may examine such witnesses using
leading questions.  This stipulation does not waive any objections by either party to the
admissibility of any testimony or evidence offered through such witnesses, nor does it
waive any privilege, confidentiality, or other applicable legal protections.  The parties
respectfully request that the Court approve this stipulation and enter it as an order of the
Court.

3.    Plaintiff will need an English-Spanish interpreter for trial. Parties have
agreed to utilized Francine Kahn, upon availability.

4.    The Parties agree to bifurcate the trial to include a secondary phase for
punitive damages.

5.    Plaintiff stipulates that she has not pled a legal or equitable claim for
rescission.

6.    The Parties estimate that trial will take five (5) days.

## <u>CERTIFICATION</u>

In preparing this final pretrial statement, I have aimed for the just, speedy, and

inexpensive resolution of this action.

Respectfully submitted this 4 day of August, 2025.

<table>
<tr>
<td>

/s/ Morgan Cardinal

**Morgan Cardinal, Esquire**
Florida Bar No. 117645
122 E. Colonial Drive, Suite 200
Orlando, Florida 32801
Telephone: (407) 322-6279
E-mail: morganc@clsmf.org
Secondary email: jackiev@clsmf.org
**John J. Martino, Esquire**
Florida Bar No. 106093
1440 N. Nova Road, Suite 101
Daytona Beach, FL 32117
Telephone: (386) 361-6674
E-mail: johnm@clsmf.org
Secondary email: sandrac@clsmf.org
Attorneys for Plaintiff

</td>
<td>

/s/ Gordon Hill

**S. Gordon Hill**
Florida Bar No. 0094374
gordon.hill@hwhlaw.com
ashley.semler@hwhlaw.com
**Shane T. Costello**
Florida Bar No. 068538
shane.costello@hwhlaw.com
michelle.ebrada@hwhlaw.com
**Lauren S. Ayers**
Florida Bar No. 1032286
lauren.ayers@hwhlaw.com
Hill, Ward & Henderson, P.A.
101 East Kennedy Blvd., Suite 3700
Tampa, Florida 33602
(813) 221-3900 Business
(813) 221-2900 Facsimile
Attorneys for Defendants

</td>
</tr>
</table>

21308673v1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

    Plaintiff,

v.                                                  Case No.
6:23-CV-1288-RBD-EJK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY AND
SANFORD HEALTH,

    Defendants.
_____

# EXHIBIT A

*Joint Trial Exhibit List*



# EXHIBIT LIST

_ PLAINTIFF ___ DEFENDANT ___ **X** ___ JOINT

___ GOVERNMENT ___ COURT

CASE NO.    __6:23-cv-1288-RBD-NWH__
STYLE:    **Yolanda Delgado v. The Evangelical Lutheran**
**Good Samaritan Society,** _et al._

| EXHIBIT NO. | DATE IDENTIFIED | DATE ADMITTED | SPONSORING WITNESSES | OBJECTIONS / STIPULATED ADMISSIONS[1] | DESCRIPTION OF EXHIBIT |
|---|---|---|---|---|---|
| 1 | | | | | Termination Agreement |
| 2 | | | | | Occupancy Agreement |
| 3 | | | | | Sanford Corporate Annual Report |
| 4 | | | | | Notice of Non-discrimination |
| 5 | | | | | Check. No. 08034613 |
| 6 | | | | | Return of Partial Security Deposit |
| 7 | | | | | Status and Acceptance Form |
| 8 | | | | | Good Samaritan Sunbiz Record |
| 9 | | | | | Affiliation Agreement |
| 10 | | | | | Kissimmee Village Resident Handbook |
| 11 | | | | | Delgado Photos |
| 12 | | | | | Maps |
| 13 | | | | | Plaintiff's Amended Response to Defendants' First Set of Interrogatories |
| 14 | | | | | 1.11.23 Physician Notes [DELGADO000364-366] |
| 15 | | | | | 1.11.23 Patient Health |

| | | | | | Questionnaire [DELGADO000367-368] |
|---|---|---|---|---|---|
| **16** | | | | | Sanford Organizational Chart |
| **17** | | | | | Good Samaritan Webpage |
| **18** | | | | | Sanford Webpage |
| 19 | | | | | Articles of Amendment to the Article of Incorporation |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,

v.                                                                                    Case No.
6:23-CV-1288-RBD-EJK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY AND
SANFORD HEALTH,

     Defendants.
_____

# EXHIBIT B

*Plaintiff Trial Exhibit List*



# EXHIBIT LIST

**X**  PLAINTIFF        ___ DEFENDANT        _____ JOINT

___ GOVERNMENT ___ COURT

CASE NO.     __6:23-cv-1288-RBD-NWH_

STYLE:        **Yolanda Delgado v. The Evangelical Lutheran**
              **Good Samaritan Society,** *et al.*

| EXHIBIT NO. | DATE IDENTIFIED | DATE ADMITTED | SPONSORING WITNESSES | OBJECTIONS / STIPULATED ADMISSIONS[1] | DESCRIPTION OF EXHIBIT |
|---|---|---|---|---|---|
| 1 | | | | RELEVANCE – 401/403 | GS COMM. PLAN, OCT. 21, 2022 |
| 2 | | | | RELEVANCE – 401/403 | LEP POLICY, 2021 |
| 3 | | | | RELEVANCE – 401/403 | GOOD SAMARITAN GRANTS |
| 4 | | | | PENDING DAUBERT MOTION | ADELSON REPORT AT 43; 4 AT 18 |
| 5 | | | | RELEVANCE – 401/403 | KISSIMMEE VILLAGE COMM. PLAN |
| 6 | | | | RELEVANCE – 401/403 | HMGP CONTRACT |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

      Plaintiff,

v.                                       Case No. 6:23-CV-1288-RBD-EJK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY AND
SANFORD HEALTH,

      Defendants.

_____

# EXHIBIT C

*Defendants' Trial Exhibit List*



# EXHIBIT LIST

___ PLAINTIFF    __X__ DEFENDANT    ____ JOINT

___ GOVERNMENT ___ COURT

CASE NO.    **6:23-cv-1288-RBD-NWH**
STYLE:    **Yolanda Delgado v. The Evangelical Lutheran Good Samaritan Society,** *et al.*

| Exhibit No. | Date Identified | Date Admitted | Sponsoring Witness | Objections/ Stipulated Admissions | Description of Exhibit |
|---|---|---|---|---|---|
| 1 | | | | Relevance | Resident Billing Statements |
| 2 | | | | Relevance | 5.11.22 Physician Notes [DELGADO000428-434] |
| 3 | | | | Relevance | 7.6.22 Physician Notes [DELGADO000422-424] |
| 5 | | | | Relevance | 7.27.22 Physician Notes [DELGADO000418-421] |
| 6 | | | | Relevance | Property Appraiser Card |
| 7 | | | | Relevance | Trustee's Deed of Real Estate |
| 8 | | | | Relevance | OUC The Reliable One billing statement |
| 9 | | | | Relevance | Ashley Furniture billing statement |
| 10 | | | | Relevance | The Home Depot billing statement |
| 11 | | | | Relevance | Spectrum billing statement |
| 12 | | | | Relevance | Toho Water Authority billing statement |
| 13 | | | | Pending Daubert Motion | Bruce Adelson's Expert Report |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

    Plaintiff,

v.                                 Case No. 6:23-CV-1288-RBD-EJK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY AND
SANFORD HEALTH,

    Defendants.
_____

# EXHIBIT D

*Plaintiff's Trial Witness List*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     *Plaintiff*,

v.                                                    Case No. 6:23-cv-1288-RBD-EJK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY, a
foreign not-for-profit corporation,
d/b/a GOOD SAMARITAN
SOCIETY – KISSIMMEE VILLAGE;
SANFORD HEALTH, a foreign not-
for-profit corporation.

                                          /

     *Defendant*.

_____

## <u>PLAINTIFF'S WITNESS LIST</u>

     Plaintiff, Yolanda Delgado ("Plaintiff"), by and through undersigned counsel, hereby provides the following list of witnesses who may be called at trial:

     i.     Witnesses Plaintiff Will Likely Call at Trial:

          a.  Yolanda Delgado

               i.    c/o Community Legal Services
                         Attn: Morgan Cardinal
                         122 E. Colonial Drive, Orlando, FL 32801

2

      ii.     Will Testify

      iii.    No objections to Plaintiff Testifying

b. Magaly Gutierrez

      i.    c/o Community Legal Services
         Attn: Morgan Cardinal
         122 E. Colonial Drive, Orlando, FL 32801

      ii.     Will Testify

      iii.    No objection to Witness Testifying

c. Chad Jungman

      i.    c/o Hill, Ward, & Henderson P.A.
         101 E. Kennedy Blvd. Suite 3700
         Tampa, FL 33602

      ii.     Will Not Testify Live (Unavailable)

      iii.    No objection to witness testifying

d. Rhona Snyder

      i.    c/o Hill, Ward, & Henderson P.A.
         101 E. Kennedy Blvd. Suite 3700
         Tampa, FL 33602

      ii.     Will Not Testify Live (Unavailable)

      iii.    No objection to witness testifying

e. Shane Knutsen

      i.    c/o Hill, Ward, & Henderson P.A.
         101 E. Kennedy Blvd. Suite 3700
         Tampa, FL 33602

ii.   Will Not Testify Live (Unavailable)

iii.   No objection to witness testifying

f.  Dylan Spader

i.   c/o Hill, Ward, & Henderson P.A.
101 E. Kennedy Blvd. Suite 3700
Tampa, FL 33602

ii.   Will Testify

iii.   No objection to witness testifying

ii.   Witnesses Defendants May Call at Trial

a.  Kaz Fleming

i.   4197 S. Orange Blossom Trail
Kissimmee, FL 34746

ii.   Will Likely Testify

iii.   Defendants object as to relevance of Witness

Testimony

b.  Aida Aponte

i.   c/o Community Legal Services
Attn: Morgan Cardinal
122 E. Colonial Drive, Orlando, FL 32801

ii.   Will Testify

iii.   Defendants object as to relevance Witness Testimony

    c.  Joel Fluit

        i.   c/o Hill, Ward, & Henderson P.A.
             101 E. Kennedy Blvd. Suite 3700
             Tampa, FL 33602

        ii.   Will Not Testify Live (Unavailable)

        iii.   No objection to witness testifying

    d.  Tamara Lund

        i.   c/o Hill, Ward, & Henderson P.A.
             101 E. Kennedy Blvd. Suite 3700
             Tampa, FL 33602

        ii.   Will Not Testify Live (Unavailable)

        iii.   No objection to witness testifying

iii.   Other Miscellaneous Witnesses May Call at Trial

    a. Any necessary rebuttal or impeachment witnesses as necessary.

    b. Any other witnesses to be determined through discovery or otherwise.

    c. All witnesses listed by any other party on a witness list in this case.

Dated:   August 4, 2025

By: /s/ Morgan Cardinal
Attorney for Plaintiff
Morgan Cardinal, Esquire
Florida Bar No. 117645
E-mail: morganc@clsmf.org
Secondary email:
christopherk@clsmf.org
122 E. Colonial Drive, Suite 200
Orlando, Florida 32801
Telephone: (407)322-6279

John Martino, Esquire
Florida Bar No. 106093
E-mail: johnm@clsmf.org
Secondary email:
sandrac@clsmf.org
1440 N Nova Road, Suite 101
Daytona Beach, FL 32117
Telephone: (386) 361-6674

Kevin K. Ross-Andino, #66214
kevin.ross@eclatlaw.com
307 Cranes Roost Boulevard
#2010
Altamonte Springs, Florida
32701
Main Line:(407) 636-7004
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,

v.                          Case No. 6:23-CV-1288-RBD-EJK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY AND
SANFORD HEALTH,

     Defendants.

_____

# EXHIBIT E

*Defendants' Trial Witness List*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,

v.                                 Case No. 6:23-CV-1288-RBD-EJK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY AND
SANFORD HEALTH,

     Defendants.

_____

### DEFENDANTS' WITNESS LIST

     Defendants, the Evangelical Lutheran Good Samaritan Society d/b/a Good

Samaritan Society-Kissimmee Village and Sanford Health ("Defendants"), by and

through undersigned counsel, hereby provides the following list of witnesses who

may be called at trial:

*I.*    *Witnesses Defendants Will Likely Call at Trial*

    1.    Bruce L. Adelson
            c/o: Hill Ward Henderson , 101 E. Kennedy Blvd., Suite 3700
            Tampa, FL 33602

    2.    Dr. Carmen Allende, M.D.
            Sanitas Medical Center, 258 South Chickasaw Trial, Suite 310
            Orlando, FL 32825

3.    Shane Knutson
       c/o: Hill Ward Henderson , 101 E. Kennedy Blvd., Suite 3700
       Tampa, FL 33602

4.    Dustin Scholz
       c/o: Hill Ward Henderson, 101 E. Kennedy Blvd., Suite 3700
       Tampa, FL 33602

5.    Rhona Snyder
       c/o: Hill Ward Henderson , 101 E. Kennedy Blvd., Suite 3700
       Tampa, FL 33602

6.    Dylan Spader
       c/o: Hill Ward Henderson , 101 E. Kennedy Blvd., Suite 3700
       Tampa, FL 33602

7.    Dr. Alexis Valles, M.D.,
       1200 South Pine Island Road, Plantation, FL 33324


## II.    *Witnesses Defendants May Call at Trial*

8.    Yolanda Delegado
       c/o:  Morgan Cardinal and John Martino, Attorneys,
       Community Legal Services, 122 E. Colonial Drive, Suite 200,
       Orlando, FL 32801

9.    Claudia Espinosa
       c/o: Hill Ward Henderson , 101 E. Kennedy Blvd., Suite 3700
       Tampa, FL 33602

10.    Magaly "Maggie" Gutierrez
       c/o:  Morgan Cardinal and John Martino, Attorneys,
       Community Legal Services, 122 E. Colonial Drive, Suite 200,
       Orlando, FL 32801

11.    Chad Jungman
       c/o: Hill Ward Henderson , 101 E. Kennedy Blvd., Suite 3700
       Tampa, FL 33602

12.    Tamara Lund
c/o: Hill Ward Henderson , 101 E. Kennedy Blvd., Suite 3700
Tampa, FL 33602

13.    Carmen Rivera
1435 Kingston Way
Kissimmee, FL 34744

14.    Mireya Rodil
c/o: Hill Ward Henderson , 101 E. Kennedy Blvd., Suite 3700
Tampa, FL 33602

15.    Travis Staples
2314 E Copalis Pl, Sioux Falls, SD 57108

## III.    *Other Miscellaneous Witnesses May Call at Trial*

16.    Any necessary rebuttal or impeachment witnesses as necessary.

17.    Any other witnesses to be determined through discovery or
otherwise.

18.    All witnesses listed by any other party on a witness list in this case.

Respectfully Submitted,

*/s/ S. Gordon Hill*
S. Gordon Hill
Florida Bar No. 0094374
gordon.hill@hwhlaw.com
ashley.semler@hwhlaw.com
Shane T. Costello
Florida Bar No. 068538
shane.costello@hwhlaw.com
Hill, Ward & Henderson, P.A.
101 East Kennedy Blvd., Suite 3700
Tampa, Florida 33602
(813) 221-3900 Business
(813) 221-2900 Facsimile
*Attorneys for Defendants*

5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,                      Case No. 6:23-cv-1288-RBD-EJK

v.

THE EVANGELICAL
LUTHERAN GOOD SAMARITAN SOCIETY, a
foreign not-for-profit corporation
d/b/a GOOD SAMARITAN SOCIETY –
KISSIMMEE VILLAGE; SANFORD GROUP
 a/k/a SANFORD a/k/a SANFORD HEALTH,
 a foreign not-for-profit corporation,

     Defendants.

_____/

**DEPOSITION DESIGNATIONS OF PLAINTIFF**

Plaintiff, Yolanda Delgado, hereby designates the following portions of the

deposition of Chad Jungman, Rhona Snyder, Shane Knutson, and Dylan Spader

for use at trial.

**I.  Chad Jungman taken February 19, 2025**

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 4:13-16 | | |
| 5:2-8 | | |
| 5:10-6:6 | | |
| 7:2-9 | | |
| 8:2-25 | | |
| 9:10-15 | | |
| 12:3-13:9 | | |
| 21:13-23:7 | | |

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 23:8-24 | | |
| 23:25-25:21 | | |
| 26:9-23 | | |
| 27:13-28:5 | | |
| 29:17-25 | | |
| 30:23-34:12 | | |
| 37:8-16 | | |
| 38:1-21 | | |
| 39:16-40:1 | | |
| 43:18-46:18 | | |
| 47:5-50:7 | | 50:8-15 (completeness) |

## II.  Rhona Snyder, taken October 12, 2024

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 5:5-12 | | |
| 6:7-10 | | |
| 7:9-14 | | |
| 7:24-8:11 | Foundation, Lack of personal knowledge, Speculation, Relevance. | |
| 8:12-19 | | |
| 9:8-24 | | |
| 10:2-11:1 | | |
| 11:11-24 | | |
| 14:12-15:6 | Rule 401 and Rule 403 | 15:7-12 |
| 15:25-16:8 | | |
| 17:4-18:9 | Rule 401 and Rule 403 | |
| 19:6– 20:18 | | |
| 21:22-25 | | |
| 23:6-24-15 | | |
| 24:16-25:6 | | 25:7-23 (completeness) |
| 25:24-27:19 | | |
| 29:11-18 | | 29:19-25 (completeness) |

## III. Dylan Spader, taken September 12, 2024

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 7:13-8:4 | | |
| 9:15-21 | | |
| 10:21-11:1 | | |
| 13:12-20 | | |
| 14:14-15:21 | | |
| 16:17-21 | | |
| 17:7-22 | | |
| 25:2-26:5 | 401, relevance. | |
| 29:5-30:6 | | |
| 31:25-32:6 | | |
| 32:7-33:12 | | |

## IV. Shane Knutsen, taken September 12, 2024

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 6:12-22 | | |
| 7:4-24 | | |
| 7:25-8:21 | | |
| 9:16-10:1 | | |
| 10:23-12:4 | | 12:5-10 (completeness) |
| 12:11-25 | Rule 401 and Rule 403, regarding testimony concerning Hurricane Irma | |
| 15:3-18 | | |
| 16:1-24 | | 15:24-25 (completeness) |
| 17:12-20 | Rule 401, Rule 403 | |
| 18:18-25 | Rule 401, Rule 403 | |
| 19:1–20:1 | Rule 401, Rule 403 | |
| 21:6-22:18 | | |
| 23:4-14 | | |
| 24:17-25:6 | | |
| 26:17-27:5 | | |
| 29:7-30:15 | | 30:16-31:16 (completeness) |
| 31:17-32:10 | | |
| 35:7-36:7 | | |

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 37:3-14 | | 37:15-23 (completeness) |
| 38:7-39:11 | Rule 401, Rule 403 | |
| 41:20-42:14 | Outside the scope of designated Rule 30(b)(6) topics. | |
| 44:5-16 | Rule 401, Rule 403 | |
| 45:9-15 | Rule 401, Rule 403 | |
| 46:6-10 | Rule 401, Rule 403 | |
| 47:4-10 | Rule 401, Rule 403 | |
| 48:2-15 | | |

VII. Plaintiff reserves the right to further designate deposition testimony for unavailable rebuttal witnesses:

Joel Fluit, September 12, 2024, and September 13, 2024
Tamara Lund, taken October 18, 2024

August 4, 2025

Respectfully submitted,

By: /s/ Morgan Cardinal
Morgan Cardinal, Esquire
Florida Bar No. 117645
122 E. Colonial Drive, Suite 200
Orlando, Florida 32801
Telephone: (407) 322-6279
E-mail: morganc@clsmf.org
Secondary email: jackiev@clsmf.org

John J. Martino, Esquire
Florida Bar No. 106093
1440 N Nova Road, Suite 101
Daytona Beach, FL 32117
Telephone: (386) 361-6674
E-mail: johnm@clsmf.org
Secondary email: sandrac@clsmf.org

Kevin Ross-Andino
Florida Bar No. 66214
Quintairos Prieto Wood & Boyer PA
255 S Orange Ave Ste 900
Orlando, FL 32801-3454
Office: 407-872-6011
kevin.ross@qpwblaw.com

*Attorneys for Plaintiff*

5

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,                      Case No. 6:23-cv-1288-RBD-EJK

v.

THE EVANGELICAL
LUTHERAN GOOD SAMARITAN SOCIETY, a
foreign not-for-profit corporation
d/b/a GOOD SAMARITAN SOCIETY –
KISSIMMEE VILLAGE; SANFORD GROUP
 a/k/a SANFORD a/k/a SANFORD HEALTH,
 a foreign not-for-profit corporation,

     Defendants.
_____/

## DEPOSITION DESIGNATIONS OF DEFENDANTS, THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY AND SANFORD

Defendants, The Evangelical Lutheran Good Samaritan Society and Sanford Group a/k/a Sanford a/k/a Sanford Health, hereby designate the following portions of the deposition of Yolanda Delgado, Magaly Gutierrez, Carmen Allende, M.D. and Alexis Gonzalez Valles, M.D for use at trial.

## I. Yolanda Delgado on May 16, 2024 and June 28, 2024

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 6:7-9 | | |
| 7:5-6 | | |
| 8:10-15 | | |
| 9:3-25 | | |
| 10:1-12 | | |

1

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 11:8-12:7 | | |
| 13:8-19 | | |
| 14:19-25 | Objection - relevance | |
| 15:2-17 | Objection – relevance | |
| 16:22-17:1 | Objection - relevance | |
| 17:15-19:7 | Objection – relevance; cumulative | |
| 19:10-19:16 | Objection relevance; cumulative | |
| 19:16-20:2 | Objection relevance; cumulative | |
| 20:8-10 | Objection relevance; cumulative | |
| 20:17-21:2 | Objection relevance | |
| 21:15-23 | | |
| 22:2-7 | | |
| 23:15-16 | Objection relevance | |
| 25:2-26:25 | Objection - relevance; cumulative | |
| 28:14-17 | | |
| 28:21-30:7 | | |
| 31:4-13 | | |
| 32:4-23 | Objection – lack of personal knowledge | |
| 33:21-34:11 | Objection - relevance | |
| 34:14-20 | | |
| 34:22 | | |
| 42:19-43:1 | Objection - relevance | |
| 45:12-15 | | |
| 46:5-7 | | |
| 46:12-47:20 | Objection – legal conclusion | |
| 49:15-22 | Objection – legal conclusion | |
| 50:2-10 | Objection – legal conclusion | |
| 50:12-51:3 | Objection – legal conclusion | |
| 51:11-20 | Objection – legal conclusion | |
| 53:20-22 | Objection - relevance | |
| 53:24-54:7 | Objection - relevance | |
| 54:11 | Objection - relevance | |
| 54:15-25 | | |

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 57:9-60:15 | | |
| 61:16-20 | | |
| 63:12-17 | | |
| 66:23-67:25 | | |
| 69:9-17 | | |
| 70:2-71:1 | | |
| 72:22-73:11 | Objection – lack of personal knowledge | |
| 73:13-18 | Objection - relevance | |
| 73:21-74:20 | | |
| 75:11-13 | | |
| 76:12-15 | | |
| 78:3-9 | | |
| 78:23-25 | | |
| 79:1-7 | | |
| 79:18-24 | | |
| 80:8-25 | Objection – lack of personal knowledge | |
| 81:7-10 | Objection – lack of personal knowledge | |
| 82:19-83:5 | | |
| 83:9-19 | | |
| 83:22 | | |
| 84:3-8 | Objection – legal conclusion | |
| 84:22-85:6 | Objection – legal conclusion | |
| 85:8 | Objection – legal conclusion | |
| 85:10-12 | Objection – legal conclusion | |
| 86:9-17 | | |
| 87:9-22 | | |
| 88:5-10 | | |
| 89:12-25 | Objection – legal conclusion | |
| 91:15-92:10 | Objection – legal conclusion | |
| 92:14-93:5 | Objection - relevance | |
| 93:16-23 | Objection - relevance | |
| 94:1-6 | Objection - relevance | |
| 95:9-23 | Objection - relevance | |

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 96:21-97:10 | Objection - relevance | |
| 97:14-98:16 | Objection - relevance | |

## II.  Magaly Gutierrez taken on June 28, 2024

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 4:2-10 | | |
| 7:14-9:4 | | |
| 9:7-10:5 | Objection - relevance | |
| 11:5-12:20 | Objection - relevance | |
| 14:2-20 | | |
| 15:4-16:23 | | |
| 17:18-18:10 | | |
| 18:12-23 | | |
| 19:13-17 | | |
| 23:22-24:8 | | |
| 25:21-22 | | |
| 26:1-5 | | |
| 26:22-27:8 | | |
| 27:16-28:12 | Objection – legal conclusion | |
| 28:18-30:5 | Objection – legal conclusion | |
| 30:23-31:21 | Objection – lack of personal knowledge | |
| 36:25-37:9 | | |
| 40:20-42:19 | Objection – lack of personal knowledge | |
| 43:20-45:16 | | |
| 46:13-47:1 | | |
| 47:11-49:4 | Objection – lack of personal knowledge | |
| 50:11-51:3 | | |
| 51:8-52:24 | | |
| 53:6-54:8 | | |
| 54:16-55:17 | | |
| 60:4-61:2 | Objection - relevance | |
| 62:19-65:7 | | |

4

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 66:1-68:3 | | |
| 68:25-71:20 | Objection – lack of personal knowledge | |
| 72:1-74:9 | Objection - relevance | |
| 74:11-75:3 | Objection - relevance | |
| 77:24-78:9 | Objection – relevance; lack of personal knowledge | |
| 80:5-81:6 | Objection – relevance; lack of personal knowledge | |
| 81:9-12 | Objection - relevance | |
| 83:21-23 | Objection – relevance; lack of personal knowledge | |
| 85:7-12 | | |
| 86:12-87:12 | | |
| 87:25-88:2 | | |
| 89:22-90:4 | | |
| 91:9-25 | | |
| 94:14-95:17 | | |

### III.  Carmen Allende, M.D., taken October 22, 2024

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 4:1-10 | | |
| 5:10-20 | | |
| 6:3-13 | Objection - relevance | |
| 6:19-7:15 | | |
| 8:6-25 | Objection - relevance | |
| 9:1-20 | | |
| 9:14-11:22 | | |
| 11:25-12:20 | | |
| 13:6-15:13 | Objection - relevance | |
| 16:4-25 | Objection - relevance | |
| 17:1-6 | | |
| 19:2-11 | Objection - relevance | |

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 19:14-21 | Objection - relevance | |
| 21:14-25 | Objection - relevance | |
| 22:2-22 | | |
| 23:8-11 | Objection - relevance | |
| 23:12-25 | Objection relevance | |
| 24:1-17 | Objection relevance | |
| 26:3-16 | | |

## IV.  Alexis Gonzalez Valles, M.D., taken November 12, 2024

| Page & Line Designations | Objections | Counter-Designations |
|---|---|---|
| 4:1-10 | Objection - relevance | |
| 4:18 – 5:25 | Objection - relevance | |
| 6:1-18 | Objection - relevance | |
| 7:1-21 | Objection - relevance | |
| 8:7-9:23 | Objection - relevance | |
| 10:5-7 | Objection - relevance | |
| 10:9-11:9 | Objection - relevance | |
| 11:14-13:7 | Objection - relevance | |
| 14:2-16:25 | Objection - relevance | |
| 17:6-20:9 | Objection - relevance | |
| 21:12-22:10 | Objection - relevance | |
| 22:12 | Objection - relevance | |
| 22:20-23:21 | Objection - relevance | |
| 24:1-7 | Objection - relevance | |

*/s/ S. Gordon Hill*
S. Gordon Hill
Florida Bar No. 0094374
gordon.hill@hwhlaw.com
ashley.semler@hwhlaw.com
Shane T. Costello
Florida Bar No. 068538
shane.costello@hwhlaw.com
penny.lalonde@hwhlaw.com
julian.lortz@hwhlaw.com
Lauren S. Ayers

Florida Bar No. 1032286
lauren.ayers@hwhlaw.com
Hill, Ward & Henderson, P.A.
101 East Kennedy Blvd., Suite 3700
Tampa, Florida  33602
(813) 221-3900 Business
(813) 221-2900 Facsimile
*Attorneys for Defendants*

Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO.:  6:23-cv-1288-RBD-EJK

YOLANDA DELGADO,

        Plaintiff,

vs.

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY and
SANFORD HEALTH,

        Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:          YOLANDA DELGADO
DATE TAKEN:             May 16, 2024
TIME:                   10:01 a.m. - 4:39 p.m.
PLACE:                  Community Legal Services
                        122 East Colonial Drive
                        Suite 200
                        Orlando, Florida 32801

TAKEN BY:               The Defendants

REPORTED BY:            Danielle Fernandez
                        Court Reporter, Notary
                        Public, State of Florida

Page 2

1  A P P E A R A N C E S:
2  MORGAN CARDINAL, ESQUIRE
    JOHN MARTINO, ESQUIRE
3  DAWN WELKIE, ESQUIRE
4  OF:  Community Legal Services of Mid-Florida
        122 East Colonial Drive, Suite 200
5       Orlando, Florida 32801
        (407)841-7777
6       morganc@clsmf.org
        johnm@clsmf.org
7       dawnw@clsmf.org
        APPEARING ON BEHALF OF THE PLAINTIFF
8
    S. GORDON HILL, ESQUIRE
9
    OF:  Hill, Ward & Henderson, P.A.
10      101 East Kennedy Boulevard, Suite 3700
        Tampa, Florida 33602
11      (813)221-3900
        gordon.hill@hwhlaw.com
12      APPEARING ON BEHALF OF THE DEFENDANTS
13  ALSO PRESENT:  Francine Kahn, Interpreter
                    Sonia Velez, Advocate
14                  Samantha Barkholz
15
16
17
18
19
20
21
22
23
24
25

Page 3

1          I N D E X
2  TESTIMONY OF YOLANDA DELGADO:
3    Direct Examination by Mr. Hill        6
4  CERTIFICATE OF OATH               104
5  CERTIFICATE OF REPORTER          105
6  ERRATA SHEET                     106
7  NOTIFICATION LETTER              107
8
          E X H I B I T S
9
    Defendants' Exhibits
10  Exhibit 1 - (OUC bills)          14
    Exhibit 2 - (Ashley Furniture statements)    17
11  Exhibit 3 - (Home Depot statements)       18
    Exhibit 4 - (Spectrum statements)        18
12  Exhibit 5 - (The Water Authority statements)   19
    Exhibit 6 - (mortgage)               23
13  Exhibit 7 - (maps)               35
    Exhibit 8 - (acceptance/denial of unit offer)  38
14  Exhibit 9 - (senior living occupancy agreement) 45
    Exhibit 10 - (notice of nondiscrimination and   55
15       accessibility requirements)
    Exhibit 11 - (resident billing statements)    63
16  Exhibit 12 - (termination of occupancy agreement 78
        and abandonment of personal
17       property agreement)
    Exhibit 13 - (return of partial security deposit)83
18  Exhibit 14 - (MedFl Med. Centers records)    92
19
20          * * * * *
21       S T I P U L A T I O N S
22      It is hereby agreed and so stipulated by and
23  between the parties hereto, through their respective
24  counsel, that the reading and signing of the
25  transcript are expressly reserved by the Witness.

Page 4

1          P R O C E E D I N G S
2              * * * * *
3        THE COURT REPORTER:  Do you swear or affirm
4  to correctly translate the following proceedings from
5  English to Spanish and from Spanish to English?
6        THE INTERPRETER:  I do.
7            FRANCINE KAHN,
8  The interpreter, was sworn to truly and correctly
9  translate English into Spanish and Spanish into
10  English.
11        THE COURT REPORTER:  Do you swear or affirm
12  the testimony you're about to give in this case will
13  be the truth, the whole truth, and nothing but the
14  truth?
15        THE WITNESS:  Yes.
16        MR. HILL:  Okay.  My name is Gordon Hill.
17  And I think just before we get started, I think it'd
18  be good to establish on the record kind of who
19  everybody is.  I just wanted to do that real quick.
20        So, again, I'm Gordon Hill.  I represent the
21  defendants in this case, Sanford Health and then Good
22  Samaritan.  And then Mrs. Delgado, I -- I'll establish
23  who you are.  I know Morgan, and then I guess we're
24  starting -- starting with you.  And I'm sorry, I
25  didn't catch your name.

Page 5

1        THE INTERPRETER:  Please allow the
2  interpreter to translate what has happened.
3        MS. VELEZ:  My name is Sonia Velez.  I'm an
4  advocate for Community Legal Services.
5        MR. MARTINO:  And I'm John Martino, and I'm
6  also an attorney for the plaintiff.
7        MR. HILL:  In the background, go ahead.
8        MS. BARKHOLZ:  My name is Samantha Barkholz.
9  I'm a law student and I'm observing.
10        MS. WELKIE:  My name is Dawn Welkie.  I'm a
11  senior staff attorney here at Community Legal Services
12  in the fair housing unit.
13        MR. HILL:  Okay.
14        MS. CARDINAL:  And just before you get
15  started, Gordon, just logistically for the purposes of
16  the translation, I think it makes sense for -- you'll
17  ask your question fully and completely.  If I have an
18  objection, I'll object fully and completely and then
19  allow the translator to make the translation before
20  Ms. Delgado attempts to answer, does that work for
21  you?
22        MR. HILL:  That's -- that's probably the
23  best way to do it, I agree.
24        MS. CARDINAL:  Okay.  So we'll just try not
25  to step on each other.

Page 6

1    MR. HILL:  That is fair.
2         YOLANDA DELGADO,
3  having first been duly sworn, was examined and testified
4  as follows:
5         DIRECT EXAMINATION
6  BY MR. HILL:
7    Q.  So my first question is:  If you can please state
8  your name for the record?
9    A.  Yolanda Delgado.
10   Q.  Have you been known by any other names?
11   A.  No.
12   Q.  Have you ever had your deposition taken before?
13   A.  No.
14   Q.  Let me go over some basic rules for the
15  deposition.  And I'll start with the first rule, and
16  then allow translation.  But the first rule is if you
17  could give out loud answers, as opposed to shaking your
18  head and nodding your head, that would be very helpful.
19      And if at any time you do not understand a
20  question that I am asking, ask me to repeat it, and I
21  will do my best to ask it in a way that you understand.
22  And if you do answer a question without asking me to
23  rephrase it, then I will assume that you understood the
24  question; is that fair?
25   A.  Yes.

Page 7

1    Q.  Are you currently taking any medications that
2  would affect your ability to understand my questions or
3  answer truthfully to the questions being asked today?
4    A.  No.
5    Q.  Are you currently suffering from any medical
6  condition that would affect your ability to understand
7  my questions and answer them truthfully?
8    A.  No.
9    Q.  Okay.  Are you competent to understand my
10  questions and answer truthfully today?
11   A.  No.
12   Q.  So you're saying you're not competent?
13   A.  No.
14   Q.  Okay.
15      MS. CARDINAL:  It might be the word,
16  competent.
17      MR. HILL:  Right.
18      THE INTERPRETER:  The interpreter will use
19  different synonyms for the same word so that it's more
20  in the deponent's jargon.
21  BY MR. HILL:
22   Q.  Let me rephrase it, I think that's the easiest
23  thing.  Are you capable of understanding my questions
24  and answering truthfully today?
25   A.  Yes.

Page 8

1    Q.  And is there any reason at all that you should
2  not have your deposition taken today?
3    A.  I don't understand the question.
4    Q.  Okay.  Well, is -- can you think of any reason
5  why you should not have your deposition taken today?
6  And I guess what I'm looking for is there any -- there's
7  no medical issue, there's no other issue that would
8  prevent you from testifying truthfully today?
9    A.  No, I don't have any problems.
10   Q.  Okay.  Where were you born?
11   A.  In Puerto Rico.
12   Q.  In what city?
13   A.  Rio Piedras.
14   Q.  Okay.  And where did you grow up?
15   A.  Rio Piedras.
16   Q.  Okay.  When you were in Puerto Rico, did you
17  speak only Spanish, or did you speak some English?
18   A.  Spanish.
19   Q.  Okay.  What is the highest level of school or
20  education that you achieved?
21      THE INTERPRETER:  The interpreter had to
22  clarify.
23      THE WITNESS:  Ninth grade.
24  BY MR. HILL:
25   Q.  So was that -- would that be considered high

Page 9

1  school in Puerto Rico?
2    A.  Yes.
3    Q.  So did you graduate high school?
4    A.  Yes.
5    Q.  And you've not taken any college courses?
6    A.  High school.
7    Q.  Okay.  And have you taken any college courses at
8  all?
9    A.  No.
10   Q.  And where did you attend school, high school?
11   A.  Puerto Rico.
12   Q.  Were your classes spoken -- taught in English or
13  Spanish or both?
14   A.  Both.
15   Q.  Okay.  Did you take any English classes?
16   A.  No.
17   Q.  Okay.  Have you ever taken any courses on, you
18  know, speaking, reading, or writing or understanding
19  English?
20   A.  Yes.
21   Q.  How many classes?
22   A.  I don't remember.
23   Q.  Where did you take those courses?
24   A.  In Puerto Rico.
25   Q.  When did you move to the United States?

3 (Pages 6 - 9)

Page 10

1    A.  Oh my, it's been a long time.  I don't remember.
2    Q.  Okay.  Can you think of, just an estimate, for
3    how many years you have lived in the United States, like
4    ten, 20, 50?
5    A.  It's been like -- it's been like -- I've been
6    here almost about 20 years.
7    Q.  Okay.  Do you remember how old you were when you
8    moved to the United States?
9    A.  Like, 50 years.
10    Q.  Okay.  And how old are you now?
11    A.  Don't tell anybody, but I just turned 79 years
12    old.
13    Q.  Happy birthday.
14    A.  Last weekend.
15    Q.  Last weekend.  I did see you had a birthday
16    coming up or actually just had a birthday, I did see
17    that.
18        And where did you move to in the United States,
19    was it here to the Orlando, area?
20    A.  No, Brooklyn.
21    Q.  Okay.  And how long did you live in Brooklyn?
22    A.  I lived, I believe it was 15 years.  I think it
23    was 15 years.  Like 15 years, I believe.  It was 15
24    years.
25    Q.  And then after Brooklyn, did you move here to

Page 11

1    Orlando?
2    A.  To Florida.
3    Q.  Where did you move to in Florida?
4    A.  Good Samaritan.
5    Q.  Okay.  So the Kissimmee Village?
6    A.  To Good Samaritan.  My daughter brought me to
7    live at Good Samaritan.
8    Q.  Okay.  Have you ever worked or been employed by
9    any company?
10    A.  Where?
11    Q.  In Puerto Rico, Brooklyn, or in Florida.
12    A.  In New York.
13    Q.  Okay.  What did you do?
14    A.  I worked in a school.
15    Q.  And what did you do in working in school?
16    A.  I would help in the dining room or cafeteria.
17    Q.  And how long did you do that?
18    A.  I don't remember.
19    Q.  Can you estimate whether it was ten or 15 years
20    or was it just one or two?
21    A.  I don't remember very well.
22    Q.  Okay.
23    A.  I don't remember very well.
24    Q.  Do you remember when you were working in the
25    school, whether you spoke to your supervisor in English

Page 12

1    Spanish or both?
2    A.  Well, I spoke in Spanish.  There was always
3    people that spoke Spanish.
4    Q.  Okay.  And did you speak to any of the -- either
5    the teachers or students in English or Spanish or both?
6    A.  I would speak both, but I would always speak more
7    Spanish.
8    Q.  Did you work in Puerto Rico?
9    A.  Yes.
10    Q.  What did you do in Puerto Rico?
11    A.  I worked sewing in industrial machineries.
12    Q.  And is that -- how long did you work in that job?
13    A.  I don't remember, it's been a long time.
14    Q.  Okay.  Well, was it ten or 20 years or something
15    shorter?
16    A.  Shorter.
17    Q.  Okay.  So less than ten years?
18    A.  Yes, like ten years.
19    Q.  And in that job, did you speak Spanish, English,
20    or both?
21    A.  No, only Spanish.
22    Q.  Were -- have you ever been married?
23    A.  Yes.
24    Q.  And how many times?
25    A.  Only once.

Page 13

1    Q.  And I don't mean to -- I have to ask these
2    questions.  And I don't mean to get too private, and
3    I'll stop eventually, okay.
4    A.  Only once.  No more.  No more.  No more.
5    Q.  Where were you married, only in Puerto Rico or
6    was it also in Brooklyn?
7    A.  Yes, in Puerto Rico.
8    Q.  And how many children do you have?
9    A.  Two.
10    Q.  And what are their names?
11    A.  Jorge Alberto Gutierrez Delgado, Magaly Gutierrez
12    Delgado.
13    Q.  Can I just refer to them by their first names for
14    the rest of this deposition because that's a lot of
15    name.  So just Jorge and Magaly?
16    A.  Yes.
17    Q.  Okay.  So where does Magaly, live?
18    A.  Magaly lives here, here in Kissimmee.  Alberto
19    Jorge lives in New York.
20    Q.  Is it -- I wrote down Jorge.  Is it Alberto Jorge
21    or Alberto Jorge?
22    A.  Jorge Alberto.
23    Q.  Okay.  Now, do you -- now, do you speak English
24    at all with either of your children, Jorge Alberto or
25    Magaly?

Page 14

1  A.  No, Spanish.
2  Q.  Do you have any friends that you speak English
3  with or is it only Spanish?
4  A.  Only Spanish.
5  Q.  Do you ever watch any movies or television shows
6  in English without Spanish subtitles?
7  A.  Always in Spanish.
8  Q.  Do you read any books or magazines or newspapers
9  that are in English?
10  A.  No.
11  Q.  I assume you're not on Facebook or Instagram, but
12  do you do any internet surfing or do anything online
13  that's in English?
14  A.  No.
15  Q.  In terms of in you getting your mail or -- like
16  especially like things like bills, are -- do you receive
17  your mail or bills in English?
18  A.  No.
19  Q.  I'm going to hand you what we'll mark as
20  Exhibit 1.
21       (Defendants' Exhibit No. 1 was marked for
22       identification.)
23  BY MR. HILL:
24  Q.  Do you see on the bottom of that first page where
25  it says your name, Yolanda Delgado, at 3513 Bay Court in

Page 15

1  St. Cloud, Florida?
2  A.  Uh-huh.
3       MS. CARDINAL:  Yes or no.
4       THE WITNESS:  What happened?
5       MS. CARDINAL:  Answer the question yes or
6  no.
7       THE WITNESS:  It's here.
8  BY MR. HILL:
9  Q.  Yes, there.  So do you see your name there at
10  3513 Bay Court, St. Cloud, Florida at the bottom of the
11  page, yes or no?
12       THE INTERPRETER:  The interpreter will
13  repeat.
14       THE WITNESS:  Yes.
15  BY MR. HILL:
16  Q.  Okay.  And is that your address?
17  A.  Yes.
18  Q.  Okay.  And do you know what this is?
19  A.  Here, it says my address.
20  Q.  Right.  But do you know what this document is?
21  This is a bill, do you know what this bill is for?
22  A.  No.
23  Q.  Okay.  So I will say for the record that this
24  appears to be a utility bill for electric, do you
25  understand that that's what this is?

Page 16

1  A.  No.
2  Q.  Okay.  Then how do -- how do you pay your bills?
3  A.  With electrical bills.
4  Q.  How do you -- how do you pay the bill?
5  A.  With the bills that they sent me to my house.
6  Q.  Okay.  Is this one of the bills that they would
7  send you to your house dated March 19th, 2024?
8  A.  Yes.
9  Q.  Okay.  Yeah, so let me -- let me just kind of set
10  a -- a rule here.  As the -- anytime that I give you a
11  document, please take your time to read it, you know,
12  before I start asking questions.  That's probably a
13  little bit my fault, but take your time to read it so
14  you can answer the questions.
15  A.  I see it here.  I see it here.
16  Q.  And you see it here, and you're pointing up and
17  down the left-hand side of the page starting at the top,
18  where it says OUC.  So, I guess, in doing that, you do
19  understand that this is your electric bill; is that
20  right?
21  A.  Right now, yes.
22  Q.  Okay.  So you -- you received this bill, and then
23  you -- what do you -- do you write a check or does it go
24  out?  How do you pay it?
25  A.  My daughter pays it directly from my bank.  My

Page 17

1  daughter pays it.
2  Q.  Okay.  So -- so what does your -- do you sit down
3  with your daughter and then go through the bills that
4  you have and then you pay them all through using her
5  help, or do you do any of that on your own?
6       MS. CARDINAL:  I'm just going to object.
7  Maybe you want to take that a step at a time.  That
8  was a lot of question in one.
9  BY MR. HILL:
10  Q.  Okay.  So when you're paying your bills, does
11  your -- does your daughter always help you, or do you
12  pay any of your bills on your own?
13  A.  No.  The check goes to the bank and my daughter
14  pays my bills.
15  Q.  Okay.  And I'm going to hand you what we'll mark
16  as Exhibit 2.
17       (Defendants' Exhibit No. 2 was marked for
18       identification.)
19  BY MR. HILL:
20  Q.  Now, take your time to read it.  And my question
21  will be:  Do you recognize what this bill is?
22  A.  Yes.
23  Q.  What is this bill?
24  A.  This is a bill that I pay monthly from Ashley,
25  because I am paying this.  I am paying the -- the -- the

5 (Pages 14 - 17)

Page 18

1 furniture.
2   Q.  And if you can just look at the entire bill
3 there.  And my question is:  This is all written in
4 English and there is no Spanish on here; is that
5 correct?
6   A.  It's all in English.
7   Q.  I'm going to hand you what we'll mark as
8 Exhibit 3.
9        (Defendants' Exhibit No. 3 marked for
10       identification.)
11 BY MR. HILL:
12   Q.  And take your time to read it, but can you tell
13 me what this bill is?
14   A.  This is a card that I owe.  I owe at Home Depot.
15   Q.  Okay.  And what is the balance that you owe,
16 according to this document, at least as of this date?
17   A.  $820.
18   Q.  And can you review this document and see if
19 there -- that this was all in English and there's
20 nothing in Spanish on here?
21   A.  All is in English.  All is in English.
22   Q.  I'm going to hand you what we'll mark as
23 Exhibit 4.
24       (Defendants' Exhibit No. 4 was marked for
25       identification.)

Page 19

1 BY MR. HILL:
2   Q.  And take your time to read it, but can you tell
3 me what this bill is?
4   A.  Cable.
5   Q.  And what is -- as of this bill, what is the
6 balance that was due for you to pay?
7   A.  I pay 101 --
8        THE INTERPRETER:  Sorry.  Interpreter's
9 correction.
10       THE WITNESS:  I pay $131 with nine cents.
11 BY MR. HILL:
12   Q.  Okay.  And is any of this document written in
13 Spanish or is it all English?
14   A.  It's all in English.
15   Q.  I'm going to hand you what we'll mark as
16 Exhibit 5.
17       (Defendants' Exhibit No. 5 was marked for
18       identification.)
19 BY MR. HILL:
20   Q.  Take your time to read it.  What is this bill?
21   A.  This is the water.
22   Q.  And what is the amount that is owed and due,
23 according to this bill?
24   A.  This bill, I pay $171 with 94 cents.
25   Q.  And do you -- in looking at this bill, do you see

Page 20

1 anything that is in Spanish or is this all in English?
2   A.  It's all in English.
3   Q.  Have you ever been a party to any lawsuits?
4   A.  No.
5   Q.  Or have you ever had any legal claims that you
6 settled before filing a lawsuit?
7   A.  No.
8   Q.  Let me go back to the bills that we covered.  We
9 covered your Home Depot, Ashley Furniture, electrical,
10 and water bills --
11       MS. CARDINAL:  Does she need to see them?
12 BY MR. HILL:
13   Q.  No.  I just -- no, I just -- simple question of
14 do you know if you had the option of receiving those
15 bills in Spanish?
16   A.  What do you mean?  I don't understand.
17   Q.  But do you know if with any of those bills, that
18 you could have maybe contacted someone and said, please
19 send those bills to me in Spanish, not in English?
20   A.  No, because -- well, because if I have no
21 problems, no.
22   Q.  Okay.  So you had no problems looking at those
23 bills and knowing how much you needed to pay and paying
24 those bills; is that correct?
25   A.  Yes.

Page 21

1   Q.  Okay.  So no problems?
2   A.  No.
3   Q.  Okay.  In your communications with your lawyers
4 in this lawsuit, I'm not going to ask about what you
5 talked about, but do you communicate with them in only
6 Spanish or only in English or both?
7        MS. CARDINAL:  I'm going to object to that
8 to preserve.  You can answer.
9        THE WITNESS:  Yes, there's always an
10 interpreter in Spanish.
11 BY MR. HILL:
12   Q.  Okay.  So you don't speak to your lawyers in
13 English at all?
14   A.  No.
15   Q.  What -- what is your daughter's -- is it Magaly
16 or is it Magaly with an "s" on the end?
17   A.  Magaly --
18   Q.  Without an "s"?
19   A.  -- without an "s".
20   Q.  Okay.  So with Magaly, is she bilingual?
21   A.  Yes, Magaly speaks English.
22   Q.  Okay.
23   A.  She's always with me here.
24   Q.  And here as is in in the Orlando area?
25   A.  I don't understand the question.

6 (Pages 18 - 21)

Page 22

1  Q.  Okay.  Never mind.
2      So where did your daughter go to school?
3  A.  She studied at the university.
4  Q.  Where, in the United States or in Puerto Rico?
5  A.  Here in the United States.  Here in Florida.
6  Q.  And where did she grow up?
7  A.  In the United States and Puerto Rico.
8  Q.  Okay.  So both?
9  A.  (By the witness) Uh-huh.
10 Q.  Okay.  Did she say yes?
11     THE INTERPRETER:  Interpreter cannot
12 interpret sounds.
13 BY MR. HILL:
14 Q.  Okay.  So is that a yes?
15 A.  Yes.
16 Q.  Okay.  It's okay.
17     MS. CARDINAL:  Yes or no, right.
18 BY MR. HILL:
19 Q.  Everybody does it, so don't worry about it.
20     MS. CARDINAL:  We may want to consider a
21 break just at some point.
22 BY MR. HILL:
23 Q.  That's another rule I have, Mrs. Delgado, if at
24 any point in time that you want to take a break, you
25 just let me know and we can take a break.  Because if I

Page 23

1  get to a natural stopping point, we'll always take a
2  break.  So whenever -- whenever you need it, you just
3  let me know, okay?
4  A.  Okay.
5      MR. HILL:  Okay.  Do you want to take a
6  break now?  Is it a good time to take a break?
7      MS. CARDINAL:  I was going to ask you
8  because we've been going for about an hour.  Yeah, so
9  maybe stretch our legs or something.  But if you have
10 a couple more questions, we're happy...
11     MR. HILL:  This is as good a stopping point
12 as any.  This is good.
13     (A recess was taken from 10:48 a.m.
14     to 11:00 a.m.)
15     MR. HILL:  So I'm going to hand you what
16 we'll mark as Exhibit 6.
17     (Defendants' Exhibit No. 6 was marked for
18     identification.)
19 BY MR. HILL:
20 Q.  So I'm going to have you just take a look at this
21 document.  Again, take your time, and my question will
22 be: Do you recognize what this document is?
23     MS. CARDINAL:  Did you have a question?
24     THE WITNESS:  I don't remember this.
25

Page 24

1  BY MR. HILL:
2  Q.  Okay.  If you go to the second to the last
3  page -- actually, I'm sorry, the -- let me -- all right,
4  let me scratch that.
5      So at the very bottom, the right-hand corner of
6  the pages, there is what's called a Bates number.  And
7  it says, Delgado 000061.  And then it goes to, in
8  sequential order, 616263.  Okay.  Do you see that?
9      MS. CARDINAL:  It's kind of buried in the
10 official records stamp at the bottom, so I'm just
11 trying --
12     MR. HILL:  You can point.
13     MS. CARDINAL:  -- to point it out for her.
14 BY MR. HILL:
15 Q.  Okay.  So if you could turn to where that number
16 is Delgado 69.
17 A.  This is 61.
18 Q.  Okay.  Turn to page that says 69.
19     MS. CARDINAL:  I'm just showing her that
20 it --
21     THE WITNESS:  Oh.
22     MS. CARDINAL:  You said 69?
23     MR. HILL:  Yes.
24     THE WITNESS:  Yes.
25

Page 25

1  BY MR. HILL:
2  Q.  So do you see there -- there are two signatures
3  on the page that is marked Delgado 69, do you see that?
4  A.  Yes, I see it.
5  Q.  Okay.  Is that your signature above your name
6  where it says Yolanda Delgado?
7  A.  Yes.
8  Q.  And that's your daughter's name and signature
9  below you?
10 A.  Yes.
11 Q.  Okay.  Do you remember signing this document
12 around February 3, 2023?
13 A.  Yes.
14 Q.  And do you understand that this is the mortgage
15 document for your home that you purchased after leaving
16 Kissimmee Village?
17 A.  What do you mean?
18 Q.  Do you understand that this is your mortgage
19 document for the home that you bought after leaving
20 Kissimmee Village?
21 A.  Yes.  This, we signed the mortgage of my house.
22 Q.  Okay.  And where did you live before buying this
23 house that is shown on this mortgage?
24 A.  With my daughter.
25 Q.  And at the time that you signed this in February

7 (Pages 22 - 25)

Page 26

1  of 2023, were you capable of understanding what you were
2  signing?
3      A.  Well, I don't understand very well.
4      Q.  You don't understand my question?
5      A.  I don't understand the question.
6      Q.  Okay.  So you -- at the time that you were
7  signing this, you knew that you were signing your
8  mortgage; is that right?
9      A.  Exactly.
10     Q.  Okay.  And was anyone else with you when you
11 signed this?
12     A.  My daughter.
13     Q.  Okay.  And did your daughter help explain this to
14 you, what this was?
15     A.  Yes.  She told me I was going to sign a mortgage
16 so I could have a house.
17     Q.  Okay.  And then when you signed this, were you in
18 kind of room like this with other people or was it just
19 you and your daughter present?
20     A.  Well, there was the person that was giving me the
21 papers.
22     Q.  Okay.  And did that person, who was giving you
23 the papers, did they speak to you in English or in
24 Spanish?
25     A.  In English, but my daughter was representing me.

Page 27

1      Q.  Okay.  Where did you -- in your residence before
2  coming to Good Samaritan here in Kissimmee, did you own
3  or rent your home up in Brooklyn?
4      A.  I rented my house.
5      Q.  And did you sign a lease for renting that house?
6      A.  Well, yes, we rented.  We paid rent.
7      Q.  When you say, we, who is we?
8      A.  Everyone that lived there.
9      Q.  Okay.  Did you live by yourself, or did you live
10 with someone?
11     A.  No, I lived by myself.
12     Q.  And do you recall if that lease that you signed
13 was in English or in Spanish?
14     A.  In Spanish.
15     Q.  Do you still have a copy of that lease?
16     A.  No.
17     Q.  Do you know if anyone -- well, what was the name
18 of the place where you lived?
19     A.  I don't remember.
20     Q.  But it was in Brooklyn; is that right?
21     A.  Yes, I don't remember.  Right now, I don't
22 remember.
23     Q.  Okay.  Do you recall when you left Brooklyn to
24 move to Kissimmee, how did you terminate your lease
25 agreement?

Page 28

1      A.  When I left Brooklyn to come to Good Samaritan?
2      Q.  Yes.
3      A.  I don't understand.
4      Q.  When you -- when you left Brooklyn to come to
5  Kissimmee, do you remember signing any kind of
6  termination documents for that lease?
7      A.  Yes.
8      Q.  Do you remember if those termination documents
9  were in English or in Spanish?
10     A.  In Spanish.
11         MS. CARDINAL:  Are we done with the --
12         MR. HILL:  Yes, uh-huh.
13 BY MR. HILL:
14     Q.  So let me take you in time to your move down here
15 to Kissimmee Village, so how did you find Kissimmee
16 Village, the place where you were going to live?
17     A.  My daughter, she communicated with them.
18     Q.  Okay.  So your daughter found Kissimmee Village
19 for you to live, you didn't find it on your own?
20     A.  No.
21     Q.  Did you tour Kissimmee Village before you signed
22 your lease?
23     A.  Yes.
24     Q.  And who went on that tour with you?
25     A.  My daughter.

Page 29

1  And do you recall the name of the person at
2  Kissimmee Village who gave you the tour?
3      A.  No.
4      Q.  Do you remember if it was a man or a woman?
5      A.  I don't remember.
6      Q.  And do you remember how long you spent going
7  through on the tour?
8      A.  I don't remember.
9      Q.  Do you -- can you estimate whether it was more or
10 less than one hour?
11     A.  Like one hour.
12     Q.  Okay.  And when you did the tour, did you walk
13 around the entire property or just the place where you
14 were looking to live, that one little area where you
15 were going to live?
16     A.  Through the entire community.
17     Q.  Okay.  Did you -- on that tour, did you focus on
18 the place where you were going to live?
19     A.  Yes.
20     Q.  And when you were doing the tour, the person who
21 gave you the tour who worked for Good Samaritan, did
22 they speak to you and your daughter in English or in
23 Spanish or both?
24     A.  In English.
25     Q.  Did you understand what the person who was giving

8 (Pages 26 - 29)

Page 30

1  you the tour, what they were saying?
2     A.  No.
3     Q.  Why not?
4     A.  Because I don't understand English.
5     Q.  Okay.  But was your daughter there to, basically,
6  translate for you?
7     A.  Exactly.
8     Q.  And at the end of that tour, did you sign a
9  lease, or did you come back later and sign the lease
10 later?
11    A.  I came back afterwards.
12    Q.  How many times did you visit before you signed
13 the lease?
14    A.  I don't remember.  I believe it was another time.
15 I don't remember.
16       MR. HILL:  Okay.  And I just need to kind of
17 set something for the record because we're doing the
18 translation, I'm trying to simplify this and calling
19 it a lease even though it's technically not a lease
20 agreement, it's an occupancy agreement and that's
21 stated in the document.  I just wanted to make that
22 for the record.
23       MS. CARDINAL:  That's fine.
24 BY MR. HILL:
25    Q.  Okay.  So if you came back a second time before

Page 31

1  you signed, do you remember if you took a tour of the
2  property that second time, or do you know?
3     A.  Yes.
4     Q.  So do you think you took a tour a second time, so
5  two tours?
6     A.  Yes, I went there to see it.
7     Q.  Okay.  Do you remember on that second tour, who
8  gave you that tour?
9     A.  I don't remember.  It was a lady.
10    Q.  Did she speak to you in Spanish or in English?
11    A.  In English.  Spoke with my daughter.
12    Q.  So your daughter was with you both times?
13    A.  Yes.
14    Q.  So as you were doing the tour, either of the two
15 different tours, do you remember talking about
16 anything -- mentioning about whether there was a
17 potential for flooding on the property?
18    A.  No.
19    Q.  And then when it came time to signing the lease,
20 do you remember where you were when you signed the
21 lease?
22    A.  I was at Good Samaritan.
23    Q.  Okay.  Do you remember what room that was in,
24 like was it in an office or some other room?
25    A.  I was in the room -- I was in the living room

Page 32

1  where I was going to live.
2     Q.  Oh, okay.  In your apartment?
3     A.  In my apartment, yes.
4     Q.  Okay.  And do you remember who was with you
5  during that meeting where you were signing the lease
6  document?
7     A.  My daughter, myself, and another person.
8     Q.  Do you remember who that other person was?
9     A.  No.
10    Q.  Was it a man or a woman?
11    A.  A lady.
12    Q.  And during that time, did the Good Samaritan
13 lady, using your word, speak to you in Spanish or in
14 English or both?
15    A.  She spoke in English, but my daughter translated
16 for me.
17    Q.  And do you remember if the lease that you signed
18 was in English or Spanish?
19    A.  It was in English.
20    Q.  Did you read the lease?
21    A.  No, because -- because I don't know English.
22    Q.  Did you have your daughter read it for you?
23    A.  Exactly.
24    Q.  Did your daughter have any trouble understanding
25 any of the terms in the lease agreement?

Page 33

1        MS. CARDINAL:  Objection.  Sorry.  You can
2  try to answer.
3  BY MR. HILL:
4     Q.  Let me rephrase.  Do you know if your daughter
5  had any trouble understanding anything in the lease
6  agreement?
7        MS. CARDINAL:  Objection.
8        THE WITNESS:  I don't know.
9
10       MR. HILL:  Okay.  And let me just, for maybe
11 cleaning it up.  What -- what was -- I know you were
12 just objecting to the form in the deposition, but what
13 was the basis for the objection?
14       MS. CARDINAL:  How would she have any
15 personal knowledge of what her daughter did or didn't
16 understand.
17       MR. HILL:  That's why I rephrased it.  I
18 asked, do you know.  And she said, she doesn't know.
19 Okay.
20 BY MR. HILL:
21    Q.  So at any point in time did you ever try to back
22 out of the lease saying you didn't know what you were
23 signing because it's in English?
24    A.  No.
25    Q.  Did you ask for the lease to be translated into

9 (Pages 30 - 33)

Page 34

1  Spanish?
2      A.  No.
3      Q.  Did you ask for the Good Samaritan to provide a
4  Spanish interpreter in relation to your signing that
5  lease?
6      A.  No.
7      Q.  And then she said por qué, which means because --
8      A.  No.  Because my daughter translated it for me in
9  Spanish.
10     Q.  And do you know if at that time the Good
11  Samaritan representative knew that you were Hispanic?
12         MS. CARDINAL:  We're going to object to
13  that.
14         THE WITNESS:  Yes.  He knew that I spoke
15  Spanish.
16  BY MR. HILL:
17     Q.  Okay.  Do you know if the person who was
18  representing the Good Samaritan at that meeting where
19  you signed the lease, do you know if they knew you were
20  from Puerto Rico?
21         MS. CARDINAL:  Objection.
22         THE WITNESS:  Yes.
23  BY MR. HILL:
24     Q.  Did you tell them you were from Puerto Rico?
25     A.  Yes.

Page 35

1      Q.  I'm going to hand you what we'll mark as
2  Exhibit 7.
3         (Defendants' Exhibit No. 7 was marked for
4             identification.)
5  BY MR. HILL:
6      Q.  I was wondering if you could take your time and
7  look at that.  And can you point on that map where your
8  I'm going to call it an apartment, where your apartment
9  was?
10         MS. CARDINAL:  It's a little small, so just
11  give her a minute.
12  BY MR. HILL:
13     Q.  Can you -- is it too small to read?
14     A.  It was Apartment 8.
15     Q.  Apartment 8.  Okay.  But you --
16     A.  Apartment 8, it was 8.
17     Q.  Okay.  But can you point -- do you know where
18  that is on the map?  And it's okay if you don't, but --
19         What was that?
20         THE INTERPRETER:  The interpreter could not
21  hear, as it was muffled.
22  BY MR. HILL:
23     Q.  Okay.  Let me put it this way:  Do you know if
24  you were in the Birchwood Court area?
25         MS. CARDINAL:  Are you all right with me

Page 36

1  pointing that out?
2         MR. HILL:  Uh-huh.
3         THE WITNESS:  Around here.
4  BY MR. HILL:
5      Q.  Do you remember the name of the road you were on?
6      A.  Last week -- last week -- Northgate.  Northgate.
7      Q.  Okay.  So if you turn the page to the second
8  page, maybe that will help.  And if you turn it sideways
9  like this, that will help, I think.
10         MS. CARDINAL:  I'm sorry.  Hold it up again
11  this way.  That's right.
12         MR. HILL:  Yeah.  I feel like that's
13  probably easiest.
14         THE WITNESS:  It had a little mound, a
15  little hill there.  Last week, I -- I...
16  BY MR. HILL:
17     Q.  So does this help where you might be able to
18  point it out where it is?
19     A.  In Northgate.  In Northgate.
20     Q.  Okay.
21     A.  Around here, it was there.  That there is where
22  the palm trees were, where there's like a little mound
23  or hill.  And there was -- there was, you know, I had
24  put stuff out there, there was a lot of -- there was a
25  garden there -- there was a garden there.  There was a

Page 37

1  lot of ducks that would come.  And I would sit on my
2  porch and there was a golf park there, fanatically.  And
3  the buses would go around there.  Oh, yes, they were my
4  people.
5      Q.  When you say who -- who is the, they, who are
6  your people, is it the ducks or the people?
7      A.  The ducks.  The ducks.  I would give them food.
8  The ducks.  The ducks, they were my babies.
9      Q.  Okay.  That's what I thought you were saying.
10     A.  My people.  My people.  My lovely people.
11         MS. CARDINAL:  Are we moving on from this
12  one or...
13         MR. HILL:  Yeah, we're moving on.  Yeah.
14  Do you want to take a break?
15         MS. CARDINAL:  I mean, if that's all right
16  with you.  I know we're getting close to lunch hour.
17         MR. HILL:  Yeah, no.  Well, like I said, it
18  doesn't matter the timing of it.  But just if it ever
19  gets emotional, I mean, no matter what the reason, if
20  you ever want to take a break.
21         MS. CARDINAL:  Maybe we can take a little --
22  do you -- do you want to take -- do you need to
23  take --
24         THE WITNESS:  The Good Samaritan, it was my
25  family.

10 (Pages 34 - 37)

Page 38

1       MS. CARDINAL: Okay. Maybe we can --
2       MR. HILL: We can take a break. Yeah, we
3   can take a break.
4       (A recess was taken from 11:38 a.m.
5       to 11:50 a.m.)
6   BY MR. HILL:
7   Q. I'm going to hand you what we'll mark as
8   exhibit -- what are we on, 8, 9 --
9       THE COURT REPORTER: 8.
10      (Defendants' Exhibit No. 8 was marked for
11      identification.)
12  BY MR. HILL:
13  Q. So on this Exhibit 8, if you just look at the
14  first page, is that your signature about middle of the
15  way down where it says name of applicant one and then
16  signature?
17      THE INTERPRETER: The interpreter will
18  repeat the question.
19      THE WITNESS: Here says, number two.
20  BY MR. HILL:
21  Q. Okay. I'm just looking at the first page, so is
22  that your signature there where your finger is pointing?
23  A. Yes.
24  Q. Okay. And is that your handwriting above the
25  signature block?

Page 39

1   A. No.
2   Q. So none of that is your handwriting, not even
3   where it says applicant name?
4   A. No.
5   Q. But that is your handwriting where it -- above
6   the name of applicant one, as well as where -- above
7   where it says signature?
8   A. No.
9   Q. Which one is your handwriting?
10  A. No place.
11  Q. Okay. So that's not -- are you saying that's now
12  that not your signature?
13  A. No.
14  Q. Okay. Do you know whose signature that is, then?
15  Do you know who signed that?
16  A. Yes.
17  Q. Who?
18  A. My daughter.
19  Q. So your daughter signed that document for you?
20  A. Yes.
21  Q. Which one is your daughter's handwriting, then,
22  is it all of that your daughter's handwriting?
23  A. Yes.
24  Q. Do you know if your daughter has like an official
25  power of attorney for -- over you?

Page 40

1   A. Yes.
2   Q. Your daughter has an official power of attorney
3   for you?
4   A. Yes.
5   Q. Do you know what that means, power of attorney?
6   A. Yes.
7   Q. What does that mean?
8   A. That my daughter has for me all -- she has all
9   the responsibility for me. She has the power over me,
10  signing documents. She is responsible for anything for
11  me.
12  Q. Do you know if you have any formal documentation
13  that you and your daughter have signed to give her an
14  official power of attorney?
15  A. Yes.
16      MR. HILL: Okay. I don't think I've seen
17  that in discovery. I'm not sure if that's something
18  that would have been under the umbrella of anything
19  that we asked for, but do you want me to -- I'd like
20  to get that. Do you want me to do a formal request
21  for production on that, or can we just agree that we
22  get that?
23      MS. CARDINAL: Yeah, I'm happy to source
24  that out. I'm not sure it would have been something
25  that would've been relevant.

Page 41

1       MR. HILL: I don't have our request
2   memorized. I don't know, yeah.
3       MS. CARDINAL: Yeah, me either. Because I'm
4   trying to -- I'm trying to think if we -- if -- I
5   think we do have it, when it covers. But, yes, I
6   can -- I'll look back and I'm happy to just -- I'll
7   make a note that we've agreed to turn it over.
8       MR. HILL: And I can do it in a formal
9   request or informally like this is fine.
10      MS. CARDINAL: That's fine.
11      MR. HILL: Just as long we get it. And just
12  any powers of attorney, so if you did it once or twice
13  or three times.
14      MS. CARDINAL: I'll look and see.
15      THE INTERPRETER: Please allow the
16  interpreter time to paraphrase what has been said.
17  BY MR. HILL:
18  Q. So if you turn to the next page, and I am on
19  specifically where it has Bates labeled, just for the
20  record, Delgado 16.
21      MS. CARDINAL: I'm sorry, Gordon. Before
22  you move on, I wanted to just clarify for the record,
23  relevant to the POA, are you talking about specific to
24  this document?
25      MR. HILL: Any powers of attorney that she

11 (Pages 38 - 41)

Page 42

1 may have signed.  I doubt she said, like I have a
2 power of attorney just to sign one little acceptance
3 of lease document.
4          MS. CARDINAL:  No, no, no.  That's -- I'm
5 sorry.  Let me rephrase, the time period.  Are you --
6 you want us to --
7          MR. HILL:  I would like all of them, just
8 period, so whatever it is.  And I can do this in a
9 formal request, if that makes things easier.
10          MS. CARDINAL:  Now -- well, it might just so
11 I understand --
12          MR. HILL:  Okay.  We can do that.
13          MS. CARDINAL:  -- you know, in temporally
14 what you're looking for.  But I don't see a problem
15 with turning it over once we get that request, that's
16 fine.
17          MR. HILL:  Right.  Okay.
18 BY MR. HILL:
19    Q.  So turning back to this Exhibit 8, the second
20 page which is Bates stamped Delgado 16, there is a
21 signature at the bottom of that page.  And my question
22 is:  Whose signature is that?
23    A.  The signature is mine.
24    Q.  Okay.  Was your daughter with you when you signed
25 this document that is Exhibit 8?

Page 43

1    A.  Yes, she was present in everything.
2    Q.  And still looking at that second page, do you
3 understand what is being covered by this upgrade or
4 alteration to unit request form?
5    A.  Here?
6    Q.  Yes.
7    A.  I don't understand the question.
8    Q.  Well, did you understand what you were signing
9 when you signed at the bottom of that upgrade or
10 alteration to unit request form on that page?
11    A.  No.
12    Q.  Do you remember installing tiles in your
13 apartment?
14    A.  No.
15    Q.  Do you understand what I'm asking?
16    A.  No.
17    Q.  Do you recall asking for any upgrades in terms of
18 decoration to your apartment before you moved in?
19    A.  Yes.
20    Q.  What upgrades did you have done?
21    A.  That I did not want carpet in my house, what I
22 want in my apartment was tiles.
23    Q.  Okay.  So tile floors; is that right?
24    A.  Yes.
25    Q.  So you paid extra for having tile floors instead

Page 44

1 of carpet; is that correct?
2    A.  Yes.
3    Q.  If you turn the page to Delgado 17, which is the
4 third page of this Exhibit 8, is that your signature
5 there?
6    A.  No.
7    Q.  Is that your daughter's?
8    A.  Yes.
9    Q.  If you turn to the next page, it's a --
10 basically, like a receipt, it looks like for the amount
11 of $1,607, do you know what that's for?
12    A.  I don't remember.
13    Q.  And then if you turn to the last page of that
14 document, do you remember getting this check in the same
15 amount as it was shown on that receipt, $1,607.70?
16    A.  I don't remember.
17    Q.  Okay.
18          MS. CARDINAL:  Done with these?
19          MR. HILL:  Done with this, yes.
20          I see that now it's like 12:05, I know we
21 sort of just took a break, but do you all want to take
22 a lunch break?  Is now a good time for that, or I can
23 keep going?  It's going -- depends on literally
24 everybody in the room.  Like I said, I'm very
25 democratic about it.

Page 45

1          THE WITNESS:  I don't know.
2          MS. CARDINAL:  Are you hungry?
3          THE WITNESS:  Not for me.
4          MR. HILL:  Okay.
5          MS. CARDINAL:  Do you want to keep going?
6          THE WITNESS:  Yes.
7          MR. HILL:  Is it good for everybody else?
8          THE INTERPRETER:  The interpreter is okay to
9 continue.
10          MR. HILL:  Okay.
11 BY MR. HILL:
12    Q.  I'm going to hand you what we'll mark as
13 Exhibit 9.
14          (Defendants' Exhibit No. 9 was marked for
15          identification.)
16 BY MR. HILL:
17    Q.  Take as long as you need, but my -- I have a
18 simple question of, do you recognize this document?
19 Have you ever seen it before?
20    A.  May I ask you a question?
21    Q.  Yes.
22    A.  To you?
23    Q.  To me or to her?
24    A.  To her.
25    Q.  Okay.

12 (Pages 42 - 45)

Page 46

1      THE WITNESS: Would this be in regards to
2    the apartment?
3      MS. CARDINAL: Well, yeah.
4  BY MR. HILL:
5    Q. Let me -- let me ask it in a simple way, do you
6    recognize this as being your, what I'll call a lease
7    agreement for your apartment at Good Samaritan?
8    A. Uh-huh.
9    Q. Can you say that out loud, yes or no?
10    A. Exactly.
11    Q. Okay. So that's a yes?
12    A. Yes.
13    Q. Okay. Now, do you see the initials on the bottom
14    right-hand corner of that first page?
15    A. Yes.
16    Q. Are -- is that you signing those initials or is
17    that your daughter signing that?
18    A. It was me.
19    Q. Okay. So then can you turn the pages and it's
20    the same question, you see there's initials at the
21    bottom right-hand corner of every -- almost every page,
22    is that you signing those initials or is that your
23    daughter?
24    A. No, that was me.
25    Q. Okay. So then if you can turn to Page 8 of 21

Page 47

1  where it says resident there, is that your signature?
2    A. Yes.
3    Q. So was your daughter with you when you signed
4    this agreement and initialed the bottom of the pages?
5    A. Yes, it was me.
6    Q. Well, your daughter was with you?
7    A. Yes.
8    Q. Okay. So did your daughter explain all of this
9    that you were signing?
10    A. Yes, my daughter was with me.
11    Q. And do you remember the name of the person with
12    Good Samaritan who was with you when you signed this
13    lease agreement?
14    A. No.
15    Q. Do you remember if it was a man or a woman?
16    A. A woman.
17    Q. And at any point in time, did you ask for this to
18    be translated into Spanish?
19    A. No, because my daughter was with me. She
20    could -- she could tell me in Spanish.
21    Q. Okay. So on the -- back to the top of the very
22    first page, Page 1. The very first paragraph in there,
23    and I'm going read it, so then you translate it: This
24    agreement made at Kissimmee, Florida between the
25    Evangelical Lutheran Good Samaritan Society, a nonprofit

Page 48

1  corporation, duly organized under the laws of the State
2  of North Dakota d/b/a Good Samaritan Society-Kissimmee
3  Village, herein after called The Society and Yolanda
4  Delgado, and as in a herein after called the resident.
5      And I guess you can translate it back because you
6  have it in front of you.
7      THE INTERPRETER: We'll do a side
8    interpretation as requested per the attorney.
9  BY MR. HILL:
10    Q. Okay. So did you understand in listening to
11    that, that your contract here was with Good Samaritan
12    Society?
13    A. I don't understand what you said.
14    Q. Okay. Do you know who your lease was with, was
15    it with Good Samaritan Society?
16      THE INTERPRETER: Interpreter will also
17    interpret the name.
18      THE WITNESS: Yes.
19  BY MR. HILL:
20    Q. And it was your understanding that Good Samaritan
21  Society owned the senior living facility where you lived
22  known as Kissimmee Village?
23      MS. CARDINAL: Objection.
24      THE WITNESS: No.
25

Page 49

1  BY MR. HILL:
2    Q. Do you know who owned the property that was
3  Kissimmee Village?
4      MS. CARDINAL: Objection.
5      THE WITNESS: No.
6      MR. HILL: Okay. And I guess, again, what
7    was the basis for the objection?
8      MS. CARDINAL: I don't think she would have
9    any basis to know what the legal holding of ownership
10    versus --
11      MR. HILL: Okay. And she answered, no, she
12    doesn't know. So, yeah, right. Okay. Okay. And
13    that's why I asked, do you know, okay.
14  BY MR. HILL:
15    Q. So can you turn to Page 2, and I'm looking at
16  section two called termination. And I will read and
17  then you can translate. But reading it verbatim,
18  Subsection A there says: This agreement shall have a
19  term of one month and shall automatically renew for one
20  month terms thereafter unless a notice of termination or
21  intent not to renew is given as outlined in this
22  agreement.
23      THE INTERPRETER: The interpreter will
24    provide side interpretation.
25

13 (Pages 46 - 49)

Page 50

1 BY MR. HILL:
2    Q. So in hearing that being read to you, is it your
3 understanding -- or do you know what your term was under
4 your lease?
5    A. Pay the rent every month.
6    Q. Okay. So do you know if your rent term was a
7 month-by-month term?
8    A. Yes.
9    Q. Okay. And did you also understand that either
10 party could terminate the lease with 30 days' notice?
11       MS. CARDINAL: Objection.
12       THE WITNESS: Yes.
13 BY MR. HILL:
14    Q. Do you know what the refund policy was under the
15 lease for your security deposit?
16    A. No.
17    Q. Do you remember paying a security deposit?
18    A. No.
19    Q. Okay. So under the lease, if you were moving
20 out, do you know if the lease would require you to move
21 all of your furniture and all of your belongings out or
22 is that something that Good Samaritan would do?
23    A. No.
24    Q. So when you moved out of your apartment in
25 Brooklyn to move down to Florida, who was responsible

Page 51

1 for moving all of your furniture and belongings out, was
2 that you or the landlord in Brooklyn?
3    A. Me.
4    Q. Okay. So do you understand that that's what you
5 would do with Good Samaritan when you lived there if you
6 had to move out, I would say under normal circumstances,
7 not including the hurricane?
8       MS. CARDINAL: Objection.
9       THE WITNESS: I don't understand.
10 BY MR. HILL:
11    Q. All right. If you could turn to Page 6 of 21,
12 and if you look at that Section J on Page 6 of 21 it
13 reads: Resident complaints about any aspects of the
14 services provided by Village are to be handled by having
15 the resident or his/her representative comply with the
16 attached resident grievance procedure.
17       And I'll let you translate.
18       So did you ever use that resident grievance
19 procedure in any way ever?
20    A. No.
21    Q. So if you look at that -- on that same Page 6 of
22 21, section six, rights and responsibilities of Village.
23 And that Subsection A says: Village is not liable for
24 loss or damage by fire, theft, or other casualty, nor
25 injuries from the use of the unit to resident, personal

Page 52

1 possessions, family, or any guest or invitee of
2 resident. And I'll let you translate.
3       So having just heard that translated to you, do
4 you know what it means in there when it says,
5 quote/unquote, other casualty?
6       MS. CARDINAL: Objection.
7       THE WITNESS: I don't understand the
8 question.
9 BY MR. HILL:
10    Q. So do you know what that phrase, quote/unquote,
11 other casualty, means in that section?
12    A. Casualties?
13    Q. Yes. But do you know what that means?
14    A. I don't understand casualty.
15    Q. Okay.
16    A. I don't understand it.
17    Q. Okay. So you don't know what that means?
18    A. No.
19    Q. So do you know, if -- if there had been a fire at
20 your unit, whether you or Good Samaritan would have been
21 responsible for that loss or damage?
22       MS. CARDINAL: Objection.
23       THE WITNESS: Well, it depends on what it
24 was.
25

Page 53

1 BY MR. HILL:
2    Q. Okay. What do you mean by that?
3    A. If it was caused -- if it was caused due to
4 electricity.
5    Q. Then what?
6    A. There has been fire caused by electricity.
7    Q. Uh-huh. And who would be responsible, you or
8 Good Samaritan, or you do know?
9       It's perfectly okay to say or answer I don't
10 know, if you don't know.
11    A. I don't know.
12    Q. So the next sentence under that says: Any
13 insurance necessary or desired by resident shall be at
14 resident's expense. Can you translate?
15       So it -- do you know whose responsibility it was
16 to get insurance to cover your apartment?
17       MS. CARDINAL: Objection.
18       THE WITNESS: I don't know.
19 BY MR. HILL:
20    Q. Okay. Do you know if you got renter's insurance
21 to cover insurance related problems for your unit at
22 Good Samaritan?
23       MS. CARDINAL: Objection.
24       THE WITNESS: I don't know.
25

14 (Pages 50 - 53)

Page 54

1  BY MR. HILL:
2    Q.  Okay.  You don't know if you got renter's
3  insurance?
4    A.  I don't know.
5    Q.  Do you know if you ever made a claim for
6  insurance based on the flooding that happened to your
7  apartment from the hurricane?
8        MS. CARDINAL:  And you're referring to
9  Hurricane Ian in 2022?
10        MR. HILL:  Yes, from the hurricane.
11        THE WITNESS:  We didn't have insurance.
12  BY MR. HILL:
13    Q.  You didn't have insurance, okay, did not?
14    A.  There was no insurance.
15    Q.  Okay.  Can you turn to Page 12 of 21, I'm looking
16  at Section II labeled charges?  And then Subsection B
17  there says:  Refundable security deposit, resident will
18  pay to Village the sum of $1,200 as a refundable
19  security deposit prior to occupancy.  And can you
20  translate?
21        So having that read to you, does that maybe
22  refresh your memory, one way or the other, yes or no, as
23  to what your security deposit was in the amount of
24  $1,200?
25    A.  Yes, they refunded the money to us.

Page 55

1    Q.  Okay.  Do you remember when they refunded the
2  money to you?
3    A.  I don't know.  I don't remember.
4        MR. HILL:  I see we're at 12:30 now.
5        MS. CARDINAL:  Yeah, I think we should take
6  a break.
7        MR. HILL:  Okay.  Break time.  We're at that
8  hour mark anyway.  Do you, again, being democratic,
9  you know, I'm happy to take a lunch break?  And I
10  slightly prefer it, because I kind of get on low blood
11  sugar.
12        MS. CARDINAL:  Yeah, no, I think we can take
13  a lunch break.  Maybe an hour; is that fine?
14        MR. HILL:  1:30 is good, yeah.
15        (A luncheon recess was taken from 12:35 p.m.
16        to 1:51 p.m.)
17        MR. HILL:  So back on the record.  What
18  exhibit did I leave off on?  Am I at 10, now?
19        THE COURT REPORTER:  Yes.
20        MR. HILL:  Okay.
21        (Defendants' Exhibit No. 10 was marked for
22        identification.)
23        MS. CARDINAL:  Are we done with 9?
24        MR. HILL:  Yes.
25

Page 56

1  BY MR. HILL:
2    Q.  I'm going to hand you what we will mark as
3  Exhibit 10.  And if you see on the bottom right-hand
4  corner it says, Delgado 44, that the Bates label that I
5  mentioned before lunch.  And that number, because it
6  says Delgado, that indicates that you provided that
7  document to us, so --
8        MS. CARDINAL:  Objection.
9        MR. HILL:  Huh?
10        MS. CARDINAL:  Objection.
11        MR. HILL:  Okay.  Doesn't mean that you
12  provided it to us?
13        MS. CARDINAL:  Well, she wouldn't -- I mean,
14  discovery usually goes through attorneys, no?
15        MR. HILL:  All right.  I don't know
16  if you want to translate that, it probably isn't
17  necessary, but...
18  BY MR. HILL:
19    Q.  So did you have this document in your possession?
20    A.  I don't understand.
21    Q.  Okay.  So the fact that it's Bates labeled
22  Delgado 44 at the bottom right-hand corner indicates
23  that your attorney gave this to us, so do you know if
24  you gave this to your attorney?
25    A.  I don't understand.  Which document, please?

Page 57

1    Q.  This document that we have here that is
2  Exhibit 10 here.
3    A.  I don't remember.
4    Q.  Okay.  Have you ever seen this document before --
5  or, actually, probably a better question is:  Do you
6  recall seeing this document before?
7    A.  I don't remember.
8    Q.  Okay.  I'm done with that.
9        So when you were living at Good Samaritan, did
10  you use any of the dining facilities there?
11    A.  There, they would bring food for me at my house.
12    Q.  Okay.  Did you ever go to their, I guess,
13  restaurant, to make it easy for translation purposes?
14    A.  I would receive -- in other words -- in other
15  words, I would pay for a car to bring me food at my
16  house.
17    Q.  Did you use any of Good Samaritan's -- any of
18  their other amenities or facilities?
19    A.  Yes, the bus.  The bus would take us to the
20  stores, it would take us to -- it would take us to
21  doctors' visits, to the store, it would take us to the
22  pharmacy.
23    Q.  Okay.  Other than the bus, did you use any of
24  Good Samaritan's other amenities or facilities?
25    A.  The bus would pick us up in the house, they would

15 (Pages 54 - 57)

Page 58

1  provide us that service.
2     Q.  Okay.  So with the bus, how often did you use the
3  bus?
4     A.  Every day.
5     Q.  Okay.  And how would you schedule the bus to come
6  pick you up?
7     A.  We didn't have to pay anything, there was a
8  service that Good Samaritan would provide for us.
9     Q.  Okay.  I'm not -- I'm not -- I guess I'm not
10  asking about payment for it, I'm asking how did you
11  schedule the bus to come pick you up?
12           THE INTERPRETER:  Interpreter is using a
13  different synonym.
14           THE WITNESS:  They would call us at the
15  house and ask us if we were going to use that service
16  that day.
17  BY MR. HILL:
18     Q.  Okay.  And then who would call you?
19     A.  The bus driver.
20     Q.  So the bus driver would call you to see if you
21  wanted to use the service that day?
22     A.  Yes.
23     Q.  And then if the bus driver -- do you know what
24  the bus driver's name was?
25     A.  No, I don't remember.

Page 59

1     Q.  Was the bus driver a male or a female?
2     A.  Sometimes it was a gentleman.  Sometimes it was a
3  lady.
4     Q.  And after the bus driver dropped you off at,
5  let's say the doctor's office, if you took the bus to
6  the doctor's office, how would you schedule for the bus
7  to come pick you up when your doctor's appointment was
8  over?
9     A.  Because I would show them the doctor's
10  appointment.
11     Q.  And they would just show up, at the end of the
12  appointment?
13     A.  I would show them that I had an appointment that
14  day.
15     Q.  Okay.  But then how would they know when to pick
16  you up?
17     A.  Well, they would go every day.  And I would show
18  them that I have an appointment that day, they would go
19  and pick me up.
20     Q.  Okay.
21     A.  Well, like, an example, if they would come and
22  pass by, we would show them the paper.  Look, I have a
23  doctor's appointment, I have an appointment tomorrow.
24  And then they would come and pick me up.
25     Q.  Okay.  Did you speak with the bus driver in

Page 60

1  Spanish or English or both?
2     A.  In Spanish.
3     Q.  I'm going to take you back to the hurricane that
4  hit around September of 2022.  The hurricane's name was
5  Hurricane Ian, do you remember that?
6     A.  Yes.
7     Q.  Okay.  Do you remember when you evacuated in
8  relation to the hurricane coming?
9     A.  Yes.
10     Q.  Okay.  So when did you evacuate?  Did you
11  evacuate before the hurricane hit or after it came
12  through?
13     A.  It was before.
14     Q.  Where did you evacuate to?
15     A.  My daughter's house.
16     Q.  Did you take anything with you, any valuables or
17  any special mementos?
18     A.  No, only a change of clothes.  I did not know my
19  house would be flooded.
20     Q.  Okay.  Do you need to take a break?
21     A.  No, it's fine.
22     Q.  Okay.  And then, do you know where the flooding
23  came from?
24     A.  No, I didn't know.  I don't know.  I didn't -- I
25  don't know it was going to flood.

Page 61

1     Q.  Okay.  And then I think as the hurricane
2  happened, that there was a mandatory evacuation order.
3  Did you understand there to be a mandatory evacuation
4  order where you were required to leave?
5     A.  I didn't know.  Nobody told us that it was going
6  to flood.
7     Q.  Okay.  And then do you remember when you returned
8  to the Good Samaritan property?
9     A.  Well, we returned three days afterwards, but they
10  didn't let us go in or enter.
11     Q.  And when you say, they wouldn't let you go in,
12  they wouldn't let you go into your apartment, is that
13  what you're saying, or they wouldn't let you get onto
14  the overall property?
15     A.  In the property.
16     Q.  Okay.  So then, do you remember when you first
17  came back and were able to get to your apartment?
18           THE INTERPRETER:  Interpreter will clarify.
19           THE WITNESS:  Yes.  Like around two weeks,
20  around two weeks.
21           THE INTERPRETER:  Interpreter needed to
22  clarify if it was two or 12.  After clarification, it
23  was stated that it was two weeks.
24           MR. HILL:  Okay.  Again, do you need -- do
25  you want me to take a break?

16 (Pages 58 - 61)

Page 62

1    MS. CARDINAL: Maybe just five minutes, if
2  we could.
3    MR. HILL: Okay.
4    THE WITNESS: Let's continue.
5    THE INTERPRETER: Anytime you want to take a
6  break --
7    THE WITNESS: We can continue. We can
8  continue.
9  BY MR. HILL:
10   Q. So after, approximately, two weeks when you
11 actually were able to return to your apartment, what did
12 you see?
13   A. Everything, the apartment was destroyed. All of
14 my things were destroyed. All of my mementos. All of
15 my belongings, all of my things. All of my mementos,
16 all of my mementos from my children. All of my things
17 were destroyed. All of the picture frames from my
18 mother, from my children, everything. My whole entire
19 clothing, everything was destroyed. Everything from my
20 siblings, everything was destroyed.
21     Everything from -- all of my furniture was
22 destroyed. Everything -- everything was destroyed.
23 Everything from my siblings that had died, everything.
24 I was not able to recuperate nothing, nothing, nothing,
25 nothing. I was left without anything, nothing, nothing,

Page 63

1  nothing. The only thing I had was my daughter, the only
2  thing I had was three changes of clothes that I took
3  with me to my daughter's.
4    MR. HILL: Okay. Do you want to take a
5  break?
6    MS. CARDINAL: Yeah, we're going to take a
7  break.
8    MR. HILL: Okay.
9      (A recess was taken from 2:13 p.m.
10     to 2:16 p.m.)
11 BY MR. HILL:
12   Q. So do you know if your apartment, after the
13 flood, was something that could be salvageable and
14 somebody could still live in there, or was it something
15 that was -- was it the flood was so bad, that you
16 couldn't live there anymore, do you know?
17   A. No, you could not salvage that apartment.
18   Q. Okay. I'm going to hand you what we'll mark as
19 Exhibit 11.
20     (Defendants' Exhibit No. 11 was marked for
21     identification.)
22 BY MR. HILL:
23   Q. I'm going to just have you turn to the page, that
24 is Bates labeled ELGSS73. So can you turn to Page 73?
25 So just looking at that one page, Bates labeled 73, do

Page 64

1  you know what this document is?
2    Take your time.
3    THE INTERPRETER: The interpreter will
4  repeat.
5    THE WITNESS: What is it?
6  BY MR. HILL:
7    Q. I'm asking, what is it? Do you recognize this?
8    A. I don't remember.
9    Q. Okay. Do you remember if you received bills that
10 may have looked like this for your rent from Good
11 Samaritan?
12   A. I don't remember.
13   Q. Do you remember what your rent was around the
14 time that the -- when you moved out?
15   A. Oh, yes. Now, I remember. I would pay $900 or
16 something for rent.
17   Q. Okay.
18   A. Now, I remember. I used to pay $900 for rent.
19   Q. Okay. Do you see the numbers on that page that's
20 marked 73, and there's an entry there on October 1, 2022
21 monthly fee and that number is $992. And I'll ask you
22 to maybe just to translate that.
23   A. Yes. Now, I remember. I would pay 900 and
24 something for the rent and 65 that was for the patio.
25 And this other one, it was for the food. I think that's

Page 65

1  what it is.
2    Q. Okay. So the total with the monthly fee, plus
3  the screened patio, is $1,057, does that seem right?
4    MS. CARDINAL: I don't see 1,050 --
5    MR. HILL: 992 plus 65 is $1,057.
6    MS. CARDINAL: You're just asking about
7  those two line items?
8    MR. HILL: Uh-huh.
9    MS. CARDINAL: Okay. It's -- it's not added
10 up on the sheets, so you're asking her to add it up?
11 BY MR. HILL:
12   Q. Let me ask this: Did you pay the $65 fee for the
13 screen patio every month?
14   A. I don't remember. I don't remember if it was for
15 two months.
16   Q. Okay. So if you look through this document -- if
17 you look through this document and just take a look at
18 like five or six pages of it, each one of them is a
19 monthly statement and each one of those shows $65 for
20 the screen patio.
21     MS. CARDINAL: That's what we're looking at,
22 yeah.
23     THE WITNESS: The $65, that's what they
24 would take out for the patio, for the patio at the
25 house.

17 (Pages 62 - 65)

Page 66

BY MR. HILL:

1  Q.  Okay.  And that was every month, right?

2  A.  Uh-huh.  Exactly.  My garden.

3  Q.  Oh, okay.

4  A.  I had it beautiful.

5     MS. CARDINAL:  Moving on from this one?

6     MR. HILL:  Yes.

7  BY MR. HILL:

8  Q.  So let me just take you back to, and I'm not

9  going to ask you anymore specific questions about what

10  you saw in the apartment, but after you got back to the

11  apartment for the first time and saw it for the first

12  time after the flood, what did you do next?

13  A.  I started -- I started crying.  What could I do,

14  I started crying.  I went in and I started crying.  I

15  screamed and started crying.  What could I have done,

16  what could I have done.  All of my belongings,

17  everything was destroyed, what could I have done.  I no

18  longer had anything.  Dear Lord, what could I have done,

19  I started crying.

20  Q.  Okay.  Was anyone with you?

21  A.  My dear daughter.

22  Q.  Okay.  Was there anyone else there at your

23  apartment when you walked in, anyone from Good Samaritan

24  or anyone else?

Page 67

1  A.  A lady soon came on a bicycle and told us to go

2  to a location or a place because they were going to give

3  us another apartment.

4  Q.  Do you remember who that person was?

5  A.  No, I don't remember.  I didn't know her.

6  Q.  Do you remember what she looked like?

7  A.  A Spanish lady.

8  Q.  Did she speak to you in Spanish or English?

9  A.  Yes, she spoke Spanish and didn't say anything

10  any longer -- she didn't say anything further.

11  Q.  Okay.  So tell me everything you remember this

12  woman, what she said to you.

13  A.  We went to a place, this place was called the

14  friendship place.  So then we could sign a piece of

15  paper so that they would reimburse us some money, so

16  they would give us back some money.  Didn't speak

17  English.  It was myself, my daughter, and another lady.

18  She spoke with my daughter.  She and my daughter talked,

19  and my daughter signed a paper so they could reimburse

20  us the money.

21  Q.  What money?

22  A.  Exactly.  The money -- the money -- the money --

23  what is it called -- what is it called, the money --

24  Q.  Security deposit?

25  A.  Exactly.  Yes, that money.  The security deposit.

Page 68

1  Q.  Okay.  But let me -- let me take you -- before

2  going to what you called the friendship place, you

3  mentioned there was a woman who spoke to you in Spanish

4  on a bicycle, tell me everything that that woman said to

5  you in Spanish.

6  A.  That those apartments, they were no longer going

7  to that -- they were no longer going to -- those

8  apartments would no longer open again, that those

9  apartments were not going to be open.  That we needed to

10  go to that place and they would reimburse us the money.

11  They would give us the money back.

12  Q.  And what money was she talking about, do you

13  know?

14  A.  The money -- the money that I just told you

15  about.

16  Q.  Okay.  The security deposit?

17  A.  Exactly.

18  Q.  Okay.

19  A.  I apologize, I'm nervous.

20  Q.  It's okay -- it's -- you have no reason to be

21  nervous.

22     MS. VELEZ:  It's okay.  Do you need another

23  break?

24     THE WITNESS:  No.

25     MS. CARDINAL:  We can take as many break as

Page 69

1  you need.

2     THE WITNESS:  It's fine.  It's fine.  I'm

3  remembering all of the things, and I'm reliving every

4  little moment.

5  BY MR. HILL:

6  Q.  That's why I stopped talking -- asking the

7  questions about what you saw and everything, so we don't

8  need to go back into that.

9  A.  It was a lot.  It was a lot.  I couldn't save

10  anything.  I -- it was a long, long time, I was very

11  happy there.  Good Samaritan was my life.  I was very

12  happy there.  I loved it there.  I lived by myself, but

13  everybody loved me there.  I loved it very much.

14  Everyone was really good to me, that was my life.  I

15  loved it there.  I had everything that I needed around

16  me.  My whole life was there.  I don't want to go

17  through this anymore.

18     MR. HILL:  We can take a break.

19     (A recess was taken from 2:37 p.m.

20     to 2:47 p.m.)

21  BY MR. HILL:

22  Q.  So I want to now take you back to the meeting

23  that you had in I think what you called the friendship

24  place, and when -- when was that meeting?

25  A.  After we went to the apartment, when the lady

18 (Pages 66 - 69)

Page 70

1  told for us to go to the friendship room.
2    Q. So do you -- when you went to the friendship room
3  and you got there, how many other people were there?
4    A. On the table that we were was myself, my
5  daughter, and the lady that was there talking to us for
6  us to sign that paper.
7    Q. Okay. And how many other people were in the room
8  in total?
9    A. There were more people, but I don't remember how
10  many.
11    Q. Okay. Can you estimate whether it was another
12  five people or ten people or 15 or 20?
13    A. I don't remember.
14    Q. Did you recognize anyone else in the room other
15  than your daughter, of course?
16    A. No.
17    Q. You didn't recognize any of the other Good
18  Samaritan employees?
19    A. Yes, but I didn't speak with anyone else.
20    Q. So you did -- you did recognize some people
21  there?
22    A. Yes.
23    Q. Do you remember who you recognized?
24    A. I know they worked there, but I don't remember.
25    Q. Okay. You don't remember their names?

Page 71

1    A. No.
2    Q. And do you remember a Claudia Espinosa who worked
3  at Good Samaritan?
4    A. I don't remember.
5    Q. What about a Carmen Rivera?
6    A. I don't remember.
7    Q. What about an Evelyn Rivas?
8    A. It's like, I remember, but I don't remember very
9  well. It's like, I remember.
10    Q. Uh-huh. Okay. Did you recognize -- well, did
11  you speak Spanish with anyone else at Good Samaritan at
12  any point in time that you lived there?
13    A. Excuse me?
14    Q. Did -- at any point in time that you lived there
15  at Good Samaritan, did you speak to any of the employees
16  in Spanish; not just that day, but anytime?
17    A. Yes.
18    Q. Do you remember any of their names?
19    A. I don't remember their names, but I spoke with
20  the drivers for the bus and the people that would come
21  in and fix anything that was broken, the maintenance
22  men. A lady that worked in the front -- in the office,
23  as well.
24    Q. Okay. Do you remember what the lady looked like
25  who worked in the office?

Page 72

1    A. I don't remember her. I don't remember, I'm
2  trying. I kind of remember, but I don't remember very
3  well.
4    Q. Do you remember seeing any of those people that
5  you spoke with in Spanish, you mentioned the lady in the
6  office, bus drivers, and maintenance people that were in
7  the friendship room that day when you signed the paper?
8    A. I don't recall having seen them there, no.
9    Q. Okay. Is it possible that they were there, but
10  you just don't recall them being there?
11      MS. CARDINAL: Objection. She can answer.
12      THE WITNESS: I don't know.
13  BY MR. HILL:
14    Q. Okay. Do you know if anyone else in the
15  friendship room that day when you were signing the
16  papers other than you and your daughter that spoke
17  Spanish?
18      MS. CARDINAL: Objection.
19      THE WITNESS: Like if other persons signed
20    that paper?
21  BY MR. HILL:
22    Q. No, anyone in that room. We described that there
23  were three people at the table with you, including you,
24  your daughter, and then the person that worked for Good
25  Samaritan. And then, do you know if anyone else in the

Page 73

1  room spoke Spanish who was employed by Good Samaritan?
2    A. Are you asking me if everyone there was an
3  employee, is that what you're asking?
4    Q. No. So the -- in terms of the people that were
5  in that room, do you know if there was anyone who was
6  employed by Good Samaritan in that room who spoke
7  Spanish?
8    A. I don't know if they spoke Spanish.
9    Q. Okay. So do you know if Good Samaritan had
10  Spanish translators available in the room that day when
11  you were in the friendship room signing the papers?
12      MS. CARDINAL: Objection.
13      THE WITNESS: I don't know.
14  BY MR. HILL:
15    Q. So when you're in the friendship room that day
16  and you're signing the papers then, you did not ask for
17  a Spanish translator; is that correct?
18    A. No, because I had my daughter.
19    Q. Can you tell me everything that you know or
20  understand -- well, let me scratch that.
21      So as you're sitting at the table in the
22  friendship room there with you, your daughter, and then
23  the Good Samaritan, you called her lady, so I'll call
24  her lady, did you understand anything that the Good
25  Samaritan lady said?

19 (Pages 70 - 73)

## Page 74

1  A. No.
2  Q. So how do you know what was told to you by the
3  Good Samaritan lady in the room that day?
4  A. Because my daughter told me.
5  Q. So let me take you to the point where you're
6  sitting at the table and the Good Samaritan
7  representative is talking to your daughter; is that
8  right, and not really talking to you?
9  A. She's talking to me and my daughter.
10  Q. Okay. Did your daughter translate what the Good
11  Samaritan representative was telling you that day as
12  you're sitting at the table, or did she wait until after
13  to tell you what happened?
14  A. No. She was telling me everything that the lady
15  was saying in Spanish.
16  Q. So realtime, as you sat there with her, similar
17  to what you're doing today with the translation
18  happening realtime?
19  A. Exactly. Translated it. Translating it right
20  there at the moment.
21  Q. Okay. So based on your daughter's translation of
22  what the Good Samaritan representative said, tell me
23  everything you recall of what was translated to you as
24  to what the Good Samaritan representative said.
25  A. I don't remember right now.

## Page 75

1  Q. Okay. Do you remember being handed a document
2  when you're sitting at the table?
3  A. We signed a paper. She only gave us a paper for
4  us to sign, for us to receive the refund of the money.
5  That is it, nothing more.
6  Q. Okay. So was it one or two pages that you
7  signed?
8  A. One paper.
9  Q. Okay. A front and back?
10  A. Only front.
11  Q. Okay. Did you turn the paper over to see if
12  there was something on the backside?
13  A. No, I didn't see.
14  Q. Okay. So you don't know if there was something
15  on the other side?
16  A. It had nothing, no.
17  Q. Well, how do you know if you didn't turn it over?
18  A. Because it was there, I signed it. It was simply
19  there, it was -- she gave it to us and we signed it.
20  Q. Okay. I think -- what did the Good Samaritan
21  representative say to you, as translated by your
22  daughter, about receiving your security deposit back?
23  A. For us to sign. For us to sign it right there to
24  refund the money.
25  Q. Okay. Did they say anything about if -- what

## Page 76

1  would happen if you did not sign it?
2  A. That they wouldn't -- that we would not have the
3  right to be refunded the money.
4  Q. Who said that?
5  A. The lady that gave us the paper.
6  Q. Okay. Did you hear her say that, or did you hear
7  your daughter translate that to you?
8  A. She told my daughter. My daughter told me.
9  Q. Okay. But you didn't understand what she was
10  saying?
11  A. No, because I don't know English.
12  Q. Do you know if the Good Samaritan representative
13  said that, if you don't sign this, it might delay
14  getting your security deposit back?
15  A. Yes.
16  Q. Okay. And did your daughter read the document
17  that she signed?
18  A. Yes, she signs -- signed it.
19  Q. Okay. But do you know if she read the document?
20  A. No. The lady told us she had to sign it in order
21  for them to refund the money.
22  Q. Okay. So that's not my question. My question
23  is: Do you know if your daughter read the document?
24  A. I don't know.
25  Q. And how long did that meeting last with the Good

## Page 77

1  Samaritan representative?
2  A. Short period of time.
3  Q. Okay. Can you estimate if it was five minutes or
4  ten minutes or 15 minutes?
5  A. Like five minutes. Like five minutes.
6  Q. Okay. And did you or your daughter ask for more
7  time to review the document?
8  A. Yes.
9  Q. Who asked, you or your daughter?
10  A. My daughter. My daughter.
11  Q. And what was the response?
12  A. That there was no more time.
13  Q. What did your daughter ask specifically about
14  asking for more time?
15     MS. CARDINAL: Objection.
16     THE WITNESS: I don't know.
17  BY MR. HILL:
18  Q. Okay. And so if your daughter is asking for more
19  time from the Good Samaritan representative, she's
20  asking for that in English; is that right?
21  A. I don't know.
22  Q. You don't know if your daughter asked that
23  question?
24  A. Because I don't know English.
25  Q. Okay. So you don't know if your daughter asked

20 (Pages 74 - 77)

Page 78

1 for more time?
2    A.  Exactly.
3    Q.  Did you or your daughter ask for that document to
4 be translated into Spanish?
5    A.  I don't know.
6    Q.  But that means, I guess, you didn't personally
7 ask for the document to be translated into Spanish; is
8 that correct?
9    A.  Yes.
10    Q.  Do you know if someone watched you -- or
11 actually, who signed the document, was that you or your
12 daughter?
13    A.  Which document?
14    Q.  The termination document.
15        MS. CARDINAL:  I don't think that we've
16 identified the termination document, it was just a
17 document.
18        MR. HILL:  Okay.  I -- that's why I'm going
19 to do that right now.
20        (Defendants' Exhibit No. 12 was marked for
21 identification.)
22 BY MR. HILL:
23    Q.  So Exhibit 12 is titled termination of --
24 Exhibit 12 is titled termination of occupancy agreement
25 and abandonment of personal property agreement.  So if

Page 79

1 you could turn to Page 2, and do you see -- do you see
2 the signature on the top left-hand side?  On the
3 left-hand side, not the right, you see where it says,
4 The Evangelical Lutheran Good Samaritan Society, right
5 here?
6        MS. CARDINAL:  Sorry.  I pointed to the
7 wrong side.  We're on this side.
8 BY MR. HILL:
9    Q.  Do you recognize that name Rhona Snyder?
10    A.  I don't remember.
11    Q.  Okay.  Do you recognize the name underneath that,
12 Tamara Lund?
13    A.  Lund?
14    Q.  Lund, L-u-n-d.
15    A.  Tamara?
16    Q.  Tamara, yes.  Do you recognize that name?
17    A.  I don't remember.
18    Q.  And then to the right of that, whose signature is
19 that?
20    A.  Yolanda Delgado.
21    Q.  That's you.  So is that your signature?
22    A.  Yes.
23    Q.  Okay.  So you signed it, not your daughter?
24    A.  No, I signed it.
25    Q.  Okay.  And do you know if someone watched you

Page 80

1 sign it besides Rhona Snyder and your daughter?
2        MS. CARDINAL:  Objection.
3        THE INTERPRETER:  Interpreter will repeat
4 the question correcting the name.  Her daughter,
5 instead of Tamara.
6        THE WITNESS:  I don't remember.
7 BY MR. HILL:
8    Q.  Okay.  All right.  So I'm going to look at -- on
9 the first page, there's a Section 3 titled abandonment
10 and surrender of property.  I'll let you translate.
11 So the first sentence here says:  From the date
12 of this agreement, resident shall have until
13 October 31, 2022 to remove all property at resident's
14 sole cost and expense.  And I'll let you translate that.
15        Okay.  So do you know if you had the ability to
16 remove any property from your unit after signing this,
17 at least until October 31, to the extent that you wanted
18 to salvage anything?
19    A.  Yes.
20    Q.  So if you go down to the -- not the -- to the --
21 let's skip a sentence and go to the next one.  It says:
22 Resident further grants access to Society and/or its
23 employees and authorized agents and representatives,
24 including without limitations, Belfor USA Group Inc., to
25 the unit to remove the property in the unit?

Page 81

1        MS. CARDINAL:  I'm just trying to find the
2 sentence.
3        THE INTERPRETER:  Interpreter is trying to
4 locate the sentence.
5        MR. HILL:  Yes, the third sentence.
6 BY MR. HILL:
7    Q.  And then I stopped there.  So do you know if Good
8 Samaritan removed your damaged furniture and other
9 belongings that were damaged from the unit?
10    A.  Yes.
11    Q.  Okay.  And then that last sentence reads:  All
12 set such removal shall be at Society's expense.  So do
13 you know if when Good Samaritan removed your damaged
14 belongings and property from the unit, that they paid
15 for all of that removal?
16        MS. CARDINAL:  Objection.
17        THE WITNESS:  Nothing worked.
18 BY MR. HILL:
19    Q.  Okay.  But do you know if they paid for it rather
20 than you paid for it?
21        MS. CARDINAL:  Same objection.
22        THE WITNESS:  I don't know, nothing worked.
23 BY MR. HILL:
24    Q.  Okay.  So Good Samaritan didn't -- never sent you
25 a bill expecting you to pay for them to remove your

21 (Pages 78 - 81)

Page 82

1  damaged belongings from your unit; is that correct?
2      A. I didn't receive anything. No papers from Good
3  Samaritan.
4      Q. Okay. So they didn't charge you for any removal
5  fee of your damaged property; is that correct?
6          MS. CARDINAL: Objection. She can answer.
7  BY MR. HILL:
8      Q. What was the answer?
9      A. No. I didn't receive any letters from Good
10 Samaritan.
11     Q. Okay. And to your knowledge, they didn't take
12 that money out of your security deposit when they
13 refunded your security deposit, did they?
14         MS. CARDINAL: Objection.
15         THE WITNESS: I don't know. I don't know
16 anything. I don't know if they paid. I don't know
17 anything.
18 BY MR. HILL:
19     Q. Okay. Do you see the top of that document, and
20 I'll just do the reading: This termination, this
21 agreement is made -- is entered into effective as of
22 October 15th, 2022, the effective date, by and among
23 Yolanda Delgado, and then there's a blank, collectively
24 resident, and The Evangelical Lutheran Good Samaritan
25 Society d/b/a Good Samaritan Society-Kissimmee Village,

Page 83

1  which is a defined term as Society. Can you translate?
2      So having just seen that and heard that, this is
3  a contract between you and Good Samaritan, is that your
4  understanding?
5      A. Yes.
6          MS. CARDINAL: Done with this one?
7          MR. HILL: Yes. I was undecided until you
8  asked.
9          I'm going to hand you what we'll mark as
10 Exhibit 13.
11         (Defendants' Exhibit No.13 was marked for
12         identification.)
13 BY MR. HILL:
14     Q. And this is a document that's titled return of
15 partial security deposit, do you recall ever receiving
16 this letter?
17     A. Wow. This was the money that Good Samaritan
18 sent.
19     Q. Okay. So do you remember receiving this letter?
20         THE INTERPRETER: The interpreter cannot
21 hear you, ma'am.
22         THE WITNESS: Yes.
23 BY MR. HILL:
24     Q. You do remember. Okay.
25     A. Yes, I remember it now. Yes.

Page 84

1      Q. Okay.
2      A. I remember it.
3      Q. So you received the deposit refund of $1,074.20?
4      A. Yes. I apologize if before I told you I had not
5  remembered having received the reimbursement, but I do
6  remember. It was just that I was very altered, I was
7  very nervous. Now, I do remember. It's a lot of
8  things.
9      Q. It's okay.
10     A. I was very nervous.
11     Q. Okay. You have no reason to be nervous. Okay.
12     A. I apologize. I apologize.
13     Q. It's okay. That's okay.
14     A. Yes. Yes. Yes.
15         MR. HILL: Now, might be a good time to take
16 a break if you all want to, we've been at it for an
17 hour.
18         MS. CARDINAL: Sure. Yeah, yeah.
19         (A recess was taken from 3:31 p.m.
20         to 3:41 p.m.)
21 BY MR. HILL:
22     Q. So I understand in this lawsuit that you are
23 claiming, among other things, that you were essentially
24 forced to sign this termination agreement, it was
25 Exhibit 12, under duress, do you know what that means?

Page 85

1          MS. CARDINAL: Objection.
2          THE WITNESS: No.
3  BY MR. HILL:
4      Q. Okay. Do you believe that Good Samaritan forced
5  you or coerced you into signing this termination
6  agreement in any way?
7          MS. CARDINAL: Objection.
8          THE WITNESS: I don't know.
9  BY MR. HILL:
10     Q. Okay. Do you feel like Good Samaritan pressured
11 you into signing this agreement in any way?
12     A. I don't know.
13     Q. Do you know if Good Samaritan and you had any
14 right or ability to agree together to terminate your
15 lease agreement?
16         MS. CARDINAL: Objection.
17         THE WITNESS: What contract? What
18 agreement?
19 BY MR. HILL:
20     Q. Your lease.
21     A. No, I don't know.
22     Q. Okay. And do you know if you wanted to terminate
23 your lease early, do you know what you would have needed
24 to do to terminate the lease?
25         MS. CARDINAL: Objection.

22 (Pages 82 - 85)

Page 86

1    THE WITNESS:  I didn't know.
2  BY MR. HILL:
3    Q.  And do you know if Good Samaritan had any right
4  or ability under the lease agreement to terminate the
5  lease on 30 days' notice?
6    MS. CARDINAL:  Objection.
7    THE WITNESS:  I didn't know.
8  BY MR. HILL:
9    Q.  Do you remember how you received your security
10  deposit, was it by a check or was it by direct deposit
11  into your bank account?
12    A.  It was a check.
13    Q.  It was a check?
14    A.  Yes, it was a check.
15    Q.  What did you do with the check, did you deposit
16  it?
17    A.  I deposited it.
18    Q.  Okay.  And did you receive that check within --
19    A.  I don't remember very well.
20    Q.  Okay.
21    MS. CARDINAL:  It's okay.
22  BY MR. HILL:
23    Q.  And do you remember if you received that check
24  within like 30 days of your signing that termination
25  agreement?

Page 87

1    A.  I don't remember, please.
2    Q.  Okay.
3    MS. CARDINAL:  It's okay.
4    MR. HILL:  It's okay.  It happens all the
5  time in depositions where people don't remember stuff.
6    THE WITNESS:  It's like everything left my
7  mind.
8  BY MR. HILL:
9    Q.  Okay.  And so you got the refund check.  And then
10  I guess, you've now, I guess, I assume you spent that
11  money; is that correct?
12    A.  Yes, I spent it.  Because buying clothes for me.
13    Q.  Okay.
14    A.  I had nothing.
15    Q.  Okay.  When you lived at Good Samaritan, you were
16  in the independent living area, is that your
17  understanding?
18    A.  Yes, I lived alone.
19    Q.  Okay.  You didn't have any nurses or caregivers
20  come take care of you or check on you for wellness
21  checks or anything; is that correct?
22    A.  No, I didn't even have a boyfriend.
23    Q.  You need to work on that.  I remember you saying
24  earlier that never again, I did hear that.  I remember
25  that.

Page 88

1    A.  I had to make you guys laugh even just a little
2  bit.  Even if you're suffering, you got to laugh a
3  little bit.
4    Q.  Right.  That's right.  That's a good attitude.
5    So you at -- when you lived there at Good
6  Samaritan, throughout the time you lived there, you were
7  able to take care of yourself, like bathing and dressing
8  and cooking meals and shopping, and doing those things;
9  is that right?
10    A.  Yes.
11    Q.  Have you ever been diagnosed with any medical or
12  mental health conditions that would mean that you can't
13  effectively understand contracts that you sign?
14    A.  Well, I would get epileptic attacks.  And for
15  that, I -- well, stopped acting fine.
16    Q.  You stopped what?
17    I'm sorry.
18    A.  Acting fine.
19    Q.  When did you have -- did you have any epileptic
20  attacks around the time of the hurricane hitting?
21    A.  No.
22    Q.  Do you remember when was your last epileptic
23  attack?
24    A.  Yes, after the hurricane passed by.  When I was
25  very frustrated and very bad, I had them.

Page 89

1    Q.  When?  Was it after you terminated your lease
2  with Good Samaritan or before?
3    A.  It was after.  It was after I came out, after I
4  moved out Good Samaritan.
5    Q.  Okay.  Do you remember about how long after, was
6  it is like weeks or months after you moved out of Good
7  Samaritan?
8    A.  About four or five months after.  About three
9  months after I left, that I had those attacks.
10    Q.  Okay.  And have they stopped?
11    A.  Yes.
12    Q.  In this lawsuit, you are also claiming, among
13  other things, that you were discriminated against in
14  some way by Good Samaritan.  Do you understand that that
15  is one of your claims that you're bringing, that you
16  were discriminated against by Good Samaritan?
17    A.  Yes.
18    Q.  Okay.  Can you tell me, based on your
19  understanding of it, how you feel like you were
20  discriminated against by Good Samaritan?
21    A.  Because they did not tell me that that part would
22  get flooded by a hurricane.  Had they told me that, I
23  would have brought all of my things to my daughter's
24  house or something.  I would not have lost all of my
25  belongings.

23 (Pages 86 - 89)

Page 90

1   Q. Can you think of any other way in which you feel
2   like Good Samaritan discriminated against you?
3   A. There's so many things. I lost all of my
4   friendships that I had there, they were all Hispanic.
5   And here, I have my house, but I don't have anyone to
6   talk to. I have no friends, because everyone is
7   American. I don't have anybody that can bring me to the
8   store. I don't have anything to bring me -- anyone to
9   bring me places. I have to wait for my daughter to have
10  time so she can bring me.
11  I don't have it. In Good Samaritan, there was
12  the bus that would take us every day to different
13  places. Right now, I don't -- no longer have this
14  service. I don't have anyone that can bring me food.
15  Q. So you don't have the Meals on Wheels food
16  anymore?
17  A. No. Because I have my daughter, one of my
18  grandchildren, they can go buy me food for the whole
19  week. At Good Samaritan, I had food that was brought to
20  me daily, it was fresh.
21  Q. So now that your daughter or other people buy you
22  food for the week, do you now cook your own food and
23  make your own meals?
24  A. No, because I can't cook.
25  Q. Okay. Then how do you -- what do you do for food

Page 91

1   then?
2   A. I cook -- well, they go and buy food for the
3   whole entire week, so I just heat it up.
4   Q. Okay. So can you think of any other way in which
5   Good Samaritan discriminated you other than the
6   things that we've just discussed?
7   A. A lot of things.
8   Q. Okay. Do you feel like Good Samaritan -- do you
9   know what -- do you what I mean by saying
10  discrimination?
11  A. Yes, of course. Because I have a lot -- of
12  course. I have a lot of -- a lot of suffering. I feel
13  alone. I'm all alone. All I do is sit in front of the
14  TV all day.
15  Q. Okay. So what does the word, discrimination,
16  mean to you?
17  A. It's like they don't want me.
18  Q. They, as in Good Samaritan, doesn't?
19  A. That Good Samaritan don't want me. Good
20  Samaritan don't want me.
21  Q. Okay. Do you know -- when you say that they
22  don't want you, do you know why or on what basis you
23  feel like they don't want you?
24  A. Well, because -- of course, there I lived in a
25  community. I had my people. And there, I don't have

Page 92

1   anyone.
2   Q. Okay. So do you feel like anyone at Good
3   Samaritan treated you differently because you're either
4   Hispanic or Puerto Rican or Spanish-speaking?
5   A. Where?
6   Q. At Good Samaritan.
7   A. Well, there was a lot of Puerto Rican people and
8   Hispanic people. They all treated us nice.
9   Q. Okay.
10  A. Very well.
11  THE INTERPRETER: Interpreter's correction,
12  very well.
13  BY MR. HILL:
14  Q. Okay. And do you know, if when they -- when you
15  signed your lease way back when several years ago, did
16  Good Samaritan know that you were Hispanic and/or Puerto
17  Rican?
18  A. The Good Samaritan or the neighbors?
19  Q. Good Samaritan.
20  A. They knew I was Hispanic.
21  Q. I'm going to hand you what we'll mark as
22  Exhibit 14.
23  (Defendants' Exhibit No. 14 was marked for
24  identification.)
25  MR. HILL: I'll just do a little statement

Page 93

1   here that these are medical records that your lawyers
2   have produced to us from one of your health care
3   providers called Primary Care Specialty and Urgent
4   Care Providers, which are -- is in Kissimmee on
5   Simpson road.
6   BY MR. HILL:
7   Q. Do you know who that is, Primary Care Specialty
8   and Urgent Care Providers on Simpson Road?
9   MS. CARDINAL: Just one clarification, for
10  the record, I think that's just a designation. I
11  believe that the actual name is MedFLoria Medical
12  Centers.
13  MR. HILL: Yep. I was going to clean that
14  up. Once again, we're missing a lot.
15  BY MR. HILL:
16  Q. So do you know is your doctor at MedFlorida
17  Medical Centers?
18  A. Oh, yes.
19  Q. And do you is your doctor Omar Perez Soto?
20  A. Omar Perez Soto, yes.
21  Q. And do you remember when you first started seeing
22  Dr. Perez Soto?
23  A. Yes.
24  Q. When was that?
25  A. It's been a long time.

24 (Pages 90 - 93)

Page 94

1  Q. Okay. So did you -- were you seeing him before
2  the Hurricane Ian hit or was it after?
3  A. Before.
4  Q. And how did you communicate with Dr. Perez Soto,
5  in Spanish, English, or both?
6  A. In both.
7  Q. And did your daughter go with you to your
8  doctor's appointment with Dr. Perez Soto?
9  A. Yes.
10  Q. Does she always go with you?
11  A. She would always come with me, always.
12  Q. Okay.
13  A. She still.
14  Q. Okay. You've got a good daughter.
15  A. Beautiful, yes. I want to have her all the time
16  with me.
17  Q. So when you were at the doctor's office and
18  she -- did she accompany you to help you fill out the
19  paperwork and also talk to the doctors, or was she was
20  always with you at the doctor's office or did she
21  sometimes stay in the waiting room?
22  A. She always goes with me for everything, even the
23  pharmacy.
24  Q. Okay. So if you look at -- this is a little
25  weird the way I had to do this, but I did different tabs

Page 95

1  just because when doctors give you records, they always
2  do it in like reverse order, so I tried to make sense of
3  it the best I could. So if you go to tab A, so that
4  first page of tab A, it's Bates labeled Delgado 367, do
5  you remember filling out any patient health
6  questionnaires, whether it was -- be a hard piece of
7  paper or on like a commuter screen or a tablet?
8  A. I don't remember.
9  Q. Okay. Do you know if your daughter would have
10  filled out the questionnaires for you if they were in
11  English and not in Spanish?
12  A. Probably my daughter filled them out.
13  Q. Okay. And when she filled those questionnaires
14  out, did she do so truthfully?
15  A. Yes, she has to do it.
16  Q. Okay. And did she ask you questions about that
17  as she's filling it out?
18  A. Yes. To see and ask how I was feeling so she can
19  tell the doctor and everything.
20  Q. Okay. So, essentially, the answers on the
21  questionnaires that are filled out are your answers as
22  translated by your daughter; is that correct?
23  A. Yes.
24  Q. Okay. So I'm going to skip over to tab B, and it
25  shows Delgado 364. So at the very top of there it has a

Page 96

1  section called reason for appointment. And it says
2  there: New patient is here today to establish care.
3       MS. CARDINAL: Just one point of clarity, we
4  went to tab B, we're now turning to 364?
5       MR. HILL: Yeah, which is tab B.
6       MS. CARDINAL: The -- she's taking this as
7  tab B, this page, because it physically has the thing
8  on it. So, yes, turn.
9       MR. HILL: We're on page 364, yes.
10       THE WITNESS: On the bottom?
11       MR. HILL: Yes, ma'am.
12  BY MR. HILL:
13  Q. Okay. So do you mind translating that again so
14  we're in the same place? So it says: Reason for
15  appointment, new patient is here today to establish
16  care.
17  A. Uh-huh.
18  Q. And so does that indicate to you that that was
19  the first time you saw Dr. Perez Soto, or do you think
20  you may have seen him before then?
21  A. Well, Dr. Soto, I see him every three months. I
22  have an appointment with him. I have an appointment
23  with him every three months. For instance, I have an
24  appointment with him next week. He's my primary care
25  doctor.

Page 97

1  Q. Okay.
2  A. He's my primary care doctor.
3  Q. So under the section new patient, it says:
4  77-year-old female presents with CO initial visit.
5  Patient presents to establish care with new provider.
6  Prior PCP Dr. Gonzalez/Orlando Family Physicians. Last
7  seen four months ago. Reason for changing providers,
8  she moved.
9       Can you really translate that and I'll stop
10  there?
11       Okay. Do you remember a Dr. Gonzalez?
12  A. It's like I remember. I remember a little bit,
13  but I kind of remember the name.
14  Q. Okay. So I'll read on from there: Feels well
15  today with no new complaints. Then skipping through it
16  says: Sleep, 3-4-5 hours. So is that information
17  accurate as of as of the date that you saw him in January
18  of 2023?
19  A. Yes, that was then. But, thankfully, right now,
20  I'm feeling better. I'm taking my new medications, and
21  thankfully I am very well. My health is doing very
22  well. Everything is very good. Thank God, my health is
23  very controlled.
24  Q. Okay. Under the next page, Delgado 365, you see
25  the column on the left side on the far bottom part of

25 (Pages 94 - 97)

Page 98

1  the left-hand column under -- and the heading is,
2  psychology.  And it says:  Patient denies -- the patient
3  does not report depression, sleep disturbance, anxiety,
4  hallucinations, mood swings.  Can you translate?
5        So assuming that information is written by the
6  doctor, but it came from you; is that correct?
7     A.  Yes.  But, thankfully, now, everything is fine.
8     Q.  Okay.  But according to his -- this medical
9  record here, and it's dated January 11th, 2023,
10  Dr. Perez Soto was saying that you do not report
11  depression, sleep disturbance, anxiety, hallucinations,
12  mood swing, that is accurate as of that date; is that
13  correct?
14     A.  Exactly.  Thank God --
15     Q.  Okay.
16     A.  -- I'm doing very well.
17     Q.  Okay.  So if you turn back to tab A, this page
18  right here, that one right there.  So this is back to
19  tab A, which is Delgado 367, this is the patient health
20  questionnaire which you previously said your daughter
21  helped fill out for you, based on your answers.  And I
22  want to run down this.  And so number one says:  Little
23  interest or pleasure in doing things, and then the box
24  checked is not at all; is that correct?
25     A.  Yes, I'm fine.

Page 99

1     Q.  Okay.  So number two it says, again, this is all
2  as of January 11, 2023 when this was filled out, it
3  says:  Feeling down, depressed or hopeless.  And number
4  two, it also says not at all; is that correct?
5     A.  Well, all of that ran away.  I feel better now,
6  thank God.
7     Q.  Okay.  But this is answered as of taking you back
8  to January 11, 2023?
9     A.  Oh, that was last year.
10     Q.  Yes, that's when this was filled out.  Yes,
11  ma'am.
12     A.  I thought it was -- we're in '24.
13     Q.  '23, January.  So as of January of 2023, the form
14  is completed.  And, again, this is your daughter filling
15  out the form based on the answers you've given, that you
16  were not at all feeling tired or having little energy;
17  is that correct?
18     A.  That's true.  That's after what happened at Good
19  Samaritan that I had a really bad depression, it was
20  very strong.
21     Q.  When?
22     A.  It was after what happened in Good Samaritan,
23  that I was very ill, you know.
24     Q.  And how long did that last?
25     A.  Well, you know, that it would come and go.

Page 100

1  Sometimes I would feel good, and sometimes I wouldn't.
2  But that has gone away, I have recovered.
3     Q.  Okay.
4     A.  After that, it all went away.  And thank God, I'm
5  doing well.
6     Q.  Good.  And when you say you were in a depression
7  after the hurricane, describe why you say that.  What
8  were -- what was happening with you?  What were your
9  symptoms?
10     A.  I was crying.  I was crying all the time.  I was
11  asking and I was praying, I was asking God, why did it
12  happen to me.  Because I asking and praying for a new
13  roof, because I didn't have anything.  I had nothing,
14  nothing at all.  Imagine, I had nothing.
15     Q.  Okay.  Did you have any symptoms that you feel
16  like happened with what you say is depression?
17     A.  Well, when that happened, that's when I had the
18  attacks.
19     Q.  What attacks, the epileptic?
20     A.  Epilepsy.
21     Q.  Okay.  Have you ever had any doctor tell you that
22  your epileptic attacks were related to what happened
23  with the hurricane?
24     A.  Yes, because I suffered so much.  I was
25  suffering.  I was suffering a lot.

Page 101

1     Q.  Which doctor told you that your epileptic attacks
2  were caused -- were caused by your -- what happened with
3  the hurricane?
4        THE INTERPRETER:  While counsel was asking a
5  question, the deponent said...
6        THE WITNESS:  I couldn't sleep -- I couldn't
7  sleep.  I cried all the time.  I just cried.
8  BY MR. HILL:
9     Q.  So I had -- I had a question in there, I think
10  somewhere.  So the question is:  Which, if any, doctors
11  told you that your -- what you said was epileptic
12  attacks were caused by what happened with the hurricane?
13     A.  Well, that I suffered so much.  Is that I got so
14  out of control and things like that, I got so out of
15  control, I would cry all the time.  I didn't want to
16  eat.
17     Q.  Okay.  So that's not my question.  My question
18  is:  Did you have any doctors tell you that your
19  epileptic attacks were caused by what happened with the
20  hurricane?
21     A.  No.  Because what the doctors said was that due
22  to the grave suffering I had, my epilepsy came back.
23     Q.  Which doctor said that?
24     A.  My neurologist.
25     Q.  Do you remember his or her name?

26 (Pages 98 - 101)

Page 102

1  A. No, because my neurologist went -- left.  My
2  neurologist left.
3  Q. Left like the state of Florida?
4  A. Yes.
5  Q. Okay.  Do you remember the neurologist's name at
6  all or where he was located or she?
7  A. No, I don't remember the name.
8  Q. Was it a man or a woman?
9  A. A man.
10  Q. And do you remember where his office was located?
11  A. No, I don't remember right now.
12      MR. HILL:  I think I'm done with that.  I'm
13  kind of looking at the clock here, It's been an hour.
14      MS. CARDINAL:  I was -- I didn't want to
15  interrupt because you were on a roll.
16      MR. HILL:  No, it's okay.  Not sure about a
17  roll, but --
18      MS. CARDINAL:  But we are getting, you know,
19  to the 5 o'clock hour.  It's been about an hour --
20      MR. HILL:  I can just tell you that I --
21  this is good news, I don't think I have more than --
22  certainly more than two hours to go.  And, hopefully,
23  it's less than that.
24      MS. CARDINAL:  Yeah.
25      MR. HILL:  So that's good news, I think,

Page 103

1  right.  So we're -- we're going to be well under
2  the -- I think even under seven hours, once you count
3  all the breaks, I think we are in a good spot.
4      (A discussion was held off the record.)
5      MS. CARDINAL:  We will read.
6      (Deposition adjourned at 4:39 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1      CERTIFICATE OF OATH
      INTERPRETED PROCEEDINGS
2
  STATE OF FLORIDA
3  COUNTY OF OSCEOLA
4      I, DANIELLE FERNANDEZ, Shorthand Reporter
5  and Notary Public, State of Florida, certify that
6  FRANCINE KAHN personally appeared before me on
7  May 16th, 2024 and was duly sworn/affirmed.
8      I, DANIELLE FERNANDEZ, Shorthand Reporter
9  and Notary Public, State of Florida, certify that
10  YOLANDA DELGADO personally appeared before me on
11  May 16th, 2024 and was duly sworn/affirmed through the
12  interpreter.
13      WITNESS my hand and official seal this 18th
14  day of June, 2024.
15
16      _Danielle_ (signature)
17  _____
   Danielle Fernandez
   Notary Public - State of Florida
18  Commission No. HH348257
   Expires:  April 19, 2027
19
20
21
22      Personally known_____
   OR Produced Identification_____X_____
23  Type of Identification produced-Florida ID card
24
25

Page 105

1      CERTIFICATE OF REPORTER
2  STATE OF FLORIDA
   COUNTY OF ORANGE
3
4      I, DANIELLE FERNANDEZ, Shorthand Reporter
5  and Notary Public, CERTIFY that I was authorized to and
6  did stenographically report the deposition of
7  YOLANDA DELGADO; that a review of the transcript was
8  requested; and that the foregoing transcript, pages 4
9  through 103, is a true and accurate record of my
10  stenographic notes.
11      I FURTHER CERTIFY that I am not a relative,
12  or employee, or attorney, or counsel of any of the
13  parties, nor am I a relative or employee of any of the
14  parties' attorneys or counsel connected with the action,
15  nor am I financially interested in the action.
16      DATED this 18th day of June, 2024.
17
18
19
20
21      _Danielle_ (signature)
   _____
22      Danielle Fernandez
23
24
25

27 (Pages 102 - 105)

Page 106

1          ERRATA SHEET
2  DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
3  IN RE:    Yolanda Delgado vs. The Evangelical Lutheran
          Good Samaritan Society and Sanford Health
4  CASE NO.:  6:23-cv-1288-RBD-EJK
    DATE:      05/16/2024       JOB: 6607189
5  DEPONENT:  YOLANDA DELGADO
    PAGE      LINE     CHANGE
6  _____
   _____
7  REASON_____
   _____
8  _____
   _____
9  PAGE_____LINE_____CHANGE_____
   _____
10 _____
   REASON_____
11 _____
   _____
12 PAGE_____LINE_____CHANGE_____
   _____
13 _____
   REASON_____
14 _____
   _____
15 PAGE_____LINE_____CHANGE_____
   _____
16 _____
   REASON_____
17 _____
   _____
18 PAGE_____LINE_____CHANGE_____
   _____
19 _____
   REASON_____
20 _____
   _____
21 _____
   _____
22 _____
   Under penalties of perjury, I declare that I have read
23 the foregoing document and the facts stated in it are
   true.
24 _____
25 YOLANDA DELGADO                    DATE

Page 107

1          June 20, 2024
2  Yolanda Delgado
   c/o Morgan Cardinal, Esquire
3  Community Legal Services of Mid-Florida
   122 East Colonial Drive, Suite 200
4  Orlando, Florida 32801
5
   In Re:  May 16, 2024 deposition of Yolanda Delgado
6      Yolanda Delgado vs. The Evangelical Lutheran
        Good Samaritan Society, et al.
7
       Job Number:  6607189
8
9  Dear Ms. Delgado:
10     The above-referenced transcript is available for
   review.
11     Yolanda Delgado should read the testimony to verify
   its accuracy.  If there are any changes, Yolanda Delgado
12 should note those with the reason on the attached errata
   sheet.
13     Yolanda Delgado should, please, date and sign the
   errata sheet and e-mail it to the deposing attorney, as
14 well as to Veritext at transcripts-fl@veritext.com and
   copies will be e-mailed to all ordering parties.
15     It is suggested that the completed errata be returned
   within 30 days of receipt of this letter, as considered
16 reasonable under *Federal Rules; however, there is no
   Florida Statute to this regard.
17     If the witness fails to do so, the transcript may be
   used as if signed.
18
19          Yours,
20
21
          Veritext Legal Solutions
22
23
24 *Federal Civil Procedure Rule 30(e)/Florida Civil
25 Procedure Rule 1.310(e)

28 (Pages 106 - 107)

**[& - 6:23]**

| & |
|---|
| **&**   2:9 |

| 0 |
|---|
| **000061**   24:7 |
| **05/16/2024** |
|    106:4 |

| 1 |
|---|
| **1**   3:10 14:20,21 |
|    47:22 64:20 |
| **1,050**   65:4 |
| **1,057**   65:3,5 |
| **1,074.20**   84:3 |
| **1,200**   54:18,24 |
| **1,607**   44:11 |
| **1,607.70**   44:15 |
| **1.310**   107:25 |
| **10**   3:14 55:18,21 |
|    56:3 57:2 |
| **101**   2:10 19:7 |
| **103**   105:9 |
| **104**   3:4 |
| **105**   3:5 |
| **106**   3:6 |
| **107**   3:7 |
| **10:01**   1:19 |
| **10:48**   23:13 |
| **11**   3:15 63:19,20 |
|    99:2,8 |
| **11:00**   23:14 |
| **11:38**   38:4 |
| **11:50**   38:5 |
| **11th**   98:9 |
| **12**   3:16 54:15 |
|    61:22 78:20,23 |

78:24 84:25
**122**   1:20 2:4
   107:3
**1288**   1:3 106:4
**12:05**   44:20
**12:30**   55:4
**12:35**   55:15
**13**   3:17 83:10
**131**   19:10
**14**   3:10,18 92:22
   92:23
**15**   10:22,23,23
   10:23 11:19
   70:12 77:4
**15th**   82:22
**16**   1:18 41:20
   42:20 107:5
**16th**   104:7,11
**17**   3:10 44:3
**171**   19:24
**18**   3:11,11
**18th**   104:13
   105:16
**19**   3:12 104:18
**19th**   16:7
**1:30**   55:14
**1:51**   55:16

| 2 |
|---|
| **2**   3:10 17:16,17 |
|    49:15 79:1 |
| **20**   10:4,6 12:14 |
|    70:12 107:1 |
| **200**   1:21 2:4 |
|    107:3 |

**2022**   54:9 60:4
   64:20 80:13
   82:22
**2023**   25:12 26:1
   97:18 98:9 99:2
   99:8,13
**2024**   1:18 16:7
   104:7,11,14
   105:16 107:1,5
**2027**   104:18
**21**   46:25 51:11
   51:12,22 54:15
**221-3900**   2:11
**22681**   104:16
   105:21
**23**   3:12 99:13
**24**   99:12
**2:13**   63:9
**2:16**   63:10
**2:37**   69:19
**2:47**   69:20

| 3 |
|---|
| **3**   3:11 18:8,9 |
|    25:12 80:9 |
| **3-4-5**   97:16 |
| **30**   50:10 86:5,24 |
|    107:15,24 |
| **31**   80:13,17 |
| **32801**   1:21 2:5 |
|    107:4 |
| **33602**   2:10 |
| **35**   3:13 |
| **3513**   14:25 |
|    15:10 |

**364**   95:25 96:4,9
**365**   97:24
**367**   95:4 98:19
**3700**   2:10
**38**   3:13
**3:31**   84:19
**3:41**   84:20

| 4 |
|---|
| **4**   3:11 18:23,24 |
|    105:8 |
| **407**   2:5 |
| **44**   56:4,22 |
| **45**   3:14 |
| **4:39**   1:19 103:6 |

| 5 |
|---|
| **5**   3:12 19:16,17 |
|    102:19 |
| **50**   10:4,9 |
| **55**   3:14 |

| 6 |
|---|
| **6**   3:3,12 23:16 |
|    23:17 51:11,12 |
|    51:21 |
| **61**   24:17 |
| **616263**   24:8 |
| **63**   3:15 |
| **65**   64:24 65:5,12 |
|    65:19,23 |
| **6607189**   106:4 |
|    107:7 |
| **69**   24:16,18,22 |
|    25:3 |
| **6:23**   1:3 106:4 |

**7**

**7**  3:13 35:2,3
**73**  63:24,25
  64:20
**77**  97:4
**78**  3:16
**79**  10:11

**8**

**8**  3:13 35:14,15
  35:16,16 38:8,9
  38:10,13 42:19
  42:25 44:4
  46:25
**813**  2:11
**820**  18:17
**83**  3:17
**841-7777**  2:5

**9**

**9**  3:14 38:8
  45:13,14 55:23
**900**  64:15,18,23
**92**  3:18
**94**  19:24
**992**  64:21 65:5

**a**

**a.m.**  1:19 23:13
  23:14 38:4,5
**abandonment**
  3:16 78:25 80:9
**ability**  7:2,6
  80:15 85:14
  86:4
**able**  36:17 61:17
  62:11,24 88:7

**above**  25:5
  38:24 39:5,6
  107:10
**acceptance**  3:13
  42:2
**access**  80:22
**accessibility**
  3:15
**accompany**
  94:18
**account**  86:11
**accuracy**  107:11
**accurate**  97:17
  98:12 105:9
**achieved**  8:20
**acting**  88:15,18
**action**  105:14
  105:15
**actual**  93:11
**actually**  10:16
  24:3 57:5 62:11
  78:11
**add**  65:10
**added**  65:9
**address**  15:16
  15:19
**adjourned**
  103:6
**advocate**  2:13
  5:4
**affect**  7:2,6
**affirm**  4:3,11
**affirmed**  104:7
  104:11

**agents**  80:23
**ago**  92:15 97:7
**agree**  5:23
  40:21 85:14
**agreed**  3:22
  41:7
**agreement**  3:14
  3:16,17 27:25
  30:20,20 32:25
  33:6 46:7 47:4
  47:13,24 49:18
  49:22 78:24,25
  80:12 82:21
  84:24 85:6,11
  85:15,18 86:4
  86:25
**ahead**  5:7
**al**  107:6
**alberto**  13:11,18
  13:20,21,22,24
**allow**  5:1,19
  6:16 41:15
**alteration**  43:4
  43:10
**altered**  84:6
**amenities**  57:18
  57:24
**american**  90:7
**amount**  19:22
  44:10,15 54:23
**answer**  5:20
  6:22 7:3,7,10
  15:5 16:14 21:8
  33:2 53:9 72:11
  82:6,8

**answered**  49:11
  99:7
**answering**  7:24
**answers**  6:17
  95:20,21 98:21
  99:15
**anxiety**  98:3,11
**anybody**  10:11
  90:7
**anymore**  63:16
  66:10 69:17
  90:16
**anytime**  16:10
  62:5 71:16
**anyway**  55:8
**apartment**  32:2
  32:3 35:8,8,14
  35:15,16 43:13
  43:18,22 46:2,7
  50:24 53:16
  54:7 61:12,17
  62:11,13 63:12
  63:17 66:11,12
  66:24 67:3
  69:25
**apartments**
  68:6,8,9
**apologize**  68:19
  84:4,12,12
**appeared**  104:6
  104:10
**appearing**  2:7
  2:12
**appears**  15:24

**applicant** 38:15
39:3,6
**appointment**
59:7,10,12,13
59:18,23,23
94:8 96:1,15,22
96:22,24
**approximately**
62:10
**april** 104:18
**area** 10:19
21:24 29:14
35:24 87:16
**ashley** 3:10
17:24 20:9
**asked** 7:3 33:18
40:19 49:13
77:9,22,25 83:8
**asking** 6:20,22
16:12 43:15,17
58:10,10 64:7
65:6,10 69:6
73:2,3 77:14,18
77:20 100:11,11
100:12 101:4
**aspects** 51:13
**assume** 6:23
14:11 87:10
**assuming** 98:5
**attached** 51:16
107:12
**attack** 88:23
**attacks** 88:14,20
89:9 100:18,19
100:22 101:1,12

101:19
**attempts** 5:20
**attend** 9:10
**attitude** 88:4
**attorney** 5:6,11
39:25 40:2,5,14
41:12,25 42:2
48:8 56:23,24
105:12 107:13
**attorneys** 56:14
105:14
**authority** 3:12
**authorized**
80:23 105:5
**automatically**
49:19
**available** 73:10
107:10

**b**

**b** 3:8 48:2 54:16
82:25 95:24
96:4,5,7
**babies** 37:8
**back** 20:8 30:9
30:11,25 33:21
41:6 42:19
47:21 48:5
55:17 60:3
61:17 66:9,11
67:16 68:11
69:8,22 75:9,22
76:14 92:15
98:17,18 99:7
101:22

**background** 5:7
**backside** 75:12
**bad** 63:15 88:25
99:19
**balance** 18:15
19:6
**bank** 16:25
17:13 86:11
**barkholz** 2:14
5:8,8
**based** 54:6
74:21 89:18
98:21 99:15
**basic** 6:14
**basically** 30:5
44:10
**basis** 33:13 49:7
49:9 91:22
**bates** 24:6 41:19
42:20 56:4,21
63:24,25 95:4
**bathing** 88:7
**bay** 14:25 15:10
**beautiful** 66:5
94:15
**behalf** 2:7,12
**belfor** 80:24
**believe** 10:22,23
30:14 85:4
93:11
**belongings**
50:21 51:1
62:15 66:17
81:9,14 82:1
89:25

**best** 5:23 6:21
95:3
**better** 57:5
97:20 99:5
**bicycle** 67:1
68:4
**bilingual** 21:20
**bill** 15:21,21,24
16:4,19,22
17:21,23,24
18:2,13 19:3,5
19:20,23,24,25
81:25
**billing** 3:15
**bills** 3:10 14:16
14:17 16:2,3,5,6
17:3,10,12,14
20:8,10,15,17
20:19,23,24
64:9
**birchwood**
35:24
**birthday** 10:13
10:15,16
**bit** 16:13 88:2,3
97:12
**blank** 82:23
**block** 38:25
**blood** 55:10
**books** 14:8
**born** 8:10
**bottom** 14:24
15:10 24:5,10
42:21 43:9
46:13,21 47:4

[bottom - claiming]                                              Page 111

56:3,22 96:10
97:25
**bought** 25:19
**boulevard** 2:10
**box** 98:23
**boyfriend** 87:22
**break** 22:21,24
22:25 23:2,6,6
37:14,20 38:2,3
44:21,22 55:6,7
55:9,13 60:20
61:25 62:6 63:5
63:7 68:23,25
69:18 84:16
**breaks** 103:3
**bring** 57:11,15
90:7,8,9,10,14
**bringing** 89:15
**broken** 71:21
**brooklyn** 10:20
10:21,25 11:11
13:6 27:3,20,23
28:1,4 50:25
51:2
**brought** 11:6
89:23 90:19
**buried** 24:9
**bus** 57:19,19,23
57:25 58:2,3,5
58:11,19,20,23
58:24 59:1,4,5,6
59:25 71:20
72:6 90:12
**buses** 37:3

**buy** 90:18,21
91:2
**buying** 25:22
87:12

**c**

**c** 2:1 4:1 107:2
**cable** 19:4
**cafeteria** 11:16
**call** 35:8 46:6
58:14,18,20
73:23
**called** 24:6 48:3
48:4 49:16
67:13,23,23
68:2 69:23
73:23 93:3 96:1
**calling** 30:18
**capable** 7:23
26:1
**car** 57:15
**card** 18:14
104:23
**cardinal** 2:2
5:14,24 7:15
15:3,5 17:6
20:11 21:7
22:17,20 23:7
23:23 24:9,13
24:19,22 28:11
30:23 33:1,7,14
34:12,21 35:10
35:25 36:10
37:11,15,21
38:1 40:23 41:3
41:10,14,21

42:4,10,13
44:18 45:2,5
46:3 48:23 49:4
49:8 50:11 51:8
52:6,22 53:17
53:23 54:8 55:5
55:12,23 56:8
56:10,13 62:1
63:6 65:4,6,9,21
66:6 68:25
72:11,18 73:12
77:15 78:15
79:6 80:2 81:1
81:16,21 82:6
82:14 83:6
84:18 85:1,7,16
85:25 86:6,21
87:3 93:9 96:3,6
102:14,18,24
103:5 107:2
**care** 87:20 88:7
93:2,3,4,7,8
96:2,16,24 97:2
97:5
**caregivers**
87:19
**carmen** 71:5
**carpet** 43:21
44:1
**case** 1:3 4:12,21
106:4
**casualties** 52:12
**casualty** 51:24
52:5,11,14

**catch** 4:25
**caused** 53:3,3,6
101:2,2,12,19
**centers** 3:18
93:12,17
**cents** 19:10,24
**certainly** 102:22
**certificate** 3:4,5
104:1 105:1
**certify** 104:5,9
105:5,11
**change** 60:18
106:5,9,12,15
106:18
**changes** 63:2
106:2 107:11
**changing** 97:7
**charge** 82:4
**charges** 54:16
**check** 16:23
17:13 44:14
86:10,12,13,14
86:15,18,23
87:9,20
**checked** 98:24
**checks** 87:21
**children** 13:8,24
62:16,18
**circumstances**
51:6
**city** 8:12
**civil** 107:24,24
**claim** 54:5
**claiming** 84:23
89:12

claims 20:5
89:15
clarification
61:22 93:9
clarify 8:22
41:22 61:18,22
clarity 96:3
classes 9:12,15
9:21
claudia 71:2
clean 93:13
cleaning 33:11
clock 102:13
close 37:16
clothes 60:18
63:2 87:12
clothing 62:19
cloud 15:1,10
clsmf.org 2:6,6
2:7
coerced 85:5
collectively
82:23
college 9:5,7
colonial 1:20
2:4 107:3
column 97:25
98:1
come 28:1,4
30:9 37:1 58:5
58:11 59:7,21
59:24 71:20
87:20 94:11
99:25

coming 10:16
27:2 60:8
commission
104:18
communicate
21:5 94:4
communicated
28:17
communicatio...
21:3
community 1:20
2:4 5:4,11 29:16
91:25 107:3
commuter 95:7
company 11:9
competent 7:9
7:12,16
complaints
51:13 97:15
completed
99:14 107:15
completely 5:17
5:18
comply 51:15
condition 7:6
conditions
88:12
connected
105:14
consider 22:20
considered 8:25
107:15
contacted 20:18
continue 45:9
62:4,7,8

contract 48:11
83:3 85:17
contracts 88:13
control 101:14
101:15
controlled
97:23
cook 90:22,24
91:2
cooking 88:8
copies 107:14
copy 27:15
corner 24:5
46:14,21 56:4
56:22
corporation
48:1
correct 18:5
20:24 44:1
73:17 78:8 82:1
82:5 87:11,21
95:22 98:6,13
98:24 99:4,17
correcting 80:4
correction 19:9
92:11
correctly 4:4,8
cost 80:14
counsel 3:24
101:4 105:12,14
count 103:2
county 104:3
105:2
couple 23:10

course 70:15
91:11,12,24
courses 9:5,7,17
9:23
court 1:1,24 4:3
4:11 14:25
15:10 35:24
38:9 55:19
cover 53:16,21
covered 20:8,9
43:3
covers 41:5
cried 101:7,7
cry 101:15
crying 66:14,15
66:15,16,20
100:10,10
currently 7:1,5
cv 1:3 106:4

**d**

d 3:1 4:1 48:2
79:14 82:25
daily 90:20
dakota 48:2
damage 51:24
52:21
damaged 81:8,9
81:13 82:1,5
danielle 1:23
104:4,8,17
105:4,22
date 1:18 18:16
80:11 82:22
97:17 98:12
106:4,25 107:13

**dated**   16:7 98:9 105:16

**daughter**   11:6 16:25 17:1,3,11 17:13 22:2 25:24 26:12,13 26:19,25 28:17 28:18,25 29:22 30:5 31:11,12 32:7,15,22,24 33:4,15 34:8 39:18,19,24 40:2,8,13 42:24 46:17,23 47:3,6 47:8,10,19 63:1 66:22 67:17,18 67:18,19 70:5 70:15 72:16,24 73:18,22 74:4,7 74:9,10 75:22 76:7,8,8,16,23 77:6,9,10,10,13 77:18,22,25 78:3,12 79:23 80:1,4 90:9,17 90:21 94:7,14 95:9,12,22 98:20 99:14

**daughter's**   21:15 25:8 39:21,22 44:7 60:15 63:3 74:21 89:23

**dawn**   2:3 5:10

**dawnw**   2:7

**day**   58:4,16,21 59:14,17,18 71:16 72:7,15 73:10,15 74:3 74:11 90:12 91:14 104:14 105:16

**days**   50:10 61:9 86:5,24 107:15

**dear**   66:19,22 107:9

**declare**   106:22

**decoration**   43:18

**defendants**   1:12 1:22 2:12 3:9 4:21 14:21 17:17 18:9,24 19:17 23:17 35:3 38:10 45:14 55:21 63:20 78:20 83:11 92:23

**defined**   83:1

**delay**   76:13

**delgado**   1:5,17 3:2 4:22 5:20 6:2,9 13:11,12 14:25 22:23 24:7,16 25:3,6 41:20 42:20 44:3 48:4 56:4,6 56:22 79:20 82:23 95:4,25

97:24 98:19 104:10 105:7 106:3,5,25 107:2,5,6,9,11 107:11,13

**democratic**   44:25 55:8

**denial**   3:13

**denies**   98:2

**depends**   44:23 52:23

**deponent**   101:5 106:5

**deponent's**   7:20

**deposing**   107:13

**deposit**   3:17 50:15,17 54:17 54:19,23 67:24 67:25 68:16 75:22 76:14 82:12,13 83:15 84:3 86:10,10 86:15

**deposited**   86:17

**deposition**   1:17 6:12,15 8:2,5 13:14 33:12 103:6 105:6 107:5

**depositions**   87:5

**depot**   3:11 18:14 20:9

**depressed**   99:3

**depression**   98:3 98:11 99:19

100:6,16

**describe**   100:7

**described**   72:22

**designation**   93:10

**desired**   53:13

**destroyed**   62:13 62:14,17,19,20 62:22,22 66:18

**diagnosed**   88:11

**died**   62:23

**different**   7:19 31:15 58:13 90:12 94:25

**differently**   92:3

**dining**   11:16 57:10

**direct**   3:3 6:5 86:10

**directly**   16:25

**discovery**   40:17 56:14

**discriminated**   89:13,16,20 90:2 91:5

**discrimination**   91:10,15

**discussed**   91:6

**discussion**   103:4

**district**   1:1,1

**disturbance**   98:3,11

**division**   1:2

**doctor** 93:16,19 95:19 96:25 97:2 98:6 100:21 101:1,23
**doctor's** 59:5,6 59:7,9,23 94:8 94:17,20
**doctors** 57:21 94:19 95:1 101:10,18,21
**document** 15:20 16:11 18:16,18 19:12 23:21,22 25:11,15,19 30:21 32:6 39:19 41:24 42:3,25 44:14 45:18 56:7,19 56:25 57:1,4,6 64:1 65:16,17 75:1 76:16,19 76:23 77:7 78:3 78:7,11,13,14 78:16,17 82:19 83:14 106:23
**documentation** 40:12
**documents** 28:6 28:8 40:10
**doing** 16:18 29:20 30:17 31:14 74:17 88:8 97:21 98:16,23 100:5

**doubt** 42:1
**dr** 93:22 94:4,8 96:19,21 97:6 97:11 98:10
**dressing** 88:7
**drive** 1:20 2:4 107:3
**driver** 58:19,20 58:23 59:1,4,25
**driver's** 58:24
**drivers** 71:20 72:6
**dropped** 59:4
**ducks** 37:1,6,7,7 37:8,8
**due** 19:6,22 53:3 101:21
**duly** 6:3 48:1 104:7,11
**duress** 84:25

**e**

**e** 2:1,1 3:1,8 4:1 4:1 107:13,14 107:24,25
**earlier** 87:24
**early** 85:23
**easier** 42:9
**easiest** 7:22 36:13
**east** 1:20 2:4,10 107:3
**easy** 57:13
**eat** 101:16
**education** 8:20

**effective** 82:21 82:22
**effectively** 88:13
**either** 12:4 13:24 31:14 41:3 50:9 92:3
**ejk** 1:3 106:4
**electric** 15:24 16:19
**electrical** 16:3 20:9
**electricity** 53:4 53:6
**elgss73** 63:24
**emotional** 37:19
**employed** 11:8 73:1,6
**employee** 73:3 105:12,13
**employees** 70:18 71:15 80:23
**energy** 99:16
**english** 4:5,5,9 4:10 8:17 9:12 9:15,19 11:25 12:5,19 13:23 14:2,6,9,13,17 18:4,6,19,21,21 19:13,14 20:1,2 20:19 21:6,13 21:21 26:23,25 27:13 28:9 29:22,24 30:4 31:10,11 32:14

32:15,18,19,21 33:23 60:1 67:8 67:17 76:11 77:20,24 94:5 95:11
**enter** 61:10 106:2
**entered** 82:21
**entire** 18:2 29:13,16 62:18 91:3
**entry** 64:20
**epilepsy** 100:20 101:22
**epileptic** 88:14 88:19,22 100:19 100:22 101:1,11 101:19
**errata** 3:6 106:1 107:12,13,15
**especially** 14:16
**espinosa** 71:2
**esquire** 2:2,2,3 2:8 107:2
**essentially** 84:23 95:20
**establish** 4:18 4:22 96:2,15 97:5
**estimate** 10:2 11:19 29:9 70:11 77:3
**et** 107:6
**evacuate** 60:10 60:11,14

[evacuated - foregoing]                                    Page 115

evacuated  60:7
evacuation  61:2
  61:3
evangelical  1:10
  47:25 79:4
  82:24 106:3
  107:6
evelyn  71:7
eventually  13:3
everybody  4:19
  22:19 44:24
  45:7 69:13
exactly  26:9
  30:7 32:23
  46:10 66:3
  67:22,25 68:17
  74:19 78:2
  98:14
examination  3:3
  6:5
examined  6:3
example  59:21
excuse  71:13
exhibit  3:10,10
  3:11,11,12,12
  3:13,13,14,14
  3:15,16,17,18
  14:20,21 17:16
  17:17 18:8,9,23
  18:24 19:16,17
  23:16,17 35:2,3
  38:8,10,13
  42:19,25 44:4
  45:13,14 55:18
  55:21 56:3 57:2

63:19,20 78:20
78:23,24 83:10
83:11 84:25
92:22,23
exhibits  3:9
expecting  81:25
expense  53:14
  80:14 81:12
expires  104:18
explain  26:13
  47:8
expressly  3:25
extent  80:17
extra  43:25

**f**

facebook  14:11
facilities  57:10
  57:18,24
facility  48:21
fact  56:21
facts  106:23
fails  107:17
fair  5:12 6:1,24
family  37:25
  52:1 97:6
fanatically  37:2
far  97:25
fault  16:13
february  25:12
  25:25
federal  107:16
  107:24
fee  64:21 65:2
  65:12 82:5

feel  36:12 85:10
  89:19 90:1 91:8
  91:12,23 92:2
  99:5 100:1,15
feeling  95:18
  97:20 99:3,16
feels  97:14
female  59:1
  97:4
fernandez  1:23
  104:4,8,17
  105:4,22
filing  20:6
fill  94:18 98:21
filled  95:10,12
  95:13,21 99:2
  99:10
filling  95:5,17
  99:14
financially
  105:15
find  28:15,19
  81:1
fine  30:23 41:9
  41:10 42:16
  55:13 60:21
  69:2,2 88:15,18
  98:7,25
finger  38:22
fire  51:24 52:19
  53:6
first  6:3,7,15,16
  13:13 14:24
  38:14,21 46:14
  47:22,22 61:16

66:12,12 80:9
80:11 93:21
95:4 96:19
five  62:1 65:18
  70:12 77:3,5,5
  89:8
fix  71:21
fl  107:14
flood  60:25 61:6
  63:13,15 66:13
flooded  60:19
  89:22
flooding  31:17
  54:6 60:22
floors  43:23,25
florida  1:1,21
  1:24 2:4,5,10
  11:2,3,11 15:1
  15:10 22:5
  47:24 50:25
  102:3 104:2,5,9
  104:17,23 105:2
  107:3,4,16,24
focus  29:17
following  4:4
follows  6:4
food  37:7 57:11
  57:15 64:25
  90:14,15,18,19
  90:22,22,25
  91:2
forced  84:24
  85:4
foregoing  105:8
  106:23

**form** 33:12 43:4
43:10 99:13,15
**formal** 40:12,20
41:8 42:9
**found** 28:18
**four** 89:8 97:7
**frames** 62:17
**francine** 2:13
4:7 104:6
**fresh** 90:20
**friends** 14:2
90:6
**friendship**
67:14 68:2
69:23 70:1,2
72:7,15 73:11
73:15,22
**friendships** 90:4
**front** 48:6 71:22
75:9,10 91:13
**frustrated**
88:25
**fully** 5:17,18
**furniture** 3:10
18:1 20:9 50:21
51:1 62:21 81:8
**further** 67:10
80:22 105:11

**g**

**g** 4:1
**garden** 36:25,25
66:3
**gentleman** 59:2
**getting** 14:15
37:16 44:14

76:14 102:18
**give** 4:12 6:17
16:10 35:11
37:7 40:13 67:2
67:16 68:11
95:1
**given** 49:21
99:15
**giving** 26:20,22
29:25
**go** 5:7 6:14
16:23 17:3 20:8
22:2 24:2 37:3
57:12 59:17,18
61:10,11,12
67:1 68:10 69:8
69:16 70:1
80:20,21 90:18
91:2 94:7,10
95:3 99:25
102:22
**god** 97:22 98:14
99:6 100:4,11
**goes** 17:13 24:7
56:14 94:22
**going** 14:19
17:6,15 18:7,22
19:15 21:4,7
23:7,8,15,20
26:15 28:16
29:6,15,18 32:1
34:12 35:1,8
38:7 44:23,23
45:5,12 47:23
56:2 58:15 60:3

60:25 61:5 63:6
63:18,23 66:10
67:2 68:2,6,7,9
78:18 80:8 83:9
92:21 93:13
95:24 103:1
**golf** 37:2
**gonzalez** 97:6
97:11
**good** 1:10 4:18
4:21 11:4,6,7
23:6,11,12 27:2
28:1 29:21
31:22 32:12
34:3,10,18
37:24 44:22
45:7 46:7 47:12
47:25 48:2,11
48:15,20 50:22
51:5 52:20 53:8
53:22 55:14
57:9,17,24 58:8
61:8 64:10
66:24 69:11,14
70:17 71:3,11
71:15 72:24
73:1,6,9,23,24
74:3,6,10,22,24
75:20 76:12,25
77:19 79:4 81:7
81:13,24 82:2,9
82:24,25 83:3
83:17 84:15
85:4,10,13 86:3
87:15 88:4,5

89:2,4,6,14,16
89:20 90:2,11
90:19 91:5,8,18
91:19,19 92:2,6
92:16,18,19
94:14 97:22
99:18,22 100:1
100:6 102:21,25
103:3 106:3
107:6
**gordon** 2:8 4:16
4:20 5:15 41:21
**gordon.hill** 2:11
**grade** 8:23
**graduate** 9:3
**grandchildren**
90:18
**grants** 80:22
**grave** 101:22
**grievance** 51:16
51:18
**group** 80:24
**grow** 8:14 22:6
**guess** 4:23 8:6
16:18 48:5 49:6
57:12 58:9 78:6
87:10,10
**guest** 52:1
**gutierrez** 13:11
13:11
**guys** 88:1

**h**

**h** 3:8
**hallucinations**
98:4,11

**[hand - hurricane]**                                                      Page 117

| | | | |
|---|---|---|---|
| **hand** 14:19 | 106:3 | 35:12,22 36:2,4 | 92:20 |
| 16:17 17:15 | **hear** 35:21 76:6 | 36:12,15,16,23 | **hit** 60:4,11 94:2 |
| 18:7,22 19:15 | 76:6 83:21 | 37:13,17 38:2,6 | **hitting** 88:20 |
| 23:15 24:5 35:1 | 87:24 | 38:12,20 40:16 | **hold** 36:10 |
| 38:7 45:12 | **heard** 52:3 83:2 | 41:1,8,11,17,25 | **holding** 49:9 |
| 46:14,21 56:2,3 | **hearing** 50:2 | 42:7,12,17,18 | **home** 3:11 |
| 56:22 63:18 | **heat** 91:3 | 44:19 45:4,7,10 | 18:14 20:9 |
| 79:2,3 83:9 | **held** 103:4 | 45:11,16 46:4 | 25:15,19 27:3 |
| 92:21 98:1 | **help** 11:16 17:5 | 48:9,19 49:1,6 | **hopefully** |
| 104:13 | 17:11 26:13 | 49:11,14 50:1 | 102:22 |
| **handed** 75:1 | 36:8,9,17 94:18 | 50:13 51:10 | **hopeless** 99:3 |
| **handled** 51:14 | **helped** 98:21 | 52:9 53:1,19 | **hour** 23:8 29:10 |
| **handwriting** | **helpful** 6:18 | 54:1,10,12 55:4 | 29:11 37:16 |
| 38:24 39:2,5,9 | **henderson** 2:9 | 55:7,14,17,20 | 55:8,13 84:17 |
| 39:21,22 | **hereto** 3:23 | 55:24 56:1,9,11 | 102:13,19,19 |
| **happen** 76:1 | **hh348257** | 56:15,18 58:17 | **hours** 97:16 |
| 100:12 | 104:18 | 61:24 62:3,9 | 102:22 103:2 |
| **happened** 5:2 | **high** 8:25 9:3,6 | 63:4,8,11,22 | **house** 16:5,7 |
| 15:4 54:6 61:2 | 9:10 | 64:6 65:5,8,11 | 25:21,23 26:16 |
| 74:13 99:18,22 | **highest** 8:19 | 66:1,7,8 69:5,18 | 27:4,5 43:21 |
| 100:16,17,22 | **hill** 2:8,9 3:3 | 69:21 72:13,21 | 57:11,16,25 |
| 101:2,12,19 | 4:16,16,20 5:7 | 73:14 77:17 | 58:15 60:15,19 |
| **happening** | 5:13,22 6:1,6 | 78:18,22 79:8 | 65:25 89:24 |
| 74:18 100:8 | 7:17,21 8:24 | 80:7 81:5,6,18 | 90:5 |
| **happens** 87:4 | 14:23 15:8,15 | 81:23 82:7,18 | **housing** 5:12 |
| **happy** 10:13 | 17:9,19 18:11 | 83:7,13,23 | **huh** 15:2 22:9 |
| 23:10 40:23 | 19:1,11,19 | 84:15,21 85:3,9 | 28:12 36:2 46:8 |
| 41:6 55:9 69:11 | 20:12 21:11 | 85:19 86:2,8,22 | 53:7 56:9 65:8 |
| 69:12 | 22:13,18,22 | 87:4,8 92:13,25 | 66:3 71:10 |
| **hard** 95:6 | 23:5,11,15,19 | 93:6,13,15 96:5 | 96:17 |
| **head** 6:18,18 | 24:1,12,14,23 | 96:9,11,12 | **hungry** 45:2 |
| **heading** 98:1 | 25:1 28:12,13 | 101:8 102:12,16 | **hurricane** 51:7 |
| **health** 1:11 4:21 | 30:16,24 33:3 | 102:20,25 | 54:7,9,10 60:3,5 |
| 88:12 93:2 95:5 | 33:10,17,20 | **hispanic** 34:11 | 60:8,11 61:1 |
| 97:21,22 98:19 | 34:16,23 35:5 | 90:4 92:4,8,16 | 88:20,24 89:22 |

94:2 100:7,23
101:3,12,20
**hurricane's**
60:4
**hwhlaw.com**
2:11

## i

**ian** 54:9 60:5
94:2
**identification**
14:22 17:18
18:10,25 19:18
23:18 35:4
38:11 45:15
55:22 63:21
78:21 83:12
92:24 104:22,23
**identified** 78:16
**ii** 54:16
**imagine** 100:14
**including** 51:7
72:23 80:24
**independent**
87:16
**indicate** 96:18
**indicates** 56:6
56:22
**industrial** 12:11
**informally** 41:9
**information**
97:16 98:5
**initial** 97:4
**initialed** 47:4
**initials** 46:13,16
46:20,22

**injuries** 51:25
**instagram** 14:11
**installing** 43:12
**instance** 96:23
**insurance** 53:13
53:16,20,21
54:3,6,11,13,14
**intent** 49:21
**interest** 98:23
**interested**
105:15
**internet** 14:12
**interpret** 22:12
48:17
**interpretation**
48:8 49:24
**interpreted**
104:1
**interpreter** 2:13
4:6,8 5:1,2 7:18
7:18 8:21,21
15:12,12 19:8
21:10 22:11,11
34:4 35:20,20
38:17,17 41:15
41:16 45:8,8
48:7,16,16
49:23,23 58:12
58:12 61:18,18
61:21,21 62:5
64:3,3 80:3,3
81:3,3 83:20,20
92:11 101:4
104:12

**interpreter's**
19:8 92:11
**interrupt**
102:15
**invitee** 52:1
**issue** 8:7,7
**it'd** 4:17
**items** 65:7

## j

**j** 51:12
**january** 97:17
98:9 99:2,8,13
99:13
**jargon** 7:20
**job** 12:12,19
106:4 107:7
**john** 2:2 5:5
**johnm** 2:6
**jorge** 13:11,15
13:19,20,20,21
13:22,24
**june** 104:14
105:16 107:1

## k

**kahn** 2:13 4:7
104:6
**keep** 44:23 45:5
**kennedy** 2:10
**kind** 4:18 16:9
24:9 26:18 28:5
30:16 55:10
72:2 97:13
102:13

**kissimmee** 11:5
13:18 25:16,20
27:2,24 28:5,15
28:15,18,21
29:2 47:24 48:2
48:22 49:3
82:25 93:4
**knew** 26:7 34:11
34:14,19 92:20
**know** 4:23 9:18
15:18,20,21
16:11 20:14,17
22:25 23:3
27:17 31:2
32:21 33:4,8,11
33:18,18,22
34:10,17,19
35:17,23 36:23
37:16 39:14,15
39:24 40:5,12
41:2 42:13
44:11,20 45:1
48:14 49:2,9,12
49:13 50:3,6,14
50:20 52:4,10
52:13,17,19
53:8,10,10,11
53:15,18,20,24
54:2,4,5 55:3,9
56:15,23 58:23
59:15 60:18,22
60:24,24,25
61:5 63:12,16
64:1 67:5 68:13
70:24 72:12,14

**[know - lot]**                                                                 Page 119

72:25 73:5,8,9
73:13,19 74:2
75:14,17 76:11
76:12,19,23,24
77:16,21,22,24
77:25 78:5,10
79:25 80:15
81:7,13,19,22
82:15,15,16,16
84:25 85:8,12
85:13,21,22,23
86:1,3,7 91:9,21
91:22 92:14,16
93:7,16 95:9
99:23,25 102:18
**knowing** 20:23
**knowledge**
33:15 82:11
**known** 6:10
48:22 104:22

**l**

**l** 3:21 79:14
**label** 56:4
**labeled** 41:19
54:16 56:21
63:24,25 95:4
**lady** 31:9 32:11
32:13 59:3 67:1
67:7,17 69:25
70:5 71:22,24
72:5 73:23,24
73:25 74:3,14
76:5,20
**landlord** 51:2

**laugh** 88:1,2
**law** 5:9
**laws** 48:1
**lawsuit** 20:6
21:4 84:22
89:12
**lawsuits** 20:3
**lawyers** 21:3,12
93:1
**lease** 27:5,12,15
27:24 28:6,22
30:9,9,13,19,19
31:19,21 32:5
32:17,20,25
33:5,22,25 34:5
34:19 42:3 46:6
47:13 48:14
50:4,10,15,19
50:20 85:15,20
85:23,24 86:4,5
89:1 92:15
**leave** 55:18 61:4
**leaving** 25:15,19
**left** 16:17 27:23
28:1,4 62:25
79:2,3 87:6 89:9
97:25 98:1
102:1,2,3
**legal** 1:20 2:4
5:4,11 20:5 49:9
107:3,21
**legs** 23:9
**letter** 3:7 83:16
83:19 107:15

**letters** 82:9
**level** 8:19
**liable** 51:23
**life** 69:11,14,16
**limitations**
80:24
**line** 65:7 106:5
106:9,12,15,18
**listening** 48:10
**literally** 44:23
**little** 16:13
29:14 35:10
36:14,15,22
37:21 42:2 69:4
88:1,3 92:25
94:24 97:12
98:22 99:16
**live** 10:21 11:7
13:17 25:22
27:9,9 28:16,19
29:14,15,18
32:1 63:14,16
**lived** 10:3,22
27:8,11,18
48:21 51:5
69:12 71:12,14
87:15,18 88:5,6
91:24
**lives** 13:18,19
**living** 3:14
31:25 48:21
57:9 87:16
**locate** 81:4
**located** 102:6,10

**location** 67:2
**logistically** 5:15
**long** 10:1,21
11:17 12:12,13
29:6 41:11
45:17 69:10,10
76:25 89:5
93:25 99:24
**longer** 66:19
67:10 68:6,7,8
90:13
**look** 18:2 23:20
35:7 38:13 41:6
41:14 51:12,21
59:22 65:16,17
65:17 80:8
94:24
**looked** 64:10
67:6 71:24
**looking** 8:6
19:25 20:22
29:14 38:21
42:14 43:2
49:15 54:15
63:25 65:21
102:13
**looks** 44:10
**lord** 66:19
**loss** 51:24 52:21
**lost** 89:24 90:3
**lot** 13:14 17:8
36:24 37:1 69:9
69:9 84:7 91:7
91:11,12,12
92:7 93:14

100:25

**loud** 6:17 46:9

**loved** 69:12,13
69:13,15

**lovely** 37:10

**low** 55:10

**lunch** 37:16
44:22 55:9,13
56:5

**luncheon** 55:15

**lund** 79:12,13
79:14

**lutheran** 1:10
47:25 79:4
82:24 106:3
107:6

**m**

**ma'am** 83:21
96:11 99:11

**machineries**
12:11

**made** 47:24
54:5 82:21

**magaly** 13:11
13:15,17,18,25
21:15,16,17,20
21:21

**magazines** 14:8

**mail** 14:15,17
107:13

**mailed** 107:14

**maintenance**
71:21 72:6

**make** 5:19
30:21 41:7

57:13 88:1
90:23 95:2

**makes** 5:16 42:9

**male** 59:1

**man** 29:4 32:10
47:15 102:8,9

**mandatory** 61:2
61:3

**map** 35:7,18

**maps** 3:13

**march** 16:7

**mark** 14:19
17:15 18:7,22
19:15 23:16
35:1 38:7 45:12
55:8 56:2 63:18
83:9 92:21

**marked** 14:21
17:17 18:9,24
19:17 23:17
25:3 35:3 38:10
45:14 55:21
63:20 64:20
78:20 83:11
92:23

**married** 12:22
13:5

**martino** 2:2 5:5
5:5

**matter** 37:18,19

**meals** 88:8
90:15,23

**mean** 13:1,2
20:16 25:17
37:15,19 40:7

53:2 56:11,13
88:12 91:9,16

**means** 34:7 40:5
52:4,11,13,17
78:6 84:25

**med** 3:18

**medfl** 3:18

**medfloria** 93:11

**medflorida**
93:16

**medical** 7:5 8:7
88:11 93:1,11
93:17 98:8

**medications** 7:1
97:20

**meeting** 32:5
34:18 69:22,24
76:25

**mementos** 60:17
62:14,15,16

**memorized** 41:2

**memory** 54:22

**men** 71:22

**mental** 88:12

**mentioned** 56:5
68:3 72:5

**mentioning**
31:16

**mid** 2:4 107:3

**middle** 1:1
38:14

**mind** 22:1 87:7
96:13

**mine** 42:23

**minute** 35:11

**minutes** 62:1
77:3,4,4,5,5

**missing** 93:14

**moment** 69:4
74:20

**money** 54:25
55:2 67:15,16
67:20,21,22,22
67:22,23,25
68:10,11,12,14
68:14 75:4,24
76:3,21 82:12
83:17 87:11

**month** 49:19,20
50:5,7,7 65:13
66:2

**monthly** 17:24
64:21 65:2,19

**months** 65:15
89:6,8,9 96:21
96:23 97:7

**mood** 98:4,12

**morgan** 2:2
4:23 107:2

**morganc** 2:6

**mortgage** 3:12
25:14,18,21,23
26:8,15

**mother** 62:18

**mound** 36:14,22

**move** 9:25 10:18
10:25 11:3
27:24 28:14
41:22 50:20,25

51:6
**moved** 10:8
43:18 50:24
64:14 89:4,6
97:8
**movies** 14:5
**moving** 37:11
37:13 50:19
51:1 66:6
**muffled** 35:21

**n**

**n** 2:1 3:1,21 4:1
79:14
**name** 4:16,25
5:3,8,10 6:8
13:15 14:25
15:9 25:5,8
27:17 29:1 36:5
38:15 39:3,6
47:11 48:17
58:24 60:4 79:9
79:11,16 80:4
93:11 97:13
101:25 102:5,7
**names** 6:10
13:10,13 70:25
71:18,19
**natural** 23:1
**necessary** 53:13
56:17
**need** 20:11 23:2
30:16 37:22
45:17 60:20
61:24 68:22
69:1,8 87:23

**needed** 20:23
61:21 68:9
69:15 85:23
**neighbors** 92:18
**nervous** 68:19
68:21 84:7,10
84:11
**neurologist**
101:24 102:1,2
**neurologist's**
102:5
**never** 22:1
81:24 87:24
**new** 11:12 13:19
96:2,15 97:3,5
97:15,20 100:12
**news** 102:21,25
**newspapers**
14:8
**nice** 92:8
**nine** 19:10
**ninth** 8:23
**no.13** 83:11
**nodding** 6:18
**nondiscrimina...**
3:14
**nonprofit** 47:25
**normal** 51:6
**north** 48:2
**northgate** 36:6
36:6,19,19
**notary** 1:24
104:5,9,17
105:5

**note** 41:7
107:12
**notes** 105:10
**notice** 3:14
49:20 50:10
86:5
**notification** 3:7
**number** 24:6,15
38:19 56:5
64:21 98:22
99:1,3 107:7
**numbers** 64:19
**nurses** 87:19

**o**

**o** 3:21 4:1 107:2
**o'clock** 102:19
**oath** 3:4 104:1
**object** 5:18 17:6
21:7 34:12
**objecting** 33:12
**objection** 5:18
33:1,7,13 34:21
48:23 49:4,7
50:11 51:8 52:6
52:22 53:17,23
56:8,10 72:11
72:18 73:12
77:15 80:2
81:16,21 82:6
82:14 85:1,7,16
85:25 86:6
**observing** 5:9
**occupancy** 3:14
3:16 30:20
54:19 78:24

**october** 64:20
80:13,17 82:22
**offer** 3:13
**office** 31:24
59:5,6 71:22,25
72:6 94:17,20
102:10
**official** 24:10
39:24 40:2,14
104:13
**oh** 10:1 24:21
32:2 37:3 64:15
66:4 93:18 99:9
**okay** 4:16 5:13
5:24 7:9,14 8:4
8:10,14,16,19
9:7,15,17 10:2,7
10:10,21 11:5,8
11:13,22 12:4
12:14,17 13:3
13:17,23 15:16
15:18,23 16:2,6
16:9,22 17:2,10
17:15 18:15
19:12 20:22
21:1,3,12,20,22
22:1,8,10,14,16
22:16 23:3,4,5
24:2,8,15,18
25:5,11,22 26:6
26:10,13,17,22
27:1,9,23 28:18
29:12,17 30:5
30:16,25 31:7
31:23 32:2,4

33:10,19 34:17
35:15,17,18,23
36:7,20 37:9
38:1,21,24
39:11,14 40:16
42:12,17,24
43:23 44:17
45:4,8,10,25
46:11,13,19,25
47:8,21 48:10
48:14 49:6,11
49:12,12,13
50:6,9,19 51:4
52:15,17 53:2,9
53:20 54:2,13
54:15 55:1,7,20
56:11,15,21
57:4,8,12,23
58:2,5,9,18
59:15,20,25
60:7,10,20,22
61:1,7,16,24
62:3 63:4,8,18
64:9,17,19 65:2
65:9,16 66:2,4
66:21,23 67:11
68:1,16,18,20
68:22 70:7,11
70:25 71:10,24
72:9,14 73:9
74:10,21 75:1,6
75:9,11,14,20
75:25 76:6,9,16
76:19,22 77:3,6
77:18,25 78:18

79:11,23,25
80:8,15 81:11
81:19,24 82:4
82:11,19 83:19
83:24 84:1,9,11
84:11,13,13
85:4,10,22
86:18,20,21
87:2,3,4,9,13,15
87:19 89:5,10
89:18 90:25
91:4,8,15,21
92:2,9,14 94:1
94:12,14,24
95:9,13,16,20
95:24 96:13
97:1,11,14,24
98:8,15,17 99:1
99:7 100:3,15
100:21 101:17
102:5,16
**old**   10:7,10,12
97:4
**omar**   93:19,20
**once**   12:25 13:4
41:12 42:15
93:14 103:2
**online**   14:12
**open**   68:8,9
**opposed**   6:17
**option**   20:14
**orange**   105:2
**order**   24:8 61:2
61:4 76:20 95:2

**ordering**   107:14
**organized**   48:1
**orlando**   1:2,21
2:5 10:19 11:1
21:24 97:6
107:4
**osceola**   104:3
**ouc**   3:10 16:18
**outlined**   49:21
**overall**   61:14
**owe**   18:14,14,15
**owed**   19:22
**own**   17:5,12
27:2 28:19
90:22,23
**owned**   48:21
49:2
**ownership**   49:9

**p**

**p**   2:1,1 3:21 4:1
**p.a.**   2:9
**p.m.**   1:19 55:15
55:16 63:9,10
69:19,20 84:19
84:20 103:6
**page**   14:24
15:11 16:17
24:3,18 25:3
36:7,8 38:14,21
41:18 42:20,21
43:2,10 44:3,4,9
44:13 46:14,21
46:25 47:22,22
49:15 51:11,12
51:21 54:15

63:23,24,25
64:19 79:1 80:9
95:4 96:7,9
97:24 98:17
106:5,9,12,15
106:18
**pages**   24:6
46:19 47:4
65:18 75:6
105:8
**paid**   27:6 43:25
81:14,19,20
82:16
**palm**   36:22
**paper**   59:22
67:15,19 70:6
72:7,20 75:3,3,8
75:11 76:5 95:7
**papers**   26:21,23
72:16 73:11,16
82:2
**paperwork**
94:19
**paragraph**
47:22
**paraphrase**
41:16
**park**   37:2
**part**   89:21
97:25
**partial**   3:17
83:15
**parties**   3:23
105:13,14
107:14

**party** 20:3
    50:10
**pass** 59:22
**passed** 88:24
**patient** 95:5
    96:2,15 97:3,5
    98:2,2,19
**patio** 64:24 65:3
    65:13,20,24,24
**pay** 16:2,4,24
    17:4,12,24 19:6
    19:7,10,24
    20:23 50:5
    54:18 57:15
    58:7 64:15,18
    64:23 65:12
    81:25
**paying** 17:10,25
    17:25 20:23
    50:17
**payment** 58:10
**pays** 16:25 17:1
    17:14
**pcp** 97:6
**penalties** 106:22
**people** 12:3
    26:18 37:4,6,6
    37:10,10,10
    70:3,7,9,12,12
    70:20 71:20
    72:4,6,23 73:4
    87:5 90:21
    91:25 92:7,8
**perez** 93:19,20
    93:22 94:4,8

96:19 98:10
**perfectly** 53:9
**period** 42:5,8
    77:2
**perjury** 106:22
**person** 26:20,22
    29:1,20,25 32:7
    32:8 34:17
    47:11 67:4
    72:24
**personal** 3:16
    33:15 51:25
    78:25
**personally** 78:6
    104:6,10,22
**persons** 72:19
**pharmacy** 57:22
    94:23
**phrase** 52:10
**physically** 96:7
**physicians** 97:6
**pick** 57:25 58:6
    58:11 59:7,15
    59:19,24
**picture** 62:17
**piece** 67:14 95:6
**piedras** 8:13,15
**place** 1:20 27:18
    28:16 29:13,18
    39:10 67:2,13
    67:13,14 68:2
    68:10 69:24
    96:14
**places** 90:9,13

**plaintiff** 1:6 2:7
    5:6
**please** 5:1 6:7
    16:11 20:18
    41:15 56:25
    87:1 107:13
**pleasure** 98:23
**plus** 65:2,5
**poa** 41:23
**point** 22:21,24
    23:1,11 24:12
    24:13 33:21
    35:7,17 36:18
    47:17 71:12,14
    74:5 96:3
**pointed** 79:6
**pointing** 16:16
    36:1 38:22
**policy** 50:14
**por** 34:7
**porch** 37:2
**possession**
    56:19
**possessions** 52:1
**possible** 72:9
**potential** 31:17
**power** 39:25
    40:2,5,9,14 42:2
**powers** 41:12,25
**praying** 100:11
    100:12
**prefer** 55:10
**present** 2:13
    26:19 43:1

**presents** 97:4,5
**preserve** 21:8
**pressured** 85:10
**prevent** 8:8
**previously**
    98:20
**primary** 93:3,7
    96:24 97:2
**prior** 54:19 97:6
**private** 13:2
**probably** 5:22
    16:12 36:13
    56:16 57:5
    95:12
**problem** 42:14
**problems** 8:9
    20:21,22 21:1
    53:21
**procedure**
    51:16,19 107:24
    107:25
**proceedings** 4:4
    104:1
**produced** 93:2
    104:22,23
**production**
    40:21
**property** 3:17
    29:13 31:2,17
    49:2 61:8,14,15
    78:25 80:10,13
    80:16,25 81:14
    82:5
**provide** 34:3
    49:24 58:1,8

**provided**  51:14
56:6,12
**provider**  97:5
**providers**  93:3
93:4,8 97:7
**psychology**  98:2
**public**  1:24
104:5,9,17
105:5
**puerto**  8:11,16
9:1,11,24 11:11
12:8,10 13:5,7
22:4,7 34:20,24
92:4,7,16
**purchased**
25:15
**purposes**  5:15
57:13
**put**  35:23 36:24

**q**

**question**  5:17
6:7,20,22,24 8:3
15:5 17:8,20
18:3 20:13
21:25 23:21,23
26:4,5 38:18
42:21 43:7
45:18,20 46:20
52:8 57:5 76:22
76:22 77:23
80:4 101:5,9,10
101:17,17
**questionnaire**
98:20

**questionnaires**
95:6,10,13,21
**questions**  7:2,3
7:7,10,23 13:2
16:12,14 23:10
66:10 69:7
95:16
**quick**  4:19
**quote**  52:5,10
**qué**  34:7

**r**

**r**  2:1 4:1
**ran**  99:5
**rather**  81:19
**rbd**  1:3 106:4
**read**  14:8 16:11
16:13 17:20
18:12 19:2,20
32:20,22 35:13
47:23 49:16
50:2 54:21
76:16,19,23
97:14 103:5
106:22 107:11
**reading**  3:24
9:18 49:17
82:20
**reads**  51:13
81:11
**real**  4:19
**really**  69:14
74:8 97:9 99:19
**realtime**  74:16
74:18

**reason**  8:1,4
37:19 68:20
84:11 96:1,14
97:7 106:7,10
106:13,16,19
107:12
**reasonable**
107:16
**recall**  27:12,23
29:1 43:17 57:6
72:8,10 74:23
83:15
**receipt**  44:10,15
107:15
**receive**  14:16
57:14 75:4 82:2
82:9 86:18
**received**  16:22
64:9 84:3,5 86:9
86:23
**receiving**  20:14
75:22 83:15,19
**recess**  23:13
38:4 55:15 63:9
69:19 84:19
**recognize**  17:21
23:22 45:18
46:6 64:7 70:14
70:17,20 71:10
79:9,11,16
**recognized**
70:23
**record**  4:18 6:8
15:23 30:17,22
41:20,22 55:17

93:10 98:9
103:4 105:9
**records**  3:18
24:10 93:1 95:1
**recovered**  100:2
**recuperate**
62:24
**refer**  13:13
**referenced**
107:10
**referring**  54:8
**refresh**  54:22
**refund**  50:14
75:4,24 76:21
84:3 87:9
**refundable**
54:17,18
**refunded**  54:25
55:1 76:3 82:13
**regard**  107:16
**regards**  46:1
**reimburse**
67:15,19 68:10
**reimbursement**
84:5
**related**  53:21
100:22
**relation**  34:4
60:8
**relative**  105:11
105:13
**relevant**  40:25
41:23
**reliving**  69:3

**remember** 9:22
10:1,7 11:18,21
11:23,24 12:13
23:24 25:11
27:19,21,22
28:5,8 29:4,5,6
29:8 30:14,15
31:1,7,9,15,20
31:23 32:4,8,17
36:5 43:12
44:12,14,16
47:11,15 50:17
55:1,3 57:3,7
58:25 60:5,7
61:7,16 64:8,9
64:12,13,15,18
64:23 65:14,14
67:4,5,6,11 70:9
70:13,23,24,25
71:2,4,6,8,8,9
71:18,19,24
72:1,1,2,2,4
74:25 75:1
79:10,17 80:6
83:19,24,25
84:2,6,7 86:9,19
86:23 87:1,5,23
87:24 88:22
89:5 93:21 95:5
95:8 97:11,12
97:12,13 101:25
102:5,7,10,11
**remembered**
84:5

**remembering**
69:3
**removal** 81:12
81:15 82:4
**remove** 80:13
80:16,25 81:25
**removed** 81:8
81:13
**renew** 49:19,21
**rent** 27:3,6 50:5
50:6 64:10,13
64:16,18,24
**rented** 27:4,6
**renter's** 53:20
54:2
**renting** 27:5
**repeat** 6:20
15:13 38:18
64:4 80:3
**rephrase** 6:23
7:22 33:4 42:5
**rephrased** 33:17
**report** 98:3,10
105:6
**reported** 1:23
**reporter** 1:24
3:5 4:3,11 38:9
55:19 104:4,8
105:1,4
**represent** 4:20
**representative**
34:11 51:15
74:7,11,22,24
75:21 76:12
77:1,19

**representatives**
80:23
**representing**
26:25 34:18
**request** 40:20
41:1,9 42:9,15
43:4,10
**requested** 48:8
105:8
**require** 50:20
**required** 61:4
**requirements**
3:15
**reserved** 3:25
**residence** 27:1
**resident** 3:15
47:1 48:4 51:13
51:15,16,18,25
52:2 53:13
54:17 80:12,22
82:24
**resident's** 53:14
80:13
**respective** 3:23
**response** 77:11
**responsibilities**
51:22
**responsibility**
40:9 53:15
**responsible**
40:10 50:25
52:21 53:7
**rest** 13:14
**restaurant**
57:13

**return** 3:17
62:11 83:14
**returned** 61:7,9
107:15
**reverse** 95:2
**review** 18:18
77:7 105:7
107:10
**rhona** 79:9 80:1
**rican** 92:4,7,17
**rico** 8:11,16 9:1
9:11,24 11:11
12:8,10 13:5,7
22:4,7 34:20,24
**right** 7:17 15:20
16:20,21 22:17
24:3,5 26:8
27:20,21 35:25
36:11 37:15
42:17 43:23
46:14,21 49:12
51:11 56:3,15
56:22 65:3 66:2
74:8,19,25
75:23 76:3
77:20 78:19
79:3,4,18 80:8
85:14 86:3 88:4
88:4,9 90:13
97:19 98:18,18
102:11 103:1
**rights** 51:22
**rio** 8:13,15
**rivas** 71:7

**rivera** 71:5
**road** 36:5 93:5,8
**roll** 102:15,17
**roof** 100:13
**room** 11:16
26:18 31:23,24
31:25,25 44:24
70:1,2,7,14 72:7
72:15,22 73:1,5
73:6,10,11,15
73:22 74:3
94:21
**rule** 6:15,16
16:10 22:23
107:24,25
**rules** 6:14
107:16
**run** 98:22

**s**

**s** 2:1,8 3:8,21,21
4:1 21:16,18,19
**salvage** 63:17
80:18
**salvageable**
63:13
**samantha** 2:14
5:8
**samaritan** 1:10
4:22 11:4,6,7
27:2 28:1 29:21
31:22 32:12
34:3,11,18
37:24 46:7
47:12,25 48:2
48:11,15,20

50:22 51:5
52:20 53:8,22
57:9 58:8 61:8
64:11 66:24
69:11 70:18
71:3,11,15
72:25 73:1,6,9
73:23,25 74:3,6
74:11,22,24
75:20 76:12
77:1,19 79:4
81:8,13,24 82:3
82:10,24,25
83:3,17 85:4,10
85:13 86:3
87:15 88:6 89:2
89:4,7,14,16,20
90:2,11,19 91:5
91:8,18,19,20
92:3,6,16,18,19
99:19,22 106:3
107:6
**samaritan's**
57:17,24
**sanford** 1:11
4:21 106:3
**sat** 74:16
**save** 69:9
**saw** 66:11,12
69:7 96:19
97:17
**saying** 7:12 30:1
33:22 37:9
39:11 61:13
74:15 76:10

87:23 91:9
98:10
**says** 14:25 15:19
16:18 24:7,18
25:6 38:15,19
39:3,7 47:1
49:18 51:23
52:4 53:12
54:17 56:4,6
79:3 80:11,21
96:1,14 97:3,16
98:2,22 99:1,3,4
**schedule** 58:5
58:11 59:6
**school** 8:19 9:1
9:3,6,10,10
11:14,15,25
22:2
**scratch** 24:4
73:20
**screamed** 66:16
**screen** 65:13,20
95:7
**screened** 65:3
**seal** 104:13
**second** 24:2
30:25 31:2,4,7
36:7 42:19 43:2
**section** 49:16
51:12,22 52:11
54:16 80:9 96:1
97:3
**security** 3:17
50:15,17 54:17
54:19,23 67:24

67:25 68:16
75:22 76:14
82:12,13 83:15
86:9
**see** 10:15,16
14:24 15:9
16:15,15,16
18:18 19:25
20:11 24:8 25:2
25:3,4 31:6
41:14 42:14
44:20 46:13,20
55:4 56:3 58:20
62:12 64:19
65:4 75:11,13
79:1,1,3 82:19
95:18 96:21
97:24
**seeing** 57:6 72:4
93:21 94:1
**seem** 65:3
**seen** 40:16
45:19 57:4 72:8
83:2 96:20 97:7
**send** 16:7 20:19
**senior** 3:14 5:11
48:21
**sense** 5:16 95:2
**sent** 16:5 81:24
83:18
**sentence** 53:12
80:11,21 81:2,4
81:5,11
**september** 60:4

**sequential** 24:8
**service** 58:1,8
  58:15,21 90:14
**services** 1:20
  2:4 5:4,11 51:14
  107:3
**set** 16:9 30:17
  81:12
**settled** 20:6
**seven** 103:2
**several** 92:15
**sewing** 12:11
**shaking** 6:17
**sheet** 3:6 106:1
  107:12,13
**sheets** 65:10
**shopping** 88:8
**short** 77:2
**shorter** 12:15
  12:16
**shorthand**
  104:4,8 105:4
**show** 59:9,11,13
  59:17,22
**showing** 24:19
**shown** 25:23
  44:15
**shows** 14:5
  65:19 95:25
**siblings** 62:20
  62:23
**side** 16:17 48:7
  49:24 75:15
  79:2,3,7,7 97:25

**sideways** 36:8
**sign** 26:15 27:5
  30:8,9 42:2
  67:14 70:6 75:4
  75:23,23 76:1
  76:13,20 80:1
  84:24 88:13
  107:13
**signature** 25:5,8
  38:14,16,22,25
  39:7,12,14
  42:21,22,23
  44:4 47:1 79:2
  79:18,21 104:16
  105:21
**signatures** 25:2
**signed** 25:21,25
  26:11,17 27:12
  28:21 30:12
  31:1,20 32:17
  34:19 39:15,19
  40:13 42:1,24
  43:9 47:3,12
  67:19 72:7,19
  75:3,7,18,19
  76:17,18 78:11
  79:23,24 92:15
  107:17
**signing** 3:24
  25:11 26:2,7,7
  28:5 31:19 32:5
  33:23 34:4
  40:10 43:8
  46:16,17,22
  47:9 72:15

  73:11,16 80:16
  85:5,11 86:24
**signs** 76:18
**similar** 74:16
**simple** 20:13
  45:18 46:5
**simplify** 30:18
**simply** 75:18
**simpson** 93:5,8
**sit** 17:2 37:1
  91:13
**sitting** 73:21
  74:6,12 75:2
**six** 51:22 65:18
**skip** 80:21 95:24
**skipping** 97:15
**sleep** 97:16 98:3
  98:11 101:6,7
**slightly** 55:10
**small** 35:10,13
**snyder** 79:9
  80:1
**society** 1:10
  47:25 48:2,3,12
  48:15,21 79:4
  80:22 82:25,25
  83:1 106:3
  107:6
**society's** 81:12
**sole** 80:14
**solutions** 107:21
**somebody** 63:14
**sonia** 2:13 5:3
**soon** 67:1

**sorry** 4:24 19:8
  24:3 33:1 36:10
  41:21 42:5 79:6
  88:17
**sort** 44:21
**soto** 93:19,20,22
  94:4,8 96:19,21
  98:10
**sounds** 22:12
**source** 40:23
**spanish** 4:5,5,9
  4:9 8:17,18 9:13
  12:1,2,3,5,7,19
  12:21 14:1,3,4,6
  14:7 18:4,20
  19:13 20:1,15
  20:19 21:6,10
  26:24 27:13,14
  28:9,10 29:23
  31:10 32:13,18
  34:1,4,9,15
  47:18,20 60:1,2
  67:7,8,9 68:3,5
  71:11,16 72:5
  72:17 73:1,7,8
  73:10,17 74:15
  78:4,7 92:4 94:5
  95:11
**speak** 8:17,17
  12:4,6,6,19
  13:23 14:2
  21:12 26:23
  29:22 31:10
  32:13 59:25
  67:8,16 70:19

71:11,15

**speaking**  9:18
92:4

**speaks**  21:21

**special**  60:17

**specialty**  93:3,7

**specific**  41:23
66:10

**specifically**
41:19 77:13

**spectrum**  3:11

**spent**  29:6 87:10
87:12

**spoke**  11:25
12:2,3 31:11
32:15 34:14
67:9,18 68:3
71:19 72:5,16
73:1,6,8

**spoken**  9:12

**spot**  103:3

**st**  15:1,10

**staff**  5:11

**stamp**  24:10

**stamped**  42:20

**start**  6:15 16:12

**started**  4:17
5:15 66:14,14
66:15,15,16,20
93:21

**starting**  4:24,24
16:17

**state**  1:24 6:7
48:1 102:3
104:2,5,9,17

105:2

**stated**  30:21
61:23 106:23

**statement**  65:19
92:25

**statements**  3:10
3:11,11,12,15

**states**  1:1 9:25
10:3,8,18 22:4,5
22:7

**statute**  107:16

**stay**  94:21

**stenographic**
105:10

**stenographica...**
105:6

**step**  5:25 17:7

**stipulated**  3:22

**stop**  13:3 97:9

**stopped**  69:6
81:7 88:15,16
89:10

**stopping**  23:1
23:11

**store**  57:21 90:8

**stores**  57:20

**stretch**  23:9

**strong**  99:20

**student**  5:9

**students**  12:5

**studied**  22:3

**stuff**  36:24 87:5

**subsection**
49:18 51:23
54:16

**subtitles**  14:6

**suffered**  100:24
101:13

**suffering**  7:5
88:2 91:12
100:25,25
101:22

**sugar**  55:11

**suggested**
107:15

**suite**  1:21 2:4,10
107:3

**sum**  54:18

**supervisor**
11:25

**sure**  40:17,24
84:18 102:16

**surfing**  14:12

**surrender**  80:10

**swear**  4:3,11

**swing**  98:12

**swings**  98:4

**sworn**  4:8 6:3
104:7,11

**symptoms**  100:9
100:15

**synonym**  58:13

**synonyms**  7:19

**t**

**t**  3:8,21,21

**tab**  95:3,4,24
96:4,5,7 98:17
98:19

**table**  70:4 72:23
73:21 74:6,12

75:2

**tablet**  95:7

**tabs**  94:25

**take**  9:15,23
16:11,13 17:7
17:20 18:12
19:2,20 22:24
22:25 23:1,5,6
23:20,21 28:14
35:6 37:14,20
37:21,22,23
38:2,3 44:21
45:17 55:5,9,12
57:19,20,20,21
60:3,16,20
61:25 62:5 63:4
63:6 64:2 65:17
65:24 66:9 68:1
68:25 69:18,22
74:5 82:11
84:15 87:20
88:7 90:12

**taken**  1:18,22
6:12 8:2,5 9:5,7
9:17 23:13 38:4
55:15 63:9
69:19 84:19

**talk**  90:6 94:19

**talked**  21:5
67:18

**talking**  31:15
41:23 68:12
69:6 70:5 74:7,8
74:9

**tamara** 79:12
79:15,16 80:5
**tampa** 2:10
**taught** 9:12
**teachers** 12:5
**technically**
30:19
**television** 14:5
**tell** 10:11 18:12
19:2 34:24
47:20 67:11
68:4 73:19
74:13,22 89:18
89:21 95:19
100:21 101:18
102:20
**telling** 74:11,14
**temporally**
42:13
**ten** 10:4 11:19
12:14,17,18
70:12 77:4
**term** 49:19 50:3
50:6,7 83:1
**terminate** 27:24
50:10 85:14,22
85:24 86:4
**terminated** 89:1
**termination**
3:16 28:6,8
49:16,20 78:14
78:16,23,24
82:20 84:24
85:5 86:24

**terms** 14:15
32:25 43:17
49:20 73:4
**testified** 6:3
**testifying** 8:8
**testimony** 3:2
4:12 107:11
**thank** 97:22
98:14 99:6
100:4
**thankfully**
97:19,21 98:7
**theft** 51:24
**thing** 7:23 63:1
63:2 96:7
**things** 14:16
42:9 62:14,15
62:16 69:3 84:8
84:23 88:8
89:13,23 90:3
91:6,7 98:23
101:14
**think** 4:17,17
5:16 7:22 8:4
10:2,22 31:4
36:9 40:16 41:4
41:5 49:8 55:5
55:12 61:1
64:25 69:23
75:20 78:15
90:1 91:4 93:10
96:19 101:9
102:12,21,25
103:2,3

**third** 44:4 81:5
**thought** 37:9
99:12
**three** 41:13 61:9
63:2 72:23 89:8
96:21,23
**tile** 43:23,25
**tiles** 43:12,22
**time** 1:19 6:19
10:1 12:13
16:11,13 17:7
17:20 18:12
19:2,20 22:24
23:6,21 25:25
26:6 28:14
30:14,25 31:2,4
31:19 32:12
33:21 34:10
35:6 41:16 42:5
44:22 47:17
55:7 64:2,14
66:12,13 69:10
71:12,14 77:2,7
77:12,14,19
78:1 84:15 87:5
88:6,20 90:10
93:25 94:15
96:19 100:10
101:7,15
**times** 12:24
30:12 31:12
41:13
**timing** 37:18
**tired** 99:16

**titled** 78:23,24
80:9 83:14
**today** 7:3,10,24
8:2,5,8 74:17
96:2,15 97:15
**together** 85:14
**told** 26:15 61:5
67:1 68:14 70:1
74:2,4 76:8,8,20
84:4 89:22
101:1,11
**tomorrow** 59:23
**took** 31:1,4
44:21 59:5 63:2
**top** 16:17 47:21
79:2 82:19
95:25
**total** 65:2 70:8
**tour** 28:21,24
29:2,7,12,17,20
29:21 30:1,8
31:1,4,7,8,14
**tours** 31:5,15
**transcript** 3:25
105:7,8 106:2
107:10,17
**transcripts**
107:14
**translate** 4:4,9
5:2 30:6 47:23
48:5 49:17
51:17 52:2
53:14 54:20
56:16 64:22
74:10 76:7

80:10,14 83:1
97:9 98:4
**translated**
32:15 33:25
34:8 47:18 52:3
74:19,23 75:21
78:4,7 95:22
**translating**
74:19 96:13
**translation** 5:16
5:19 6:16 30:18
57:13 74:17,21
**translator** 5:19
73:17
**translators**
73:10
**treated** 92:3,8
**trees** 36:22
**tried** 95:2
**trouble** 32:24
33:5
**true** 99:18 105:9
106:23
**truly** 4:8
**truth** 4:13,13,14
**truthfully** 7:3,7
7:10,24 8:8
95:14
**try** 5:24 33:2,21
**trying** 24:11
30:18 41:4,4
72:2 81:1,3
**turn** 24:15,18
36:7,8 41:7,18
44:3,9,13 46:19

46:25 49:15
51:11 54:15
63:23,24 75:11
75:17 79:1 96:8
98:17
**turned** 10:11
**turning** 42:15
42:19 96:4
**tv** 91:14
**twice** 41:12
**two** 11:20 13:9
25:2 31:5,14
38:19 49:16
61:19,20,22,23
62:10 65:7,15
75:6 99:1,4
102:22
**type** 104:23

**u**

**u** 3:21 79:14
**uh** 15:2 22:9
28:12 36:2 46:8
53:7 65:8 66:3
71:10 96:17
**umbrella** 40:18
**undecided** 83:7
**under** 40:18
48:1 50:3,14,19
51:6 53:12
84:25 86:4 97:3
97:24 98:1
103:1,2 106:22
107:16
**underneath**
79:11

**understand**
6:19,21 7:2,6,9
8:3 15:25 16:19
20:16 21:25
25:14,18 26:3,4
26:5 28:3 29:25
30:4 33:16
42:11 43:3,7,8
43:15 48:10,13
50:9 51:4,9 52:7
52:14,16 56:20
56:25 61:3
73:20,24 76:9
84:22 88:13
89:14
**understanding**
7:23 9:18 26:1
32:24 33:5
48:20 50:3 83:4
87:17 89:19
**understood**
6:23
**unit** 3:13 5:12
43:4,10 51:25
52:20 53:21
80:16,25,25
81:9,14 82:1
**united** 1:1 9:25
10:3,8,18 22:4,5
22:7
**university** 22:3
**unquote** 52:5,10
**upgrade** 43:3,9
**upgrades** 43:17
43:20

**urgent** 93:3,8
**usa** 80:24
**use** 7:18 51:18
51:25 57:10,17
57:23 58:2,15
58:21
**used** 64:18
107:17
**using** 17:4 32:13
58:12
**usually** 56:14
**utility** 15:24

**v**

**valuables** 60:16
**velez** 2:13 5:3,3
68:22
**verbatim** 49:17
**verify** 107:11
**veritext** 107:14
107:21
**veritext.com**
107:14
**versus** 49:10
**village** 11:5
25:16,20 28:15
28:16,18,21
29:2 48:3,22
49:3 51:14,22
51:23 54:18
82:25
**visit** 30:12 97:4
**visits** 57:21
**vs** 1:7 106:3
107:6

| w | | | |
|---|---|---|---|
| **wait** 74:12 90:9 | **we've** 23:8 41:7 | 69:2 72:12,19 | **wrote** 13:20 |
| **waiting** 94:21 | 78:15 84:16 | 73:13 77:16 | **x** |
| **walk** 29:12 | 91:6 | 80:6 81:17,22 | **x** 3:1,8 104:22 |
| **walked** 66:24 | **week** 36:6,6,15 | 82:15 83:22 | **y** |
| **want** 17:7 22:20 | 90:19,22 91:3 | 85:2,8,17 86:1,7 | **yeah** 16:9 23:8 |
| 22:24 23:5 | 96:24 | 87:6 96:10 | 36:12 37:13,13 |
| 37:14,20,22 | **weekend** 10:14 | 101:6 104:13 | 37:17 38:2 |
| 40:19,20 42:6 | 10:15 | 107:17 | 40:23 41:2,3 |
| 43:21,22 44:21 | **weeks** 61:19,20 | **woman** 29:4 | 46:3 49:12 55:5 |
| 45:5 56:16 | 61:23 62:10 | 32:10 47:15,16 | 55:12,14 63:6 |
| 61:25 62:5 63:4 | 89:6 | 67:12 68:3,4 | 65:22 84:18,18 |
| 69:16,22 84:16 | **weird** 94:25 | 102:8 | 96:5 102:24 |
| 91:17,19,20,22 | **welkie** 2:3 5:10 | **wondering** 35:6 | **year** 97:4 99:9 |
| 91:23 94:15 | 5:10 | **word** 7:15,19 | **years** 10:3,6,9 |
| 98:22 101:15 | **wellness** 87:20 | 32:13 91:15 | 10:11,22,23,23 |
| 102:14 | **went** 28:24 31:6 | **words** 57:14,15 | 10:24 11:19 |
| **wanted** 4:19 | 66:15 67:13 | **work** 5:20 12:8 | 12:14,17,18 |
| 30:21 41:22 | 69:25 70:2 96:4 | 12:12 87:23 | 92:15 |
| 58:21 80:17 | 100:4 102:1 | **worked** 11:8,14 | **yep** 93:13 |
| 85:22 | **wheels** 90:15 | 12:11 29:21 | **yolanda** 1:5,17 |
| **ward** 2:9 | **witness** 3:25 | 70:24 71:2,22 | 3:2 6:2,9 14:25 |
| **watch** 14:5 | 4:15 8:23 15:4,7 | 71:25 72:24 | 25:6 48:3 79:20 |
| **watched** 78:10 | 15:14 19:10 | 81:17,22 | 82:23 104:10 |
| 79:25 | 21:9 22:9 23:24 | **working** 11:15 | 105:7 106:3,5 |
| **water** 3:12 | 24:21,24 33:8 | 11:24 | 106:25 107:2,5 |
| 19:21 20:10 | 34:14,22 36:3 | **worry** 22:19 | 107:6,11,11,13 |
| **way** 5:23 6:21 | 36:14 37:24 | **would've** 40:25 | **york** 11:12 |
| 35:23 36:11 | 38:19 45:1,3,6 | **wow** 83:17 | 13:19 |
| 38:15 46:5 | 46:1 48:18,24 | **write** 16:23 | |
| 51:19 54:22 | 49:5 50:12 51:9 | 106:2 | |
| 85:6,11 89:14 | 52:7,23 53:18 | **writing** 9:18 | |
| 90:1 91:4 92:15 | 53:24 54:11 | **written** 18:3 | |
| 94:25 | 58:14 61:19 | 19:12 98:5 | |
| | 62:4,7 64:5 | **wrong** 79:7 | |
| | 65:23 68:24 | | |

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Page 1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                    ORLANDO DIVISION

 3

 4    YOLANDA DELGADO,

 5            Plaintiff,

 6    vs.

 7    THE EVANGELICAL LUTHERAN
      GOOD SAMARITAN SOCIETY and
 8    SANFORD HEALTH,

 9            Defendants.

10    _____/

11

12    DEPOSITION OF:  MAGALY GUTIERREZ

13    DATE:           June 28, 2024

14    TIME:           COMMENCED:  11:07 a.m.
                      CONCLUDED:   1:39 p.m.

15

      TAKEN BY:       Defendants
16

      PLACE:          Community Legal Services
17                    122 East Colonial Drive
                      Suite 200
18                    Orlando, Florida 32801

19    REPORTED BY:    Mae Fisher, RMR, CRR

20

21

22

23

24

25
```

Page 2

```
 1         A P P E A R A N C E S:
 2  MORGAN CARDINAL, ESQUIRE
    DAWN WELKIE, ESQUIRE
 3  ALEC ROSE, ESQUIRE
      Of: Community Legal Services of Mid-Florida
 4      122 East Colonial Drive
        Suite 200
 5      Orlando, Florida 32801
        (407) 841-7777
 6      Morganc@clsmf.org
        Dawnw@clsmf.org
 7      Alecr@clsmf.org
 8      Counsel for the PLAINTIFF
 9  S. GORDON HILL, ESQUIRE
      Of: Hill, Ward & Henderson, P.A.
10      101 East Kennedy Boulevard
        Suite 3700
11      Tampa, Florida 33602
        (813) 227-8495
12      Gordon.hill@hwhlaw.com
13      Counsel for the DEFENDANTS
14  ALSO PRESENT:
15  FRANCINE KAHN
      Interpreter
16
    RICHELLE DE JESUS
17  CLS Intern
18  SONIA VELEZ
      CLS Staff
19
    SAMANTHA BARKHOLZ
20  CLS Fellow
21
22
23
24
25
```

Page 3

```
 1         I N D E X
 2  TESTIMONY OF MAGALY GUTIERREZ
 3      DIRECT EXAMINATION BY MR. HILL ........... 4
 4  CERTIFICATE OF OATH ........................... 99
 5  REPORTER'S DEPOSITION CERTIFICATE ............. 100
 6
 7
          E X H I B I T S
 8
    PLAINTIFF'S EXHIBITS
 9
    (NONE)
10
    DEFENDANTS' EXHIBITS
11
    Exhibit 7 - Map ................................ 24
12
    Exhibit 8 - Acceptance/Denial of Unit Offer .... 20
13
    Exhibit 9 - Occupancy Agreement ................ 25
14
    Exhibit 12 - Termination of Occupancy Agreement
15          and Abandonment of Personal
            Property Agreement ................ 50
16
    Exhibit 13 - Return of Partial Security Deposit. 61
17
    Exhibit 14 - Medical Records ................... 74
18
19
20
21
22
23
24
25
```

Page 4

```
 1         P R O C E E D I N G S
 2      THE COURT REPORTER:  Can you raise your right
 3  hand, please.
 4      Do you solemnly swear or affirm that the
 5  testimony you are about to give in this cause will be
 6  the truth, the whole truth, and nothing but the truth?
 7      THE WITNESS:  I do.
 8          MAGALY GUTIERREZ,
 9  a witness herein, having been first duly sworn, was
10  examined, and testified as follows:
11         DIRECT EXAMINATION
12  BY MR. HILL:
13    Q.  So, good morning.  My name is Gordon Hill and I
14  represent the defendants in the lawsuit brought by your
15  mother, Ms. Delgado.  And I wanted to just depose you
16  and ask you several questions today.
17      So have you ever had your deposition taken
18  before?
19    A.  No.
20    Q.  Okay.  Let me start by establishing just some
21  basic rules for the deposition.  First and foremost,
22  it's important for you to provide out-loud answers,
23  audible answers, as opposed to nodding your head and
24  shaking your head or say uh-uh or uh-huh, so say yes or
25  no at a minimum --
```

Page 5

```
 1    A.  Okay.
 2    Q.  -- for each of that because the court reporter is
 3  taking down every word and it's impossible for her to
 4  capture nodding of the head or shaking of the head, so
 5  yes or no --
 6    A.  Understood.
 7    Q.  -- okay?
 8      And then the second is, if -- and I'm going to do
 9  this to you, too, so I'm going to ask that we kind of
10  work together on this -- but I do tend to talk over
11  people, so I will try not to talk over you.  But also
12  please let me finish a question before you start
13  answering it because if we start talking over each
14  other, then the court reporter can't capture everything
15  we're saying, okay?
16    A.  Okay.
17    Q.  Okay.  And if at any point in time you don't
18  understand a question, just let me know and I will try
19  to repeat the question, okay?
20    A.  Okay.
21    Q.  And if you do answer a question, I will assume
22  that you understood the question.  Is that fair?
23    A.  Yes.
24    Q.  Okay.  Are you on -- currently on any medications
25  that would affect your ability to understand my
```

Page 6

1  questions or answer them truthfully?
2  A. No.
3  Q. Do you have any medical conditions that would
4  affect your testimony today?
5  A. No.
6  Q. Let me start by asking about your preparation for
7  your deposition today. Who have you spoken with about
8  your deposition today?
9  A. The attorney, Morgan.
10  Q. Okay. Did you speak with your mother as well?
11  A. We know we were coming here for the deposition,
12  yes.
13  Q. Okay. Did you speak at all to your mother about
14  the potential subject matters that you might be asked
15  about today?
16  A. No, we don't know what questions you will ask.
17  Q. Okay. Did you do -- did you prepare any answers
18  that you may provide today?
19  A. No.
20  Q. Go over any topics that we may -- I might cover
21  today?
22  A. No.
23  Q. Okay. And how about the same with Ms. Cardinal
24  or -- and someone in her office?
25  A. No. We haven't.

Page 7

1  Q. Did you -- have you ever reviewed any documents
2  that we have exchanged in this case in, let's say, the
3  last week?
4  A. No. I have provided everything prior that she
5  asked.
6  Q. Okay. All right. Did you have any meetings with
7  Ms. Cardinal or anyone else in her office during this
8  week?
9  A. No.
10  Q. Any times where you've spoken by Zoom or Teams or
11  over the phone?
12  A. Confirming the appointment for today.
13  Q. That was it? Okay. All right.
14  Let me ask you just a couple of background
15  questions. I don't mean to pry too much and I'll try
16  not to. But where were you born?
17  A. Puerto Rico.
18  Q. And where did you grow up?
19  A. Puerto Rico.
20  Q. Where do you live now?
21  A. Florida.
22  Q. Where in Florida?
23  A. Kissimmee.
24  Q. Okay. And where did you go to school? Let's
25  start with the very beginning of elementary school.

Page 8

1  A. Puerto Rico.
2  Q. And did you go to school in Puerto Rico all the
3  way through high school?
4  A. Correct.
5  Q. Did you get your high school -- did you finish
6  high school?
7  A. Yes.
8  Q. Did you go to college anywhere or university?
9  A. In New York.
10  Q. In New York?
11  A. Yes.
12  Q. Okay. When you were in school in Puerto Rico,
13  were your classes taught in English, Spanish or both?
14  A. Both.
15  Q. Okay. What about in -- when you went to the
16  university in New York?
17  A. English.
18  Q. What was the name of that school?
19  A. BMCC, Borough of Manhattan Community College.
20  Q. Okay. So what's the highest level of education
21  that you've got?
22  A. Associate's degree in accounting.
23  Q. Okay. And do you use your accounting degree?
24  A. Yes.
25  Q. Okay. Where do you work now?

Page 9

1  A. At a pharmaceutical company as a human resource
2  director.
3  Q. Okay. What's the name of that company?
4  A. PPSC.
5  Q. P...
6  A. PPSC.
7  Q. Okay. And how many employees do they have?
8  A. That one has 14 employees.
9  Q. Okay. And do you oversee as human resources
10  director any other employees, other than just those 14?
11  A. Yes.
12  Q. How many total employees are you responsible for
13  as human resources director?
14  A. 35.
15  Q. Okay. And how long have you worked there?
16  A. 12 years.
17  Q. Okay. In the times that you have worked using
18  your accounting degree and, also, taking -- doing human
19  resources, have you ever, you know, reviewed or prepared
20  any legal documents like severance agreements?
21  A. We have a general counsel that review those
22  documents for us.
23  Q. Okay. Do you help in any way with preparing
24  those documents?
25  A. Just forwarding to the employees.

3 (Pages 6 - 9)

Page 10

1   Q. Okay. Do you ever have an option -- opportunity
2  to explain what's in those documents as you forward them
3  to an employee?
4      A. The employee reads them and sign them. I
5  understand the document that is going through me, yes.
6   Q. Okay. Do the employees ever ask you any
7  questions about the documents?
8      A. The questions that they ask is the term of the
9  agreement, if it's two years or one year. That's pretty
10 much the questions that we normally get.
11  Q. Okay. When you say term of, what term, like
12 the --
13     A. The noncompete or nonsolicitation agreements.
14  Q. Okay. Has anyone asked you any questions
15 about -- let me scratch that.
16      So as part of your severance agreement, do you
17 have employees sign a release so that when they accept
18 the severance, that they then can't sue the company?
19     A. Well, they could review the severance and
20 depending on the age group, they will have either
21 21 days to review and accept the severance and then they
22 have seven days to retract their severance signature.
23  Q. Okay. So -- but when somebody signs a severance
24 agreement, does it contain a release where the employee
25 will promise not to sue the company for anything that

Page 11

1  happened at the company?
2      A. I would have to look at the document. I mean...
3   Q. Okay. You're not familiar with that?
4      A. I just don't remember right now.
5   Q. Okay. All right. And at your job, do you speak
6  primarily English or Spanish or is it a tie?
7      A. English most of the time.
8   Q. Okay. Do you currently own or do you rent your
9  residence?
10     A. Own.
11  Q. And so you have a mortgage?
12     A. Yes.
13  Q. Okay. And did you review and sign the mortgage
14 document?
15     A. I did.
16  Q. Okay. Was that written in English or Spanish?
17     A. English.
18  Q. Okay. Have you ever signed any kind of a
19 severance document where you release and promise not to
20 sue any of your employers, if you've ever departed?
21     A. No.
22  Q. Okay. And do you know what I mean when I say a
23 release?
24     A. Release of what?
25  Q. Yeah. When I say that, have you ever signed a

Page 12

1  release or a document that has a release in it, do you
2  know what I mean?
3      A. That I cannot sue that person or that company?
4   Q. Right. Okay. So that's what I mean. Okay. All
5  right.
6      A. Okay.
7   Q. That's your understanding of what a release is?
8      A. That's my understanding of release, yes.
9   Q. And let me speak just briefly about your mother,
10 Ms. Delgado. Did you ever speak English with her at any
11 point in time in your childhood, in your home there
12 growing up with her?
13     A. No.
14  Q. How about now?
15     A. No.
16  Q. So when you speak with your mother, it's
17 exclusively in Spanish?
18     A. Correct.
19  Q. Okay. Does your mother speak any English?
20     A. No.
21  Q. Let me take you to the time when you were looking
22 for your mother to have a place to live down here in
23 Florida. It's my understanding that before she moved to
24 Florida, she was up in New York; is that right?
25     A. Correct.

Page 13

1   Q. And then how did she decide to move to Florida?
2      A. Her last sibling, her sister passed away of
3  cancer. And it was the last sibling that she had in New
4  York living with her.
5   Q. Okay.
6      A. And so she was by herself.
7   Q. Okay.
8      A. It was the best interest, she agreed with us to
9  move close to me.
10  Q. Okay. And now, I think your brother lived in New
11 York as well; is that right?
12     A. Right. Um-hmm.
13  Q. But you decided to have her come down here to be
14 closer to her?
15     A. I didn't decide. We collectively spoke about it
16 and it was -- she agreed that it was for her best
17 interest to be close to us --
18  Q. Okay.
19     A. -- to me here in Florida.
20  Q. Okay. Right. At any point in time, if this gets
21 emotional or any other reason, please take a break and
22 just let me know and we can take a break.
23     A. I understand.
24  Q. I truly don't want this to be painful for
25 anybody.

4 (Pages 10 - 13)

Page 14

1    A. Thank you.
2    Q. Okay. With the -- so you collectively decided,
3  including with your mom, to move to Florida. How did
4  you find Kissimmee Village, where she lived?
5    A. Through research. It was a 55-plus community.
6  It had great services. They have Hispanic residents and
7  services. So we brought to her -- she came down and she
8  looked at the area and she liked it.
9    Q. Okay. When you say they, as in Kissimmee
10  Village, had Hispanic services, describe what you mean
11  by that.
12    A. They had events, like in their photo and when I
13  called them, the representative that answered the phone
14  talked to me about their events that they do for Latin
15  community that lives in the Village.
16    Q. Okay. So it's basically social events --
17    A. Right.
18    Q. -- for Hispanic --
19    A. Correct.
20    Q. -- and Spanish speakers?
21    A. Um-hmm, correct.
22    Q. Okay. Okay. We're starting to do it a little
23  bit where we're talking over each other, so --
24    A. I --
25    Q. I know it's hard because you're anticipating my

Page 15

1  question and you're trying to answer quickly. But I'll
2  just have to do general reminders and then she'll
3  eventually yell at both of us, so...
4    All right. So describe when you -- when your mom
5  initially toured Kissimmee Village, were you with her?
6    A. Yes.
7    Q. Okay. During every time that your mom toured
8  Kissimmee Village, to your knowledge, were you always
9  with her?
10    A. Correct.
11    Q. Okay. So when did you first tour Kissimmee
12  Village, do you know?
13    A. With my mom. I would say probably about two
14  months prior move-in date.
15    Q. Okay. And how long was that tour?
16    A. I didn't time it so I don't know.
17    Q. Do you feel like it was like ten minutes or over
18  an hour?
19    A. No, it was probably over an hour.
20    Q. Okay. And did you walk the property or did you
21  just stay in the main office area?
22    A. She took us to the apartment that was going to be
23  available for her.
24    Q. Okay. And was that indeed the apartment that she
25  ended up renting?

Page 16

1    A. Correct.
2    Q. And do you remember who you spoke with and who
3  was giving you the tour?
4    A. Her first name is Debra.
5    Q. Debra, okay. Did Debra speak Spanish or English
6  or both?
7    A. Both.
8    Q. So did Debra speak Spanish to your mother?
9    A. Correct.
10    Q. So did you help also translate what Debra was
11  saying or did you-all just speak in Spanish the whole
12  time?
13    A. We all spoke Spanish the whole time.
14    Q. Okay. Can you describe what Debra looked like,
15  if you can remember?
16    A. She was light skinned, short -- maybe short hair.
17  I think like brownish hair. She was not slim but she
18  was not heavyset.
19    Q. Okay. And did you -- do you remember speaking
20  with anyone else there that day during the day of your
21  first tour, other than Debra, who was employed by or
22  with Kissimmee Village?
23    A. No. Just Debra.
24    Q. And do you recall if you and your mother had any
25  other visits to Kissimmee Village before she signed the

Page 17

1  lease?
2    A. No.
3    Q. So it was really just one tour and did you sign
4  at the end of the tour or did you go home and think
5  about it and then sign later?
6    A. Yes. We -- what we did was, I brought her here
7  so she could look at it to see if she liked it. And
8  then we took all the papers with us, like brochures and
9  things like that, and we talked about it and then my
10  mother agreed to move.
11    Q. So at the time of the tour, your mother still was
12  living in New York --
13    A. Correct.
14    Q. -- but visiting down here?
15    A. I'm sorry.
16    Q. Is that correct?
17    A. Correct.
18    Q. Okay. And when she ended up -- your mother ended
19  up signing the papers, the lease paperwork and anything
20  else, was -- did she do that in person at Kissimmee
21  Village or she do that at home and then you mailed
22  them in or delivered them, hand-delivered?
23    A. I think she did them in person.
24    Q. So at Kissimmee Village?
25    A. At Kissimmee Village.

Page 18

1    Q.  So do you remember where you were at Kissimmee
2  Village when your mother signed the paperwork?
3    A.  It was on the area where, let's see, I don't know
4  the name of it.  But it was not at the place where we
5  met Debra first.  So it was at another location within
6  the Village.
7    Q.  Was that like an office?
8    A.  It was an office.  But in that office that also
9  do services for the tenants.  I don't know.  It was just
10  a different location --
11    Q.  Okay.
12    A.  -- than --
13    Q.  Did you -- do you remember who you spoke with
14  then who was part of the paperwork signing?
15    A.  I don't remember her name.
16    Q.  It was not Debra, though?
17    A.  No.
18    Q.  Did that person speak exclusively English or did
19  they speak Spanish as well?
20    A.  Spoke Spanish, yes.
21    Q.  Okay.  And so was that entire conversation all in
22  Spanish?
23    A.  Yes.
24    Q.  Can you describe -- was it a male or female?
25    A.  Female.

Page 19

1    Q.  Okay.  Can you describe her?
2    A.  I think she had black hair.  She was also fair
3  skinned.
4    Q.  I'm going to throw some names out at you.  Maybe
5  Claudia Espinosa, do you recognize that name?
6    A.  I don't want to give you the wrong information.
7    Q.  Okay.
8    A.  I'm not a hundred percent sure.
9    Q.  Okay.  Yeah, if you don't know the answer to the
10  question, I don't know is --
11    A.  Right.
12    Q.  -- is the right answer.  Okay.  All right.
13    And how long did that meeting last?
14    A.  Probably about an hour or so.
15    Q.  And the lease document that was signed was in
16  English, right?
17    A.  I believe so.
18    Q.  Okay.  Who translated that document for your
19  mother?  Was that you who did that?
20    A.  The lady was going through all the lines that she
21  needs to answer.
22    Q.  Did you do any translating of the document to
23  your mother?
24    A.  No.  She spoke Spanish --
25    Q.  Okay.

Page 20

1    A.  -- to my mom.
2    Q.  I'm going to hand you what we will mark as our
3  Exhibit 8, and I'm just going to go with the old exhibit
4  numbers I had.
5        (Defendants' Exhibit No. 8 was marked for
6    identification.)
7  BY MR. HILL:
8    Q.  I'll just ask you to take a look at that
9  document.  And my question as you're looking at that is,
10  have you ever seen that document before?  And take your
11  time whenever I give you a document to look at.
12    A.  Um-hmm.  Yes.  I recall this tile document.
13    Q.  Yeah, so tell me just generally what is this
14  document and what does it do, this Exhibit 8?
15    A.  Well, looking at this, I remember that the unit
16  was coming with carpet and my mom doesn't like carpet,
17  so she asked to do the tiles instead, since that was
18  given an option.
19    Q.  Okay.  And there was a little bit of an upcharge
20  for that?
21    A.  Yes, I believe so.
22    Q.  Okay.  And was this something that was completed
23  on that same day when you signed the -- when your mother
24  signed the lease?
25    A.  I don't remember if it was -- I think it was sent

Page 21

1  via e-mail.
2    Q.  And if it was sent by e-mail, who was the e-mail
3  sent to, you or your mother or both?
4    A.  My e-mail.
5    Q.  Okay.  Was it sent to your work e-mail?
6    A.  Personal e-mail.
7    Q.  Personal, okay.
8        And if you look at the handwriting on this
9  document, is -- other than your mother's signature in
10  there, where I see signatures on page 1 and 2, is
11  that -- well, let me ask, the signatures on page 1 and 2
12  where it says Yolanda Delgado, is that your mother's
13  signature?
14        THE WITNESS:  Is this referring to...
15        MS. CARDINAL:  Where on the page?
16  BY MR. HILL:
17    Q.  So right here on the middle of page 1, is that
18  your mother's signature?
19    A.  Well, I sign on behalf of my mom.
20    Q.  Okay.  But your mom is sitting right there with
21  you as you're explaining --
22    A.  I spoke about this document with my mother, yes,
23  because the fact that there was the tiles, it was her
24  choice.  She doesn't like carpet.  So she didn't want
25  carpet.  So she asked to complete the document where it

Page 22

1 requires all the change the way the unit was come. The
2 unit come naturally with carpet, she didn't like carpet,
3 she asked for this document to be -- for the upgrade to
4 happen.
5 Q. So where it's signed Yolanda Delgado on page 1,
6 that's actually your signature, not hers?
7 A. Right.
8 Q. You were signing on her behalf, though?
9 A. Right.
10 Q. Okay. And the same thing on bottom of page 2, is
11 that your signature or hers?
12 A. Correct. My signature.
13 Q. Okay. And then the same thing on the bottom of
14 page 3?
15 A. Correct.
16 Q. That's your signature. Okay.
17     Is the rest of the document where there's
18 handwriting on the document, starting on page 1, is that
19 your handwriting or is that somebody at Kissimmee
20 Village?
21 A. The top one is not my handwriting.
22 Q. Okay.
23 A. No.
24 Q. And then on page 2, where there's this box,
25 specifically describe the upgrade or alteration being

Page 23

1 requested and the answer is handwritten in there, tiles.
2 Please provide price per room, living room and bedroom,
3 as well as throughout.
4     Is that your handwriting?
5 A. That is my handwriting.
6 Q. And did you end up doing tile work throughout the
7 entire unit or just in the living room or bedroom?
8 A. The entire apartment, it was tile. Yes.
9 Q. Okay.
10     MS. CARDINAL: If we're done with that, hand it
11 back to the court reporter.
12     MR. HILL: Yeah, we're done with that.
13 BY MR. HILL:
14 Q. And I'm going to hand you what we will mark as --
15 well, actually, before I get into that, back to the tile
16 upcharge -- you don't need the document in front of you
17 but -- so basically in relation to the tile upcharge
18 because you explained everything to her, your mom knew
19 what she was signing or what you were signing on her
20 behalf?
21 A. Correct.
22 Q. Okay. Do you know if the representative for
23 Kissimmee Village knew that your mom was Hispanic when
24 Kissimmee Village was renting to her?
25 A. Yes.

Page 24

1 Q. Okay. How do you know that? How do you know
2 that they knew?
3 A. Because they were speaking to her only in
4 Spanish.
5 Q. Okay. Right. And did you ever -- you or your
6 mother ever tell them that she was Puerto Rican?
7 A. Yes. I think Debra was Puerto Rico too -- she
8 was from Puerto Rico.
9 Q. Okay. I'm going to hand you what we'll -- I've
10 already -- what we'll mark as Exhibit 7.
11     (Defendants' Exhibit No. 7 was marked for
12 identification.)
13     MR. HILL: I only have one of those. I'm
14 sorry.
15     MS. CARDINAL: That's all right.
16     MR. HILL: My assistant was supposed to
17 replenish them.
18     MS. CARDINAL: That's okay. This is the map?
19     MR. HILL: Yes.
20 BY MR. HILL:
21 Q. So I have handed you what we have marked as
22 Exhibit 7 and if you can just look on the first page
23 there. Do you recognize where your mother's unit was?
24 A. I don't have my glasses. Sorry.
25     MS. CARDINAL: Do you need them?

Page 25

1     THE WITNESS: It's here, the Northgate Drive.
2 Unit 7.
3 BY MR. HILL:
4 Q. Okay.
5 A. I believe is where the yellow ones. The yellow
6 boxes.
7 Q. Was she in the yellow boxes, or I guess they're
8 called Cypress Landings and then there's also Birchwood
9 Court?
10 A. Right.
11 Q. Do you know which she was in?
12 A. Oh, 4163 Birchwood Court, yes. 4163.
13 Q. Okay. So it says 4163 --
14 A. Right.
15 Q. -- Birchwood Court. So that's in blue.
16 A. Right. The blue one.
17 Q. Do you mind maybe just circling that on the
18 document?
19 A. The blue?
20 Q. Yeah. Okay. Thank you.
21     I'm going to hand you what we will call
22 Exhibit 9.
23     (Defendants' Exhibit No. 9 was marked for
24 identification.)
25 BY MR. HILL:

Veritext Legal Solutions
800-726-7007                                                305-376-8800

Page 26

1   Q. And have you ever seen that document before? And
2   take your time to look at it.
3       A. This looks like it's her lease agreement.
4   Q. Okay. It actually says Occupancy Agreement on
5   there but we can just call it a lease agreement, okay?
6       MS. CARDINAL: That's what we were calling it
7   for translation purposes, so I think we're just
8   keeping it consistent.
9       MR. HILL: We'll streamline it, call it a lease
10  agreement.
11      MS. CARDINAL: Yeah.
12      MR. HILL: We don't need to get into legalities
13  of whether or not this is officially a lease or not --
14      MS. CARDINAL: No --
15      MR. HILL: So we'll just call this a lease
16  for --
17      MS. CARDINAL: That's right. That's a later
18  sort of issue. Right. Exactly. Happy to stipulate
19  to it being called a lease in the deposition.
20      MR. HILL: Right.
21  BY MR. HILL:
22  Q. So did you review this document with your mother
23  before she ended up signing the document?
24      A. They gave us this when we were accepting the --
25  to -- when we agreed to move there, they gave us this

Page 27

1   and they explained to us the -- what it -- you know,
2   what it means.
3   Q. Right.
4       A. And where she needs to sign.
5   Q. So when did you first receive this document, when
6   you showed up that day to say, hey, we're ready to sign,
7   let's get that unit 7?
8       A. Right. Yes.
9   Q. Okay.
10      A. Yes.
11  Q. And was it the same person that worked with you
12  when you were signing the tile agreement, that worked
13  with you on this?
14      A. Yes. When we went to that other office place,
15  yes.
16  Q. Okay. So this was the same woman who spoke
17  Spanish to you --
18      A. Right.
19  Q. -- female, black hair, fair-skinned?
20      A. Correct.
21  Q. Now, I see on the bottom of each page is
22  initialed.
23      A. Yes.
24  Q. Who did the initialing? Was that your mother or
25  you?

Page 28

1       A. My mom.
2   Q. Your mother did. Okay.
3       And was this offered to you in Spanish?
4       A. No.
5   Q. Okay. Did you ask for it to be in Spanish?
6       A. No.
7   Q. Okay. And at the very end of the document, where
8   it's a space to sign the actual lease, which is on page
9   8 of 21, is that your mother's signature there?
10      A. Correct.
11  Q. Okay. And she signed it, not you?
12      A. Yes.
13  Q. So this document is a contract; you understand
14  that, that this is a contract?
15      A. I don't see it as a contract. Saw this as a
16  lease agreement.
17  Q. Okay. A lease agreement. Okay.
18      And this is a lease agreement, if you just look
19  at the very first paragraph, it says that it's between
20  the Evangelical Lutheran Good Samaritan Society d/b/a
21  Good Samaritan Society and your mother, Ms. Delgado; is
22  that correct?
23      A. Correct.
24  Q. And if you'd turn your page to page -- paper to
25  page 3 of 21. Do you see the section where it says

Page 29

1   Roman Numeral III, refund formula?
2       A. I'm on page 3. Refund formula, yes.
3   Q. Yes. Okay. So was the refund formula, that
4   section explained to you and your mother?
5       A. I don't recall.
6   Q. Okay. And turn to page 6 of 21. You see the
7   section where it's section 6, Rights and
8   Responsibilities of Village?
9       A. Yes.
10  Q. Let me ask you this: When you received this
11  document, did you read everything in here?
12      A. No.
13  Q. You just kind of went and -- went to
14  understanding of this as the person was covering it with
15  you?
16      A. Correct.
17  Q. And you didn't read everything?
18      A. No.
19  Q. Okay. Did you read the part in that section 6,
20  section A where it says: Village is not liable for loss
21  or damage by fire, theft or other casualty, nor injuries
22  from the use at the unit to resident, personal
23  possessions, family or any guest or invitee of resident?
24      A. No.
25  Q. Do you recall if that was explained to you?

Page 30

1  A.  No.
2  Q.  And if you can turn the document to page 14 of
3  21.  This is the Addendum B, Resident Grievance
4  Procedure.  Did you review this document?
5  A.  I don't recall.
6  Q.  Okay.  I'm done with that document.
7  A.  I'm returning also Exhibit 7?
8  Q.  Yes.
9  MS. CARDINAL:  Hand those to the court
10  reporter.
11  MR. HILL:  Don't leave with any of those
12  exhibits.  I've had that happen before.
13  MS. CARDINAL:  The sticker ones, yeah.  The
14  ones that have the stickers on them.
15  BY MR. HILL:
16  Q.  Do you know, as your mother was living there at
17  Kissimmee Village, did she, you know, use any of the
18  facilities that Kissimmee Village offered outside of her
19  unit, like common areas, anything?
20  A.  I don't think so.  But then again, she was --
21  Q.  She was independent?
22  A.  -- independent, so, yeah.
23  Q.  Do you know if your mother interacted with any of
24  the Kissimmee Village staff?
25  A.  Yes.

Page 31

1  Q.  Do you know of any of the names of the staff
2  members that she interacted with?
3  A.  No, I don't recall.
4  Q.  All right.  Do you know if she interacted with
5  them in English at all or was it always in Spanish?
6  A.  Spanish.
7  Q.  Do you know if she ever used any Spanish
8  interpreter to speak with anyone at Kissimmee Village?
9  A.  No.
10  Q.  Let me take you to the time of September of 2022,
11  when the Hurricane Ian came through and hit the
12  Kissimmee area.  Tell me what you remember about your
13  mother's evacuation from Kissimmee Village as that
14  hurricane was approaching.
15  A.  So there was notice of the hurricane coming.  I
16  went to pick her up so she could be with me.  There was
17  still -- the neighbors were there still, but I chose to
18  bring her with me.
19  Q.  Okay.  And you -- you evacuated her to your
20  house?
21  A.  Right.  Correct.
22  Q.  Okay.  And how far away were you to Kissimmee
23  Village?
24  A.  About 20, 25 minutes.
25  Q.  Did your house experience any damage or flooding?

Page 32

1  A.  No.
2  Q.  And how long did she stay with you after
3  evacuating?
4  A.  Well, until she found -- we found out that she
5  cannot go back.  She couldn't go back to the apartment.
6  So she stayed with me all the way through.
7  Q.  Okay.  All the way until she found another place
8  to live?
9  A.  Correct.
10  Q.  So several months?
11  A.  Yes.
12  Q.  Okay.  Do you know, as she was evacuating, was
13  that something that was -- was that a mandatory
14  evacuation imposed by Kissimmee Village or the
15  government or was that a voluntary thing that she did?
16  A.  Voluntary.
17  Q.  Do you know if at any point in time, was there a
18  mandatory evacuation issued for the Kissimmee Village?
19  A.  I don't know if there was.
20  Q.  Did your mother take anything with her as she
21  evacuated?
22  A.  Just a bag of clothes and her medicines.
23  Q.  Okay.  And did she take any other belongings,
24  like mementos, pictures, things like that?
25  A.  No.

Page 33

1  Q.  And tell me about the first time that you and
2  your mother attempted to return to the Kissimmee Village
3  property after Hurricane Ian passed through.
4  A.  We just drove towards Kissimmee Village and at
5  the gate, the entrance, there were police officers and
6  they weren't letting anyone in.
7  Q.  And this was the gate to even get into the
8  Village?
9  A.  Correct.
10  Q.  You couldn't even get in?
11  A.  Correct.
12  Q.  Okay.  All right.  And there were police
13  officers?
14  A.  Yes.
15  Q.  Okay.  Do you know why they were there?
16  A.  I guess I'm assuming, not letting people in.
17  Q.  Right.  But do you know why they were not letting
18  people in?
19  A.  Because it was flooded.
20  Q.  Okay.
21  A.  You could see from the entrance that it was --
22  Q.  You could see the flooding from the entrance?
23  A.  Yes.
24  Q.  Okay.  And how long after the evacuation was that
25  where you first tried to access her property?

9 (Pages 30 - 33)

Page 34

1    A. Probably about two weeks, two and a half weeks.
2    Q. And did the police officers tell you anything as
3  they were stopping you?
4    A. Just simply that we couldn't go in because the
5  whole area was flooded.
6    Q. Did you then have any conversations with anyone
7  associated with Kissimmee Village that day about the
8  flooding or you being stopped from entering the area?
9    A. No.
10   Q. And when was the next time that you tried to get
11 into the Kissimmee Village area?
12   A. We have gone by probably like a week later just
13 to see if they let us in.  But there was still no
14 access.
15   Q. How many times did you try to get in and you were
16 denied entry in it?  Was it two times?
17   A. About three times.
18   Q. And for that second time, did you speak with
19 anybody, either police or anyone associated with
20 Kissimmee Village that second time that you tried to
21 enter?
22   A. No.
23   Q. Just the gate was closed and you could see it was
24 still flooded so you just didn't -- there was nobody at
25 the gate at that time; is that right?

Page 35

1    A. Correct.  We didn't reach out to anyone.  It was
2  barricades that we couldn't go.
3    Q. Okay.  And how about the third time?
4    A. The same.
5    Q. Okay.  So you didn't speak with anybody the third
6  time?
7    A. No.
8    Q. Okay.  And then the fourth time you were able to
9  gain access; is that right?
10   A. Correct.
11   Q. Did -- how did you know to go there?  Was it just
12 a random time where you just drove by again and you just
13 got lucky that they were opening it or did somebody
14 reach out to you and say, hey, it's now open?
15   A. No, we just drove by and we saw that there was
16 another entrance where they were letting -- residents
17 were going through.  So we went through that entrance.
18 It was just a side.
19   Q. So with the -- at that time, between the time of
20 your mother evacuating and the time where you finally
21 gained access to the unit, did you or your mother have
22 any communication with anyone at Good Samaritan or
23 associated with Kissimmee Village about the status or
24 anything?
25   A. I had called the general number and they were

Page 36

1  just telling us that it was no access, no access, no
2  access.
3    Q. Do you remember who you spoke with?
4    A. No.  There was always somebody different.
5    Q. So how many calls did you make?
6    A. Several.
7    Q. Okay.
8    A. More than two.
9    Q. And tell me, as best you can recall, what the
10 Kissimmee Village people told you when you called?
11   A. The area's still flooded and there was no access
12 until further notice.  They didn't have much information
13 to give us.
14   Q. Okay.  So then taking you to the time where you
15 finally gain access, you said, I think through a side
16 entrance, tell me just in chronological order what
17 happened that day.  Where did you go first?
18   A. So first we went and -- first time that we were
19 able to go through, and the area was still -- some areas
20 was still flooded and we just drove around and we spoke
21 with some residents that they had also nearby.  They
22 didn't know what was going on.  So then we went another
23 day, taking a chance and just drove by and the water had
24 subside enough that we just drove through the unit.
25   Q. So the first time you gained access, you didn't

Page 37

1  actually get to the unit because there was still
2  flooding?
3    A. Right.  Right.
4    Q. So the second time that you went, you actually
5  were able to access the unit for the first time?
6    A. Right.  Correct.
7    Q. Do you remember how long after your mother
8  evacuating was that?
9    A. That was that October 15 date.
10   Q. Why do you -- why does the October 15, that
11 specific date stand out to you?
12   A. Because that's the day where everything occurred.
13 We were able to go into the unit.  I have the videos.
14 And look at the damage in the apartment.
15   Q. Okay.  You say you have videos.  What do you
16 mean?
17   A. I took a video of her apartment and the damages.
18   Q. Okay.  Did you video the actual apartment itself
19 or the outside or both?
20   A. The actual apartment.
21   Q. Okay.  And you took that, what, on your phone?
22   A. Yes.
23   Q. Do you still have those?
24   A. Yes.
25   Q. Okay.

10 (Pages 34 - 37)

1    MR. HILL: Just for simplicity's sake, I would
2  subpoena those, but would you accept the subpoena on
3  her behalf or do you want me to go through normal
4  formal process?
5    MS. CARDINAL: We can accept it on her behalf.
6    MR. HILL: Okay. Good.
7  BY MR. HILL:
8    Q. And did you give those videos to your mother at
9  all or you just kept them on your phone?
10    A. I kept them on my phone.
11    Q. Okay.
12    A. She didn't have a phone at the time.
13    Q. So when you got into the unit, your mother was
14  with you the whole time; is that right?
15    A. Correct.
16    Q. Okay. Did you speak with anybody while you were
17  at the unit?
18    A. When we got there first, no. There was nobody to
19  speak with.
20    Q. Okay. And describe what you saw. What was
21  basically the condition of the unit and your mother's
22  belongings there?
23    A. Everything was completely damaged. The
24  refrigerator was flipped over. The sofas was full of
25  mold. Pictures, her bedroom, everything was gone.

1    Q. Do you remember how high up -- could you see
2  where the water line was on the walls?
3    A. Yes. They were about -- I don't know how much,
4  it would be a measure like something like this,
5  probably.
6    Q. Okay. I can't see your hand there, so --
7    MS. CARDINAL: She's maybe about two inches
8  below the edge of this table.
9  BY MR. HILL:
10    Q. Okay. So was it approximately three to four
11  feet?
12    A. I would say so. I think. I'm not good at
13  measurements.
14    Q. Right. Okay. Was there anything in the
15  apartment that was above that water line that was still
16  salvageable, stuff like in higher cabinet, pictures that
17  were on the wall, anything like that, lamps?
18    A. Well, the pictures -- everything that was in the
19  outside created mold. So there was -- it was damaged --
20    Q. Okay.
21    A. -- whether -- and then what we were able to
22  salvage was some of the millions of towels that she had
23  in the upper rack that still needed to be washed because
24  everything had that mold smell to it. But that's pretty
25  much it. Everything -- because of the mold that had

1  created, the clothes, everything was...
2    Q. So even clothes that were maybe hanging up higher
3  and the water never even touched them, they were still
4  molded?
5    A. Yes. Yes. Everything was moldy. We couldn't
6  get anything.
7    Q. So what is the full list of what you could and
8  did salvage? Was it just her towels that were up high?
9    A. There were some towels, there were -- she
10  insisted to grab some clothing that we had to wash
11  several times, but there were some other ones that were
12  not good even to even attempt to wash. In the kitchen,
13  there were some dishes on the top, but then again, there
14  weren't.
15    Q. What about like pots and pans, were those stored
16  underneath?
17    A. They were stored at the bottom, yes.
18    Q. So they were destroyed?
19    A. Yes.
20    Q. Okay. Would you describe, then, that the unit
21  was unlivable?
22    A. Absolutely.
23    Q. You couldn't move back in there?
24    A. Absolutely not.
25    Q. It was too far gone?

1    A. Correct.
2    Q. Okay. Do you know what it would have costed
3  to -- for Kissimmee Village to try to salvage the unit
4  and make it livable?
5    A. No.
6    Q. Okay. Do you think it was even possible?
7    A. I don't know construction, so I don't know.
8    Q. Do you know if your mother's unit ended up being
9  demolished?
10    A. That's what I was told. We were told that they
11  were going to -- they were not going to rebuild.
12    Q. Okay. And who told you that?
13    A. So when we were at the unit, this lady on a bike
14  pulled in and told us that we should go to this
15  friendship room because they were giving more
16  information about what was going on. So once we left
17  the apartment, we went to the friendship room, that was
18  the name of the building --
19    Q. Let me stop you there because I don't want to
20  talk about what happened in the friendship room just
21  there; I want to kind of keep focused on where you're
22  still in the unit. So do you remember who the lady on
23  the bike was?
24    A. No, never seen her before.
25    Q. Okay. Did she speak English or Spanish?

11 (Pages 38 - 41)

Page 42

1    A. English.
2    Q. Can you describe her?
3    A. She was a white lady. I hate to use those terms.
4    Q. That's okay.
5        And can you describe her otherwise, color hair?
6    A. She has short hair. She was slim. A bike rider,
7  I would assume.
8    Q. Do you know if she was employed by --
9    A. No.
10   Q. -- Kissimmee Village?
11   A. No.
12   Q. Okay. So it could have been a resident, even?
13   A. Right. She didn't identify herself.
14   Q. Okay. And what specifically did she say?
15   A. That we should stop by the friendship room, that
16  they were giving more information.
17   Q. And that's it, just we're giving you more
18  information, that's it?
19   A. Correct.
20   Q. Okay. Have you ever gone back to Kissimmee
21  Village since that day when you went to the friendship
22  room and your mother officially kind of terminated her
23  lease?
24   A. No.
25   Q. Okay. So you've never seen if they actually

Page 43

1  ended up demolishing the units?
2    A. No.
3    Q. Okay.
4        MR. HILL: Can we take a break real quick?
5        MS. CARDINAL: Of course.
6        (A brief recess was taken.)
7  BY MR. HILL:
8    Q. All right. So we left off right before the break
9  talking about what you saw and observed and who you
10 spoke with while you were at the unit. You said a woman
11 on a bike came and said, go to the friendship room where
12 we can tell you more. So tell me, did you know where
13 the friendship room was?
14   A. No.
15   Q. Okay. How did you find it, then?
16   A. We drove. She kind of told us which way to go.
17 We just drove and then we found the name of it.
18   Q. So was it on the outside of the building?
19   A. It said friendship room.
20   Q. So when you went into the friendship room and you
21 accompanied your mother the whole time when you were in
22 the friendship room, I assume, right?
23   A. Correct.
24   Q. Okay. Do you know what time of day that was?
25   A. I would think midday.

Page 44

1    Q. So after lunch?
2    A. Yes. I think so.
3    Q. Okay. And who all was present in the friendship
4  room in general, like how many people were there?
5    A. We didn't count the people that were there. It
6  wasn't crowded full of people. There were a few.
7    Q. And when you went there -- how big is the
8  friendship room? Is it as large as this room or is it
9  larger?
10   A. Well, there's a patio area first. And they have
11 chairs there. So we walked in. Nobody greeted us. We
12 sat at the chairs. Then a lady came to us and she
13 greeted us and she took us to a table. I didn't look,
14 like all around the place.
15   Q. Okay. And then did that lady at the table, is
16 she the one that ended up talking to you and presenting
17 documents to you or was it somebody else?
18   A. No. She brought us to the table where there was
19 another lady there. And that -- the lady that greeted
20 us left.
21   Q. Was the lady who greeted you -- did she speak to
22 you in English, Spanish or both?
23   A. She spoke to me in English.
24   Q. Okay. Did she speak with your mom at all?
25   A. No.

Page 45

1    Q. What did she say?
2    A. She just say, sorry for what's going on, please
3  come in, sit here and we'll take care of you.
4    Q. And that's it, she didn't say anything else?
5    A. No.
6    Q. Okay. Did you catch her name?
7    A. No.
8    Q. Can you describe her?
9    A. She was a white lady. I don't remember her.
10   Q. Like height, build, anything?
11   A. She was probably as tall as me. I'm 5-7. But I
12 can't tell you anything else because I don't remember
13 her.
14   Q. So you only talked to her, if you can even call
15 it that, for just a few seconds, it sounds like?
16   A. Correct.
17   Q. Okay. So then as you're walking into the room,
18 can you at least estimate how many more tables there
19 were in that room?
20   A. Well, I do recall that there was another table,
21 like not directly next to us, but I could see that table
22 from where we were sitting.
23   Q. Okay.
24   A. In sight, front of us.
25   Q. Were there other people sitting at the table,

12 (Pages 42 - 45)

Page 46

1  like a resident and a Kissimmee Village representative
2  or --
3     A.  Not that I recall.
4     Q.  Okay.  So that table was empty as far as you
5  recall?
6     A.  As far as I remember.
7     Q.  Okay.  So there was only two tables in that room?
8     A.  Well, I don't know if there was more tables in
9  the back.  I just -- we just walked in and sat and
10  that's it.
11     Q.  At the table that you were directed to?
12     A.  Right.
13     Q.  Okay.  And then who was at the table that you
14  were directed to?
15     A.  Another lady.
16     Q.  Did you ever catch her name?
17     A.  No, I don't remember her name.
18     Q.  Did she speak to you in English, Spanish or both?
19     A.  English.
20     Q.  And can you describe her?
21     A.  She was a white lady.  Long, blondish, whitish
22  hair.
23     Q.  And did you -- once you got to the table, did you
24  speak with anyone else, other than your mother and the
25  lady who was there?

Page 47

1     A.  No.
2     Q.  Okay.  So it was just the one person?
3     A.  Correct.
4     Q.  Did anybody at any point in time come and stop in
5  at the table and speak to any of you, including the
6  white lady with the long blond hair?
7     A.  No.
8     Q.  Okay.  Does the name Rhona Snyder ring a bell to
9  you?
10     A.  I don't remember her name.
11     Q.  Do you know if anyone else in the room spoke
12  Spanish?
13     A.  I don't know.  I didn't speak with anyone else.
14     Q.  Do you know if Kissimmee Village had any Spanish
15  translators available to you and your mother in the
16  room?
17     A.  No, I don't know.
18     Q.  So you -- let me take you back.  You're now
19  sitting down at the table, and tell me just in
20  chronological order as best your recollection,
21  everything that was said at that table, from beginning
22  to end.
23     A.  Yeah.  Well, the lady was really nice.  She was
24  very empathetic about the situation, what was going on.
25  And then she went on to letting us know that the area

Page 48

1  was not going to be rebuilt.  She pulled up -- she
2  pulled up the map.  She highlighted it, the area.  She
3  said it was not going to be rebuilt.  And then I
4  communicated that to my mom.  And then it was rough on
5  her to find that out.  So we had a few, little moment
6  and then she was very empathetic, gave us some time.
7  And then she said that -- she showed us a document and
8  said that since it wasn't going to be rebuilt, that
9  document was -- if we sign it, we'll get our deposit
10  back sooner.  If not, after 30 days, they will then
11  start the process to refund the deposits to all the
12  residents that are living in that area.  But if we want
13  it faster, we just needed to sign that document.
14     Q.  Okay.  And did you translate that to your mother?
15     A.  I did.
16     Q.  Okay.  And how did you do the translation?  Did
17  you let her speak for just a little bit and then you
18  translated and went back and forth or did you let her
19  kind of finish what she was saying and then you
20  basically provided a general explanation of what she
21  said?
22     A.  No.  She spoke a few words, then I translated to
23  my mom, then -- it was a back and forth.
24     Q.  Okay.  So you literally translated every word
25  that was said?

Page 49

1     A.  That she told us, yes.
2     Q.  Okay.  And did your mom then understand through
3  your translations of what she was saying, I guess?
4     A.  Right.
5     Q.  Okay.  Did she say what the reason was for the
6  30 days, if you did not -- or if your mother did not
7  sign it?
8     A.  What do you mean, the reason of the 30 days?
9     Q.  I think you testified that she said that if your
10  mother signed it, then the refund could happen sooner,
11  like immediately, but if she did not sign it, then they
12  would have to wait 30 days and then the refund process
13  would start after 30 days; is that correct?
14     A.  Correct.
15     Q.  Okay.  So did she explain the reason for the
16  30 days being thrown in there, if she did not sign?
17     A.  No, she did not.
18     Q.  Okay.  And when we're talking about a refund,
19  we're talking about the security deposit, right?
20     A.  Correct.
21     Q.  Okay.  And when you said that -- I think you said
22  earlier that you and your mother had a moment and the
23  lady was nice and let you have your moment.  Tell me
24  what you mean, you and your mother had a moment.
25     A.  Well, she was sensitive.  She was crying and was

13 (Pages 46 - 49)

Page 50

1  very disappointed.
2  Q. Your mother was crying?
3  A. Correct.
4  Q. Right. Okay.
5  A. I tear up, too.
6  Q. Right. Right.
7  A. Yeah.
8  Q. Okay. And so she gave you a moment to kind of
9  get through the emotions and everything?
10  A. Correct.
11  Q. Okay. And you said she gave you a document. I'm
12  going to show you what will be Exhibit 12.
13      (Defendants' Exhibit No. 12 was marked for
14  identification.)
15  BY MR. HILL:
16  Q. And take your time with that document, but my
17  question is, is this -- as you're looking at this, is
18  this the document that was handed to you at that table
19  that day?
20  A. I believe it is.
21  Q. Okay. And when she handed you this document, was
22  it two pages stapled together, like I have here, or was
23  it one page, front and back?
24  A. I don't recall. I think it was just one page.
25  Q. Okay.

Page 51

1  A. To my recollection.
2  Q. What do you mean it was just one page?
3  A. Front and back.
4  Q. Okay. Okay. So it had writing on both sides?
5  A. I think --
6  Q. But just on one page?
7  A. From my recollection, yes.
8  Q. Okay. And then what did she explain to you about
9  this document?
10  A. By signing this document at that time, they will
11  start the process immediately for the refund of our
12  deposit -- of her deposit.
13  Q. Okay. Did she explain to you anything about
14  the -- what's written in paragraph 3, where it talks
15  about resident shall have until October 31 to remove all
16  of the resident's property at resident's expense. Did
17  she talk about, you can come back in and take what is
18  salvageable?
19  A. No. She didn't tell us that. We had told her
20  that we came from the apartment and it was all damaged.
21  But she didn't tell us like, oh, you can come as many
22  times as you want, if that's what you mean with your
23  question.
24  Q. She didn't explain that part?
25  A. No.

Page 52

1  Q. But you did take what was salvageable?
2  A. Right, the little bit that was, yes.
3  Q. Okay. And then -- did you read the whole
4  document?
5  A. No.
6  Q. Why not?
7  A. She just -- I trusted it, what she explained to
8  me that the document was about, what was what it was
9  about.
10  Q. What did she explain to you what the document was
11  about? What you said earlier about the refund?
12  A. Correct.
13  Q. Okay. And did she say anything else about the
14  document?
15  A. No.
16  Q. And then if you turn to page 2, it's a document
17  dated October 15, 2022. Whose signature is that where
18  it's your mother's signature block?
19  A. Her signature, my mother's signature.
20  Q. Okay. And so it says that -- and you can see
21  there's a signature and right underneath there it's a
22  printed name. So is that handwriting both your mother's
23  or did you write anything on this document?
24  A. No, those are my mom's.
25  Q. Okay. And I had asked you earlier about the name

Page 53

1  Rhona Snyder. Does that ring a bell now that you see
2  her signature there?
3  A. I don't recall her name.
4  Q. Okay. Or Tamara Lund, do you recall that name?
5  A. I don't recall any of the names.
6  Q. Okay. And with this document, like you had with
7  the initial lease and the tile paperwork that your mom
8  signed a couple years prior, neither you nor your mother
9  asked for an interpreter for that -- you know, for
10  looking at this document; is that right?
11  A. Correct.
12  Q. And you've never asked for this document to be
13  translated into Spanish; is that correct?
14  A. No. We trust the lady was giving us the correct
15  information.
16  Q. Okay. And it wouldn't -- if you wanted to read
17  it, you could have read it and interpreted it for your
18  mother, right? You could have done that?
19  A. Right, I know how to read, yes.
20  Q. Right. Right. I didn't mean that to be
21  insulting. I'm sorry. It came out that way. I
22  apologize.
23      And the woman who was there, she never said that,
24  hey, you can't read this document, did she?
25  A. No.

14 (Pages 50 - 53)

Page 54

1  Q. And so when your mom signed the document, do you
2  feel like she signed that voluntarily?
3  A. Yes.
4  Q. Do you know if she knew what she was signing?
5  A. Yes.
6  Q. So she knew what she was signing, your mother?
7  A. Correct. The release of -- for her deposit to be
8  returned.
9  Q. Okay. And your mother at the time wanted to get
10  that deposit back as soon as she could, right?
11  A. Once we knew that the apartment was not going to
12  be rebuilt, there was no other option or anything left
13  to do but to obtain the deposit, that would have helped
14  her to move on and find another place or buy things that
15  she needed.
16  Q. Right. Right. Okay. And then do you know,
17  after that day -- how long was that meeting there when
18  you were at the table speaking to the woman there?
19  A. Definitely less than an hour, probably
20  30 minutes.
21  Q. 30 minutes, okay. Do you know who that woman was
22  employed by?
23  A. We believe she was a representative of Good
24  Samaritan.
25  Q. Okay. Good Samaritan, okay.

Page 55

1  And do you know if -- what ended up happening to
2  your mother's belongings that were not salvageable,
3  which was almost everything, it sounds like?
4  A. We don't know.
5  Q. Do you know who disposed of that?
6  A. No.
7  Q. Do you know if it was ultimately disposed of?
8  A. We don't know.
9  Q. Okay. So at any point in time -- well, did you
10  get a copy of this document after your mother signed it?
11  A. Yes.
12  Q. You kept a copy?
13  A. Correct.
14  Q. Okay. And after you -- that meeting ended in the
15  friendship room, did you ever look back at the document
16  and read it?
17  A. No.
18  Q. So when was the first time you read this document
19  since really that day?
20  A. I brought it with me when they had like a town
21  hall, I would say, that meeting where everybody from the
22  community was meeting. At one point, they held a
23  meeting for all the residents for the first time after
24  all of this happened. I don't remember the date.
25  Q. Tell me about that town hall meeting. When you

Page 56

1  say they held a meeting, who was the they?
2  A. It was -- it was the -- it was from Osceola
3  County. It was not from the Good Samaritan village. It
4  was that lady from -- I don't remember her title.
5  Q. Was it somebody employed by Osceola County?
6  A. Right. She was a representative from the county.
7  Q. Okay. Where was the town hall meeting?
8  A. Downtown Kissimmee.
9  Q. Literally in the town hall?
10  A. No. Shoot. Town hall meeting -- it was like in
11  a plaza by 192 and Oak Street.
12  Q. So it was not at Kissimmee Village?
13  A. No.
14  Q. Were Kissimmee Village representatives there?
15  A. No. They never, ever communicated with us or we
16  never knew anyone from them regarding this happening.
17  Q. So you didn't hear -- neither you nor your
18  mother, to the best of your knowledge, ever heard back
19  from Kissimmee Village after you signed this document?
20  A. About the incident, about the flooding?
21  Q. About the flooding or what happened to the
22  demolition or the units?
23  A. Absolutely not.
24  Q. Okay. So then how did you hear about the town
25  hall?

Page 57

1  A. It was on the news.
2  Q. And was -- what was the purpose of the town hall
3  meeting?
4  A. Well, when we got there, they were talking about
5  benefits that residents, as homeless, had options with
6  the county of Osceola, either looking for lower
7  resources, benefits.
8  Q. Were you there for the whole meeting or did you
9  arrive a little bit late?
10  A. I was there for the entire. The news were there.
11  Q. So they were essentially telling you, here are
12  some resources that the county has to help people who
13  have been displaced?
14  A. Correct.
15  Q. Okay. And did your mother apply for and get any
16  of those resources?
17  A. We took the number from a lady that was giving
18  some contacts on finding apartments, things like that.
19  I called but left a message and things like that. We
20  didn't follow through to that. I was just helping her,
21  trying to get apartments on my own.
22  Q. Okay. So your mother did not getting any of the
23  resources?
24  A. No.
25  Q. Did she officially apply and got rejected or she

15 (Pages 54 - 57)

1 just never applied?
2    A. No, we never applied for anything.
3    Q. And how long did that town hall meeting last?
4    A. Probably like two, three hours.
5    Q. Oh, wow.  Okay.
6    A. A lot of people talking and...
7    Q. When you say a lot of people talking, was it only
8 Osceola County government representatives or was it
9 affected people were all talking?
10    A. Yeah.  Everyone, affected people.
11    Q. Okay.
12    A. There were a lot of residents.
13    Q. I know it's difficult to estimate how many people
14 were in a given room --
15    A. Oh, yes.
16    Q. -- but can you give an estimate?
17    A. Oh, yes.
18    Q. How many?
19    A. A lot.  I don't know.
20    Q. Like 50, 100, 200, a thousand?
21    A. There were not a thousand.  Probably not --
22 probably more than 50.
23    Q. Okay.
24    A. So somewhere between 50 and a thousand.
25    Q. Okay.  That's a big spread.  All right.  So a

1 large room.  Was the room full?
2    A. Yes.
3    Q. Filled up the room?  Okay.
4       And did your mother speak?
5    A. No.
6    Q. Did you speak?
7    A. No.
8    Q. And were there -- in terms of affected people,
9 you know, community residents, was it only people that
10 lived at Kissimmee Village or was it a lot of other
11 people as well as Kissimmee Village residents?
12    A. From our understanding, people that lived at the
13 Kissimmee Village.
14    Q. Okay.  So is it your understanding that this was
15 a meeting held only to help Kissimmee Village residents
16 who had been displaced?
17    A. Correct.
18    Q. Did you take any documents away, like brochures
19 or anything else from that meeting?
20    A. No.
21    Q. You said you found out about it on the news.  Do
22 you have any documents at all relating to that meeting?
23    A. No.
24    Q. When -- have you ever rented an apartment or a
25 house?

1    A. Me personally?
2    Q. Um-hmm.
3    A. Yes.
4    Q. Okay.  When was the most recent time that you
5 rented?
6    A. About eight years ago, nine years ago.
7    Q. Okay.  Is your understanding that when you -- you
8 moved out of that and moved into your home; is that
9 correct?
10    A. Correct.
11    Q. So is it your understanding that it was, when
12 you're moving out, it's your responsibility to take
13 everything with you; is that correct?
14    A. Correct.
15    Q. So all of your belongings, your bedding, the
16 whole nine yards, you take all of that with you, right?
17    A. Correct.
18    Q. Was that your understanding of if under normal
19 circumstances at Kissimmee Village that the same would
20 have applied, if your mom had to move out, that she
21 would be responsible for taking all of her belongings
22 and getting it all out of the apartment?
23    A. Correct.
24    Q. Okay.  Did your mother receive the deposit?
25    A. Yes.

1    Q. Or the refund of the deposit?
2    A. Yes.
3    Q. Okay.  Was it the full amount that she was owed?
4    A. I -- we received the check.  I believe it was
5 1400.  I didn't go -- we didn't go back and check if it
6 was the full amount that we deposited or anything like
7 that.
8    Q. Okay.  I'm going to hand you what we'll mark as
9 Exhibit 13.
10       (Defendants' Exhibit No. 13 was marked for
11 identification.)
12 BY MR. HILL:
13    Q. Have you ever seen this document before?
14    A. I don't recall.
15    Q. If you look at it, it says the amount of -- I'm
16 looking at the second paragraph -- the amount of the
17 security deposit placed with Kissimmee Village was
18 $1,200.
19       Do you know if that's correct?
20    A. I'm not for certain.  I would have to go back on
21 my records.
22    Q. And it then says:  After a credit given for
23 September 28, 29 and 30, you have an outstanding balance
24 on your account of $125.80.
25       Do you know if that's correct, or would you have

Page 62

1 to go back?
2    A. I would have to go back and review.
3    Q. And essentially it says then this brings your
4 security deposit refund to $1,074.20.
5        Do you know if that's the amount that was
6 refunded?
7    A. I would have to check back on my records.
8    Q. Okay. And did you read this letter when you got
9 it?
10    A. I don't recall receiving this letter.
11    Q. Okay. But your mother did, in fact, get the
12 security deposit and essentially deposited the money and
13 spent the money, right?
14    A. Correct.
15    Q. Okay. She didn't object to the amount that was
16 given or anything like that; she just deposited it and
17 spent the money?
18    A. Correct.
19    Q. Okay. Do you know if Kissimmee Village charged
20 your mother for disposing of her personal property?
21    A. I believe not.
22    Q. And after the meeting in which this termination
23 agreement was signed that's Exhibit 12, did you have any
24 more conversations, whether it be over the phone, in
25 person, e-mail, text, with anyone employed by or

Page 63

1 associated with Kissimmee Village?
2    A. In regards to what?
3    Q. Anything.
4    A. Well, a gentleman called offering an apartment
5 for my mom. But his -- his conversation was that they
6 have an apartment, we can place my mom to that apartment
7 but we need to accept right away.
8    Q. Okay.
9    A. I responded to him that can we go see the
10 apartment? Where is it located? He told us that that
11 was not an option. They are several, hundreds of
12 people, homeless right now that can take advantage of
13 that opportunity and this is the one opportunity only
14 that she will have to just accept it and I needed to
15 give him an acceptance right there and then on the
16 phone.
17    Q. Okay.
18    A. I told him, I cannot do that. I have to, one,
19 discuss it with my mother; and two, we will need to see
20 it before accepting. Knowing that everything was -- a
21 lot of properties were damaged, we needed to see the
22 location, if there's any water damage, how's the
23 apartment and all of those, now that we were nervous,
24 right, had been through this experience. And he told me
25 that that was not an option, that we needed to accept it

Page 64

1 right away.
2    Q. Okay. And so you did not accept?
3    A. No, he gave me -- I told him I have to speak with
4 my mother, so he told me that I need to call him the
5 next day at the latest. I only had 24 hours to tell him
6 that and then I discussed that with my mom and she
7 agreed that she needed to see the apartment. When I
8 went to him and I said, well, can we schedule an
9 appointment to see the apartment, he told us that that
10 was not an option, that I needed to accept it right
11 away, that there's hundreds of people waiting for this
12 opportunity.
13    Q. Okay. So you didn't see the apartment; you did
14 not move forward with that at all?
15    A. No. That was not an option to see the apartment
16 and the conditions that he was presenting were
17 absolutely outrageous.
18    Q. Did you ever get a price of what the rent would
19 be?
20    A. I don't remember the exact number. I do remember
21 being higher than what she was paying at the time of
22 prior to the hurricane.
23    Q. Can you estimate how much higher it was?
24    A. I want to say it was probably somewhere around
25 1200 because it was over a thousand.

Page 65

1    Q. Okay. So that's the total number; it wasn't
2 $1,200 more, right?
3    A. No, no, no.
4    Q. Yeah. Okay. And that's per month, right?
5    A. Right.
6    Q. And do you remember that man's name?
7    A. Starts with a J. I don't know if it was John.
8    Q. Johnson?
9    A. It's probably -- I don't remember.
10    Q. Okay.
11    A. I will have to -- I don't know. I don't remember
12 the name. I'm so bad with names. I'm sorry.
13    Q. That's okay. Did you take down notes of that
14 conversation?
15    A. No.
16    Q. Okay. So you didn't jot down his number. How
17 did you get his number to call him back?
18    A. I believe that -- I want to say that he had
19 given -- did he send me an e-mail? I don't know. I
20 have to go back to see if there was an e-mail on that
21 with a number or if he told me the number. I don't
22 remember exactly --
23    Q. Did he --
24    A. -- how it transpired. But I know that -- you
25 know, the conversation that we had.

17 (Pages 62 - 65)

1    Q.  Did he speak with your mother?
2    A.  No.
3    Q.  Okay.  He just spoke to you?
4    A.  Right.
5    Q.  Did you -- was your mother with you at the time?
6    A.  No.
7    Q.  Okay.  She was somewhere else?
8    A.  Right.
9    Q.  Okay.  Did he call you like on your cell phone?
10   A.  On my cell phone, correct.
11   Q.  Do you know how he had your cell phone?
12   A.  I was as an emergency contact on my mother's.
13   Q.  And so you were basically away from the house or
14   away from your mom when that happened?
15   A.  I was at work.
16   Q.  Okay.  And did you, right after you hung up with
17   him, did you then talk to your mom about it?
18   A.  Correct.
19   Q.  Okay.  And you decided you can't just go ahead
20   and commit to something like that, sight unseen, you
21   need to look at it and it was just too fast, too rushed?
22   A.  We decided.  My mom also.
23   Q.  Right.
24   A.  She wanted to see the apartment.
25   Q.  Right.  Okay.  Okay.  So with that, you felt like

1    you were kind of being rushed into something?
2    A.  Correct.
3    Q.  Okay.  Taking you back to the friendship room,
4    did you feel like you were being rushed into signing
5    that document, that termination document like this man
6    was rushing you into doing the new apartment?
7    A.  Not that we were rushed, but we weren't given
8    like take this home, come back.  We weren't given any
9    other option but sign it there.
10   Q.  Did somebody say you have to sign it here or then
11   this offer is withdrawn and we won't let you ever do
12   this again?
13   A.  The lady told us that we need to sign that
14   document in order to receive the deposit, otherwise, it
15   will be 30 days and we'll -- the process will take
16   longer.
17   Q.  Okay.
18   A.  But we needed to sign it while we were there.
19   Q.  Okay.  She said you had to sign it now.  You
20   couldn't -- do you know if you could have returned it
21   the next day and then gotten the faster deposit refund?
22   A.  That was not an option.  We didn't ask.
23   Q.  Okay.  When you say it wasn't an option, you just
24   didn't ask about that, right?
25   A.  She didn't offer it either.

1    Q.  Okay.  But did you ask for, hey, can I take this
2    home?
3    A.  No.
4    Q.  Okay.  When you went to -- so after this,
5    obviously you rejected the offer to, you know, stay at
6    Kissimmee Village or for your mom to stay at Kissimmee
7    Village under those circumstances.  So then describe the
8    efforts that you and your mom went through to find
9    another place to live for her.
10   A.  I researched a lot of 55-plus communities around
11   the area.  All of them were either full capacity or
12   three-plus years of waiting time.
13   Q.  Oh, wow.  Okay.  Were there any openings at all
14   in any 55-plus community?
15   A.  No.
16   Q.  Okay.  And how far did you look away from like
17   Kissimmee Village?  Did you look like within a 10-mile
18   radius, a 2-mile radius, a 30-mile radius?
19   A.  I looked at places near me that I could be at
20   least about the same distance where Kissimmee Village
21   were.  So between, you know, at the most, 20, 25 minutes
22   from me, just so I could have close contact with my mom.
23   Q.  Okay.  And how did you come to find her current
24   place?
25   A.  A friend of mine told me about that house being

1    for sale.
2    Q.  And so you -- your mom -- you and your mom toured
3    the house and ended up she bought the house?
4    A.  Correct.
5    Q.  And so now she owns this house?
6    A.  Correct.
7    Q.  And is it a regular mortgage or is it like a
8    reverse mortgage?
9    A.  It's a regular mortgage.
10   Q.  Okay.  And your mom now lives by herself; is that
11   right?
12   A.  Correct.
13   Q.  When your mother was at Kissimmee Village, was
14   she in an independent living arrangement?
15   A.  Correct.
16   Q.  There was no nursing home or assisted-living
17   facility, she wasn't using that, right?
18   A.  No.
19   Q.  Was Good Samaritan a caregiver of hers?
20   A.  No.
21   Q.  She didn't rely on Good Sam -- Good Samaritan for
22   medical treatment or nursing care or anything like that?
23   A.  No.
24   Q.  At the time she was at Kissimmee Village, was
25   your mother able to like fully take care of herself?

Page 70

```
 1    A.  Yes.
 2    Q.  Okay.  Was there anything your mother couldn't do
 3  of like just normal activities that people do daily?
 4    A.  No.
 5    Q.  Do you know if your mother took advantage of the
 6  shuttle bus that Kissimmee Village offered?
 7    A.  Yes.
 8    Q.  Do you know how she did that, like how did --
 9  what were the logistics for her calling and using the
10  shuttle?
11    A.  That, I -- she was the one that found out about
12  it.  I'm not sure how exactly she found out about it.
13  Perhaps through a neighbor.  But --
14    Q.  But she would just do that on her own, as far as
15  you know?
16    A.  Right.
17    Q.  Okay.
18    A.  They stopped like by her apartment to pick her
19  up.
20    Q.  And they would take her to stores, doctors'
21  appointments, those kind of things?
22    A.  Correct.
23    Q.  Okay.  Do you know if when she was done at the
24  store or done with the doctor's appointment, did she
25  call the shuttle and say, hey, I'm ready to be picked
```

Page 71

```
 1  up, or did they just come back around?
 2    A.  From my understanding, we had conversations of
 3  she was excited about when they picked her up and stuff.
 4  I believe they would wait for her because there was more
 5  people.  So they would take them to the supermarket,
 6  they'll do the groceries and they'll go back.
 7    Q.  Okay.  When your mother was at Kissimmee Village,
 8  who actually paid the rent checks?  Did she do that or
 9  did you do that?
10    A.  It was ACH.
11    Q.  What do you mean?
12    A.  Debited from her account.
13    Q.  Oh, okay.  So she didn't actually write a check,
14  it was just --
15    A.  No.
16    Q.  Did your mother cook her own meals at Kissimmee
17  Village, any of her own meals?
18    A.  No, actually, those were one of the benefits that
19  she loved the most.  She would get a menu and she'll
20  order food and they'll deliver it to her.
21    Q.  Okay.  Was it like through Meals on Wheels; is
22  that right?
23    A.  No, it's directly from Good Samaritan.
24    Q.  Oh, from Good Samaritan, okay.
25    A.  Yeah.
```

Page 72

```
 1    Q.  What did they do for breakfast, was it the same
 2  thing or did she make own breakfast?
 3    A.  She would make her own like soup and she buys
 4  breakfast, egg breakfast that she can put in the
 5  microwave.
 6    Q.  Okay.  At any point in time when your mother
 7  lived at Kissimmee Village, do you know if she was ever
 8  diagnosed with any kind of a medical or mental health
 9  condition that would have inhibited her ability to
10  engage in activities of daily living?
11    A.  No.
12    Q.  What about that would allow her -- that would
13  impair her thinking in any way?
14    A.  No.
15    Q.  Eventually, I know in March of 2023, several
16  months after your mother moved out of Kissimmee Village,
17  you ended up having a power of attorney for her; is that
18  correct?
19    A.  Correct.
20    Q.  Why did that happen?  Was that just kind of
21  convenience?
22    A.  Well, it was just brought to my attention that in
23  order to be able to help her with medicals or any
24  documentation at my mother's advanced age, I should have
25  one in place to just make sure that everything is legal
```

Page 73

```
 1  and, you know, done the proper way to assist my mother
 2  in making decisions in the event that something may
 3  happen with her.
 4    Q.  So basically, you have it there in case of an
 5  emergency, if something bad happened to her, now you
 6  have the ability to deal with her mortgage and legal
 7  documents and those things?
 8    A.  Correct.
 9    Q.  Okay.  When your mother went to doctors'
10  appointments, did you always go with her?
11    A.  No.  I -- we make sure that she was enrolled or
12  attending doctors that spoke Spanish and clinics where
13  they have Spanish-speaking employees and nurses so she
14  could better communicate with them.
15    Q.  Okay.
16    A.  So they all spoke Spanish.
17    Q.  Okay.  So when she would go -- did you ever
18  accompany her to the doctor?
19    A.  At times, I have.
20    Q.  So when you would do that, the doctors would
21  usually do like some kind of an intake form where they'd
22  give you a whole bunch of questions that you'd have to
23  ask about your health conditions and things like that;
24  is that right?
25    A.  Well, when you go first to a clinic and enroll in
```

19 (Pages 70 - 73)

Page 74

1 that clinic, I guess, for lack of the best word for it,
2 they do give you an assessment, right?
3    Q.  Right.
4    A.  A questionnaire that you answer.
5    Q.  Okay.  And when you were with her, would you help
6 her fill that out?
7    A.  They're in Spanish.
8    Q.  They're all in Spanish?
9    A.  Yes.
10    Q.  Okay.  So -- okay.
11       I'm going to hand you what we'll mark as
12 Exhibit 14?
13       (Defendants' Exhibit No. 14 was marked for
14    identification.)
15 BY MR. HILL:
16    Q.  I had to do this with these tabs and everything
17 because medical records they always give you when --
18 give the documents to you in reverse order.  So these
19 have now been sorted into chronological order with the
20 different tabs, A, B, C, D.
21       So if you turn to tab A of this Exhibit 14, this
22 is a patient health questionnaire from the doctor's
23 office from January 11, 2023.  So shortly after your
24 mother moved out of Kissimmee Village; is that right?
25    A.  Um-hmm.

Page 75

1    Q.  So it says med -- FL Med Centers.  Do you know
2 who this healthcare provider is?
3    A.  These are her current clinic where she goes to.
4    Q.  Okay.  Do you know if you accompanied your mother
5 on this appointment on January 11, 2023?
6    A.  No, I did not go to -- I know that we went first
7 to the location that is on -- by Oak Street, which is
8 the MedFlorida, another center.  And that's when we
9 started -- that's when we got to know about the
10 location.  But this is where her doctor.
11    Q.  If you turn the page to tab -- turn to tab B.
12 The first page on tab B, which is marked Delgado 364.
13 You can see on the top, it says PCP is Omar Perez Soto.
14    A.  Correct.
15    Q.  Is that her doctor there?
16    A.  Correct.
17    Q.  Okay.  So if you go down to that -- very top of
18 that, it says:  Reason for appointment, new patient is
19 here today to establish care.
20    A.  Correct.
21    Q.  You see that?
22    A.  Yes.
23    Q.  So does this mean that this is her first
24 appointment with Dr. Perez Soto?
25    A.  I believe so.

Page 76

1    Q.  And do you recall if you attended this first
2 appointment with him?
3    A.  I did not.
4    Q.  You did not attend?
5    A.  I did not.  I did not.  We knew that -- I knew
6 that that doctor spoke Spanish and the whole clinic
7 pretty much, they speak Spanish.
8    Q.  Okay.
9    A.  So I felt confident that she will go to this
10 appointment, the nurse spoke Spanish, everybody.
11    Q.  Okay.  So do you know if your mother filled out
12 this questionnaire that was in tab A, do you know if
13 this was done in Spanish for her?
14    A.  I was not present at this time.
15    Q.  So you don't know, okay.
16    A.  Right.
17    Q.  So essentially, if you look at the history of
18 present illness, new patient, it says your mother was
19 77 years old at the time.
20    A.  Where are we looking at?  Oh.
21    Q.  I'm sorry.  My bad.  This is on tab B.  I'm
22 sorry.
23    A.  Okay.
24    Q.  And it says that the reason for the visit was to
25 establish care with a new provider.  The prior provider

Page 77

1 was Dr. Gonzalez.  Do you remember him or her?
2    A.  I don't recall that name.
3    Q.  Okay.  And it says in there that -- that
4 Dr. Gonzalez was last seen four months prior; is that
5 right, or do you know?
6    A.  I don't know.  But the timeline looks like it was
7 when she was living at Good Samaritan, that there was a
8 clinic by.
9    Q.  Okay.  But here, this is after Good Samaritan,
10 right?
11    A.  Right.
12    Q.  Yeah, okay.  So it indicates in here that in that
13 paragraph:  Feels well today with no new complaints.
14       Do you know if that's correct?
15    A.  I was not there with her.
16    Q.  So you don't know?
17    A.  So I'm trusting the doctor.
18    Q.  Do you know if she was feeling well at that time?
19    A.  Yes.
20    Q.  Okay.  And it indicated that she had a history of
21 epilepsy but had no epileptic episodes around that time;
22 is that right?
23    A.  Correct.
24    Q.  Okay.  And do you see the section in there,
25 skipping down a little bit, it says:  Depression

20 (Pages 74 - 77)

1 screening?

2    A.  Um-hmm.  Correct.

3    Q.  And you kind of read the paragraph, just the

4 first one, you can kind of get a flavor of it, it says:

5 PHQ-9, little interest or pleasure in doing things, and

6 then the answer is, not at all.

7        Do you know if that's correct?  Was that your

8 mother's state of mind at this time?

9    A.  I would think so.

10    Q.  Okay.  And it ultimately goes down to after a

11 whole bunch of questions asked and the answers were not

12 at all, her total score on that was zero.  Do you know

13 if that is correct?  So like she basically was not

14 having depression symptoms --

15        MS. CARDINAL:  Objection.

16 BY MR. HILL:

17    Q.  -- as of this time of January 2023?

18        MS. CARDINAL:  Sorry.  Objection.

19 BY MR. HILL:

20    Q.  You can still answer.

21    A.  I'm not sure what do you mean by that.  I'm not a

22 doctor to evaluate her.

23    Q.  Okay.  Well, in your -- you, at the time, were

24 you still living with your mother or she was still

25 living with you?

1    A.  No.

2    Q.  As of January?

3    A.  Oh, January, yes.

4    Q.  Okay.  So January 2023, she's living with you.

5 Do you feel like she was having depression then?

6        MS. CARDINAL:  Objection.  Depression's a

7    clinical term.

8 BY MR. HILL:

9    Q.  Okay.  You can answer the question.

10    A.  I'm not a doctor.  I don't know what depression

11 was.

12    Q.  You don't know what depression means?

13    A.  It can mean anything.

14    Q.  Okay.  At the time, do you know if your mother

15 was having little interest or pleasure in doing things?

16    A.  She will have her moments of sadness, thinking

17 back of her situation.  But when she was with family,

18 she was what we consider or what we think was normal for

19 us.

20    Q.  Okay.  Among the other questions it asks in

21 there, it asks whether she was having trouble falling or

22 staying asleep or sleeping too much.

23        Do you know if she was having trouble with any of

24 those things?

25        MS. CARDINAL:  Objection.

1 BY MR. HILL:

2    Q.  You may answer the question.  And the question is

3 do you know?  And you may not know.

4    A.  Right.  Yeah.  No, I mean, I don't know if...

5    Q.  Do you know if your mother was having poor

6 appetite, or on the flip side of that, was she

7 overeating at the time?

8        MS. CARDINAL:  Objection.

9        THE WITNESS:  She was not overeating.

10 BY MR. HILL:

11    Q.  Okay.  Was she eating normal?

12    A.  What she would consider normal.

13    Q.  Okay.

14    A.  I don't know what normal is -- different for

15 everybody, but --

16    Q.  Was she eating the normal amount in your

17 observations of what she normally ate around January of

18 2023, compared to, let's say, six months earlier?

19    A.  Her style of eating has been uniform throughout.

20 She may be more hungry other days than not.  I don't

21 know.

22    Q.  Okay.  So you didn't see any difference in her

23 style of eating, then, at that time, compared to like,

24 say, six months prior?

25    A.  No.

1    Q.  Okay.  Did she ever tell you that she was feeling

2 bad about herself around this time of January of 2023?

3    A.  She never communicated that with me.

4    Q.  Did you ever notice her moving or speaking

5 slowly?

6    A.  Out of the norm, no.

7    Q.  Okay.  What about being fidgety or restless?

8    A.  No.

9    Q.  Did she ever express to you -- and I hate to pry,

10 but did she ever express to you that she was having like

11 suicidal thoughts?

12    A.  She never expressed that to me.

13    Q.  Okay.  Do you remember if your mother ended up

14 having any epileptic seizures after her evacuation from

15 Kissimmee Village?

16    A.  She had.

17    Q.  Do you know when, how long afterwards?

18    A.  No.  I mean, they're very unpredictable.

19    Q.  Okay.  And were you present when she had the

20 epileptic seizure?

21    A.  Yes.

22    Q.  Can you describe what that was, like how that

23 was?

24    A.  She was sitting on the sofa.  I was in the dining

25 room.  And we hear -- it's certain descriptive noise --

21 (Pages 78 - 81)

Page 82

1 that they make when they're going through a seizure.
2 Q. Okay. Was it like -- because I understand that
3 there's, you know, major seizures called grand mal
4 seizures and then there's littler seizures. Do you know
5 what hers was?
6 A. Yeah, so living with --
7 MS. CARDINAL: Objection. Sorry. Go ahead.
8 THE WITNESS: Living with 54 years of -- with
9 my mom, having epilepsy, we have been notified by the
10 doctors, specialists that she has brain discharge
11 throughout her entire brain. So she gets them really
12 strong or she gets them mild. So she just --
13 BY MR. HILL:
14 Q. Okay. So at this point in time, was it -- was
15 this one of the what you described as really strong or
16 was this more of a mild one?
17 A. The one that I'm describing right now, that is in
18 my vision, in my memory, it was a mild one.
19 Q. Okay. And do you know if she -- how many
20 epileptic seizures she had after -- between the time of
21 her moving out of Kissimmee Village and like today?
22 A. I don't count them.
23 Q. Okay. But it's more than one?
24 A. Right.
25 Q. Okay.

Page 83

1 A. Yes.
2 Q. Do you know whether a doctor has ever diagnosed
3 the cause of those epileptic seizures after she moved
4 out of Kissimmee Village?
5 A. It was a condition that she had since she was
6 young. So that is not just epilepsy being diagnosed --
7 Q. Okay.
8 A. -- 2022.
9 Q. Okay. So you don't know if there was something
10 that caused them -- something that happened to her or
11 anything like that in her life that caused them one way
12 or the other?
13 A. No.
14 MR. HILL: Okay. I see we're now after one but
15 my thought is I can plow through and be done in less
16 than an hour. Maybe less than 30 minutes. Knowing
17 that, do you want to take a lunch break? Again this
18 is very democratic if -- we can go off the record.
19 (A discussion off the record was held.)
20 BY MR. HILL:
21 Q. Do you know if your mother ever suffered from
22 depression or anxiety?
23 A. Not that I know of.
24 Q. In terms of the mortgage that your mother is
25 paying now, do you know if it's greater than the lease

Page 84

1 she was paying at the end of her time at Kissimmee
2 Village?
3 A. A lot greater.
4 Q. How much, do you know?
5 A. Her mortgage is 1773, I think, with an HOA of 350
6 a month.
7 Q. Okay.
8 A. So it's about 2,000.
9 Q. Total, all --
10 A. For the mortgage and the HOA, yes.
11 Q. Okay. And in terms of her current living
12 arrangements, does she have any friends that are close
13 by that she's made?
14 A. No.
15 Q. Okay. Did she have anybody that she can speak
16 Spanish to that's close by?
17 A. No.
18 Q. Is it an older community?
19 A. No.
20 Q. It's just a regular neighborhood?
21 A. Correct.
22 Q. Okay. But she's in a subdivision so there is an
23 HOA?
24 A. Right.
25 Q. Do you know if Sanford Health, the separate

Page 85

1 entity, owns the property that Kissimmee Village is on,
2 do you know one way or the other?
3 A. No.
4 Q. Okay. Do you know anything about Sanford Health
5 and why they're being sued?
6 A. No.
7 Q. Okay. Do you know if any of the employees that
8 you were communicating with about the termination, you
9 know, in the friendship room, do you know who they were
10 employed by, whether it was Good Samaritan or Sanford
11 Health?
12 A. We assumed that they were from Good Samaritan.
13 Q. Okay. All right.
14 MR. HILL: And I lied, I guess, because I'm
15 done. I told you it was less than 15 minutes.
16 MS. CARDINAL: You were being generous.
17 MR. HILL: Yeah, no, I had a whole 'nother page
18 and I was just thinking, okay, I'm done.
19 MS. WELKIE: It's always hard to guess.
20 MS. CARDINAL: Yeah. Timing's very difficult.
21 Okay. So if you'll give me five minutes, I'll
22 go through my notes and then we'll have a couple
23 questions for you.
24 (A brief recess was taken.)
25 CROSS-EXAMINATION

22 (Pages 82 - 85)

---

Page 86

1 BY MS. CARDINAL:
2  Q. So like I said, this should take a few minutes.
3 Maggie, Morgan, we've spoken before but hello. So a
4 couple things I want to redirect you on, if you don't
5 mind, we talked a little bit about your background, your
6 career background, and you testified that you are an HR
7 director?
8  A. Correct.
9  Q. Do you have any legal training that goes with the
10 HR director role?
11  A. No.
12  Q. And we spent some time, you mentioned that you
13 did some research on Good Samaritan Kissimmee Village.
14 What is it -- what was it about Good Samaritan Kissimmee
15 Village that attracted your mom to that property, you
16 and your mom to that property?
17  A. The fact that she could still live independently
18 and the services. There were Spanish -- when we were
19 visiting, Debra had told us that there were a lot of
20 Hispanic tenants living in that community.
21  Q. Okay.
22  A. So that was appealing to her as well.
23  Q. Did she -- when she said a lot, did she give you
24 any kind of specific numbers or anything like that?
25  A. No.

---

Page 87

1  Q. Okay. Was there anything else that was
2 beneficial about the Good Samaritan property?
3  A. They had restaurants onsite. And the activities
4 that they were -- the social activities.
5  Q. And the social activities, how did your mom get
6 notice of those social activities?
7  A. I don't know. I know that one time I saw like a
8 flyer that she had gotten from -- while she was at the
9 bus, the other residents had communicated to her. But I
10 never saw like constant communication.
11  Q. Okay. Was that flyer in English or Spanish?
12  A. Spanish.
13  Q. Okay. Now, you also mentioned that for the
14 execution of the occupancy agreement or what we've been
15 referring to as the lease, that you had gone to an
16 office on the property with your mom to sign that lease.
17 Did the person you were with -- and I don't -- I believe
18 that you testified it wasn't Debra, it was someone else
19 whose name we couldn't remember, correct?
20  A. Correct.
21  Q. Right. When you were going through the occupancy
22 agreement in that office, did you, as a group, go
23 through it in English or Spanish?
24  A. She explained it to us in Spanish.
25  Q. Okay. Did she go through the whole occupancy

---

Page 88

1 agreement?
2  A. No. Not in detail.
3  Q. Okay. Did employees, when you met anyone at the
4 property at Good Samaritan Kissimmee Village, did they
5 ever introduce themselves to you with their names and
6 titles and who they worked for?
7  A. No (indiscernible) --
8  Q. So you wouldn't have --
9  (Court reporter clarification.)
10  THE WITNESS: Not necessarily.
11  MS. CARDINAL: Now I'm doing it. Sorry.
12  MR. HILL: Trying to get home.
13  MS. CARDINAL: I'm trying to get everybody out
14 of here.
15 BY MS. CARDINAL:
16  Q. Sorry. Yes. Go ahead.
17  A. No.
18  Q. No. Okay. So you wouldn't necessarily have
19 known if you were speaking to someone who worked solely
20 for Good Samaritan?
21  A. No.
22  Q. Okay. Now, in the friendship room, we talked
23 about the termination agreement. How was that document
24 presented to you and your mom?
25  A. It was just placed on the table.

---

Page 89

1  Q. Okay. And what could you see when it was placed
2 on the table?
3  A. Just the document, like I understand.
4  Q. No, that's my fault. When it was placed on the
5 table, was there any, like, writing that was visible to
6 you?
7  A. No. It was just placed where we needed -- where
8 my mom needed to sign.
9  Q. Okay. And the lady that you spoke to, did she
10 tell you what that document was?
11  MR. HILL: Objection.
12  THE WITNESS: Yes.
13  MR. HILL: Go ahead. I just objected.
14 Sometimes we object to preserve the record because we
15 don't have a judge here to rule on our objections like
16 we see on TV.
17  MS. CARDINAL: Yeah.
18  MR. HILL: So I have to object and then we kind
19 of work it out later.
20  MS. CARDINAL: Perfect. Yeah.
21 BY MS. CARDINAL:
22  Q. So I'll ask again. Did she tell you what that
23 document was?
24  A. Yes.
25  Q. Okay. And what did she say?

---

23 (Pages 86 - 89)

Page 90

1  A. That by signing that document, they will give us
2  the deposit faster. Otherwise, we would need to wait
3  30 days and then while they do the process, so we'll get
4  the deposit later, later.
5  Q. Um-hmm. And do you know why your mom decided to
6  sign that document in the friendship room?
7  A. Because prior to that, she told us that they were
8  not going to rebuild.
9  Q. Okay. That they were not going to be rebuilding
10 the units on the map?
11 A. Correct.
12 Q. Okay. And did you talk to your mom about what
13 her options were based on what was presented to you at
14 that table?
15 A. Absolutely, yes.
16 Q. And what did you tell her?
17 A. Just as the lady told me, that they weren't going
18 to rebuild, she highlighted the area, and that by
19 signing this document, we're just going to get the
20 deposit anyways. This document will give us the option
21 to get the deposit sooner and then otherwise, we have to
22 wait 30 days and then we'll get the deposit later.
23 Q. Okay. And so it's your understanding your mom
24 signed the document because she wanted the deposit
25 sooner?

Page 91

1  A. She signed the document because that was the only
2  option she had.
3  Q. Okay.
4  A. They didn't tell her anything about, oh, wait six
5  months and we may move you somewhere else.
6  Q. Okay.
7  A. Nothing was mentioned like that. They just --
8  that was the only option that we had.
9  Q. Okay. And did you talk to your mom about the
10 deposit that was returned to her?
11 A. Absolutely.
12 Q. And she took the money and deposited it?
13 A. Yes. She needs to sign the check.
14 Q. Okay.
15 A. To get the deposit.
16 Q. Okay. And did you have any discussion with her
17 about what she needed that security deposit for?
18 A. Yes. We saved that for when she get another
19 apartment and for all her personal needs.
20 Q. Okay. And I think that I heard you testify at
21 one point that your mom knew what she was signing for
22 the termination agreement. How do you know that your
23 mom knew that?
24 A. She acknowledged what I was telling her. And she
25 decided then to sign the paper.

Page 92

1  Q. Okay. And what you shared with her was regarding
2  the not rebuilding the property and the return -- the
3  speed -- or the duration to return the security deposit?
4  A. Correct.
5    MR. HILL: Objection.
6  BY MS. CARDINAL:
7  Q. Sorry, just switching through this.
8    Were your mom's seizures controlled by her
9  medication while she was living at Good Samaritan?
10 A. Yes.
11 Q. Okay. Did you notice in any increase in seizures
12 after she left?
13 A. Well, I feel that the seizures happen more when
14 she's under a lot of stress.
15 Q. Okay.
16 A. She had had few seizures, you know, while she was
17 living with me that I could see all the time. I mean,
18 she didn't have several-several, tons.
19 Q. Okay.
20 A. I don't know if I answered your question. I'm
21 sorry.
22 Q. That's okay. That's okay. That's your
23 recollection. That's what I'm asking.
24    And sorry to kind of take you back in time, but
25 do you remember the -- we talked a little bit about the

Page 93

1  evacuation from Good Samaritan. Do you recall that
2  period, like September 2022?
3  A. Right.
4  Q. Okay. And what notice did you have about the
5  storm that was coming?
6    MR. HILL: Objection.
7  BY MS. CARDINAL:
8  Q. You can answer.
9  A. She didn't have or she didn't know that they were
10 mandating evacuation. She just -- she left with me.
11 Q. Your --
12 A. My mom. She left with me because I advised her
13 to move -- stay in my house while the hurricane so she
14 didn't path through the hurricane by herself at the
15 apartment.
16 Q. Okay. And -- okay. So what made you want your
17 mom to be with you for the hurricane?
18 A. Just to keep her company, for her to feel safe.
19 Q. And what information did you have about, I'll
20 say, this may not be the right terminology but the
21 hurricane path, how did you get any information about
22 that?
23 A. The news.
24 Q. Okay. Do you know if your mom received any
25 notices about the hurricane path from Good Samaritan?

24 (Pages 90 - 93)

1   A.  Not that I know of.
2       MS. CARDINAL:  Okay.  I think that's it.  Yep.
3   That's it.  Ten minutes.
4       MR. HILL:  Yeah, you were short.  I was
5   expecting an hour.  I do have a few follow-up
6   questions and I will not be long.
7                REDIRECT EXAMINATION
8   BY MR. HILL:
9   Q.  So you went back and described the termination
10  agreement as being part of that termination agreement
11  was that your mom could get the refund sooner; is that
12  correct?
13  A.  Correct.
14  Q.  So do you know if that's true or false, that
15  through the termination agreement, your mom could get
16  the deposit back sooner?
17      MS. CARDINAL:  Objection.
18      THE WITNESS:  By -- the way she explained it to
19  us was, by signing that document, she could get her
20  deposit sooner, that sooner, we didn't know.  She said
21  otherwise, we'll have to wait until 30 days when they
22  process everything and then after that, whatever time
23  it takes.
24  BY MR. HILL:
25  Q.  Okay.  So she -- did your mom get the deposit

1   refunded within 30 days of signing that termination
2   document?
3   A.  I'm not sure of which exact date was it that she
4   received it.  I would have to look back in the records.
5   Q.  Okay.  I think I showed you the letter.  It's in
6   the exhibits there.  There it is right there.  What's
7   the date at the top of the letter there that's
8   Exhibit 15?
9   A.  October 31st.
10  Q.  Okay.  So the signing of the termination
11  agreement was --
12  A.  The 15th.
13  Q.  -- the 15th.  So that's within really two weeks,
14  right?
15  A.  Seems like it.
16  Q.  Okay.  So less than 30 days, correct?
17  A.  Correct.
18  Q.  And do you know how -- if your mom had not signed
19  that termination document, what would the process have
20  been for the lease to be terminated?
21  A.  I don't know.
22  Q.  You don't know.  Okay.  And then you mentioned
23  your mother's seizures and you said that you felt like
24  when she has stress, she may have more seizures; is that
25  correct?

1   A.  Correct.
2   Q.  So have you ever heard any doctor diagnose that
3   and say this is what causes it, stress causes her
4   seizures?
5   A.  Not specifically.
6   Q.  So that's your observation?
7   A.  Correct.
8       MR. HILL:  Okay.  That's all the questions I
9   have.
10      MS. CARDINAL:  Okay.
11      MR. HILL:  Read or waive?
12      MS. CARDINAL:  Well, it's, I guess, we'll read.
13  Do you want to read the transcript and sign for
14  accuracy?
15      THE WITNESS:  Sure.
16      MR. HILL:  What that means is you -- and I'm
17  not your attorney.  Neither of us are your attorneys,
18  I don't think.  But you have the ability to read the
19  transcript and then make corrections on it to the
20  extent you feel like they are needed.  Particularly if
21  you felt like, wow, I answered yes and then the
22  transcription says no and I got that answer wrong,
23  somehow it was typed up wrong.  So you can do that or
24  you can waive your right to do that and just let the
25  transcript --

1       MS. CARDINAL:  -- be what it is, right.
2       THE WITNESS:  Oh, gosh.
3       MR. HILL:  Totally your choice.
4       MS. CARDINAL:  Yeah, it's up to you.
5       MS. WELKIE:  It's not a problem either way.
6   You have the opportunity -- you can have the
7   opportunity and then you would say, I did not answer
8   this like this.
9       MS. CARDINAL:  Right.
10      MS. WELKIE:  If you feel you didn't answer like
11  that.
12      MS. CARDINAL:  Court reporters are very
13  professional.  There's no trick to it.  So it's not
14  like you're going to be missing anything.  It is
15  really your choice.
16      MR. HILL:  And depending on what changes are
17  made, we may have to ask you about those changes and
18  why they were made.  That's a ground for kind of
19  reopening the deposition, but it doesn't happen very
20  often.
21      THE WITNESS:  I feel comfortable --
22      MS. CARDINAL:  Okay.
23      MR. HILL:  Okay.
24      THE WITNESS:  -- that she will --
25      MS. CARDINAL:  Then what you would just say is

Page 98

1 waive.
2      MR. HILL:  You're waiving.
3      THE WITNESS:  Waive?
4      THE COURT REPORTER:  Are you ordering this one
5 as well?
6      MR. HILL:  Yes.
7      THE COURT REPORTER:  Ordering a copy?
8      MS. CARDINAL:  Copy, please, yes.  Thank you.
9      (The deposition was concluded at 1:39 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 99

1      CERTIFICATE OF OATH
2
  STATE OF FLORIDA)
3 COUNTY OF ORANGE)
4
5      I, MAE FISHER, Registered Merit Reporter,
6 Certified Realtime Reporter and Notary Public, State of
7 Florida, certify that MAGALY GUTIERREZ personally
8 appeared before me on June 28, 2024, and was duly
9 sworn/affirmed.
10
11      WITNESS my hand and official seal this 3rd day of
12 July, 2024.
13
14
15
16      MAE FISHER, RMR, CRR
     Notary Public - State of Florida
17      Commission HH 443649
     Expires:  January 8, 2028
18
19
20      Personally known _____
21      OR Produced Identification X_____
22 Type of Identification Produced Passport
23
24
25

Page 100

1      TRANSCRIPT CERTIFICATE
2 STATE OF FLORIDA)
  COUNTY OF ORANGE)
3
4      I, MAE FISHER, Registered Merit Reporter,
  Certified Realtime Reporter and Notary Public, State of
5 Florida, certify that I was authorized to and did
  stenographically report the deposition of Magaly
6 Gutierrez; that a review of the transcript was not
  requested; and the foregoing transcript, pages 4 through
7 98, is a true record of my stenographic notes.
8      I FURTHER CERTIFY that I am not a relative,
  employee, attorney, or counsel of any of the parties,
9 nor am I a relative or employee of any of the parties'
  attorney or counsel connected with the action, nor am I
10 financially interested in the action.
11
12      DATED this 3rd day of July, 2024, at Orlando,
  Orange County, Florida.
13
14
15
16
17      _____
     MAE FISHER, Notary Public
18      State of Florida
19
20
21
22
23
24
25

Veritext Legal Solutions
800-726-7007                                             305-376-8800

| & |
| --- |
| **&**  2:9 |

| 1 |
| --- |
| **1**  21:10,11,17 22:5,18 |
| **1,074.20.**  62:4 |
| **1,200**  61:18 65:2 |
| **10**  68:17 |
| **100**  3:5 58:20 |
| **101**  2:10 |
| **11**  74:23 75:5 |
| **11:07**  1:14 |
| **12**  3:14 9:16 50:12,13 62:23 |
| **1200**  64:25 |
| **122**  1:17 2:4 |
| **125.80.**  61:24 |
| **13**  3:16 61:9,10 |
| **14**  3:17 9:8,10 30:2 74:12,13 74:21 |
| **1400**  61:5 |
| **15**  37:9,10 52:17 85:15 95:8 |
| **15th**  95:12,13 |
| **1773**  84:5 |
| **192**  56:11 |
| **1:39**  1:14 98:9 |

| 2 |
| --- |
| **2**  21:10,11 22:10 22:24 52:16 68:18 |
| **2,000**  84:8 |

**20**  3:12 31:24 68:21
**200**  1:17 2:4 58:20
**2022**  31:10 52:17 83:8 93:2
**2023**  72:15 74:23 75:5 78:17 79:4 80:18 81:2
**2024**  1:13 99:8 99:12 100:11
**2028**  99:17
**21**  10:21 28:9,25 29:6 30:3
**227-8495**  2:11
**22714**  99:15 100:16
**24**  3:11 64:5
**25**  3:13 31:24 68:21
**28**  1:13 61:23 99:8
**29**  61:23

| 3 |
| --- |
| **3**  22:14 28:25 29:2 51:14 |
| **30**  48:10 49:6,8 49:12,13,16 54:20,21 61:23 67:15 68:18 83:16 90:3,22 94:21 95:1,16 |
| **31**  51:15 |

| 31st  95:9 |
| --- |
| **32801**  1:18 2:5 |
| **33602**  2:11 |
| **35**  9:14 |
| **350**  84:5 |
| **364**  75:12 |
| **3700**  2:10 |
| **3rd**  99:11 100:11 |

| 4 |
| --- |
| **4**  3:3 100:6 |
| **407**  2:5 |
| **4163**  25:12,12 25:13 |
| **443649**  99:17 |

| 5 |
| --- |
| **5-7**  45:11 |
| **50**  3:15 58:20,22 58:24 |
| **54**  82:8 |
| **55**  14:5 68:10,14 |

| 6 |
| --- |
| **6**  29:6,7,19 |
| **61**  3:16 |

| 7 |
| --- |
| **7**  3:11 24:10,11 24:22 25:2 27:7 30:7 |
| **74**  3:17 |
| **77**  76:19 |

| 8 |
| --- |
| **8**  3:12 20:3,5,14 28:9 99:17 |

**813**  2:11
**841-7777**  2:5

| 9 |
| --- |
| **9**  3:13 25:22,23 78:5 |
| **98**  100:7 |
| **99**  3:4 |

| a |
| --- |
| **a.m.**  1:14 |
| **abandonment**  3:15 |
| **ability**  5:25 72:9 73:6 96:18 |
| **able**  35:8 36:19 37:5,13 39:21 69:25 72:23 |
| **above**  39:15 |
| **absolutely**  40:22,24 56:23 64:17 90:15 91:11 |
| **accept**  10:17,21 38:2,5 63:7,14 63:25 64:2,10 |
| **acceptance**  3:12 63:15 |
| **accepting**  26:24 63:20 |
| **access**  33:25 34:14 35:9,21 36:1,1,2,11,15 36:25 37:5 |
| **accompanied**  43:21 75:4 |

**accompany**
73:18
**account** 61:24
71:12
**accounting** 8:22
8:23 9:18
**accuracy** 96:14
**ach** 71:10
**acknowledged**
91:24
**action** 100:9,10
**activities** 70:3
72:10 87:3,4,5,6
**actual** 28:8
37:18,20
**actually** 22:6
23:15 26:4 37:1
37:4 42:25 71:8
71:13,18
**addendum** 30:3
**advanced** 72:24
**advantage**
63:12 70:5
**advised** 93:12
**affect** 5:25 6:4
**affected** 58:9,10
59:8
**affirm** 4:4
**affirmed** 99:9
**age** 10:20 72:24
**ago** 60:6,6
**agreed** 13:8,16
17:10 26:25
64:7

**agreement** 3:13
3:14,15 10:9,16
10:24 26:3,4,5
26:10 27:12
28:16,17,18
62:23 87:14,22
88:1,23 91:22
94:10,10,15
95:11
**agreements**
9:20 10:13
**ahead** 66:19
82:7 88:16
89:13
**alec** 2:3
**alecr** 2:7
**allow** 72:12
**alteration** 22:25
**amount** 61:3,6
61:15,16 62:5
62:15 80:16
**answer** 5:21 6:1
15:1 19:9,12,21
23:1 74:4 78:6
78:20 79:9 80:2
93:8 96:22 97:7
97:10
**answered** 14:13
92:20 96:21
**answering** 5:13
**answers** 4:22,23
6:17 78:11
**anticipating**
14:25

**anxiety** 83:22
**anybody** 13:25
34:19 35:5
38:16 47:4
84:15
**anyways** 90:20
**apartment**
15:22,24 23:8
32:5 37:14,17
37:18,20 39:15
41:17 51:20
54:11 59:24
60:22 63:4,6,6
63:10,23 64:7,9
64:13,15 66:24
67:6 70:18
91:19 93:15
**apartments**
57:18,21
**apologize** 53:22
**appealing** 86:22
**appeared** 99:8
**appetite** 80:6
**applied** 58:1,2
60:20
**apply** 57:15,25
**appointment**
7:12 64:9 70:24
75:5,18,24 76:2
76:10
**appointments**
70:21 73:10
**approaching**
31:14

**approximately**
39:10
**area** 14:8 15:21
18:3 31:12 34:5
34:8,11 36:19
44:10 47:25
48:2,12 68:11
90:18
**area's** 36:11
**areas** 30:19
36:19
**arrangement**
69:14
**arrangements**
84:12
**arrive** 57:9
**asked** 6:14 7:5
10:14 20:17
21:25 22:3
52:25 53:9,12
78:11
**asking** 6:6 92:23
**asks** 79:20
**asleep** 79:22
**assessment** 74:2
**assist** 73:1
**assistant** 24:16
**assisted** 69:16
**associate's** 8:22
**associated** 34:7
34:19 35:23
63:1
**assume** 5:21
42:7 43:22

assumed 85:12
assuming 33:16
ate 80:17
attempt 40:12
attempted 33:2
attend 76:4
attended 76:1
attending 73:12
attention 72:22
attorney 6:9
  72:17 96:17
  100:8,9
attorneys 96:17
attracted 86:15
audible 4:23
authorized
  100:5
available 15:23
  47:15

**b**

b 3:7 28:20 30:3
  74:20 75:11,12
  76:21
back 23:11,15
  32:5,5 40:23
  42:20 46:9
  47:18 48:10,18
  48:23 50:23
  51:3,17 54:10
  55:15 56:18
  61:5,20 62:1,2,7
  65:17,20 67:3,8
  71:1,6 79:17
  92:24 94:9,16
  95:4

background
  7:14 86:5,6
bad 65:12 73:5
  76:21 81:2
bag 32:22
balance 61:23
barkholz 2:19
barricades 35:2
based 90:13
basic 4:21
basically 14:16
  23:17 38:21
  48:20 66:13
  73:4 78:13
bedding 60:15
bedroom 23:2,7
  38:25
beginning 7:25
  47:21
behalf 21:19
  22:8 23:20 38:3
  38:5
believe 19:17
  20:21 25:5
  50:20 54:23
  61:4 62:21
  65:18 71:4
  75:25 87:17
bell 47:8 53:1
belongings
  32:23 38:22
  55:2 60:15,21
beneficial 87:2
benefits 57:5,7
  71:18

best 13:8,16
  36:9 47:20
  56:18 74:1
better 73:14
big 44:7 58:25
bike 41:13,23
  42:6 43:11
birchwood 25:8
  25:12,15
bit 14:23 20:19
  48:17 52:2 57:9
  77:25 86:5
  92:25
black 19:2
  27:19
block 52:18
blond 47:6
blondish 46:21
blue 25:15,16
  25:19
bmcc 8:19
born 7:16
borough 8:19
bottom 22:10,13
  27:21 40:17
bought 69:3
boulevard 2:10
box 22:24
boxes 25:6,7
brain 82:10,11
break 13:21,22
  43:4,8 83:17
breakfast 72:1,2
  72:4,4

brief 43:6 85:24
briefly 12:9
bring 31:18
brings 62:3
brochures 17:8
  59:18
brother 13:10
brought 4:14
  14:7 17:6 44:18
  55:20 72:22
brownish 16:17
build 45:10
building 41:18
  43:18
bunch 73:22
  78:11
bus 70:6 87:9
buy 54:14
buys 72:3

**c**

c 2:1 4:1 74:20
cabinet 39:16
call 25:21 26:5,9
  26:15 45:14
  64:4 65:17 66:9
  70:25
called 14:13
  25:8 26:19
  35:25 36:10
  57:19 63:4 82:3
calling 26:6
  70:9
calls 36:5
cancer 13:3

capacity 68:11
capture 5:4,14
cardinal 2:2
6:23 7:7 21:15
23:10 24:15,18
24:25 26:6,11
26:14,17 30:9
30:13 38:5 39:7
43:5 78:15,18
79:6,25 80:8
82:7 85:16,20
86:1 88:11,13
88:15 89:17,20
89:21 92:6 93:7
94:2,17 96:10
96:12 97:1,4,9
97:12,22,25
98:8
care 45:3 69:22
69:25 75:19
76:25
career 86:6
caregiver 69:19
carpet 20:16,16
21:24,25 22:2,2
case 7:2 73:4
casualty 29:21
catch 45:6 46:16
cause 4:5 83:3
caused 83:10,11
causes 96:3,3
cell 66:9,10,11
center 75:8
centers 75:1

certain 61:20
81:25
certificate 3:4,5
99:1 100:1
certified 99:6
100:4
certify 99:7
100:5,8
chairs 44:11,12
chance 36:23
change 22:1
changes 97:16
97:17
charged 62:19
check 61:4,5
62:7 71:13
91:13
checks 71:8
childhood 12:11
choice 21:24
97:3,15
chose 31:17
chronological
36:16 47:20
74:19
circling 25:17
circumstances
60:19 68:7
clarification
88:9
classes 8:13
claudia 19:5
clinic 73:25 74:1
75:3 76:6 77:8

clinical 79:7
clinics 73:12
close 13:9,17
68:22 84:12,16
closed 34:23
closer 13:14
clothes 32:22
40:1,2
clothing 40:10
cls 2:17,18,20
clsmf.org 2:6,6
2:7
collectively
13:15 14:2
college 8:8,19
colonial 1:17
2:4
color 42:5
come 13:13 22:1
22:2 45:3 47:4
51:17,21 67:8
68:23 71:1
comfortable
97:21
coming 6:11
20:16 31:15
93:5
commenced
1:14
commission
99:17
commit 66:20
common 30:19
communicate
73:14

communicated
48:4 56:15 81:3
87:9
communicating
85:8
communication
35:22 87:10
communities
68:10
community 1:16
2:3 8:19 14:5,15
55:22 59:9
68:14 84:18
86:20
company 9:1,3
10:18,25 11:1
12:3 93:18
compared 80:18
80:23
complaints
77:13
complete 21:25
completed
20:22
completely
38:23
concluded 1:14
98:9
condition 38:21
72:9 83:5
conditions 6:3
64:16 73:23
confident 76:9
confirming 7:12

**connected** 100:9
**consider** 79:18
   80:12
**consistent** 26:8
**constant** 87:10
**construction**
   41:7
**contact** 66:12
   68:22
**contacts** 57:18
**contain** 10:24
**contract** 28:13
   28:14,15
**controlled** 92:8
**convenience**
   72:21
**conversation**
   18:21 63:5
   65:14,25
**conversations**
   34:6 62:24 71:2
**cook** 71:16
**copy** 55:10,12
   98:7,8
**correct** 8:4
   12:18,25 14:19
   14:21 15:10
   16:1,9 17:13,16
   17:17 22:12,15
   23:21 27:20
   28:10,22,23
   29:16 31:21
   32:9 33:9,11
   35:1,10 37:6
   38:15 41:1

42:19 43:23
45:16 47:3
49:13,14,20
50:3,10 52:12
53:11,13,14
54:7 55:13
57:14 59:17
60:9,10,13,14
60:17,23 61:19
61:25 62:14,18
66:10,18 67:2
69:4,6,12,15
70:22 72:18,19
73:8 75:14,16
75:20 77:14,23
78:2,7,13 84:21
86:8 87:19,20
90:11 92:4
94:12,13 95:16
95:17,25 96:1,7
**corrections**
96:19
**costed** 41:2
**counsel** 2:8,13
9:21 100:8,9
**count** 44:5
82:22
**county** 56:3,5,6
57:6,12 58:8
99:3 100:2,12
**couple** 7:14 53:8
85:22 86:4
**course** 43:5
**court** 1:1 4:2
5:2,14 23:11

25:9,12,15 30:9
88:9 97:12 98:4
98:7
**cover** 6:20
**covering** 29:14
**created** 39:19
40:1
**credit** 61:22
**cross** 85:25
**crowded** 44:6
**crr** 1:19 99:16
**crying** 49:25
50:2
**current** 68:23
75:3 84:11
**currently** 5:24
11:8
**cypress** 25:8

**d**

**d** 3:1 4:1 28:20
74:20
**daily** 70:3 72:10
**damage** 29:21
31:25 37:14
63:22
**damaged** 38:23
39:19 51:20
63:21
**damages** 37:17
**date** 1:13 15:14
37:9,11 55:24
95:3,7
**dated** 52:17
100:11

**dawn** 2:2
**dawnw** 2:6
**day** 16:20,20
20:23 27:6 34:7
36:17,23 37:12
42:21 43:24
50:19 54:17
55:19 64:5
67:21 99:11
100:11
**days** 10:21,22
48:10 49:6,8,12
49:13,16 67:15
80:20 90:3,22
94:21 95:1,16
**de** 2:16
**deal** 73:6
**debited** 71:12
**debra** 16:4,5,5,8
16:10,14,21,23
18:5,16 24:7
86:19 87:18
**decide** 13:1,15
**decided** 13:13
14:2 66:19,22
90:5 91:25
**decisions** 73:2
**defendants** 1:9
1:15 2:13 3:10
4:14 20:5 24:11
25:23 50:13
61:10 74:13
**definitely** 54:19
**degree** 8:22,23
9:18

delgado 1:4
4:15 12:10
21:12 22:5
28:21 75:12
deliver 71:20
delivered 17:22
17:22
democratic
83:18
demolished 41:9
demolishing
43:1
demolition
56:22
denial 3:12
denied 34:16
departed 11:20
depending
10:20 97:16
depose 4:15
deposit 3:16
48:9 49:19
51:12,12 54:7
54:10,13 60:24
61:1,17 62:4,12
67:14,21 90:2,4
90:20,21,22,24
91:10,15,17
92:3 94:16,20
94:25
deposited 61:6
62:12,16 91:12
deposition 1:12
3:5 4:17,21 6:7
6:8,11 26:19

97:19 98:9
100:5
deposits 48:11
depression
77:25 78:14
79:5,10,12
83:22
depression's
79:6
describe 14:10
15:4 16:14
18:24 19:1
22:25 38:20
40:20 42:2,5
45:8 46:20 68:7
81:22
described 82:15
94:9
describing
82:17
descriptive
81:25
destroyed 40:18
detail 88:2
diagnose 96:2
diagnosed 72:8
83:2,6
difference 80:22
different 18:10
36:4 74:20
80:14
difficult 58:13
85:20
dining 81:24

direct 3:3 4:11
directed 46:11
46:14
directly 45:21
71:23
director 9:2,10
9:13 86:7,10
disappointed
50:1
discharge 82:10
discuss 63:19
discussed 64:6
discussion
83:19 91:16
dishes 40:13
displaced 57:13
59:16
disposed 55:5,7
disposing 62:20
distance 68:20
district 1:1,1
division 1:2
doctor 73:18
75:10,15 76:6
77:17 78:22
79:10 83:2 96:2
doctor's 70:24
74:22
doctors 70:20
73:9,12,20
82:10
document 10:5
11:2,14,19 12:1
19:15,18,22
20:9,10,11,12

20:14 21:9,22
21:25 22:3,17
22:18 23:16
25:18 26:1,22
26:23 27:5 28:7
28:13 29:11
30:2,4,6 48:7,9
48:13 50:11,16
50:18,21 51:9
51:10 52:4,8,10
52:14,16,23
53:6,10,12,24
54:1 55:10,15
55:18 56:19
61:13 67:5,5,14
88:23 89:3,10
89:23 90:1,6,19
90:20,24 91:1
94:19 95:2,19
documentation
72:24
documents 7:1
9:20,22,24 10:2
10:7 44:17
59:18,22 73:7
74:18
doing 9:18 23:6
67:6 78:5 79:15
88:11
downtown 56:8
dr 75:24 77:1,4
drive 1:17 2:4
25:1
drove 33:4
35:12,15 36:20

36:23,24 43:16
43:17
**duly** 4:9 99:8
**duration** 92:3

**e**

**e** 2:1,1 3:1,7 4:1
4:1 21:1,2,2,4,5
21:6 62:25
65:19,20
**earlier** 49:22
52:11,25 80:18
**east** 1:17 2:4,10
**eating** 80:11,16
80:19,23
**edge** 39:8
**education** 8:20
**efforts** 68:8
**egg** 72:4
**eight** 60:6
**either** 10:20
34:19 57:6
67:25 68:11
97:5
**elementary** 7:25
**emergency**
66:12 73:5
**emotional** 13:21
**emotions** 50:9
**empathetic**
47:24 48:6
**employed** 16:21
42:8 54:22 56:5
62:25 85:10
**employee** 10:3,4
10:24 100:8,9

**employees** 9:7,8
9:10,12,25 10:6
10:17 73:13
85:7 88:3
**employers**
11:20
**empty** 46:4
**ended** 15:25
17:18,18 26:23
41:8 43:1 44:16
55:1,14 69:3
72:17 81:13
**engage** 72:10
**english** 8:13,17
11:6,7,16,17
12:10,19 16:5
18:18 19:16
31:5 41:25 42:1
44:22,23 46:18
46:19 87:11,23
**enroll** 73:25
**enrolled** 73:11
**enter** 34:21
**entering** 34:8
**entire** 18:21
23:7,8 57:10
82:11
**entity** 85:1
**entrance** 33:5
33:21,22 35:16
35:17 36:16
**entry** 34:16
**epilepsy** 77:21
82:9 83:6

**epileptic** 77:21
81:14,20 82:20
83:3
**episodes** 77:21
**espinosa** 19:5
**esquire** 2:2,2,3
2:9
**essentially**
57:11 62:3,12
76:17
**establish** 75:19
76:25
**establishing**
4:20
**estimate** 45:18
58:13,16 64:23
**evacuated** 31:19
32:21
**evacuating** 32:3
32:12 35:20
37:8
**evacuation**
31:13 32:14,18
33:24 81:14
93:1,10
**evaluate** 78:22
**evangelical** 1:7
28:20
**event** 73:2
**events** 14:12,14
14:16
**eventually** 15:3
72:15
**everybody**
55:21 76:10

80:15 88:13
**exact** 64:20 95:3
**exactly** 26:18
65:22 70:12
**examination** 3:3
4:11 85:25 94:7
**examined** 4:10
**exchanged** 7:2
**excited** 71:3
**exclusively**
12:17 18:18
**execution** 87:14
**exhibit** 3:11,12
3:13,14,16,17
20:3,3,5,14
24:10,11,22
25:22,23 30:7
50:12,13 61:9
61:10 62:23
74:12,13,21
95:8
**exhibits** 3:8,10
30:12 95:6
**expecting** 94:5
**expense** 51:16
**experience**
31:25 63:24
**expires** 99:17
**explain** 10:2
49:15 51:8,13
51:24 52:10
**explained** 23:18
27:1 29:4,25
52:7 87:24
94:18

**explaining** 21:21
**explanation** 48:20
**express** 81:9,10
**expressed** 81:12
**extent** 96:20

**f**

**facilities** 30:18
**facility** 69:17
**fact** 21:23 62:11 86:17
**fair** 5:22 19:2 27:19
**falling** 79:21
**false** 94:14
**familiar** 11:3
**family** 29:23 79:17
**far** 31:22 40:25 46:4,6 68:16 70:14
**fast** 66:21
**faster** 48:13 67:21 90:2
**fault** 89:4
**feel** 15:17 54:2 67:4 79:5 92:13 93:18 96:20 97:10,21
**feeling** 77:18 81:1
**feels** 77:13
**feet** 39:11

**fellow** 2:20
**felt** 66:25 76:9 95:23 96:21
**female** 18:24,25 27:19
**fidgety** 81:7
**fill** 74:6
**filled** 59:3 76:11
**finally** 35:20 36:15
**financially** 100:10
**find** 14:4 43:15 48:5 54:14 68:8 68:23
**finding** 57:18
**finish** 5:12 8:5 48:19
**fire** 29:21
**first** 4:9,21 15:11 16:4,21 18:5 24:22 27:5 28:19 33:1,25 36:17,18,18,25 37:5 38:18 44:10 55:18,23 73:25 75:6,12 75:23 76:1 78:4
**fisher** 1:19 99:5 99:16 100:4,17
**five** 85:21
**fl** 75:1
**flavor** 78:4
**flip** 80:6

**flipped** 38:24
**flooded** 33:19 34:5,24 36:11 36:20
**flooding** 31:25 33:22 34:8 37:2 56:20,21
**florida** 1:1,18 2:3,5,11 7:21,22 12:23,24 13:1 13:19 14:3 99:2 99:7,16 100:2,5 100:12,18
**flyer** 87:8,11
**focused** 41:21
**follow** 57:20 94:5
**follows** 4:10
**food** 71:20
**foregoing** 100:6
**foremost** 4:21
**form** 73:21
**formal** 38:4
**formula** 29:1,2 29:3
**forth** 48:18,23
**forward** 10:2 64:14
**forwarding** 9:25
**found** 32:4,4,7 43:17 59:21 70:11,12
**four** 39:10 77:4

**fourth** 35:8
**francine** 2:15
**friend** 68:25
**friends** 84:12
**friendship** 41:15,17,20 42:15,21 43:11 43:13,19,20,22 44:3,8 55:15 67:3 85:9 88:22 90:6
**front** 23:16 45:24 50:23 51:3
**full** 38:24 40:7 44:6 59:1 61:3,6 68:11
**fully** 69:25
**further** 36:12 100:8

**g**

**g** 4:1
**gain** 35:9 36:15
**gained** 35:21 36:25
**gate** 33:5,7 34:23,25
**general** 9:21 15:2 35:25 44:4 48:20
**generally** 20:13
**generous** 85:16
**gentleman** 63:4
**getting** 57:22 60:22

**give**  4:5 19:6
   20:11 36:13
   38:8 58:16
   63:15 73:22
   74:2,17,18
   85:21 86:23
   90:1,20
**given**  20:18
   58:14 61:22
   62:16 65:19
   67:7,8
**giving**  16:3
   41:15 42:16,17
   53:14 57:17
**glasses**  24:24
**go**  6:20 7:24 8:2
   8:8 17:4 20:3
   32:5,5 34:4 35:2
   35:11 36:17,19
   37:13 38:3
   41:14 43:11,16
   61:5,5,20 62:1,2
   63:9 65:20
   66:19 71:6
   73:10,17,25
   75:6,17 76:9
   82:7 83:18
   85:22 87:22,25
   88:16 89:13
**goes**  75:3 78:10
   86:9
**going**  5:8,9 10:5
   15:22 19:4,20
   20:2,3 23:14
   24:9 25:21

   35:17 36:22
   41:11,11,16
   45:2 47:24 48:1
   48:3,8 50:12
   54:11 61:8
   74:11 82:1
   87:21 90:8,9,17
   90:19 97:14
**gonzalez**  77:1,4
**good**  1:7 4:13
   28:20,21 35:22
   38:6 39:12
   40:12 54:23,25
   56:3 69:19,21
   69:21 71:23,24
   77:7,9 85:10,12
   86:13,14 87:2
   88:4,20 92:9
   93:1,25
**gordon**  2:9 4:13
**gordon.hill**  2:12
**gosh**  97:2
**gotten**  67:21
   87:8
**government**
   32:15 58:8
**grab**  40:10
**grand**  82:3
**great**  14:6
**greater**  83:25
   84:3
**greeted**  44:11
   44:13,19,21
**grievance**  30:3

**groceries**  71:6
**ground**  97:18
**group**  10:20
   87:22
**grow**  7:18
**growing**  12:12
**guess**  25:7 33:16
   49:3 74:1 85:14
   85:19 96:12
**guest**  29:23
**gutierrez**  1:12
   3:2 4:8 99:7
   100:6

**h**

**h**  3:7
**hair**  16:16,17
   19:2 27:19 42:5
   42:6 46:22 47:6
**half**  34:1
**hall**  55:21,25
   56:7,9,10,25
   57:2 58:3
**hand**  4:3 17:22
   20:2 23:10,14
   24:9 25:21 30:9
   39:6 61:8 74:11
   99:11
**handed**  24:21
   50:18,21
**handwriting**
   21:8 22:18,19
   22:21 23:4,5
   52:22
**handwritten**
   23:1

**hanging**  40:2
**happen**  22:4
   30:12 49:10
   72:20 73:3
   92:13 97:19
**happened**  11:1
   36:17 41:20
   55:24 56:21
   66:14 73:5
   83:10
**happening**  55:1
   56:16
**happy**  26:18
**hard**  14:25
   85:19
**hate**  42:3 81:9
**head**  4:23,24
   5:4,4
**health**  1:8 72:8
   73:23 74:22
   84:25 85:4,11
**healthcare**  75:2
**hear**  56:17,24
   81:25
**heard**  56:18
   91:20 96:2
**heavyset**  16:18
**height**  45:10
**held**  55:22 56:1
   59:15 83:19
**hello**  86:3
**help**  9:23 16:10
   57:12 59:15
   72:23 74:5

**helped** 54:13
**helping** 57:20
**henderson** 2:9
**hey** 27:6 35:14
  53:24 68:1
  70:25
**hh** 99:17
**high** 8:3,5,6
  39:1 40:8
**higher** 39:16
  40:2 64:21,23
**highest** 8:20
**highlighted**
  48:2 90:18
**hill** 2:9,9 3:3
  4:12,13 20:7
  21:16 23:12,13
  24:13,16,19,20
  25:3,25 26:9,12
  26:15,20,21
  30:11,15 38:1,6
  38:7 39:9 43:4,7
  50:15 61:12
  74:15 78:16,19
  79:8 80:1,10
  82:13 83:14,20
  85:14,17 88:12
  89:11,13,18
  92:5 93:6 94:4,8
  94:24 96:8,11
  96:16 97:3,16
  97:23 98:2,6
**hispanic** 14:6,10
  14:18 23:23
  86:20

**history** 76:17
  77:20
**hit** 31:11
**hmm** 13:12
  14:21 20:12
  60:2 74:25 78:2
  90:5
**hoa** 84:5,10,23
**home** 12:11
  17:4,21 60:8
  67:8 68:2 69:16
  88:12
**homeless** 57:5
  63:12
**hour** 15:18,19
  19:14 54:19
  83:16 94:5
**hours** 58:4 64:5
**house** 31:20,25
  59:25 66:13
  68:25 69:3,3,5
  93:13
**how's** 63:22
**hr** 86:6,10
**huh** 4:24
**human** 9:1,9,13
  9:18
**hundred** 19:8
**hundreds** 63:11
  64:11
**hung** 66:16
**hungry** 80:20
**hurricane** 31:11
  31:14,15 33:3
  64:22 93:13,14

93:17,21,25
**hwhlaw.com**
  2:12

**i**

**ian** 31:11 33:3
**identification**
  20:6 24:12
  25:24 50:14
  61:11 74:14
  99:21,22
**identify** 42:13
**iii** 29:1
**illness** 76:18
**immediately**
  49:11 51:11
**impair** 72:13
**important** 4:22
**imposed** 32:14
**impossible** 5:3
**inches** 39:7
**incident** 56:20
**including** 14:3
  47:5
**increase** 92:11
**independent**
  30:21,22 69:14
**independently**
  86:17
**indicated** 77:20
**indicates** 77:12
**indiscernible**
  88:7
**information**
  19:6 36:12
  41:16 42:16,18

53:15 93:19,21
**inhibited** 72:9
**initial** 53:7
**initialed** 27:22
**initialing** 27:24
**initially** 15:5
**injuries** 29:21
**insisted** 40:10
**insulting** 53:21
**intake** 73:21
**interacted** 30:23
  31:2,4
**interest** 13:8,17
  78:5 79:15
**interested**
  100:10
**intern** 2:17
**interpreted**
  53:17
**interpreter** 2:15
  31:8 53:9
**introduce** 88:5
**invitee** 29:23
**issue** 26:18
**issued** 32:18

**j**

**j** 65:7
**january** 74:23
  75:5 78:17 79:2
  79:3,4 80:17
  81:2 99:17
**jesus** 2:16
**job** 11:5
**john** 65:7

**johnson** 65:8
**jot** 65:16
**judge** 89:15
**july** 99:12
  100:11
**june** 1:13 99:8

**k**

**kahn** 2:15
**keep** 41:21
  93:18
**keeping** 26:8
**kennedy** 2:10
**kept** 38:9,10
  55:12
**kind** 5:9 11:18
  29:13 41:21
  42:22 43:16
  48:19 50:8 67:1
  70:21 72:8,20
  73:21 78:3,4
  86:24 89:18
  92:24 97:18
**kissimmee** 7:23
  14:4,9 15:5,8,11
  16:22,25 17:20
  17:24,25 18:1
  22:19 23:23,24
  30:17,18,24
  31:8,12,13,22
  32:14,18 33:2,4
  34:7,11,20
  35:23 36:10
  41:3 42:10,20
  46:1 47:14 56:8
  56:12,14,19

59:10,11,13,15
60:19 61:17
62:19 63:1 68:6
68:6,17,20
69:13,24 70:6
71:7,16 72:7,16
74:24 81:15
82:21 83:4 84:1
85:1 86:13,14
88:4
**kitchen** 40:12
**knew** 23:18,23
  24:2 54:4,6,11
  56:16 76:5,5
  91:21,23
**know** 5:18 6:11
  6:16 9:19 11:22
  12:2 13:22
  14:25 15:12,16
  18:3,9 19:9,10
  23:22 24:1,1
  25:11 27:1
  30:16,17,23
  31:1,4,7 32:12
  32:17,19 33:15
  33:17 35:11
  36:22 39:3 41:2
  41:7,7,8 42:8
  43:12,24 46:8
  47:11,13,14,17
  47:25 53:9,19
  54:4,16,21 55:1
  55:4,5,7,8 58:13
  58:19 59:9
  61:19,25 62:5

62:19 65:7,11
65:19,24,25
66:11 67:20
68:5,21 70:5,8
70:15,23 72:7
72:15 73:1 75:1
75:4,6,9 76:11
76:12,15 77:5,6
77:14,16,18
78:7,12 79:10
79:12,14,23
80:3,3,4,5,14,21
81:17 82:3,4,19
83:2,9,21,23,25
84:4,25 85:2,4,7
85:9,9 87:7,7
90:5 91:22
92:16,20 93:9
93:24 94:1,14
94:20 95:18,21
95:22
**knowing** 63:20
83:16
**knowledge** 15:8
56:18
**known** 88:19
99:20

**l**

**lack** 74:1
**lady** 19:20
  41:13,22 42:3
  44:12,15,19,19
  44:21 45:9
  46:15,21,25
  47:6,23 49:23

53:14 56:4
57:17 67:13
89:9 90:17
**lamps** 39:17
**landings** 25:8
**large** 44:8 59:1
**larger** 44:9
**late** 57:9
**latest** 64:5
**latin** 14:14
**lawsuit** 4:14
**lease** 17:1,19
  19:15 20:24
  26:3,5,9,13,15
  26:19 28:8,16
  28:17,18 42:23
  53:7 83:25
  87:15,16 95:20
**leave** 30:11
**left** 41:16 43:8
  44:20 54:12
  57:19 92:12
  93:10,12
**legal** 1:16 2:3
  9:20 72:25 73:6
  86:9
**legalities** 26:12
**letter** 62:8,10
  95:5,7
**letting** 33:6,16
  33:17 35:16
  47:25
**level** 8:20
**liable** 29:20

**lied** 85:14
**life** 83:11
**light** 16:16
**liked** 14:8 17:7
**line** 39:2,15
**lines** 19:20
**list** 40:7
**literally** 48:24
  56:9
**little** 14:22
  20:19 48:5,17
  52:2 57:9 77:25
  78:5 79:15 86:5
  92:25
**littler** 82:4
**livable** 41:4
**live** 7:20 12:22
  32:8 68:9 86:17
**lived** 13:10 14:4
  59:10,12 72:7
**lives** 14:15
  69:10
**living** 13:4
  17:12 23:2,7
  30:16 48:12
  69:14,16 72:10
  77:7 78:24,25
  79:4 82:6,8
  84:11 86:20
  92:9,17
**located** 63:10
**location** 18:5,10
  63:22 75:7,10
**logistics** 70:9

**long** 9:15 15:15
  19:13 32:2
  33:24 37:7
  46:21 47:6
  54:17 58:3
  81:17 94:6
**longer** 67:16
**look** 11:2 17:7
  20:8,11 21:8
  24:22 26:2
  28:18 37:14
  44:13 55:15
  61:15 66:21
  68:16,17 76:17
  95:4
**looked** 14:8
  16:14 68:19
**looking** 12:21
  20:9,15 50:17
  53:10 57:6
  61:16 76:20
**looks** 26:3 77:6
**loss** 29:20
**lot** 58:6,7,12,19
  59:10 63:21
  68:10 84:3
  86:19,23 92:14
**loud** 4:22
**loved** 71:19
**lower** 57:6
**lucky** 35:13
**lunch** 44:1
  83:17
**lund** 53:4

**lutheran** 1:7
  28:20

**m**

**made** 84:13
  93:16 97:17,18
**mae** 1:19 99:5
  99:16 100:4,17
**magaly** 1:12 3:2
  4:8 99:7 100:5
**maggie** 86:3
**mail** 21:1,2,2,4
  21:5,6 62:25
  65:19,20
**mailed** 17:21
**main** 15:21
**major** 82:3
**make** 36:5 41:4
  72:2,3,25 73:11
  82:1 96:19
**making** 73:2
**mal** 82:3
**male** 18:24
**man** 67:5
**man's** 65:6
**mandating**
  93:10
**mandatory**
  32:13,18
**manhattan** 8:19
**map** 3:11 24:18
  48:2 90:10
**march** 72:15
**mark** 20:2
  23:14 24:10
  61:8 74:11

**marked** 20:5
  24:11,21 25:23
  50:13 61:10
  74:13 75:12
**matters** 6:14
**meals** 71:16,17
  71:21
**mean** 7:15 11:2
  11:22 12:2,4
  14:10 37:16
  49:8,24 51:2,22
  53:20 71:11
  75:23 78:21
  79:13 80:4
  81:18 92:17
**means** 27:2
  79:12 96:16
**measure** 39:4
**measurements**
  39:13
**med** 75:1,1
**medflorida** 75:8
**medical** 3:17
  6:3 69:22 72:8
  74:17
**medicals** 72:23
**medication** 92:9
**medications**
  5:24
**medicines** 32:22
**meeting** 19:13
  54:17 55:14,21
  55:22,23,25
  56:1,7,10 57:3,8
  58:3 59:15,19

59:22 62:22
**meetings** 7:6
**members** 31:2
**mementos** 32:24
**memory** 82:18
**mental** 72:8
**mentioned**
86:12 87:13
91:7 95:22
**menu** 71:19
**merit** 99:5
100:4
**message** 57:19
**met** 18:5 88:3
**microwave** 72:5
**mid** 2:3
**midday** 43:25
**middle** 1:1
21:17
**mild** 82:12,16
82:18
**mile** 68:17,18,18
**millions** 39:22
**mind** 25:17 78:8
86:5
**mine** 68:25
**minimum** 4:25
**minutes** 15:17
31:24 54:20,21
68:21 83:16
85:15,21 86:2
94:3
**missing** 97:14
**mold** 38:25
39:19,24,25

**molded** 40:4
**moldy** 40:5
**mom** 14:3 15:4
15:7,13 20:1,16
21:19,20 23:18
23:23 28:1
44:24 48:4,23
49:2 53:7 54:1
60:20 63:5,6
64:6 66:14,17
66:22 68:6,8,22
69:2,2,10 82:9
86:15,16 87:5
87:16 88:24
89:8 90:5,12,23
91:9,21,23
93:12,17,24
94:11,15,25
95:18
**mom's** 52:24
92:8
**moment** 48:5
49:22,23,24
50:8
**moments** 79:16
**money** 62:12,13
62:17 91:12
**month** 65:4 84:6
**months** 15:14
32:10 72:16
77:4 80:18,24
91:5
**morgan** 2:2 6:9
86:3

**morganc** 2:6
**morning** 4:13
**mortgage** 11:11
11:13 69:7,8,9
73:6 83:24 84:5
84:10
**mother** 4:15
6:10,13 12:9,16
12:19,22 16:8
16:24 17:10,11
17:18 18:2
19:19,23 20:23
21:3,22 24:6
26:22 27:24
28:2,21 29:4
30:16,23 32:20
33:2 35:20,21
37:7 38:8,13
42:22 43:21
46:24 47:15
48:14 49:6,10
49:22,24 50:2
53:8,18 54:6,9
55:10 56:18
57:15,22 59:4
60:24 62:11,20
63:19 64:4 66:1
66:5 69:13,25
70:2,5 71:7,16
72:6,16 73:1,9
74:24 75:4
76:11,18 78:24
79:14 80:5
81:13 83:21,24

**mother's** 21:9
21:12,18 24:23
28:9 31:13
38:21 41:8
52:18,19,22
55:2 66:12
72:24 78:8
95:23
**move** 13:1,9
14:3 15:14
17:10 26:25
40:23 54:14
60:20 64:14
91:5 93:13
**moved** 12:23
60:8,8 72:16
74:24 83:3
**moving** 60:12
81:4 82:21

**n**

**n** 2:1 3:1 4:1
**name** 4:13 8:18
9:3 16:4 18:4,15
19:5 41:18
43:17 45:6
46:16,17 47:8
47:10 52:22,25
53:3,4 65:6,12
77:2 87:19
**names** 19:4 31:1
53:5 65:12 88:5
**naturally** 22:2
**near** 68:19
**nearby** 36:21

**necessarily** 88:10,18

**need** 23:16 24:25 26:12 63:7,19 64:4 66:21 67:13 90:2

**needed** 39:23 48:13 54:15 63:14,21,25 64:7,10 67:18 89:7,8 91:17 96:20

**needs** 19:21 27:4 91:13,19

**neighbor** 70:13

**neighborhood** 84:20

**neighbors** 31:17

**neither** 53:8 56:17 96:17

**nervous** 63:23

**never** 40:3 41:24 42:25 53:12,23 56:15 56:16 58:1,2 81:3,12 87:10

**new** 8:9,10,16 12:24 13:3,10 17:12 67:6 75:18 76:18,25 77:13

**news** 57:1,10 59:21 93:23

**nice** 47:23 49:23

**nine** 60:6,16

**nodding** 4:23 5:4

**noise** 81:25

**noncompete** 10:13

**nonsolicitation** 10:13

**norm** 81:6

**normal** 38:3 60:18 70:3 79:18 80:11,12 80:14,16

**normally** 10:10 80:17

**northgate** 25:1

**notary** 99:6,16 100:4,17

**notes** 65:13 85:22 100:7

**nother** 85:17

**notice** 31:15 36:12 81:4 87:6 92:11 93:4

**notices** 93:25

**notified** 82:9

**number** 35:25 57:17 64:20 65:1,16,17,21 65:21

**numbers** 20:4 86:24

**numeral** 29:1

**nurse** 76:10

**nurses** 73:13

**nursing** 69:16 69:22

**o**

**o** 4:1

**oak** 56:11 75:7

**oath** 3:4 99:1

**object** 62:15 89:14,18

**objected** 89:13

**objection** 78:15 78:18 79:6,25 80:8 82:7 89:11 92:5 93:6 94:17

**objections** 89:15

**observation** 96:6

**observations** 80:17

**observed** 43:9

**obtain** 54:13

**obviously** 68:5

**occupancy** 3:13 3:14 26:4 87:14 87:21,25

**occurred** 37:12

**october** 37:9,10 51:15 52:17 95:9

**offer** 3:12 67:11 67:25 68:5

**offered** 28:3 30:18 70:6

**offering** 63:4

**office** 6:24 7:7 15:21 18:7,8,8 27:14 74:23 87:16,22

**officers** 33:5,13 34:2

**official** 99:11

**officially** 26:13 42:22 57:25

**oh** 25:12 51:21 58:5,15,17 68:13 71:13,24 76:20 79:3 91:4 97:2

**okay** 4:20 5:1,7 5:15,16,17,19 5:20,24 6:10,13 6:17,23 7:6,13 7:24 8:12,15,20 8:23,25 9:3,7,9 9:15,17,23 10:1 10:6,11,14,23 11:3,5,8,13,16 11:18,22 12:4,4 12:6,19 13:5,7 13:10,18,20 14:2,9,16,22,22 15:7,11,15,20 15:24 16:5,14 16:19 17:18 18:11,21 19:1,7 19:9,12,18,25 20:19,22 21:5,7 21:20 22:10,13

22:16,22 23:9
23:22 24:1,5,9
24:18 25:4,13
25:20 26:4,5
27:9,16,21 28:2
28:5,7,11,17,17
29:3,6,19 30:6
31:19,22 32:7
32:12,23 33:12
33:15,20,24
35:3,5,8 36:7,14
37:15,18,21,25
38:6,11,16,20
39:6,10,14,20
40:20 41:2,6,12
41:25 42:4,12
42:14,20,25
43:3,15,24 44:3
44:15,24 45:6
45:17,23 46:4,7
46:13 47:2,8
48:14,16,24
49:2,5,15,18,21
50:4,8,11,21,25
51:4,4,8,13 52:3
52:13,20,25
53:4,6,16 54:9
54:16,21,25,25
55:9,14 56:7,24
57:15,22 58:5
58:11,23,25
59:3,14 60:4,7
60:24 61:3,8
62:8,11,15,19
63:8,17 64:2,13

65:1,4,10,13,16
66:3,7,9,16,19
66:25,25 67:3
67:17,19,23
68:1,4,13,16,23
69:10 70:2,17
70:23 71:7,13
71:21,24 72:6
73:9,15,17 74:5
74:10,10 75:4
75:17 76:8,11
76:15,23 77:3,9
77:12,20,24
78:10,23 79:4,9
79:14,20 80:11
80:13,22 81:1,7
81:13,19 82:2
82:14,19,23,25
83:7,9,14 84:7
84:11,15,18,22
85:4,7,13,18,21
86:21 87:1,11
87:13,25 88:3
88:18,22 89:1,9
89:25 90:9,12
90:23 91:3,6,9
91:14,16,20
92:1,11,15,19
92:22,22 93:4
93:16,16,24
94:2,25 95:5,10
95:16,22 96:8
96:10 97:22,23
**old**  20:3 76:19

**older**  84:18
**omar**  75:13
**once**  41:16
46:23 54:11
**ones**  25:5 30:13
30:14 40:11
**onsite**  87:3
**open**  35:14
**opening**  35:13
**openings**  68:13
**opportunity**
10:1 63:13,13
64:12 97:6,7
**opposed**  4:23
**option**  10:1
20:18 54:12
63:11,25 64:10
64:15 67:9,22
67:23 90:20
91:2,8
**options**  57:5
90:13
**orange**  99:3
100:2,12
**order**  36:16
47:20 67:14
71:20 72:23
74:18,19
**ordering**  98:4,7
**orlando**  1:2,18
2:5 100:11
**osceola**  56:2,5
57:6 58:8
**outrageous**
64:17

**outside**  30:18
37:19 39:19
43:18
**outstanding**
61:23
**overeating**  80:7
80:9
**oversee**  9:9
**owed**  61:3
**own**  11:8,10
57:21 70:14
71:16,17 72:2,3
**owns**  69:5 85:1

**p**

**p**  2:1,1 4:1 9:5
**p.a.**  2:9
**p.m.**  1:14 98:9
**page**  21:10,11
21:15,17 22:5
22:10,14,18,24
24:22 27:21
28:8,24,24,25
29:2,6 30:2
50:23,24 51:2,6
52:16 75:11,12
85:17
**pages**  50:22
100:6
**paid**  71:8
**painful**  13:24
**pans**  40:15
**paper**  28:24
91:25
**papers**  17:8,19

**[paperwork - proper]**                                    Page 116

**paperwork**
  17:19 18:2,14
  53:7
**paragraph**
  28:19 51:14
  61:16 77:13
  78:3
**part**  10:16
  18:14 29:19
  51:24 94:10
**partial**  3:16
**particularly**
  96:20
**parties**  100:8,9
**passed**  13:2
  33:3
**passport**  99:22
**path**  93:14,21
  93:25
**patient**  74:22
  75:18 76:18
**patio**  44:10
**paying**  64:21
  83:25 84:1
**pcp**  75:13
**people**  5:11
  33:16,18 36:10
  44:4,5,6 45:25
  57:12 58:6,7,9
  58:10,13 59:8,9
  59:11,12 63:12
  64:11 70:3 71:5
**percent**  19:8
**perez**  75:13,24

**perfect**  89:20
**period**  93:2
**person**  12:3
  17:20,23 18:18
  27:11 29:14
  47:2 62:25
  87:17
**personal**  3:15
  21:6,7 29:22
  62:20 91:19
**personally**  60:1
  99:7,20
**pharmaceutical**
  9:1
**phone**  7:11
  14:13 37:21
  38:9,10,12
  62:24 63:16
  66:9,10,11
**photo**  14:12
**phq**  78:5
**pick**  31:16
  70:18
**picked**  70:25
  71:3
**pictures**  32:24
  38:25 39:16,18
**place**  1:16 12:22
  18:4 27:14 32:7
  44:14 54:14
  63:6 68:9,24
  72:25
**placed**  61:17
  88:25 89:1,4,7

**places**  68:19
**plaintiff**  1:5 2:8
**plaintiff's**  3:8
**plaza**  56:11
**please**  4:3 5:12
  13:21 23:2 45:2
  98:8
**pleasure**  78:5
  79:15
**plow**  83:15
**plus**  14:5 68:10
  68:12,14
**point**  5:17 12:11
  13:20 32:17
  47:4 55:9,22
  72:6 82:14
  91:21
**police**  33:5,12
  34:2,19
**poor**  80:5
**possessions**
  29:23
**possible**  41:6
**potential**  6:14
**pots**  40:15
**power**  72:17
**ppsc**  9:4,6
**preparation**  6:6
**prepare**  6:17
**prepared**  9:19
**preparing**  9:23
**present**  2:14
  44:3 76:14,18
  81:19

**presented**  88:24
  90:13
**presenting**
  44:16 64:16
**preserve**  89:14
**pretty**  10:9
  39:24 76:7
**price**  23:2 64:18
**primarily**  11:6
**printed**  52:22
**prior**  7:4 15:14
  53:8 64:22
  76:25 77:4
  80:24 90:7
**probably**  15:13
  15:19 19:14
  34:1,12 39:5
  45:11 54:19
  58:4,21,22
  64:24 65:9
**problem**  97:5
**procedure**  30:4
**process**  38:4
  48:11 49:12
  51:11 67:15
  90:3 94:22
  95:19
**produced**  99:21
  99:22
**professional**
  97:13
**promise**  10:25
  11:19
**proper**  73:1

**properties**
63:21
**property** 3:15
15:20 33:3,25
51:16 62:20
85:1 86:15,16
87:2,16 88:4
92:2
**provide** 4:22
6:18 23:2
**provided** 7:4
48:20
**provider** 75:2
76:25,25
**pry** 7:15 81:9
**public** 99:6,16
100:4,17
**puerto** 7:17,19
8:1,2,12 24:6,7
24:8
**pulled** 41:14
48:1,2
**purpose** 57:2
**purposes** 26:7
**put** 72:4

**q**

**question** 5:12
5:18,19,21,22
15:1 19:10 20:9
50:17 51:23
79:9 80:2,2
92:20
**questionnaire**
74:4,22 76:12

**questions** 4:16
6:1,16 7:15 10:7
10:8,10,14
73:22 78:11
79:20 85:23
94:6 96:8
**quick** 43:4
**quickly** 15:1

**r**

**r** 2:1 4:1
**rack** 39:23
**radius** 68:18,18
68:18
**raise** 4:2
**random** 35:12
**reach** 35:1,14
**read** 29:11,17
29:19 52:3
53:16,17,19,24
55:16,18 62:8
78:3 96:11,12
96:13,18
**reads** 10:4
**ready** 27:6
70:25
**real** 43:4
**really** 17:3
47:23 55:19
82:11,15 95:13
97:15
**realtime** 99:6
100:4
**reason** 13:21
49:5,8,15 75:18
76:24

**rebuild** 41:11
90:8,18
**rebuilding** 90:9
92:2
**rebuilt** 48:1,3,8
54:12
**recall** 16:24
20:12 29:5,25
30:5 31:3 36:9
45:20 46:3,5
50:24 53:3,4,5
61:14 62:10
76:1 77:2 93:1
**receive** 27:5
60:24 67:14
**received** 29:10
61:4 93:24 95:4
**receiving** 62:10
**recent** 60:4
**recess** 43:6
85:24
**recognize** 19:5
24:23
**recollection**
47:20 51:1,7
92:23
**record** 83:18,19
89:14 100:7
**records** 3:17
61:21 62:7
74:17 95:4
**redirect** 86:4
94:7
**referring** 21:14
87:15

**refrigerator**
38:24
**refund** 29:1,2,3
48:11 49:10,12
49:18 51:11
52:11 61:1 62:4
67:21 94:11
**refunded** 62:6
95:1
**regarding** 56:16
92:1
**regards** 63:2
**registered** 99:5
100:4
**regular** 69:7,9
84:20
**rejected** 57:25
68:5
**relating** 59:22
**relation** 23:17
**relative** 100:8,9
**release** 10:17,24
11:19,23,24
12:1,1,7,8 54:7
**rely** 69:21
**remember** 11:4
16:2,15,19 18:1
18:13,15 20:15
20:25 31:12
36:3 37:7 39:1
41:22 45:9,12
46:6,17 47:10
55:24 56:4
64:20,20 65:6,9
65:11,22 77:1

81:13 87:19 92:25
**reminders** 15:2
**remove** 51:15
**rent** 11:8 64:18 71:8
**rented** 59:24 60:5
**renting** 15:25 23:24
**reopening** 97:19
**repeat** 5:19
**replenish** 24:17
**report** 100:5
**reported** 1:19
**reporter** 4:2 5:2 5:14 23:11 30:10 88:9 98:4 98:7 99:5,6 100:4,4
**reporter's** 3:5
**reporters** 97:12
**represent** 4:14
**representative** 14:13 23:22 46:1 54:23 56:6
**representatives** 56:14 58:8
**requested** 23:1 100:6
**requires** 22:1
**research** 14:5 86:13
**researched** 68:10

**residence** 11:9
**resident** 29:22 29:23 30:3 42:12 46:1 51:15
**resident's** 51:16 51:16
**residents** 14:6 35:16 36:21 48:12 55:23 57:5 58:12 59:9 59:11,15 87:9
**resource** 9:1
**resources** 9:9,13 9:19 57:7,12,16 57:23
**responded** 63:9
**responsibilities** 29:8
**responsibility** 60:12
**responsible** 9:12 60:21
**rest** 22:17
**restaurants** 87:3
**restless** 81:7
**retract** 10:22
**return** 3:16 33:2 92:2,3
**returned** 54:8 67:20 91:10
**returning** 30:7
**reverse** 69:8 74:18

**review** 9:21 10:19,21 11:13 26:22 30:4 62:2 100:6
**reviewed** 7:1 9:19
**rhona** 47:8 53:1
**rican** 24:6
**richelle** 2:16
**rico** 7:17,19 8:1 8:2,12 24:7,8
**rider** 42:6
**right** 4:2 7:6,13 11:4,5 12:4,5,24 13:11,12,20 14:17 15:4 19:11,12,12,16 21:17,20 22:7,9 24:5,15 25:10 25:14,16 26:17 26:18,20 27:3,8 27:18 31:4,21 33:12,17 34:25 35:9 37:3,3,6 38:14 39:14 42:13 43:8,8,22 46:12 49:4,19 50:4,6,6 52:2,21 53:10,18,19,20 53:20 54:10,16 54:16 56:6 58:25 60:16 62:13 63:7,12 63:15,24 64:1 64:10 65:2,4,5

66:4,8,16,23,25 67:24 69:11,17 70:16 71:22 73:24 74:2,3,24 76:16 77:5,10 77:11,22 80:4 82:17,24 84:24 85:13 87:21 93:3,20 95:6,14 96:24 97:1,9
**rights** 29:7
**ring** 47:8 53:1
**rmr** 1:19 99:16
**role** 86:10
**roman** 29:1
**room** 23:2,2,7 41:15,17,20 42:15,22 43:11 43:13,19,20,22 44:4,8,8 45:17 45:19 46:7 47:11,16 55:15 58:14 59:1,1,3 67:3 81:25 85:9 88:22 90:6
**rose** 2:3
**rough** 48:4
**rule** 89:15
**rules** 4:21
**rushed** 66:21 67:1,4,7
**rushing** 67:6

[s - signed]

| s | | | |
|---|---|---|---|
| **s** 2:1,9 3:7 4:1 | 61:15,22 62:3 | **seems** 95:15 | **short** 16:16,16 |
| **sadness** 79:16 | 75:1,13,18 | **seen** 20:10 26:1 | 42:6 94:4 |
| **safe** 93:18 | 76:18,24 77:3 | 41:24 42:25 | **shortly** 74:23 |
| **sake** 38:1 | 77:25 78:4 | 61:13 77:4 | **show** 50:12 |
| **sale** 69:1 | 79:21 96:22 | **seizure** 81:20 | **showed** 27:6 |
| **salvage** 39:22 | **schedule** 64:8 | 82:1 | 48:7 95:5 |
| 40:8 41:3 | **school** 7:24,25 | **seizures** 81:14 | **shuttle** 70:6,10 |
| **salvageable** | 8:2,3,5,6,12,18 | 82:3,4,4,20 83:3 | 70:25 |
| 39:16 51:18 | **score** 78:12 | 92:8,11,13,16 | **sibling** 13:2,3 |
| 52:1 55:2 | **scratch** 10:15 | 95:23,24 96:4 | **side** 35:18 36:15 |
| **sam** 69:21 | **screening** 78:1 | **send** 65:19 | 80:6 |
| **samantha** 2:19 | **seal** 99:11 | **sensitive** 49:25 | **sides** 51:4 |
| **samaritan** 1:7 | **second** 5:8 | **sent** 20:25 21:2 | **sight** 45:24 |
| 28:20,21 35:22 | 34:18,20 37:4 | 21:3,5 | 66:20 |
| 54:24,25 56:3 | 61:16 | **separate** 84:25 | **sign** 10:4,17 |
| 69:19,21 71:23 | **seconds** 45:15 | **september** | 11:13 17:3,5 |
| 71:24 77:7,9 | **section** 28:25 | 31:10 61:23 | 21:19 27:4,6 |
| 85:10,12 86:13 | 29:4,7,7,19,20 | 93:2 | 28:8 48:9,13 |
| 86:14 87:2 88:4 | 77:24 | **services** 1:16 | 49:7,11,16 67:9 |
| 88:20 92:9 93:1 | **security** 3:16 | 2:3 14:6,7,10 | 67:10,13,18,19 |
| 93:25 | 49:19 61:17 | 18:9 86:18 | 87:16 89:8 90:6 |
| **sanford** 1:8 | 62:4,12 91:17 | **seven** 10:22 | 91:13,25 96:13 |
| 84:25 85:4,10 | 92:3 | **several** 4:16 | **signature** 10:22 |
| **sat** 44:12 46:9 | **see** 17:7 18:3 | 32:10 36:6 | 21:9,13,18 22:6 |
| **saved** 91:18 | 21:10 27:21 | 40:11 63:11 | 22:11,12,16 |
| **saw** 28:15 35:15 | 28:15,25 29:6 | 72:15 92:18,18 | 28:9 52:17,18 |
| 38:20 43:9 87:7 | 33:21,22 34:13 | **severance** 9:20 | 52:19,19,21 |
| 87:10 | 34:23 39:1,6 | 10:16,18,19,21 | 53:2 99:15 |
| **saying** 5:15 | 45:21 52:20 | 10:22,23 11:19 | 100:16 |
| 16:11 48:19 | 53:1 63:9,19,21 | **shaking** 4:24 | **signatures** |
| 49:3 | 64:7,9,13,15 | 5:4 | 21:10,11 |
| **says** 21:12 25:13 | 65:20 66:24 | **shared** 92:1 | **signed** 11:18,25 |
| 26:4 28:19,25 | 75:13,21 77:24 | **she'll** 15:2 71:19 | 16:25 18:2 |
| 29:20 52:20 | 80:22 83:14 | **shoot** 56:10 | 19:15 20:23,24 |
| | 89:1,16 92:17 | | 22:5 28:11 |

[signed - stenographically]                                    Page 120

49:10 53:8 54:1
54:2 55:10
56:19 62:23
90:24 91:1
95:18
**signing** 17:19
18:14 22:8
23:19,19 26:23
27:12 51:10
54:4,6 67:4 90:1
90:19 91:21
94:19 95:1,10
**signs** 10:23
**simplicity's** 38:1
**simply** 34:4
**sister** 13:2
**sit** 45:3
**sitting** 21:20
45:22,25 47:19
81:24
**situation** 47:24
79:17
**six** 80:18,24
91:4
**skinned** 16:16
19:3 27:19
**skipping** 77:25
**sleeping** 79:22
**slim** 16:17 42:6
**slowly** 81:5
**smell** 39:24
**snyder** 47:8
53:1
**social** 14:16
87:4,5,6

**society** 1:7
28:20,21
**sofa** 81:24
**sofas** 38:24
**solely** 88:19
**solemnly** 4:4
**somebody** 10:23
22:19 35:13
36:4 44:17 56:5
67:10
**sonia** 2:18
**soon** 54:10
**sooner** 48:10
49:10 90:21,25
94:11,16,20,20
**sorry** 17:15
24:14,24 45:2
53:21 65:12
76:21,22 78:18
82:7 88:11,16
92:7,21,24
**sort** 26:18
**sorted** 74:19
**soto** 75:13,24
**sounds** 45:15
55:3
**soup** 72:3
**space** 28:8
**spanish** 8:13
11:6,16 12:17
14:20 16:5,8,11
16:13 18:19,20
18:22 19:24
24:4 27:17 28:3
28:5 31:5,6,7

41:25 44:22
46:18 47:12,14
53:13 73:12,13
73:16 74:7,8
76:6,7,10,13
84:16 86:18
87:11,12,23,24
**speak** 6:10,13
11:5 12:9,10,16
12:19 16:5,8,11
18:18,19 31:8
34:18 35:5
38:16,19 41:25
44:21,24 46:18
46:24 47:5,13
48:17 59:4,6
64:3 66:1 76:7
84:15
**speakers** 14:20
**speaking** 16:19
24:3 54:18
73:13 81:4
88:19
**specialists** 82:10
**specific** 37:11
86:24
**specifically**
22:25 42:14
96:5
**speed** 92:3
**spent** 62:13,17
86:12
**spoke** 13:15
16:2,13 18:13
18:20 19:24

21:22 27:16
36:3,20 43:10
44:23 47:11
48:22 66:3
73:12,16 76:6
76:10 89:9
**spoken** 6:7 7:10
86:3
**spread** 58:25
**staff** 2:18 30:24
31:1
**stand** 37:11
**stapled** 50:22
**start** 4:20 5:12
5:13 6:6 7:25
48:11 49:13
51:11
**started** 75:9
**starting** 14:22
22:18
**starts** 65:7
**state** 78:8 99:2,6
99:16 100:2,4
100:18
**states** 1:1
**status** 35:23
**stay** 15:21 32:2
68:5,6 93:13
**stayed** 32:6
**staying** 79:22
**stenographic**
100:7
**stenographica...**
100:5

**[sticker - things]**                                    Page 121

| | | | |
|---|---|---|---|
| **sticker**  30:13 | **sure**  19:8 70:12 | 83:17 86:2 | **ten**  15:17 94:3 |
| **stickers**  30:14 | 72:25 73:11 | 92:24 | **tenants**  18:9 |
| **stipulate**  26:18 | 78:21 95:3 | **taken**  1:15 4:17 | 86:20 |
| **stop**  41:19 42:15 | 96:15 | 43:6 85:24 | **tend**  5:10 |
| 47:4 | **swear**  4:4 | **takes**  94:23 | **term**  10:8,11,11 |
| **stopped**  34:8 | **switching**  92:7 | **talk**  5:10,11 | 79:7 |
| 70:18 | **sworn**  4:9 99:9 | 41:20 51:17 | **terminated** |
| **stopping**  34:3 | **symptoms**  78:14 | 66:17 90:12 | 42:22 95:20 |
| **store**  70:24 | | 91:9 | **termination** |
| **stored**  40:15,17 | **t** | **talked**  14:14 | 3:14 62:22 67:5 |
| **stores**  70:20 | | 17:9 45:14 86:5 | 85:8 88:23 |
| **storm**  93:5 | **t**  3:7 | 88:22 92:25 | 91:22 94:9,10 |
| **streamline**  26:9 | **tab**  74:21 75:11 | **talking**  5:13 | 94:15 95:1,10 |
| **street**  56:11 | 75:11,12 76:12 | 14:23 43:9 | 95:19 |
| 75:7 | 76:21 | 44:16 49:18,19 | **terminology** |
| **stress**  92:14 | **table**  39:8 44:13 | 57:4 58:6,7,9 | 93:20 |
| 95:24 96:3 | 44:15,18 45:20 | **talks**  51:14 | **terms**  42:3 59:8 |
| **strong**  82:12,15 | 45:21,25 46:4 | **tall**  45:11 | 83:24 84:11 |
| **stuff**  39:16 71:3 | 46:11,13,23 | **tamara**  53:4 | **testified**  4:10 |
| **style**  80:19,23 | 47:5,19,21 | **tampa**  2:11 | 49:9 86:6 87:18 |
| **subdivision** | 50:18 54:18 | **taught**  8:13 | **testify**  91:20 |
| 84:22 | 88:25 89:2,5 | **teams**  7:10 | **testimony**  3:2 |
| **subject**  6:14 | 90:14 | **tear**  50:5 | 4:5 6:4 |
| **subpoena**  38:2,2 | **tables**  45:18 | **tell**  20:13 24:6 | **text**  62:25 |
| **subside**  36:24 | 46:7,8 | 31:12 33:1 34:2 | **thank**  14:1 |
| **sue**  10:18,25 | **tabs**  74:16,20 | 36:9,16 43:12 | 25:20 98:8 |
| 11:20 12:3 | **take**  12:21 | 43:12 45:12 | **theft**  29:21 |
| **sued**  85:5 | 13:21,22 20:8 | 47:19 49:23 | **thing**  22:10,13 |
| **suffered**  83:21 | 20:10 26:2 | 51:19,21 55:25 | 32:15 72:2 |
| **suicidal**  81:11 | 31:10 32:20,23 | 64:5 81:1 89:10 | **things**  17:9 |
| **suite**  1:17 2:4,10 | 43:4 45:3 47:18 | 89:22 90:16 | 32:24 54:14 |
| **supermarket** | 50:16 51:17 | 91:4 | 57:18,19 70:21 |
| 71:5 | 52:1 59:18 | **telling**  36:1 | 73:7,23 78:5 |
| **supposed**  24:16 | 60:12,16 63:12 | 57:11 91:24 | 79:15,24 86:4 |
| | 65:13 67:8,15 | | |
| | 68:1 69:25 | | |
| | 70:20 71:5 | | |

**think** 13:10
16:17 17:4,23
19:2 20:25 24:7
26:7 30:20
36:15 39:12
41:6 43:25 44:2
49:9,21 50:24
51:5 78:9 79:18
84:5 91:20 94:2
95:5 96:18
**thinking** 72:13
79:16 85:18
**third** 35:3,5
**thought** 83:15
**thoughts** 81:11
**thousand** 58:20
58:21,24 64:25
**three** 34:17
39:10 58:4
68:12
**throw** 19:4
**thrown** 49:16
**tie** 11:6
**tile** 20:12 23:6,8
23:15,17 27:12
53:7
**tiles** 20:17 21:23
23:1
**time** 1:14 5:17
11:7 12:11,21
13:20 15:7,16
16:12,13 17:11
20:11 26:2
31:10 32:17
33:1 34:10,18

34:20,25 35:3,6
35:8,12,19,19
35:20 36:14,18
36:25 37:4,5
38:12,14 43:21
43:24 47:4 48:6
50:16 51:10
54:9 55:9,18,23
60:4 64:21 66:5
68:12 69:24
72:6 76:14,19
77:18,21 78:8
78:17,23 79:14
80:7,23 81:2
82:14,20 84:1
86:12 87:7
92:17,24 94:22
**timeline** 77:6
**times** 7:10 9:17
34:15,16,17
40:11 51:22
73:19
**timing's** 85:20
**title** 56:4
**titles** 88:6
**today** 4:16 6:4,7
6:8,15,18,21
7:12 75:19
77:13 82:21
**together** 5:10
50:22
**told** 36:10 41:10
41:10,12,14
43:16 49:1
51:19 63:10,18

63:24 64:3,4,9
65:21 67:13
68:25 85:15
86:19 90:7,17
**tons** 92:18
**took** 15:22 17:8
37:17,21 44:13
57:17 70:5
91:12
**top** 22:21 40:13
75:13,17 95:7
**topics** 6:20
**total** 9:12 65:1
78:12 84:9
**totally** 97:3
**touched** 40:3
**tour** 15:11,15
16:3,21 17:3,4
17:11
**toured** 15:5,7
69:2
**towards** 33:4
**towels** 39:22
40:8,9
**town** 55:20,25
56:7,9,10,24
57:2 58:3
**training** 86:9
**transcript** 96:13
96:19,25 100:1
100:6,6
**transcription**
96:22
**translate** 16:10
48:14

**translated**
19:18 48:18,22
48:24 53:13
**translating**
19:22
**translation** 26:7
48:16
**translations**
49:3
**translators**
47:15
**transpired**
65:24
**treatment** 69:22
**trick** 97:13
**tried** 33:25
34:10,20
**trouble** 79:21
79:23
**true** 94:14 100:7
**truly** 13:24
**trust** 53:14
**trusted** 52:7
**trusting** 77:17
**truth** 4:6,6,6
**truthfully** 6:1
**try** 5:11,18 7:15
34:15 41:3
**trying** 15:1
57:21 88:12,13
**turn** 28:24 29:6
30:2 52:16
74:21 75:11,11
**tv** 89:16

**two** 10:9 15:13
34:1,1,16 36:8
39:7 46:7 50:22
58:4 63:19
95:13
**type** 99:22
**typed** 96:23

**u**

**uh** 4:24,24,24
**ultimately** 55:7
78:10
**um** 13:12 14:21
20:12 60:2
74:25 78:2 90:5
**under** 60:18
68:7 92:14
**underneath**
40:16 52:21
**understand**
5:18,25 10:5
13:23 28:13
49:2 82:2 89:3
**understanding**
12:7,8,23 29:14
59:12,14 60:7
60:11,18 71:2
90:23
**understood** 5:6
5:22
**uniform** 80:19
**unit** 3:12 20:15
22:1,2 23:7
24:23 25:2 27:7
29:22 30:19
35:21 36:24

37:1,5,13 38:13
38:17,21 40:20
41:3,8,13,22
43:10
**united** 1:1
**units** 43:1 56:22
90:10
**university** 8:8
8:16
**unlivable** 40:21
**unpredictable**
81:18
**unseen** 66:20
**upcharge** 20:19
23:16,17
**upgrade** 22:3,25
**upper** 39:23
**use** 8:23 29:22
30:17 42:3
**used** 31:7
**using** 9:17 69:17
70:9
**usually** 73:21

**v**

**velez** 2:18
**video** 37:17,18
**videos** 37:13,15
38:8
**village** 14:4,10
14:15 15:5,8,12
16:22,25 17:21
17:24,25 18:2,6
22:20 23:23,24
29:8,20 30:17
30:18,24 31:8

31:13,23 32:14
32:18 33:2,4,8
34:7,11,20
35:23 36:10
41:3 42:10,21
46:1 47:14 56:3
56:12,14,19
59:10,11,13,15
60:19 61:17
62:19 63:1 68:6
68:7,17,20
69:13,24 70:6
71:7,17 72:7,16
74:24 81:15
82:21 83:4 84:2
85:1 86:13,15
88:4
**visible** 89:5
**vision** 82:18
**visit** 76:24
**visiting** 17:14
86:19
**visits** 16:25
**voluntarily** 54:2
**voluntary** 32:15
32:16
**vs** 1:6

**w**

**wait** 49:12 71:4
90:2,22 91:4
94:21
**waiting** 64:11
68:12
**waive** 96:11,24
98:1,3

**waiving** 98:2
**walk** 15:20
**walked** 44:11
46:9
**walking** 45:17
**wall** 39:17
**walls** 39:2
**want** 13:24 19:6
21:24 38:3
41:19,21 48:12
51:22 64:24
65:18 83:17
86:4 93:16
96:13
**wanted** 4:15
53:16 54:9
66:24 90:24
**ward** 2:9
**wash** 40:10,12
**washed** 39:23
**water** 36:23
39:2,15 40:3
63:22
**way** 8:3 9:23
22:1 32:6,7
43:16 53:21
72:13 73:1
83:11 85:2
94:18 97:5
**we've** 86:3
87:14
**week** 7:3,8
34:12
**weeks** 34:1,1
95:13

**welkie** 2:2 85:19
  97:5,10
**went** 8:15 27:14
  29:13,13 31:16
  35:17 36:18,22
  37:4 41:17
  42:21 43:20
  44:7 47:25
  48:18 64:8 68:4
  68:8 73:9 75:6
  94:9
**wheels** 71:21
**white** 42:3 45:9
  46:21 47:6
**whitish** 46:21
**withdrawn**
  67:11
**witness** 4:7,9
  21:14 25:1 80:9
  82:8 88:10
  89:12 94:18
  96:15 97:2,21
  97:24 98:3
  99:11
**woman** 27:16
  43:10 53:23
  54:18,21
**word** 5:3 48:24
  74:1
**words** 48:22
**work** 5:10 8:25
  21:5 23:6 66:15
  89:19
**worked** 9:15,17
  27:11,12 88:6

88:19
**wow** 58:5 68:13
  96:21
**write** 52:23
  71:13
**writing** 51:4
  89:5
**written** 11:16
  51:14
**wrong** 19:6
  96:22,23

**x**

**x** 3:1,7 99:21

**y**

**yards** 60:16
**yeah** 11:25 19:9
  20:13 23:12
  25:20 26:11
  30:13,22 47:23
  50:7 58:10 65:4
  71:25 77:12
  80:4 82:6 85:17
  85:20 89:17,20
  94:4 97:4
**year** 10:9
**years** 9:16 10:9
  53:8 60:6,6
  68:12 76:19
  82:8
**yell** 15:3
**yellow** 25:5,5,7
**yep** 94:2
**yolanda** 1:4
  21:12 22:5

**york** 8:9,10,16
  12:24 13:4,11
  17:12
**young** 83:6

**z**

**zero** 78:12
**zoom** 7:10

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:23-cv-1288-RBD-EJK

YOLANDA DELGADO,

    Plaintiff,

    -vs-

THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY,
a foreign not-for-profit corporation,
d/b/a GOOD SAMARITAN SOCIETY-KISSIMMEE VILLAGE;
SANFORD HEALTH, a foreign not-for-profit corporation,

    Defendants.
_____/

Community Legal Services
122 East Colonial Drive, Suite 200
Orlando, Florida 32801

Thursday, September 12, 2024
11:25 a.m. to 12:47 p.m.

DEPOSITION OF

SHANE KNUTSON

      Taken before Lorena Agudelo, Court Reporter, a

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition filed in the

above-styled cause.

APPEARANCES:

On Behalf of the Plaintiff:

COMMUNITY LEGAL SERVICES

122 East Colonial Drive, Suite 200

Orlando, Florida 32801

(407) 841-7777

morganc@clsmf.org

dawnw@clsmf.org

alecr@clsmf.org

nicolec@clsmf.org

BY:  MORGAN CARDINAL, ESQUIRE

BY:  DAWN M. WELKIE, ESQUIRE

BY:  ALEC W. ROSE, ESQUIRE

BY:  NICOLE K. CARRERO, ESQUIRE


COMMUNITY LEGAL SERVICES

1440 North Nova Road, Suite 101

Daytona Beach, Florida 32117-3244

(386) 255-6573

john@clsmf.org

BY:  JOHN J. MARTINO, ESQUIRE (via Zoom)

```
 1                    APPEARANCES (Cont'd):

 2        On Behalf of the Defendants:

 3        HILL WARD HENDERSON

 4        101 East Kennedy Boulevard, Suite 3700

 5        Tampa, Florida  33602-5195

 6        (813) 221-3900

 7        ghill@hwhlaw.com

 8        BY:  S. GORDON HILL, ESQUIRE

 9

10        Also Present:

11        Tom Peninsten, Sanford Health (via Zoom)

12        Samantha Barkholz, Community Legal Services,

13        Fair Housing Advocate

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2     TESTIMONY OF SHANE KNUTSON              PAGE

3     Direct Examination by Ms. Cardinal        5

4     Certificate of Oath                      52

5     Certificate of Reporter                  53

6

7                       INDEX OF EXHIBITS

8               PLAINTIFF'S EXHIBITS MARKED

9     NUMBER            DESCRIPTION            PAGE

10    Exhibit 1      Termination Agreement      29

11    Exhibit 2      Language Handbook          17

12        [Exhibits were retained by Ms. Cardinal.]

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   THEREUPON:

 2                      SHANE KNUTSON,

 3          having been first duly sworn and responding,

 4       I do,  was examined and testified as follows:

 5                    DIRECT EXAMINATION

 6   BY MS. CARDINAL:

 7      Q.   Well, let me -- good morning.  I was checking

 8   to see if it was even still morning.  Good morning,

 9   Mr. Knutson.  Thank you for joining us.

10      A.   Good morning.

11      Q.   So before we jump into it, really quickly,

12   have you ever been deposed before?

13      A.   Just once.

14      Q.   Okay.  So you're --

15      A.   So it's my second time.

16      Q.   Okay.  So, this is generally going to be,

17   probably the same process, right.  I'm going to ask a

18   question completely and fully and I will allow you to

19   answer completely and fully, so we're not talking over

20   each other.

21          Particularly today, because we are virtual, if

22   you could try to refrain from any, you know, uh-huhs,

23   nuh-uhs, those kinds of answers, and stick with verbals,

24   yes, no's.  Just that'll make it easier for the Court

25   Reporter and again, because we are virtual, make it
```

```
 1    easier for me to understand your answer.

 2            Okay.  Do you have any questions about any of

 3    that?

 4       A.   I don't.

 5       Q.   Perfect.  And can I ask you, for the record,

 6    is there anything that would prevent you from testifying

 7    truthfully and completely today?

 8       A.   No.

 9       Q.   Okay.  No medications or other issues that are

10    going on?

11       A.   No.

12       Q.   Gotcha.  Okay.  So what I will ask you to do

13    for us to get started is can you state your name and

14    spell it for the record.

15       A.   Shane Knutson, S-H-A-N-E, Knutson is

16    K-N-U-T-S-O-N.

17       Q.   Great.  And what is your current title in your

18    position today?

19       A.   Director of Operations, Senior Living.

20       Q.   Gotcha.  And who are you representing today?

21       A.   My understanding is I'm representing the Good

22    Samaritan Society.

23       Q.   Great.  And if we refer to the Evangelical

24    Lutheran Good Samaritan Society or Good Samaritan

25    Society as Good Sam, will you understand who we're
```

1    referring to?

2         A.    Yes.

3         Q.    Okay.  Because I probably will, just because

4    that's a mouthful.  I probably will refer to it as Good

5    Sam.  Can you describe your educational background for

6    us?

7         A.    I have a bachelor's degree in education with a

8    focus on social science with a business ad minor.

9         Q.    Gotcha.  And do you have any specific licenses

10   or certificates related to your role as Director of

11   Operations?

12        A.    I at one time was a registered housing manager

13   for the National Center for Housing Management.  I

14   believe that designation has expired, but I at one time

15   held that.

16        Q.    And did you need that designation for a

17   specific role?

18        A.    No.

19        Q.    Okay.  And how long have you worked with --

20   worked for Good Sam?

21        A.    I started in July of 2001.

22        Q.    Okay.  And have you been with Good Sam from

23   2001 through the current date consecutively, no breaks?

24        A.    Yes.

25        Q.    Okay.  Have you held any roles other than

1    Director of Operations?

2        A.    I have.

3        Q.    I know 2001 is quite the tenure, but do you

4    recall any of those roles?

5        A.    Yeah, so I'll try to recall them as best I

6    can.  I was an --

7        Q.    As best you can.

8        A.    -- application support specialist, because I

9    started.  Then I was a HUD consultant, or Affordable

10    Housing consultant.

11        Q.    Uh-hmm (affirmative).

12        A.    I was an Affordable Housing manager.  I was an

13    Environmental Services consultant.  I was a director of

14    support services.  I was an interim director of -- I

15    forget exactly what that title was, but it over -- of

16    operations, because it oversaw skilled and senior

17    living.  I was a manager of Affordable -- or I think I

18    said that.  But I went back to Affordable Housing as a

19    manager.  And then Director of Senior Living.  I think

20    that -- oh, I was also a Senior Living Resource

21    Consultant for a short time.

22        Q.    Okay.  Excellent.  And in any of those roles,

23    were you ever employed by Sanford Health or Sanford?

24        A.    No.

25        Q.    And did you do anything to prepare for your

1    deposition today?

2        A.    I reviewed the assigned topics.  They were

3    similar to the previous deposition, so I was familiar

4    with those topics, generally.  There were a couple of

5    additional topics that I reviewed I think the policy on.

6        Q.    Okay.  And when you say -- and I'm sorry, just

7    for clarification, when you say prior deposition, not

8    for this case?

9        A.    No.

10        Q.    Right.  Okay.

11        A.    No, a very different case.

12        Q.    Understood.

13        A.    I did also reach out to Jesse Ratch (phonetic)

14    who's the supervisor of Tammy Lund, to get her

15    employment information.

16        Q.    Got it.  So in your current position, can you

17    kind of describe what your role entails, the duties that

18    you are responsible for?

19        A.    Yeah, I mean, it's relatively broad.  So I do

20    operational support for senior living, which, you know,

21    for us is our assisted living, our Independent Living

22    apartments, and our Independent Living twin homes.  I

23    also -- we have two affordable housing locations that I

24    provide support to.  I work with helping to develop

25    policy and procedure, training documents, and then

```
1   general strategy for our operations.

2        Q.   Understood.  And who do you report to?

3        A.   I report to Greg Kurzmarcyzk (phonetic).

4        Q.   I'm going to ask you to spell that.

5        A.   I -- if you -- if I may pull up my email, I

6   could look up how to spell his name.  I don't have it

7   memorized.

8        Q.   That's fair.

9        A.   But I'll -- to my email.

10       Q.   No, I won't make you hunt it down.  But you --

11  so you said Kurzmarcyzk?

12       A.   Kurzmarcyzk, yeah.  There's a lot of

13  consonants.

14       Q.   That's fair.  I just want to make sure if I

15  refer back to it, I'm not -- we'll call him Greg, how

16  about that?

17       A.   Greg works.

18       Q.   Okay.

19       A.   Greg works.

20       Q.   Okay.  And can you tell me what his position

21  is again?

22       A.   He is the Vice President of Operations.

23       Q.   Got it.  And in your role of Director of

24  Operations, I heard you say Senior Living, which

25  includes the Independent Living as well as the ALF
```

1    facilities; is that correct?

2        A.    Yeah, assisted living and memory care assisted

3    living, correct.

4        Q.    Got it.   Okay.   And is that for multiple

5    campuses, or just one specific property?   Not to use --

6        A.    That's for --

7        Q.    -- those interchangeably.

8        A.    Sorry.

9        Q.    No, I was going to say --

10        A.    That's for our entire footprint.

11        Q.    Your entire -- okay.   And do you know

12    relatively how many properties that is for the

13    footprint?

14        A.    I don't have that number today.

15        Q.    Okay.   More than ten?

16        A.    Yes.

17        Q.    More than 20?

18        A.    Significant -- more than 20.

19        Q.    You were going to say significantly more than

20    that?

21        A.    Significantly more than ten, yes.

22        Q.    Yeah.   Okay.

23        A.    Part of my hesitation is we're in the middle

24    of some divestiture.   So I can't give you an exact

25    number.

1    Q.    That's fine.    That's fine.    A roundabout number,

2    you know, several dozen would suffice.    I'm just

3    wondering about the scope of your --

4    A.    Correct.    Yeah, several dozen.

5    Q.    Okay.    So what -- can you describe your role's

6    relationship with the Good Samaritan Kissimmee Village

7    property specifically?

8    A.    It's the same -- I guess the same as what I

9    described in terms of my responsibilities applied to

10   that campus.

11   Q.    Gotcha.    Have you ever been out to that

12   property?

Defendants' objection: Rule
401 and 403 regarding
testimony concerning
Hurricane Irma

13   A.    I have.

14   Q.    Okay.    And what did you -- do you recall when

15   and why?

16   A.    So I'm trying to think if there's any other

17   times I've been there besides the one.    I don't believe

18   so.    But it was in response to Hurricane Irma.

19   Q.    And what was your role on site in response to

20   Hurricane Irma?

21   A.    So I went down there after the hurricane and

22   really helped assess next steps in terms of what we're

23   able to do operationally to support the local staff.

24   And working with, for example, our vendor that was

25   assessing damage on the unit.

1       Q.   Okay.  And do you recall the --

2            MR. HILL:  I just wanted to just interject

3       just for the record.  This is partly objected to

4       topics.  So we have a standing objection on that.

5       Anything related to Hurricane Irma.

6            MS. CARDINAL:  Okay.  And again, just for the

7       record, if you want to just say objection to the

8       scope, and then we can move forward.

9            MR. HILL:  Yeah, that's not what we agreed on

10      in the prior deposition.  But -- or at the end of

11      Mr. Spader's second one.

12           MS. CARDINAL:  Well --

13           MR. HILL:  I think that -- I'll object to the

14      scope if it's something that is not objected to,

15      but outside the scope of that particular witness's

16      designation.  And then I would say this is partly

17      objected to topics for those for which we have

18      written a lot about, back and forth, on our

19      objection.

20           MS. CARDINAL:  Right, and --

21           MR. HILL:  But there are two different

22      categories.

23           MS. CARDINAL:  Okay.  Fine.  But I still --

24           MR. HILL:  This is that second category.

25           MS. CARDINAL:  I would still maintain that if

1      you can limit it to objected to this topic, or

2      objected to this scope, that would be preferable

3      because now we're getting into a lengthy discussion

4      on objections, which is not something that is

5      procedurally necessary in a deposition, or really

6      allowed.

7           MR. HILL:  Well, I thought I did that, but,

8      okay.

9           MS. CARDINAL:  Well, just now?

10          MR. HILL:  Yeah, I said this is part of the

11     objected two topics.  Period.  That's all I said.

12          MS. CARDINAL:  Oh, okay.  If -- if you say so.

13          MR. HILL:  And then you started telling me to

14     say then this was part of the outside of the scope,

15     which is a different category.  So I just wanted to

16     make sure we're on the same page --

17          MS. CARDINAL:  Yes.

18          MR. HILL:  -- as to what my --

19          MS. CARDINAL:  We are --

20          MR. HILL:  -- standing objections are.

21          MS. CARDINAL:  -- on the same page.  But I

22     think the discussion was much more lengthy than

23     what you're representing.  And so, but that's fine,

24     objected to topic noted.

25          MR. HILL:  Yeah, I'm trying to keep them short

```
1          so that we can -- I'm not interrupting.

2     BY MS. CARDINAL:

3          Q.    Okay.   Mr. Knutson, I'm sorry, going -- so

4     going back to your current position as the Director of

5     Operations, did you receive any training prior to

6     entering that current position?

7          A.    Yes.

8          Q.    Can you describe that training for us?

9          A.    Well, the training would have happened over a

10    number of years.    I was an Affordable Housing consultant

11    for five, a manager for five years.    Much of that

12    crossed over to what would I -- what I would be doing in

13    my current role.    So it'd be difficult to succinctly

14    describe the training.

15         Q.    Maybe sort of on-the-job training that you

16    apply in this new role.

17         A.    Yeah.   External training, on-the-job training,

18    internally developed training.

19         Q.    Did you need to get any specific -- we might

20    have touched on this, but any specific certifications or

21    training specific to director of operations that you

22    wouldn't have otherwise held?

23         A.    No.

24         Q.    Okay.   So one of the roles that I heard you

25    mention was support with operations.    Can you describe
```

 1    for us what you mean by operations?  What that looks like

 2    in a property, for example, the Kissimmee Village?

 3        A.    Well, yeah, for any of our senior living

 4    properties or locations, that would include a variety of

 5    things, whether it's, you know, reviewing budgets and

 6    income statements and balance sheets, capital planning,

 7    potentially training of staff, the manager, for example

 8    or at least developing training for that manager.

 9            Responding to anything that may happen from

10    day to day, or at least connecting that location with a

11    person that would be responsible for supporting that

12    area.

13        Q.    Okay.  And so, training and developing

14    training, do you have any specific examples of what you

15    mean by training or developing training?

16        A.    I assisted in our job orientation training --

17        Q.    Okay.

18        A.    -- material, would be an example.

19        Q.    Okay.  And does that material include any sort

20    of handbook or reference materials for staff?

21        A.    The job orientation training contains a text

22    that helps guide that manager in what they'll need to do

23    on a day-to-day basis and refers to a number of our

24    policies and resources that we have in the organization.

25        A.    Understood.  And so if you'll give me just one

```
 1    second, I'm going to pull something up for us.

 2            MS. CARDINAL:  And, Gordon, for your

 3        reference, I'm going to be bringing up Exhibit 2

 4        again, probably.  Where is it?  There it is.  All

 5        right.  Oh, give it a minute.  Okay.

 6            (Thereupon, Plaintiff's Exhibit 2 was marked

 7    for identification.)

 8    BY MS. CARDINAL:

 9        Q.   Can you -- are you able to see my screen,

10    Mr. Knutson?

11        A.   Yes.

12        Q.   And so, what I see or what I have in front of

13    you is what appears to be titled "Language Assistance or

14    Access for Limited English Proficient Persons, Senior

15    Living in AH."  Is this something that you would be

16    familiar with?

17        A.   Yes.

18        Q.   Is this something that you would have had a

19    hand in developing?

20        A.   Yeah, I would have been part of that team.

21        Q.   You said team?

22        A.   Uh-hmm (affirmative).

23        Q.   Okay.  And so, I'm just going to scroll

24    through a little bit, just to -- let me know if you need

25    me to slow down a little bit.  I realize I was going
```

Defendants'
objection: Rule
401 and 403

```
 1    kind of quickly, but I just -- or if you need me to expand

 2    it at all, because I also realize it's kind of small.

 3    Is that a little bit bigger for you?

 4         A.   I can see it fine.

 5         Q.   Okay.  Perfect.  So really quick, I just want

 6    to draw your attention to this box that I'm circling

 7    right here:  Date reviewed, revised.  Is there a

 8    schedule that policies are on in terms of review or

 9    revisions?

10         A.   There is now.

11         Q.   Okay.

12         A.   Those are an annual review now.

13         Q.   Okay.  And so one thing I did want to ask you

14    about, copyright here, where it says, "Copyright

15    Sanford."  I heard you mention earlier that you work for

16    Good Sam and that you would have -- but you would also

17    have been part of the team in developing this procedure.

18              Can you tell us who -- where is this procedure

19    from?  Is this a Good Sam procedure?

20         A.   It's a policy and procedure that applies to

21    our senior living within Good Samaritan Society.

22         Q.   Okay.  Do you have any indication why this

23    would be copyrighted by Sanford, if this is a Good

24    Samaritan procedure?

25         A.   I don't know.
```

Defendants'
objection: Rule
401 and 403

1     Q.   Okay.  And then, I just wanted to draw your

2   attention to the actual policy.  So we're on Page 2 of

3   3, and I'll just read this aloud for the record.

4      "The Senior Living Community will take

5   reasonable steps to ensure that persons with limited

6   English proficiency have meaningful access and an equal

7   opportunity to participate in our services, activities,

8   and programs."

9      I'm going to stop right there.  Can you tell

10   me what reasonable steps were in place or are in place

11   to ensure that this policy is effectuated?

12      MR. HILL:  Objection.  And you can answer the

13     question.

14     A.   Okay.  So we have a number of resources, for

15   example, language cards and other documents that would

16   support or help facilitate that conversation --

17     Q.   Uh-hmm (affirmative).

18     A.   -- with somebody that had a limited English

19   proficiency.

20     Q.   Uh-hmm (affirmative).

21     A.   Along with this policy would be part of that

22   manager's initial training.

23     Q.   Okay.  Is there any -- you said initial

24   training, is there any future or refresher training

25   that's offered to managers or staff?

> Defendants' objection: Rule 401 and 403

1      A.    We do offer ongoing training to staff.

2      Q.    Okay.  All right.

3      A.    To be clear, I'm not speaking specifically on

4   and only of this policy.  I'm not aware of the specific

5   training with regard to this policy.

6      Q.    But there are opportunities for general

7   refresher training for staff?

8      A.    Our Senior Living consultants are in pretty

9   frequent contact with our manager, so if there is ever

10  an issue, certainly they'd be available to support them

11  with any, you know, clarity around policy or any actions

12  that they need to take.

13     Q.    So actually going back up to the title so that

14  you can reference it again.  Is this a type of policy

15  that would be available in those -- I think we were

16  calling them the printed materials, or I refer to them

17  as printed materials in the initial training?

18     A.    I'm not sure -- so I'm not completely

19  understanding what you're asking.

20     Q.    I just want to know if staff would have access

21  to this policy.

22     A.    Yes.

23     Q.    Okay.

24     A.    They would.  Yeah.

25     Q.    In print form or is this something that would

1    be available digitally?

2        A.    Currently it's available digitally.

3        Q.    Understood.  Got it.  Okay.  I am going to

4    stop sharing my screen.  Make sure you can still see and

5    hear me, I didn't screw anything up.

6            Okay.  So back to your role as the Director of

7    Operations, we've kind of covered, you know, that

8    operations includes training in these policies that we

9    just talked about.  Do you have any direct reports as

10   part of being Director of Operations?

11       A.    I do.

12       Q.    How many would you say?

13       A.    I have five.

14       Q.    And what are the roles of those five

15   individuals?

16       A.    The titles?

17       Q.    Yes.

18       A.    So I have the three Senior Living consultants;

19   a Senior Living consultant of resources, and then an

20   Affordable Housing manager.

21       Q.    And are these people that are located on site

22   at specific properties?

23       A.    No, they provide consultation for the entire

24   program.  They have region assignments.

25       Q.    Understood.

```
 1          A.    Referring to the Senior Living consultants, those
 2    three.
 3          Q.    Have region assignments.   Got it.   And what
 4    are those regions?
 5          A.    Currently?
 6          Q.    Yeah.
 7          A.    So let me see, Maryann Roman is assigned to
 8    Iowa and Minnesota, and she's currently supporting one
 9    location in Tennessee.   Rona Snyder (phonetic) is
10    assigned to North Dakota, South Dakota, the Kissimmee
11    campus, Nebraska.   And then Sy Norton (phonetic) is
12    assigned to -- so we have some southwest locations that
13    are transitioning, you know, like divestiture right now
14    --
15          Q.    Okay.
16          A.    -- in Texas, New Mexico, and Arizona.   He has
17    oversight or support responsibilities for Kansas and
18    Colorado.   And then we have a location in Hawaii.
19          Q.    Oh, okay.  Are you putting in -- this one's
20    off the record.  Are you putting in a bid for that
21    Hawaii assignment?
22          A.    And I haven't been there.
23          Q.    Okay.
24          A.    My wife would come along with, though.
25          Q.    Oh, for sure.  For sure, and then you have to
```

```
 1    find reasons why you have to keep staying out there longer

 2    and longer.

 3         A.   Right.

 4         Q.   I gotcha.  I gotcha.  So I heard you mention

 5    Rona Snyder as a Senior Living Consultant; is that

 6    correct?

 7         A.   Yeah, Rona --

 8         Q.   Rona.

 9         A.   -- is -- yup.

10         Q.   Got it.  And how long has Ms. Snyder been a

11    Senior Living consultant?

12         A.   So I believe it was 2010, if I'm remembering

13    correctly.  She was first employed with Good Samaritan

14    in, I believe, it was 1993.

15         Q.   Oh, okay.  Do you know what her role was

16    originally?

17         A.   I believe she was a social worker.

18         Q.   Okay.  And how -- and you're -- so you're

19    saying since 2010, she's been the -- been a Senior

20    Living consultant?

21         A.   Yeah, if I'm remembering that date correctly,

22    I believe it was --

23         Q.   Okay.

24         A.   -- 2010.

25         Q.   Perfect.  And she -- so she is in the -- I
```

1    hope I got this down right, in the North -- the South

2    Dakota and the Kissimmee Village properties?

3         A.    Yeah.   North Dakota and Nebraska.

4         Q.    And Nebraska.   That's it.   Is she onsite at

5    any of those properties?

6         A.    Occasionally she travels to those properties.

7    She works remotely from her home in Iowa.

8         Q.    What would be an occasion for a Senior Living

9    consultant to need to be onsite?

10        A.    There would be a variety of reasons for that.

11   It might be to help orientate a new manager.   It might

12   be that there's a business opportunity that we need to

13   investigate.   It might be that there is a concern at a

14   property.   It might be just to, you know, stay in

15   contact with the staff there and to maintain that

16   relationship.   So there's a variety of reasons.

17        Q.    Gotcha.   Can you describe the primary duties

18   of a Senior Living consultant?

19        A.    Yeah, very similar to roles and

20   responsibilities that I have.   They assist in

21   development and identification for need to update

22   policies and procedures, training materials, those types

23   of resources.   But they also are working directly with

24   the manager and staff at these locations to support

25   their operation.

1          So they're frequently in contact with them,

2    whether it's, you know, doing a financial review which

3    happens on a recurring basis within our organization.

4    Or, as I said, they may be out connecting with them as

5    an orientation process for a new manager.  Or just

6    checking in on operations.

7        Q.   Gotcha.  And is there any specific training

8    required to be a Senior Living consultant?

9        A.   So other than the training that's required for

10   all of our staff members, there's specific training

11   that's assigned to the service line.  So, for example,

12   Fair Housing training is a training that is required of

13   all of our staff.

14          So specific to the title, I guess, I'm just

15   clarifying.  I don't believe so, outside of what is

16   typically assigned to our service line.

17       Q.   And when you say service line, who is in that

18   -- what -- not who, what roles would be in that service

19   line?

20       A.   Sorry, yeah.  Referencing the service line

21   would be Senior Living.  So it would be any operations

22   within Senior Living.

23       Q.   I see.  And so, would it be safe to kind of

24   understand that that service line for Senior Living

25   would be separate and apart from the service line for

```
 1    like ALF or Assisted Living Facilities?

 2         A.    No, Assisted Living is included in that.

 3    So --

 4         Q.    Okay.

 5         A.    -- the Senior Living, that's the Independent

 6    Living, apartments, twin homes, and Assisted Living.  An

 7    example of another service line would be skilled nursing

 8    facilities.

 9         Q.    I see.  I see.  And do you over -- and you

10    might have said this before, and I apologize, but just

11    to clarify.  Do you as Director of Operations also

12    oversee the skilled nursing?

13         A.    No.

14         Q.    Okay.  That's something separate?

15         A.    Correct.

16         Q.    Okay.  Appreciate the clarity.  I just want to

17    wrap my head around all these different pieces.  So I

18    heard you mention this earlier, so we'll jump into it.

19    Tamara Lund, I believe you called her Tammy --

20         A.    Uh-hmm (affirmative).

21         Q.    -- Lund, what is her role in relation to you

22    as Director of Operations?

23         A.    So she is a Nursing and Clinical Services

24    consultant.  So she provides consultation and training

25    to our clinical staff within our Senior Living service
```

1   line.

2       Q.   Let me make sure I understand that.   She

3   provides nursing and clinical like training services for

4   the Senior Living staff?

5       A.   Yes.

6       Q.   Okay.

7       A.   Yeah.   She's a registered nurse and, you know,

8   we have staff in our Assisted Living operations that are

9   nurses.

10      Q.   Uh-hmm (affirmative).

11      A.   And so there's a large clinical component that

12  she works with.

13      Q.   Gotcha.   But I heard you say that she does

14  this for all of the Senior Living service lines.   So

15  would that include Independent Living or only the ALF?

16      A.   That would -- yes.   Sorry.   Clarification.   It

17  would be just Assisted Living.   There's no -- well,

18  yeah, it would just be Assisted Living.   The reason I

19  hesitate is in Minnesota, we're licensed as an Assisted

20  Living in many of our buildings, but we can also house

21  non-care residents in those buildings.

22          So there is a bit of -- we refer to that often

23  as a mixed building with both Independent Living and

24  Assisted Living.   But she'd be involved in those, along

25  with one other nursing consultant.

```
1        Q.   In Minnesota, or is that for the entire
2    footprint?
3        A.   Entire footprint.  And they're assigned
4    regions as well.  I don't know exactly how that's
5    distributed.
6        Q.   Understood.  Do you know how long Ms. Lund has
7    held this position?
8        A.   I believe it is 2021.
9        Q.   Okay.  And has she held the same position the
10   entire time that she's been with Good Samaritan, Good
11   Sam?
12       A.   Yeah, I think their titles may have changed,
13   but the roles and responsibilities have substantially
14   been the same.
15       Q.   Gotcha.  And I heard you mention that she was
16   a registered nurse; is that correct?
17       A.   Correct.
18       Q.   And just to confirm, she's employed with Good
19   Samaritan?
20       A.   Yes.
21       Q.   Not Sanford or Sanford Health?
22       A.   She's employed with Good Samaritan.
23            MS. CARDINAL:  All right.  So give me just one
24       second.  I'm going to pull up another document.
25       And, Gordon, again, for -- just for your purposes,
```

1          this is going to be Exhibit 1 again, which you have.

2          And I'm going to -- I think I'm getting faster at

3          this.

4               (Thereupon, Plaintiff's Exhibit 1 was marked

5     for identification.)

6     BY MS. CARDINAL:

7          Q.    All right.   So just looking now at the title

8     of this document, "Termination of Occupancy Agreement

9     and Abandonment of Personal Property."

10    Taking aside for a second that there does appear,

11    obviously, to be a specific individual's name on this,

12    namely the Plaintiff, just generally speaking, are you

13    aware of the termination of occupancy agreement and

14    abandonment of personal property agreement?

15         A.    Yes.

16         Q.    Okay.   Did you have any part or were you part

17    of the team that had a part in creating these documents?

18         A.    I was part of a team that did.

19         Q.    And what was your understanding of the purpose

20    of these documents?

21         A.    It's my understanding the purpose of the

22    documents was to effectuate a termination of the

23    agreement between the resident and the location.

24         Q.    And can I just ask --

25         A.    And as that was one --

```
 1        Q.    I'm sorry.

 2        A.    Go ahead.

 3        Q.    No, no, no, go ahead.

 4        A.    And then also to release the property so that

 5   we could assist in removing or discarding any of the

 6   property that the resident no longer wished to maintain.

 7        Q.    Okay.   And just to go back, what I was going

 8   to ask is can you tell me what you mean by effectuate

 9   termination of the agreement?

10        A.    Yeah.   So we have an occupancy agreement with

11   our residents.   And if a resident so chose to mutually

12   agree to this termination of occupancy agreement, and

13   allowed us to have mutual agreement on termination of

14   that occupancy agreement, so that we could perpetuate

15   the security deposit refunds.

16        Q.    Okay.   Was it your understanding that this

17   document was required to effectuate the security deposit

18   return?

19        A.    No.

20        Q.    Okay.   So what was your understanding about

21   the holding the security deposit to possibly returning

22   that for residents?

23        A.    Can you -- I -- can you repeat that or clarify

24   what you're asking?

25        Q.    Sure.   So, and again, feel free to correct me,
```

1    but I heard you say that this was meant to effectuate a

2    termination and allow for the return of the security

3    deposit.

4            So then I followed up saying did this need to

5    be signed to return the security deposit?  I heard you

6    say no.  So I just want to generally understand what was

7    your understanding of Good Sam's ability to hold a

8    security deposit after or due to a termination?

9        A.    Sure.

10            MR. HILL:  Objection to the question.  You can

11        go ahead, Mr. Knutson, if you can answer.

12        A.    Yeah.  So this allowed for a mutual agreement

13    to the termination of the occupancy agreement.  There

14    are other means for that occupancy agreement to be

15    terminated.  But this allowed for a mutual agreement

16    that would bypass the need for notices.

17        Q.    Okay.  And that mutual agreement to terminate,

18    so both parties are agreeing to terminate and you're

19    saying separate and apart from other possible

20    termination procedures.  How did this relate to the

21    return of the security deposit, this mutual agreement?

22            MR. HILL:  Objection.

23        A.    Well --

24            MR. HILL:  Go ahead.

25        A.    It allowed for that security deposit to be --

1    to return upon agreement of this occupancy agreement

2    termination without the need to wait for a notice

3    period.  That's my understanding of it.

4         Q.   You're saying without, is that -- did I hear

5    that correctly?

6         A.   Correct.

7         Q.   And this notice period, do you know how long

8    that notice period was or would have been at this time?

9         A.   Yeah, I believe it's 30 days on the occupancy

10   agreement.

11        Q.   And who else was present or rather part of the

12   team that was responsible for creating this termination?

13        A.   I don't know all the parties involved.  I do

14   know that our legal counsel was part of that.

15        Q.   And do you know if that legal counsel would

16   have been licensed to practice law in the State of

17   Florida?

18        A.   I don't know.

19        Q.   So turning to this agreement that is on the

20   screen in front of you, I do just want to point really

21   quickly out, I'm trying to circle it with my cursor so

22   you can see.  But it's a little bit light.

23        A.   Yeah, I can see it.

24        Q.   Perfect.  October 15th, 2022, do -- would you

25   have been present at Kissimmee Village on that date?

1      A.    No.

2      Q.    Do you know if any of your direct reports

3  would have been present on -- at Kissimmee Village at

4  that day?

5      A.    Yeah, I know that Rona Synder was.  I believe

6  Sy Norton was.  On that specific day, I can't be

7  positive --

8      Q.    Okay.

9      A.    -- about Sy.  My other direct report that

10  would have been down there would have been Maryanne

11  Roman.

12      Q.    Uh-hmm (affirmative).

13      A.    I don't know if she was there on that specific

14  date.  I had two other direct reports on campus, but at

15  the time I was overseeing our Environmental Services

16  area.  And so, those two may have been onsite on that

17  date as well.

18      Q.    You said Environmental Services?

19      A.    Correct.

20      Q.    Is that not a role that you oversee any

21  longer?

22      A.    Correct, I do not.

23      Q.    Are you aware of the procedures in place to

24  have clients sign these documents, specifically this

25  termination?

1           MR. HILL:  Objection.

2           MS. CARDINAL:  Sorry, Gordon.

3           MR. HILL:  I apologize.  I thought you were

4      done with your question.  I did an objection over

5      you.

6           MS. CARDINAL:  That's okay.  I just wanted to

7      make sure it got on the record.

8  BY MS. CARDINAL:

9      Q.   Mr. Knutson, go ahead.

10     A.   I'm not sure what you're asking.  If you're

11  asking if there are written procedures or verbal

12  procedures.  I'm not sure, I guess, what you're asking.

13     Q.   Sure.  Let's start with written procedures.

14  Did you have any written procedures in place for your

15  staff that were onsite regarding the termination of

16  occupancy agreements?

17     A.   Not that I'm aware of.

18     Q.   Okay.  Well, then turning to verbal

19  procedures, what were the verbal instructions or

20  procedures for the termination of occupancy agreement?

21     A.   I don't recall specifically what the

22  discussions were with them.

23     Q.   Do you know if these documents needed to be

24  signed like physically with a resident present or were

25  they being signed electronically?

1       A.    My understanding was that they were being signed

2    with the resident present.

3       Q.    Okay.  Do you know where residents would have

4    been meeting with staff to sign these documents?

5       A.    Yeah, I believe they're referred to as the

6    Friendship Room on campus.

7       Q.    Gotcha.  Are you aware of residents being

8    given a copy of this agreement prior to signing?

9       A.    My understanding was that the agreement was

10   shared with the resident.  Is that what you're asking?

11      Q.    Sort of.  Shared, I appreciate that.  But do

12   you know if they were handed a copy of the document

13   prior to signing to review, maybe let's say it that way.

14      A.    That was my understanding.

15      Q.    Okay.  Do you have any records of who was

16   scheduled throughout, let's say post-Hurricane Ian, at

17   Kissimmee Village?  Let me start over.

18           Do you -- did you keep any records of what

19   Good Sam staff members would have been present at

20   Kissimmee Village and when during the -- we'll call it

21   recovery efforts following Hurricane Ian?

22      A.    I personally don't have those records.  I

23   don't know if those records exist.

24      Q.    Okay.  Were you -- are you aware of any

25   records maintained to confirm that clients were provided

1    with -- clients, I'm sorry, residents were provided with

2    copies of the termination of occupancy agreement?

3         MR. HILL:  Objection.

4    A.    I can't speak to whether they were provided a

5    copy or not.  You know, certainly the expectation would

6    be that if they wanted one, that they would be given

7    one.

8         Q.    Do you have any knowledge of whether or not

9    Good Sam residents were contacted directly about the

10   termination of occupancy agreement?  Like told to come

11   sign it?

12        A.    I don't know.

13        Q.    Do you have any information on how residents

14   maybe became aware of the termination of occupancy

15   agreements?

16        A.    Generally, you know, we were sending out

17   communications to residents in various modes.  But not

18   -- I don't know specifically with relation to this

19   effort.

20        Q.    Okay.  Those -- you were sending out

21   communications.  Would any of those communications been

22   in writing?

23        A.    I don't know.

24        Q.    Are you aware of whether or not those

25   communications would have been provided in English or

1   any other language?

2       A.   I don't know.

3       Q.   Do you know if professional interpretation or

4   translation services were engaged for the termination of

5   occupancy agreements?

6       A.   Those would be if, you know, requested by the

7   resident.   I can't speak to whether that was requested

8   by any residents.

9       Q.   Were any of your staff provided with

10  translated documents?   And by document --

11          MR. HILL:   Objection.

12      Q.   And sorry, by documents I mean this

13  termination of occupancy agreement.

14      A.   Not that I'm aware of.

15      Q.   Are you aware of what happened with any of the

16  property that was -- that remained at Kissimmee Village

17  owned by residents?

18      A.   Generally, the practice was that they were

19  given an opportunity to recover any personal items that

20  they wished to retain.   If they had released that

21  property, then after that timeframe, that would have

22  either have been discarded or part of the demolition in

23  the building.

24      Q.   And do you know how many buildings were

25  demolished after Hurricane Ian?

1          A.   I don't.

2          Q.   Okay.  So going back to -- okay, I think I

3     stopped.  Yes, I did stop sharing.  Going back to this

4     Exhibit 2, hopefully one second.  Okay.  Where did it

5     go?  All right.  I just want to identify one -- I think

6     you can see it.  There we go.

7               This line here under Procedure, what it says,

8     "The Senior Living manager or other designated employee

9     will identify the language and communication needs of

10    the person with limited English proficiency."

11              Do you know if records are kept regarding that

12    identification?

13         A.   I don't know.

Defendants'
objection: Rule
401 and 403

14         Q.   Is this something that would have been part of

15    the training for the manager, how to identify limited

16    English proficiency?

17         A.   This policy and procedure would have been part

18    of that training.

19         Q.   Okay.  And so then, here we have, "The Senior

20    Living manager or other designated employee" -- I'm in

21    the second paragraph, by the way.  "Will ensure

22    residents are informed in a language they can understand

23    of the right to language assistance, and the

24    availability of such assistance free of charge."

25              Would this policy have been in place or other

1    such policy like it been in place during the -- again,

2    we'll just refer to it as the recovery efforts following

3    Hurricane Ian?

Defendants'
objection: Rule
401 and 403

4         A.    Yes.

5         Q.    Okay.   Would that have been part of the verbal

6    instructions or communications related to the

7    termination of occupancy agreement to make sure that

8    folks understood language assistance would be available?

9         A.    I'm not aware of what was shared.

10        Q.    Okay.   Understood.

11        A.    Or don't recall, anyway.

12        Q.    All right.   I'll put that down for now.   Just

13   one second.   Okay.   Turning to maybe more of the

14   business side of operations, do you maintain any sales

15   or rental records relating to residents?   And by you, I

16   think I mean more generally as Director of Operations,

17   do you maintain any sales or rental records related to

18   not just the Plaintiff but any residents at Kissimmee

19   Village?

20             MR. HILL:   Objection.

21        A.    We retain them --

22             THE WITNESS:   Oh, sorry, Gordon.

23             MR. HILL:   Go ahead.   You can go ahead.   It's

24        an objection.   Go ahead.

25             THE WITNESS:   Okay.   Are you asking if we

```
1          retain them here in Sioux Falls or if the location

2          retains records?

3     BY MS. CARDINAL:

4          Q.   That's an excellent question.  Let's start

5     with Sioux Falls.  Do you retain records in Sioux Falls?

6          A.   Not individual resident records, no.

7          Q.   Okay.  Does the specific campus or property,

8     so in this case, I'm referring to Kissimmee Village,

9     would they maintain those records?

10         A.   Yes.

11         Q.   Okay.  And so, talking specifically on rental

12    records, what would be something that Kissimmee Village

13    would be instructed to maintain?

14         A.   So, for example, we would have, of course, the

15    occupancy agreement, evidence of a background check,

16    evidence of proof of age.

17         Q.   Uh-hmm (affirmative).

18         A.   Unit inspection form.  There might be some --

19    occasionally we may have a waiver, for example, for use

20    of wellness gym or a wood shop, or that sort of thing.

21    The application from the resident.

22              I don't know, I can't comprehensively list

23    every single document that may be in there.  But that's

24    generally -- those would be --

25         Q.   That's fine.
```

```
 1        A.   -- what we would refer to as, you know, kind of

 2    the major documents.

 3        Q.   Okay.  Do you maintain any communication

 4    records for residents?  Would staff, I mean.

 5             MR. HILL:  Objection.  This is outside of the

 6        scope.  Go ahead.

 7        A.   Yeah.  So there would be circumstances where

 8    we would potentially document a communication with

 9    residents.

10        Q.   Understood.  What is your understanding of the

11    relationship between Good Samaritan and Sanford Health?

12             MR. HILL:  Objection.  This is outside the

13        scope.

14        A.   What do you mean by relationship?

15        Q.   How are they connected or affiliated or how do

16    they interact in any way?

17        A.   I'm not, you know, an expert in entity

18    organizational structure.  So I don't -- I couldn't

19    speak to that.

20        Q.   Okay.  I've heard you mention earlier that all

21    staff would be responsible or would be provided with --

22    actually I think the word that you used was assigned

23    Fair Housing training.  Can you describe what that Fair

24    Housing training entails?

25             MR. HILL:  Objection.  Outside of the scope.
```

Defendants'
objection: Rule
401 and 403

1        A.    Fair Housing training would be -- I would say a

2    high level refresher on the basic fundamentals of the

3    Fair Housing Act.   So for example, the protected classes

4    included in the Fair Housing Act.

5        Q.    Understood.   Would staff be provided with any

6    information -- well, okay, with any examples, rather, of

7    what could be prohibited under the Fair Housing Act?

8        A.    It's been a while since I've taken that

9    course, so I -- my assumption would be that that is part

10   of the training.   But I can't say with certainty.

11       Q.    Do you know if staff will be provided

12   procedures or mechanisms for reporting possible Fair

13   Housing Act violations?

14       A.    Yes, we have policy and procedure on that.

15           MR. HILL:  I'm going to object, outside the

16       scope.  But it's fine, Mr. Knutson, if you can give

17       me a second to --

18           THE WITNESS:  Sorry.

19           MR. HILL:  -- make the objection for you, just

20       a quick pause.

21           THE WITNESS:  Sorry.

22           MS. CARDINAL:  And once again, if it's all

23       right with everyone, I would just take maybe five

24       minutes to go through my notes, so we can wrap up

25       here.  Is that all right with you, Mr. Knutson?

1           THE WITNESS:  Yeah, that's fine.

2           MS. CARDINAL:  Gordon?

3           MR. HILL:  If you don't mind, I'll step out

4       and use the bathroom, and then I'll be back within

5       that time period.

6           MS. CARDINAL:  That's perfectly fine.  Please,

7       yeah, take -- and you know, I probably should have

8       mentioned this at the beginning, you're welcome to

9       take a break whenever you need one.  Just let me

10      know.

11          THE WITNESS:  No, I'm fine.

12          MS. CARDINAL:  Okay.  Perfect.

13          THE WITNESS:  Yeah, appreciate it.

14          MS. CARDINAL:  All right.  That's good with

15      you, Gordon?

16          MR. HILL:  Yup.  Thank you.

17          MS. CARDINAL:  All right.  We'll take a quick

18      off the record break.

19          (Off the record.)

20          (On the record.)

21   BY MS. CARDINAL:

22      Q.   And I just wanted to ask you a couple more

23   questions.  So first, and I can put the document back up

24   if you need me to, but that -- I heard -- I recall you

25   saying that there is a team that would have been

```
 1    responsible for that limited -- that language assistance

 2    form.  Maybe I will just put it back up, just so we know

 3    what I'm talking about.  Give me just one second.  This

 4    document here.

 5              Can you tell me if you recall who would have

 6    been part of that team?

 7         A.    That would have been -- the initial creation

 8    of the policy and procedure, are you --

 9         Q.    Yes, yeah.

10         A.    -- referring to that?

11         Q.    Uh-hmm (affirmative).

12         A.    I don't recall everyone that would be involved

13    in it.  I know that I was, and my supervisor at the time

14    was Dustin Sholes (phonetic).  He would have been

15    involved.  I don't know of -- I can't recall exactly who

16    else was part of that.

17         Q.    Understood.  Okay.  And then, I heard you say

18    that at one point you would have been responsible for

19    overseeing, I believe you called it Environmental

20    Services; is that correct?

21         A.    Correct.

22         Q.    Can you tell me what that -- what

23    Environmental Services would have entailed?

24         A.    So, yeah, internally at the time, when we said

25    Environmental Services, we were referring to
```

Defendants'
objection: Rule
401 and 403

1      maintenance, housekeeping, and laundry.  We also provided

2      support regarding life safety code compliance.

3          Q.    Okay.  And how long would you have overseen

4      Environmental Services?

5          A.    I don't recall the length of time on that.  I

6      apologize.

7          Q.    Do you know who oversees it now?

8          A.    Jason Gunther.

9          Q.    And I recall you telling me that you had five

10     direct reports, three Senior Living consultants, one

11     Affordable Housing and what would have the -- what would

12     the fifth have been?

Defendants'
objection: Rule
401 and 403

13         A.    It's a Senior Living consultant resources.  So

14     he does not have a region assignment.  He assists with

15     the updating of documents and forms.

16         Q.    And --

17         A.    As well as some other responsibilities.

18         Q.    Okay.  And what is his -- and what's his name?

19         A.    Jason Twite.

20         Q.    And spell that like Dwight; is that correct?

21         A.    It's T-W-I-T-E.

22         Q.    Oh, okay.  Thank you.  And so when you're

23     saying resources, and I heard you say updates, would

24     that be the policies that Senior Living Consultants use?

25         A.    He provides administrative support for that.

1    Sorry, Gordon.  I jumped in too soon.

2              MR. HILL:  It's okay.

3         A.   So that's one of a number of different

4    functions, including software support and various other

5    responsibilities.

6         Q.   Got it.  And do you -- are you aware of any of

7    your five direct reports speaking or reading Spanish?

8         A.   I'm not aware.

9         Q.   And do you yourself speak or read Spanish?

10        A.   I do not.

Defendants'
objection: Rule
401 and 403

11        Q.   Okay.  And one other -- I heard -- so you had

12   mentioned that you had made an onsite visit to Kissimmee

13   Village after Irma, correct?

14        A.   Correct.

15        Q.   Who instructed you to visit Kissimmee Village?

16             MR. HILL:  Objection as outside of the scope

17        and objected to.

18        A.   My direct supervisor at the time, Linda Studer

19   (phonetic).

20        Q.   I'm sorry.  Linda?

21        A.   Studer.

22        Q.   Okay.  And what did you observe when you were

23   onsite after Ian?

24             MR. HILL:  Objection.  I think you said  Ian,

25        but did you mean  Irma ?

 1          MS. CARDINAL:  Oh, I'm sorry.  You're absolutely

 2     right.  Thank you, Gordon.

 3   BY MS. CARDINAL:

 4     Q.   Yes.  What did you observe at the property

 5   after Irma?

 6     A.   Are you inquiring about the physical nature of

 7   the property?

 8     Q.   Yeah.

 9     A.   Okay.  So there was wind damage and flood

10   damage.

Defendants'
objection: Rule
401 and 403

11     Q.   Okay.  And would you be able to recall whether

12   that was wind damage and flood damage to resident units,

13   to the Kissimmee Village shared or controlled part of

14   the property, both?

15          MR. HILL:  Objection.

16     A.   So I can't speak to the entirety of the

17   damage.  I know that resident units were damaged,

18   common, there were -- there was damage to common areas.

19     Q.   Okay.  Did you meet with any residents while

20   you were onsite after Irma?

21     A.   I did.

22     Q.   And what were the contexts of those meetings?

23     A.   Discussions about what resources were

24   available to them.  We worked with FEMA and Red Cross as

25   well as discussions about what their desire was in terms

```
1    of their relationship with the campus moving forward.
2        Q.    Okay.  Do you recall if there was a
3    termination of occupancy agreement in use after Irma?
4        A.    I don't recall, yeah, I don't recall.
5        Q.    Okay.  Is it your understanding that the
6    termination of occupancy agreement that I was showing
7    you previously and I can put up again if you want to
8    give me just a second.  Was created following Hurricane
9    Ian only?  This --
10       A.    That is the form that was used for Hurricane
11   Ian.  I don't recall a specific form.  Certainly there
12   was discussion about ending of occupancy agreements if
13   those residents desired to do that during Irma.
14       Q.    Understood.
15       A.    I don't recall a specific form.
16       Q.    Okay.
17       A.    We would have documented that on something.  I
18   just don't recall what that form was.
19       Q.    Understood.  Following Irma, were you aware of
20   the steps taken to make repairs to that wind and flood
21   damage you described?
22       A.    Generally aware there was discussions around
23   the potential FEMA grant.
24       Q.    Potential FEMA grant.  Okay.  Are you aware of
25   what the status of that potential FEMA grant was?
```

1       A.   What the status of it is currently, is that what

2   you're asking?

3       Q.   Yeah, I guess.  I mean, you referred to it as

4   potential, so I guess I'm just following up, did you

5   ever learn of the outcome of that grant?

6       A.   I don't recall what the specific outcome was

7   in terms of, you know, whether it was submitted, whether

8   it was rejected, whether it was -- I don't know the

9   specifics of that.

10      Q.   Okay.  And previously I had asked you about

11  the relationship between Good Sam and Sanford Health.

12  And I understood, you know, that you made a comment

13  about not being an expert on the relationship.  And

14  that's fine.

15           I just wanted to follow up, recognizing that

16  you are not the expert, can you describe that

17  relationship based on your own individual knowledge of

18  what it might be?

19      A.   Sure.  What I know is there are a lot of

20  different terms that were used by various people that

21  didn't have firsthand knowledge of how that transaction

22  was occurring.  But my current understanding is that

23  it's an affiliation --

24      Q.   Okay.

25      A.   -- of entities.

1      Q.   Okay.  In your role as Director of Operations,

2    did you ever receive any specific instruction or

3    information on how to refer to that relationship?

4      A.   I don't recall.

5      Q.   Okay.  I'm good.  We're good?  I heard you

6    mention a -- I heard you describe it as transaction.

7    What did you mean by transaction?

8           MR. HILL:  Objection.

9      A.   Yeah, again, I'm not an expert in how entities

10   come together.  So I don't know what word, necessarily,

11   should be used to describe it.  So that's the word that

12   I chose.

13     Q.   Okay.  But your understanding is that the

14   entities came together in some way?

15     A.   In some fashion.

16          MS. CARDINAL:  Okay.  All right.  I think

17      that's it for me.  Mr. Knutson, thank you for your

18      time.  Gordon, I don't know if you have anything.

19          MR. HILL:  I don't have any questions.  Thank

20      you.

21          MS. CARDINAL:  Okay.  So we can --

22          MR. HILL:  For Mr. Fluit, do you want to take

23      -- it's 12:45.  Do you want to take a lunch break?

24          MS. CARDINAL:  I was just about to ask.

25          MR. HILL:  And then we can --

1          MS. CARDINAL:  I was just about to ask what your

2      preference is, because it is 12:45.  So I am

3      definitely not opposed to maybe convening until

4      like, I don't know, 1:30.

5          But I also recognize that you had mentioned

6      that your folks have other stuff on their schedules

7      today.  So I don't want to interrupt what Mr. Fluit

8      has got going on.

9          But I am happy to take a lunch break and

10     reconvene at his convenience.

11         MR. HILL:  Why don't we take a break.  I mean,

12     we're not too far along and 1:30 seems fine to me.

13         (Thereupon, the deposition was concluded at

14  12:47 p.m.)

15         (Reading and signing of the deposition

16  transcript was reserved.)

17

18

19

20

21

22

23

24

25

52

1                           CERTIFICATE OF OATH

2       STATE OF FLORIDA

3       COUNTY OF ORANGE

4

5            I, Lorena Agudelo, Court Reporter, Notary

6       Public, State of Florida, certify that Shane

7       Knutson personally appeared before me on the 12th

8       day of September 2024, and was duly sworn.

9            Signed this 23rd day of September 2024.

10

11

12                            *Lorena Agudelo*

13       _____

14       Lorena Agudelo, Court Reporter

15       Notary Public, State of Florida

16       Commission No.: HH 495988

17       Commission Expires: 02/22/28

18

19

20

21

22

23

24

25

53

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF ORANGE


I, Lorena Agudelo, Court Reporter, certify

that I was authorized to and did report the

deposition of Shane Knutson; that a review of the

transcript was reserved; and that the transcript is

a true and correct record of my notes.

I further certify that I am not a relative,

employee, attorney, or counsel of any of the

parties, nor am I a relative or employee of any of

the parties' attorneys or counsel connected with

the action, nor am I financially interested in the

action.

Dated this 23rd day of September 2024.


*Lorena Agudelo*

_____

Lorena Agudelo, Court Reporter

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:23-cv-1288-RBD-EJK

YOLANDA DELGADO,

    Plaintiff,

    -vs-

THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY,
a foreign not-for-profit corporation,
d/b/a GOOD SAMARITAN SOCIETY-KISSIMMEE VILLAGE;
SANFORD HEALTH, a foreign not-for-profit corporation,

    Defendants.
_____/

Community Legal Services
122 East Colonial Drive, Suite 200
Orlando, Florida 32801

Thursday, September 12, 2024
10:03 a.m. to 11:05 a.m.

DEPOSITION OF

DYLAN SPADER

      Taken before Lorena Agudelo, Court Reporter, a

Notary Public for the State of Florida at Large,

pursuant to Notice of Taking Deposition filed in the

above-styled cause.

APPEARANCES:

On Behalf of the Plaintiff:

COMMUNITY LEGAL SERVICES

122 East Colonial Drive, Suite 200

Orlando, Florida 32801

(407) 841-7777

morganc@clsmf.org

dawnw@clsmf.org

alecr@clsmf.org

nicolec@clsmf.org

BY:  MORGAN CARDINAL, ESQUIRE

BY:  DAWN M. WELKIE, ESQUIRE

BY:  ALEC W. ROSE, ESQUIRE

BY:  NICOLE K. CARRERO, ESQUIRE


COMMUNITY LEGAL SERVICES

1440 North Nova Road, Suite 101

Daytona Beach, Florida 32117-3244

(386) 255-6573

john@clsmf.org

BY:  JOHN J. MARTINO, ESQUIRE (via Zoom)

```
 1                    APPEARANCES (Cont'd):

 2        On Behalf of the Defendants:

 3        HILL WARD HENDERSON

 4        101 East Kennedy Boulevard, Suite 3700

 5        Tampa, Florida  33602-5195

 6        (813) 221-3900

 7        ghill@hwhlaw.com

 8        BY:  S. GORDON HILL, ESQUIRE

 9

10        Also Present:

11        Tom Peninsten, Sanford Health (via Zoom)

12        Samantha Barkholz, Community Legal Services,

13        Fair Housing Advocate

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            INDEX

 2     TESTIMONY OF DYLAN SPADER    PAGE

 3     Direct Examination by Ms. Cardinal       6

 4     Certificate of Oath                     42

 5     Certificate of Reporter                 43

 6

 7                      INDEX OF EXHIBITS

 8               PLAINTIFF'S EXHIBITS MARKED

 9     NUMBER          DESCRIPTION              PAGE

10     Exhibit 1      Termination Agreement     27

11          [Exhibit was retained by Ms. Cardinal.]

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    THEREUPON:

2          COURT REPORTER:  Good morning.  Today is

3    September 12th, 2024, and the time is 10:04 a.m.

4    We are present to record a discovery deposition.

5    If I could please have attorneys state their

6    appearances for the record.

7          MS. CARDINAL:  Sure.  Morgan Cardinal for the

8    Plaintiff, Yolanda Delgado, and I'm with Community

9    Legal Services.

10         We also have in the room with us Attorneys

11   Alec Rose and Dawn Welkie for Community Legal

12   Services on behalf of the Plaintiff, Yolanda

13   Delgado, and our non-attorney advocate, Samantha

14   Barkholz.

15         Virtually, we have John Martino with -- also

16   with Community Legal Services on behalf of

17   Plaintiff Yolanda Delgado; and Nicole Carrero.

18         COURT REPORTER:  Thank you very much.  I've

19   already taken a look at the witness ID, so I'll go

20   ahead and swear him in.

21                    DYLAN SPADER,

22       having been first duly sworn and responding,

23    Yes,  was examined and testified as follows:

24         COURT REPORTER:  Thank you very much.  You may

25   proceed, Counsel.

1          MS. CARDINAL:  Do you want to get the parties on

2     behalf of the Defendant?

3          COURT REPORTER:  Oh, yes.  I thought it was --

4          MS. CARDINAL:  Because -- I mean, not the

5     parties, the attorneys, right.

6          COURT REPORTER:  Yes, please.  If I could get

7     everybody else's appearances.

8          MR. HILL:  Sure.  I was about to interrupt,

9     but then you started doing the oath, and I did not

10     want to interrupt that.

11          So my name is Gordon Hill, and I'm an attorney

12     for -- we're calling it Good Sam, as kind of the

13     short version that you'll be hearing today for the

14     Defendant.  And then, also on the line is Tom

15     Peninsten.  He is in-house counsel with Good Sam up

16     in Sioux Falls.

17          COURT REPORTER:  Thank you very much.

18          MS. CARDINAL:  Okay.  I'm going to zoom back

19     in so we can kind of see each other.

20                    DIRECT EXAMINATION

21  BY MS. CARDINAL:

22     Q.    Mr. Spader, thank you again this morning, or

23  if I haven't thanked you yet, thanks so much for being

24  here this morning.  Could you -- have been deposed

25     before?

1       A.   Yes.

2       Q.   Okay.  So you know the logistics, right?  I'll

3   try to, you know, answer my -- or ask my question

4   completely and fully and allow you the opportunity to

5   answer completely, fully.  We'll just try not to talk

6   over each other.

7            And we would just request, particularly

8   because we're virtual today, right, we would just

9   request that you make sure that you answer verbally, you

10  know.  Yes, no's, rather than uh-hmm, uh-huh, that sort

11  of thing.

12      A.   Understood.

13      Q.   Great.  So can we go ahead and just really

14  quickly, for the record, can you state and spell your

15  name for us?

16      A.   Dylan, D-Y-L-A-N, Spader, S-P-A-D-E-R.

17      Q.   Thank you so much.  And let's go ahead, can

18  you tell us what role you are satisfying today for this

19  deposition?  What's your title?

20      A.   My title this -- as of this morning is

21  Administrator.

22      Q.   Okay.  And is -- and which of the Defendants

23  is that on behalf of, just for the record?

24      A.   The Good Samaritan Society.

25      Q.   Got it.  And do you work in any capacity for

1    the other Defendant, Sanford Health?

2        A.    I work for the Good Samaritan Society.    I am

3    not familiar with exactly how the relationship is

4    between Sanford and the Good Samaritan Society.

5        Q.    Okay.  But it's safe to say that you were

6    specifically asked here on behalf of Good Samaritan

7    only.

8        A.    Correct.

9        Q.    Got it.  Okay.  Did you do anything today to

10   prepare for your deposition?

11       A.    I did have a meeting with our Counsel

12   regarding the three topics --

13       Q.    Okay.

14       A.    -- that I was being asked to be a corporate

15   representative on.

16       Q.    Understood.  And are you -- who are you

17   currently employed by?

18       A.    The Good Samaritan Society.

19       Q.    Was there -- I'm sorry, was there something

20   else?  Oh, okay.

21       A.    Nothing from me.

22       Q.    Okay.  Just checking.  I thought I heard

23   something, and I just wanted to make sure I wasn't about

24   to cut you off.

25            Have you ever been employed by Sanford Health?

```
 1        A.   No, I'm not employed by Sanford Health.

 2        Q.   Okay.  What about Sanford, or also known as

 3   Sanford Group?

 4        A.   Again, I'm unfamiliar with the exact agreement

 5   or relationship between Sanford and the Good Samaritan

 6   Society.

 7        Q.   Got it.  And how long have you worked in this

 8   role as administrator?

 9        A.   It has been a little over two years.

10        Q.   Okay.  And how long have you worked for Good

11   Sam in -- and if I refer to it as Good Sam, do you

12   understand that I'm speaking about the Evangelical

13   Lutheran Good Samaritan Society?  I think I got that

14   name right -- the whole name right.  Okay.  Perfect.

15             So how long have you worked for Good Sam in

16   totality?

17        A.   In totality, I've worked for them from 2013 to

18   2018.

19        Q.   Okay.

20        A.   And then, rejoined the company in 2020 until

21   currently.

22        Q.   Okay.  And what did you -- where were you

23   between 2018 and 2020?

24        A.   I worked for a couple different organizations,

25   Brookdale Senior Living and Genesys Healthcare.
```

```
 1       Q.    Okay.  And was that similar work to what you're

 2   doing now for Good Sam?

 3       A.    Yes.

 4       Q.    Okay.  And what -- prior to being the

 5   administrator, what were your positions with Good Sam?

 6       A.    Morgan, do you want me to go back to 2013 or

 7   just from this most recent in 2020?

 8       Q.    That's an excellent question.  You know, as

 9   many of them as you can recall from your time with Good

10   Sam from 2013 forward.

11       A.    Okay.  I was an administrator-in-training --

12       Q.    Okay.

13       A.    -- again at Good Sam in 2013.  I was then

14   named an administrator for one of our campuses in 2015

15   -- I'm sorry, 2014, that would have been, then,

16   Executive Director, so I was looking at three titles

17   during my first stint.  And then most recently, since

18   I've been here in Florida, the titles have been Senior

19   Living Administrator, Territory Sales Manager, and

20   currently Administrator.

21       Q.    Okay.  Thank you.  I'm sure that was -- that's

22   quite aways to go back, so thank you for that.  Can you

23   describe the duties for your current position as

24   administrator?

25       A.    Generally, it is just to kind of manage and
```

1    oversight the day-to-day operations of the community.

2        Q.   Okay.  And who do you directly report to?

3        A.   I directly report to Senior Director Travis

4    Staples.

5        Q.   And do you have any direct reports that you

6    oversee?

7        A.   Yes.

8        Q.   Okay.  How many?

9        A.   Nine.

10       Q.   Nine.  Okay.  And are those direct reports all

11   on one specific campus, or are they over different

12   campuses?

13       A.   One specific campus.

14       Q.   Okay.  And I guess let's back up a little bit,

15   because I heard you mention that campus, right.  And so

16   could you explain that a little bit.  What do you mean

17   by campus?

18       A.   Yeah, so I'm responsible, Morgan, for managing

19   the 400 acres of land --

20       Q.   Okay.

21       A.   -- here that our community sits on.   In

22   addition to overseeing the independent living site

23   community as well as the assisted living.

24       Q.   And are you referring to the -- when you say

25   the 480 acres, are you referring to the Kissimmee

1    Village property?

2       A.   Yes.

3       Q.   Okay.

4       A.   And it's a little over 400 acres.

5       Q.   Sorry.  I heard 480, but you're saying a

6    little over 400.  My mistake.  Okay.  In our -- is that

7    the only campus that you have worked on?

8       A.   No.

9       Q.   Okay.  Is that the only campus in Florida that

10   you've worked on?

11      A.   No.

12      Q.   Oh, okay.  Do you recall any of the names of

13   the other campuses?

14      A.   So since I've been employed here in Florida --

15      Q.   Uh-huh (affirmative).

16      A.   -- I have also worked on the Deland campus.

17   That was part of my role --

18      Q.   Okay.

19      A.   -- during the territory sales manager

20   position.  And then, my first stint from 2013 to 2018, I

21   worked at Canistota, South Dakota and then Rapid City,

22   South Dakota.

23      Q.   You can say no, but would you be able to spell

24   Canistota for us?

25      A.   Yes, of course, C-A-N-I-S-T-O-T-A.

1      Q.   I wasn't even close.  So, thank you, thank you.

2    And I'm sure the Court Reporter appreciates that as

3    well.  Okay.  And I -- and -- okay, so I think I got you

4    said the 2013 to 2018, your first stint, that's when you

5    were at the Canistota campus.

6      A.   So those -- yeah, 2013 to 2018, would have

7    been during my AIT, my administrator-in-training program

8    in Sioux Falls, South Dakota.  Then running the nursing

9    home in Canistota, South Dakota.  And then being the

10   executive director for the three communities in Rapid

11   City, South Dakota.

12     Q.   Got it.  But currently, your role as

13   administrator is just for the one campus, Kissimmee

14   Village?

15     A.   That is correct.

16     Q.   Got it.  Have you ever been out to Kissimmee

17   Village, or are you stationed out at Kissimmee Village?

18     A.   Yes, I am on site.

19     Q.   Okay.  Is that every day, five days a week?

20     A.   Yes.

21     Q.   So, if I understand correctly, you were

22   originally in South Dakota, that's where you did your

23   training and where you had your initial positions.  And

24   then you came down to Florida.  Can you talk to us a

25   little bit about the -- what facilitated that transition

1    from South Dakota to Florida?

2        A.   Yes, so I worked for Good Sam from 2013 to

3    2018.

4        Q.   Uh-hmm (affirmative).

5        A.   I then relocated to Denver, Colorado.  And

6    worked for Brookdale Senior Living approximately a year.

7        Q.   Uh-hmm (affirmative).

8        A.   Then I worked for Genesys Healthcare for

9    approximately a year.

10        Q.   Uh-hmm (affirmative).

11        A.   And then decided to relocate down to Florida

12    in December of 2020, and that's where I'm -- when I

13    rejoined the Good Samaritan Society.

14        Q.   Gotcha.  Were you provided any training before

15    you were -- before you entered this current position as

16    an administrator in Florida?

17        A.   Yes.

18        Q.   What sort of training?

19        A.   I completed a job orientation training manual.

20        Q.   Uh-hmm (affirmative).

21        A.   In addition to that, there were several state

22    and federal mandated trainings that I had to complete

23    online via a computer module.

24        Q.   Okay.  When you say state and federal, was

25    that related to any specific licensing?

1    A.    Not specifically for me.   It is just, you know,

2    the federal guidelines are just a certain set of rules

3    and topics that, you know, people in our industry have

4    to have training on every single year.

5    Q.    Okay.   Do you have any specific state or

6    federal licensing related to your position as an

7    administrator?

8    A.    I do.   So I'm a licensed administrator in the

9    states of South Dakota, Colorado, and Florida.

10    Q.    Okay.   And is there any training or coursework

11    that goes along with that licensure?

12    A.    Yes, so first you have to complete a national

13    exam.

14    Q.    Okay.

15    A.    Then once you pass the national exam, then

16    depending on the state that you operate in, some states

17    then have you take a state test as well.   And then, you

18    have to pass that state exam and then you can become

19    licensed in those states.   And then there are continuing

20    education credits that I have to fulfill and keep up to

21    date in order to maintain my license.

22    Q.    Got it.   Okay.   I appreciate all that

23    background information.   But sort of transitioning to

24    the topics we're here for today, are you familiar with

25    what a senior occupancy agreement is?

```
 1        A.    Yes.

 2        Q.    Can you describe it for us?

 3        A.    So it is the occupancy agreement between, you

 4   know, potential residents and the organization, as far

 5   as kind of guidelines for living and what can -- you

 6   know, the rules are in the execution of that contract.

 7        Q.    And have you ever read one in its entirety?

 8        A.    Yes.

 9        Q.    Okay.  Did you prepare the senior occupancy

10   agreement -- living agreement, sorry?

11        A.    When you say prepare, are you asking like if I

12   created it or drafted it, or?

13        Q.    Right, right.

14        A.    No, I did not create or draft the document.

15        Q.    Do you know who does prepare those documents?

16        A.    I do not.

17        Q.    Have you received any training on the contents

18   of the senior occupancy living agreement?

19        A.    Yes.

20        Q.    And what -- and who conducted that training?

21        A.    That would have been Rona Snyder (phonetic).

22        Q.    Okay.  If a resident were to have a question

23   about the senior occupancy living agreement, would you

24   be the person that would answer those questions for that

25   resident?
```

```
 1          MR. HILL:  Objection.

 2     A.   Potentially I could be.

 3     Q.   So did you ever receive any training about how

 4  you would explain the senior occupancy agreement to a

 5  tenant, or a resident, rather?

 6     A.   It would depend on what the question was.

 7     Q.   Okay.  And that's fair enough.  So, for

 8  example, the termination component of the agreement, did

 9  you ever receive questions about a resident trying to

10  terminate the living agreement and were you able -- or

11  were you directed to answer those questions in any way?

12     A.   I guess, Morgan, I can't say a hundred percent

13  that we'd spent a bunch of time on that --

14     Q.   Uh-hmm (affirmative).

15     A.   -- section.  I would say this, if somebody

16  asks a specific question, I would feel comfortable

17  rereading the section of the agreement and working

18  through that with the resident.

19          And then if I had additional questions or

20  follow-up or could not answer, then I would reach out

21  for guidance for assistance as far as how to best answer

22  their questions.

23     Q.   Okay.  Who is responsible for having a

24  resident execute a senior living -- senior living

25  occupancy agreement?
```

1        A.    When you say who is responsible, are you looking

2    -- I guess what exactly are you looking for, Morgan,

3    when you say who is responsible?

4        Q.    Sure.  So somebody comes to the property.

5    They're interested in residing there.  What -- maybe --

6    and maybe this is the way I should phrase it.  What role

7    is designated to talk to that person and potentially

8    walk them through executing a senior living occupancy

9    agreement, if that helps.

10       A.    Yes, it does.  Thank you.

11       Q.    No problem.

12       A.    So we've got several senior living

13   administrative team members that have been assigned that

14   task and are well-versed in kind of helping explain that

15   contract and going through that residence -- potential

16   residence.

17       Q.    Understood.  And are those team members that

18   you oversee as -- in your role as administrator?

19       A.    Yes.

20       Q.    And I recall that you said that you oversee

21   nine direct reports.  Are all nine of them those types

22   of team members that you described?

23       A.    No.

24       Q.    Okay.  So could you -- would -- can you take

25   us through the different roles that you oversee?

```
1        A.   Yes.  So we've got an administrative assistant.

2   We've got two senior living managers.  There is a --

3   what's her title -- senior living operations manager.

4   There is a purchasing assistant.

5        Then we've got a patient financial

6   representative.  There is a director of environmental

7   services, a director of assisted living, and then dining

8   director.

9        Q.   Okay.  So, I heard you say senior living

10  versus the assisted living.  Could you describe the

11  distinction for those categories?

12       A.   Yes, so when we say senior living, what we

13  mean is the independent living portion of campus.

14       Q.   And then the assisted living would be your

15  traditional more hands-on living --

16       A.   Yes, so the assisted living is a licensed

17  healthcare facility.  It provides a certain level of

18  healthcare services.

19       Q.   Got it.  But in your role at Kissimmee

20  Village, as the administrator, you oversee both of those

21  programs?

22       A.   Yes, ma'am.

23       Q.   Got it.  Okay.  So focusing on the senior

24  living program, specifically, and I heard you describe

25  it as an independent living.  Is this -- so this would
```

1    be dedicated solely to individuals who are considered

2    senior, I guess, is the first question.

3         A.   So, our community is a 55 and older community.

4         Q.   That was going to be my next question.  What

5    -- how do you define senior?  Perfect.  Thank you.  And

6    do you have any procedures specific to potential --

7    reviewing potential residents for eligibility to live in

8    this independent portion of the property?

9         A.   Yes.

10             MR. HILL:  I'm going to have to interject.

11        It's an objection, but also the witness can answer.

12        But this is something that's outside the scope of

13        the designated topics.  So if the witness knows the

14        answer, then that's fine.  That would be his

15        personal answer.  But these would not be the

16        answers of the company.

17             MS. CARDINAL:  Noted, Gordon, this particular

18        topic wasn't designated to anyone.  So if the

19        witness would like to answer, we are going to be

20        asking this question today.

21             MR. HILL:  Yeah, that's fine.  It's just that

22        the nuance is that this would not -- this is -- we

23        have a standing objection to topics like this --

24        that would be.  This would not be the answer of the

25        company, but this would be Dylan Spader's answer on

1          his personal knowledge.

2     BY MS. CARDINAL:

3          Q.   Mr. Spader, are you comfortable answering?

4          A.   Yeah, could repeat the question, Morgan?

5          Q.   Absolutely.  I was just asking if you were

6     aware of any procedures in place to screen the

7     eligibility for individuals interested in residing in

8     the senior living -- the independent portion of the

9     property.

10              MR. HILL:  And I'll also object as vague and

11         ambiguous.

12              MS. CARDINAL:  Screening procedures is vague

13         and ambiguous?

14              MR. HILL:  Yes.

15              MS. CARDINAL:  For eligibility to a 55-plus

16         community?

17              MR. HILL:  For the -- I don't know what you're

18         talking about with screening, I guess.  If the

19         witness understands the question, then I'm

20         preserving the question from -- I'm preserving my

21         objection for the record.

22     BY MS. CARDINAL:

23         Q.   Mr. Spader, do you need any more specificity

24     for that question?

25         A.   I don't want to misspeak.  I believe I know

1    what you're asking, but I'm not a hundred percent certain.

2        Q.    Sure.  And I'm happy to provide more

3    specificity.  But basically, you know, you indicated

4    that this was a 55-plus community, which would mean that

5    not everybody would be eligible to reside at the

6    property.

7            So I'm just asking what procedures you are

8    aware of are in place at the independent living portion

9    of Kissimmee Village to make sure that residents are

10   actually eligible to reside in the senior living -- the

11   independent portion of the property of the senior living

12   community.

13           MR. HILL:  And I'm going to repeat my

14       objection.

15       A.    Yes, there are certain procedures in place.

16       Q.    Uh-hmm (affirmative).  And just generally

17   speaking, do you -- can you tell me what some of those

18   procedures would look like?

19       A.    Yeah, in general terms, I don't have all the

20   specifics, but we do run a background check, a

21   background screen on individuals.

22       Q.    Uh-hmm (affirmative).

23       A.    You know, we do a -- I'll also need to have

24   some sort of proof of age verification, since we are a

25   55 and older community.

1            And then we also do have a financial requirement

2      as well, primarily to make sure the potential residents

3      can financially, you know, make their monthly rent

4      payment.

5          Q.    Understood.  And is this something that you as

6      the administrator do or do you -- or any of your direct

7      reports follow these procedures?

8          A.    The campus follows the procedures.

9          Q.    Understood.  So I heard you mention Rona

10     Snyder before.  Are you familiar with Ms. Snyder's role

11     with Good -- the Good Samaritan Society or Good Sam,

12     rather?

13         A.    I do not know the specifics of her role.

14         Q.    Uh-hmm (affirmative).

15         A.    I only kind of know how her and I interact and

16     work together.

17         Q.    Oh, okay.  Can you describe that for us?

18              MR. HILL:  Excuse me, Dylan, give me a second.

19         Just let me interject again.  And in terms of

20         questions relating to Rona Snyder, again, this is

21         outside of the designated topics for Mr. Spader.

22              But if he knows the answers to the questions

23         as an individual witness, then please answer those.

24         But just for the record, I'm objecting that this is

25         not corporate representative designated testimony.

```
 1        A.   So my and Rona's relationship, she is a senior
 2   living consultant.  So she helps provide me with some
 3   guidance and direction kind of regarding day-to-day
 4   operations and management.
 5        Q.   Understood.  And is she at the Kissimmee
 6   Village campus onsite with you?
 7        A.   No.
 8        Q.   Okay.  Do you know where she is located?
 9        A.   She is a remote-based worker.
10        Q.   Got it.  Are you familiar with an employee
11   named Tamara -- or Tamara Lund (phonetic)?
12        A.   Yes.
13        Q.   In what context?
14        A.   I do not know Tammy's, you know, job title or
15   descriptives, but again, I know that she has provided
16   some assistance and guidance as far as assisted living
17   rules and regulations for me.
18        Q.   Got it.  And is she at the Kissimmee Village
19   property onsite with you?
20        A.   No.
21        Q.   Understood.  What about an employee named
22   James Johnson, are you familiar with him?
23        A.   Yes.
24        Q.   And in what context?
25        A.   James Johnson worked here on the Kissimmee
```

1    campus in the sales department.

2       Q.   And what is the role of the sales department?

3       A.   So the sales provides support on the overall

4    sales effort for the senior living community.  They kind

5    of act as the key point of contact between the community

6    and any potential residents and referral partners.

7       Q.   And when you say referral partners, what do

8    you mean?

9       A.   Well, so, for example, they will go out to

10   senior living expos, healthcare fair expos, kind of meet

11   with different physician groups, home healthcare

12   organizations.

13      Q.   And does he report to you directly?

14      A.   James Johnson does not work at the

15   organization any longer.

16      Q.   Okay.  Do you know when -- what dates

17   approximately he did work for the organization?

18      A.   Yeah, so James was hired in February of 2020.

19   And then, his -- I believe last effective date was

20   November of 2023.

21      Q.   And he was employed with Good Sam or with

22   Sanford Health?

23      A.   Not Sanford Health.  What I could find in the

24   HR system was Sanford.

25      Q.   Is that like Sanford Group or just Sanford?

Defendants' objection: 401

1        A.    Again, based on what I could find in the HR

2    system --

3        Q.    Sure.

4        A.    -- the only name associated with it was

5    Sanford.

6        Q.    Okay.  But he was an employee with Good Sam?

7        A.    I'm unfamiliar, Morgan, with exactly, you

8    know, how the affiliation agreement worked --

9        Q.    Okay.

10        A.    -- between Sanford and GSS.  So there's a

11    possibility that at some point in time, you know, James

12    could have been a Good Sam employee.  But I guess I

13    can't speak to the specifics regarding that.

14        Q.    Understood.  Are you familiar with the

15    Plaintiff in this lawsuit, Ms. Yolanda Delgado?

16        A.    I am not.

17        Q.    Okay.  Never had an occasion to meet her?

18        A.    I am not saying that I did not meet her.

19        Q.    Uh-hmm (affirmative).

20        A.    But with the amount of residents on campus, I

21    cannot a hundred percent say that I sat down with her,

22    engaged with her, you know, one-on-one or anything like

23    that.

24        Q.    Okay.  If you will give me just one second.

25    I'm going to pull a document really quickly to chat with

1    you about.  And I'm hoping I can do it quickly.  And we

2    will mark this one as Exhibit 1.

3              (Thereupon, Plaintiff's Exhibit 1 was marked

4    for identification.)

5              MS. CARDINAL:  And, Gordon, if it's all right

6         with you, I will drop this in the chat so that you

7         can see it.  And I'll also -- and, Mr. Spader,

8         you'll have access to it in the chat as well.  But

9         I'm also going to put it up on my screen so we can

10        look at it together.

11             THE WITNESS:  Okay.

12             MS. CARDINAL:  Unless you want it sent a

13        different way, Gordon, I'm -- it's up to you.

14             MR. HILL:  That would be -- if you can email

15        it to me, that would be better.  That way I'd have

16        it forever in the chat -- you know, after the chat

17        goes away.

18             MS. CARDINAL:  Yeah, that's fair.  Okay.  How

19        am I going to get this into said chat.  That's the

20        other thing, I don't know that I have access to

21        this.

22             If you prefer it being emailed, Gordon, I'll

23        just -- I'll email that to you.  And,

24        Mr. Peninsten, I don't have your email address, but

25        I'm assuming that Gordon can get that sent over to

```
 1      you.

 2              MR. HILL:  Yup.

 3              MR. PENINSTEN:  Yes, thank you.

 4              MS. CARDINAL:  No problem.  All right, coming

 5          at you.  Gordon, do you want to just let me know

 6          when you get it, hopefully?  All right, so it's up

 7          on the screen, but I'll give it a minute, Gordon,

 8          just to make sure that you have access to it, and

 9          you can get it to Mr. Peninsten.

10              MR. HILL:  It just came in.

11              MS. CARDINAL:  Okay.  We are having some fun

12          Outlook issues today.  So I apologize in advance

13          for any slow emails.  They've told us it's resolved

14          but you never know.

15      BY MS. CARDINAL:

16          Q.  Okay.  So very quickly, I'm just going to scan

17      through this for you, Mr. Spader.  If you need me to

18      slow down at any point, let me know, but I just want to

19      get a sense of if you recognize this document at all.

20              MR. HILL:  And while you're doing that, I'll

21          state another, you know, statement and objection

22          for the record, that this is outside of the

23          designated topics for Mr. Spader.  But if he knows

24          off of his personal knowledge any of the answers to

25          those questions, then answer accordingly.
```

```
 1        A.   I have not seen this specific document regarding

 2    Yolanda, but I have seen a blank form --

 3        Q.   Okay.

 4        A.   -- of this document.

 5        Q.   Okay.   And what is your understanding of this

 6    document, the blank form?

 7        A.   Very little, just that it's the termination of

 8    the occupancy agreement and abandonment of personal

 9    property agreement.

10        Q.   Okay.   Were you involved in the -- any

11    conversations related to the preparation of this

12    document?

13        A.   No.

14        Q.   Okay.   Were you -- you'll see in this first

15    paragraph here, I'm sort of trying to circle around it

16    for you, on October 15th, 2022, would you have been at

17    Kissimmee Village on that date?

18        A.   Yes.

19        Q.   Okay.   Do you recall sort of the circumstances

20    of what was going on at the property on that date?

21        A.   In general terms, yes.

22        Q.   Sure.   And in general terms, would you

23    describe that for us?

24             MR. HILL:   Objection.

25        A.   On the -- yes, we had a few different kind of
```

1    things going on.  So we were kind of helping residents

2    coming into the campus.  And then, if they had

3    questions, thoughts, concerns, kind of about kind of the

4    state of their units, that they were being directed to

5    meet with representatives of the organization in the

6    Friendship Room.

7        Q.    Understood.  And what's the Friendship Room if

8    you don't mind explaining?

9        A.    Yeah, it's just a room on campus that we just

10   call the Friendship Room.  It's kind of a big open room.

11       Q.    And outside of just the circumstances of this

12   date, can you tell us, maybe, generally what the

13   Friendship Room would have been used for?

14       A.    Purely used for meeting space, whether if it

15   was a meeting for team members.  The current resident

16   groups also would rent out that space for their

17   different meetings.

18       Q.    And when you say resident groups, are you

19   talking about groups put together by Kissimmee Village

20   for residents or just residents gathering on their own?

21       A.    Residents gathering on their own.

22       Q.    Okay.  Are you aware of any activities that

23   Kissimmee Village put together for residents?

24            MR. HILL:  Objection.

25       A.    Yes, we do have an activity department, and we

1    have scheduled activities daily for residents on campus.

2        Q.    Okay.    And who is responsible for the activity

3    department?

4            MR. HILL:    Let me interject again, as you --

5        it looks like you're working into a topic related

6        to activities.    This is also not something that's a

7        designated topic for, really for anyone.

8            But if Mr. Spader knows the answers to the

9        questions, that would be his answers, and not that

10       of the company.

11       A.    The activity and wellness director's name is

12   Evelyn Ribas.

13       Q.    Okay.    I'm going to take this document down.

14   Give me just one second.    Stop sharing.    I am going to

15   replace it with another document, so give me just one

16   second.    Okay.    This one is headed your way, now, too,

17   Gordon.    Okay.    All right.    Give it just a second.

18           And just generally speaking, this one's a few

19   pages long, but I just wanted to ask Mr. Spader, have

20   you seen this document before?

21           MR. HILL:    And I'll object again.    This is

22       something that's outside the designated topics for

23       Mr. Spader, so the answers are his if he knows.

24       A.    I have not read through this specific policy.

25       Q.    Okay.    Are you aware of any language

```
1    assistance or access policies for Kissimmee Village?

2         A.    I know that the community has them.  But as

3    far as the details I am unable to speak to them.

4         Q.    Understood.  Mr. Spader, do you speak any

5    languages other than English?

6         A.    I do not.

7         Q.    Do you have staff at Kissimmee Village that

8    speak languages other than English?

9         A.    Yes, ma'am.

10        Q.    And what language is that?

11        A.    Spanish.

12        Q.    Okay.  And approximately how many individuals

13   would you estimate speak Spanish at Kissimmee Village,

14   that you supervise, not residents.  I wouldn't ask you

15   to estimate the residents.  But that you supervise.

16        A.    Are you referring to the nine direct

17   reports --

18        Q.    Yes.

19        A.    -- Morgan?

20        Q.    Yes.

21        A.    Six.

22        Q.    Okay.  And do those six individuals have

23   direct contact with residents?  Or --

24        A.    All but one.

25        Q.    All but one, okay.  I was going to kind of
```

```
 1    rephrase to make that clearer.  Would their roles have

 2    direct -- require direct contact with residents, I guess

 3    is probably a better way to answer that.  Is it still

 4    all but one?

 5         A.   Yes.

 6         Q.   And so of those five, would you be able to

 7    provide their names?

 8         A.   Yes, Mireya, M-I-R-E-Y-A, Rodil, R-O-D-I-L.

 9    Claudia, C-L-A-U-D-I-A, Espinosa, E-S-P-I-N-O-S-A.

10    Evelyn Ribas, E-V-E-L-Y-N, R-I-B-A-S.  Emerson, E-M-E-R-

11    S-O-N, Diaz, D-I-A-Z; and Zobeida, Z-O-B-E-I-D-A,

12    Molina, M-O-L-I-N-A.

13              MS. CARDINAL:  Thank you.  I am going to ask,

14         if it's all right with everyone, to take just a

15         quick five-minute off the record, so that I can

16         just go through my notes and hopefully get you out

17         of here shortly, Mr. Spader.  Any objection to

18         that?

19              MR. HILL:  No, not at all.

20              MS. CARDINAL:  Okay.  All right.  We'll be

21         back in, yeah, give us about five minutes.  Okay?

22         Thank you.

23              (Off the record.)

24              (On the record.)

25    BY MS. CARDINAL:
```

```
1        Q.   And just really quick to clean up, because this

2   is my mistake from the beginning.  But I just want to

3   confirm that you are okay to testify today?  You're not

4   taking any medications or any -- there's nothing that

5   would prevent you from testifying truthfully and

6   honestly today?

7        A.   Yes, I'm okay testifying today.

8        Q.   Or having testified today.  Yes?

9        A.   Yeah, I'm good.

10       Q.   Okay.

11       A.   So yes, I'm good.

12       Q.   Yeah.  No problem.

13       A.   Yeah.

14       Q.   No problem.  And then really quick.  I know we

15  started to touch on this, but I want to ask you about

16  your educational background.  I know we mentioned

17  licenses, but do you hold any specific degrees?

18       A.   I have a Bachelor's of Science degree from the

19  University of South Dakota.  Major in psychology, minor

20  in chemistry.

21       Q.   Got it.  Any master's or other higher level

22  degrees?

23       A.   No, ma'am.

24            MS. CARDINAL:  Okay.  So then I think that

25       covers it for us for questions for you, Mr. Spader.
```

1      Gordon, I do just want to put on the record, you know,

2      that we are aware of the standing objections and

3      that you and I have been back and forth on our

4      positions related to those objections.

5          Going forward, you know, we would just ask

6      that you be mindful of making those objections

7      without interference with the witness in terms of

8      speaking about the full context of the witness per,

9      you know, our -- the rules governing depositions.

10     And we will just conclude that for Mr. Spader with

11     that, unless you have anything to add.

12         MR. HILL:  I guess, Morgan, what are you

13     proposing?  That's how I've always done it.  I've

14     never had anybody say that I'm doing it wrong.  And

15     I tried to be very short and to the point with it,

16     but I'm trying not to interfere.  But I do have to

17     kind of state my position for the record.

18         MS. CARDINAL:  Yeah.

19         MR. HILL:  Do you have a different way to

20     propose that, or --

21         MS. CARDINAL:  Well, I mean, as you're aware,

22     speaking objections are not allowable in the

23     deposition context.  And I am aware of your

24     standing objections.  We have a written record to

25     support that.  So if your intent is to preserve it

1      on the record today, then simply stating the objection

2      should be sufficient.

3          MR. HILL:  Okay.  So why don't we do this,

4      because there's kind of two different categories.

5      The one is we have objections that are out there,

6      you and I have written at length on those.

7          MS. CARDINAL:  Uh-hmm (affirmative).

8          MR. HILL:  And so I can just simply say, you

9      know, objection for -- those were objected two

10     times, period.  And then I'll be done and that way,

11     I'm not -- I can't be accused of a speaking

12     objection.  That's not my intent.

13         But then there's another category of things

14     that you've done, say, for instance, with Dylan

15     Spader, where you asked him some questions that are

16     not objected to, but for which we designated

17     someone else to testify on those.

18         MS. CARDINAL:  Uh-hmm (affirmative).

19         MR. HILL:  So we don't have any record on

20     that.  There is no written record on that.  So I'm

21     --

22         MS. CARDINAL:  Right, but we're --

23         MR. HILL:  -- if you have --

24         MS. CARDINAL:  -- in -- but --

25         MR. HILL:  -- a different proposal, I just

1      said what I said, and then I felt like it worked out

2      fine.  You got to ask your questions.  He answered

3      the question.  And that's -- I don't count that as

4      a speaking objection.  It's not like I can say

5      "Objection, form," because that's not a form

6      objection.

7              MS. CARDINAL:  Right, but --

8              MR. HILL:  That's actually has a procedure to

9      it.

10             MS. CARDINAL:  Right, but we're not prohibited

11     from asking follow-up questions within the context

12     of the deposition regardless of who's assigned a

13     specific topic.  In this specific example, Mr.

14     Spader brought up his own interactions with Ms.

15     Snyder, so we were following up on that.

16             MR. HILL:  Actually, that's not true.  You

17     asked him point blank a question.  But I don't --

18     we don't need to argue over that.

19             But he -- if you're asking for -- just

20     generally speaking, if you're asking for something

21     that we have not objected to, but it's a topic

22     designated for someone else, say, for instance Joel

23     Fluit, then I have to say something for the record

24     to just clarify for the record that that's not one

25     of his designated topics.

1          And the nuance there is that his answer is not

2      that of the company, it's his personal answer.  So

3      that's all I'm doing.  That's not a speaking

4      objection.  I'm not coaching him how to answer or

5      anything like that.

6          MS. CARDINAL:  Well, right, but our position

7      would be it can be perceived as coaching if you're

8      putting on the record that he's sort of out there

9      on his own without the backing of the company to

10     answer this question.  And he's here today --

11         MR. HILL:  Yeah, but --

12         MS. CARDINAL:  -- intending to be a corporate

13     representative.  That's my -- that's all my point.

14         MR. HILL:  As to his designated topics.  But

15     the way the rule of law is that you're allowed to

16     ask those questions, and I'm not saying you're not,

17     and I think he's been answering those questions.

18         But the nuance is that when you go outside the

19     scope of his designated topics, those are not the

20     answers of the company, those are the answers of

21     Dylan Spader or Joel Fluitt, whoever the person

22     was.

23         MS. CARDINAL:  Right, and I think a simple

24     objection to that, if it -- again, we don't need a

25     speaking objection with specific direction to the

1     witness, preserves it in the context of this

2     procedure.

3          And if, for whatever reason, we wanted to use

4     that in the future as representative of the

5     company, you would have that preserved to say,

6     well, it wasn't representative of the company,

7     right?  This was not a topic that was designated.

8     It was designated for someone else.  And we have

9     the written record to support that.

10         MR. HILL:  Why don't I do this?  I think this

11    solves it.  Why don't I just say, "Objection,

12    that's outside the scope," as opposed to "Objection

13    for that," and then I can just stop.  And then the

14    witness can continue to answer.

15         And that way, and really, it's not my desire

16    to interrupt your flow --

17         MS. CARDINAL:  Yeah.

18         MR. HILL:  -- but I feel like that's probably

19    the best way to do it.  We can have an agreement

20    that --

21         MS. CARDINAL:  Right.

22         MR. HILL:  -- that goes into the sub-topic of

23    things that no, we have an objection to those, but

24    those are outside of the scope of the designated

25    witness.  And that will be --

1          MS. CARDINAL:  And I think that's fine.

2          MR. HILL:  -- sustaining the kind of queue or

3       objection that I can do on that.

4          MS. CARDINAL:  I think that's fine.

5          MR. HILL:  Is that it?

6          MS. CARDINAL:  And I think that would be

7       within the rules.

8          MR. HILL:  Okay.

9          MS. CARDINAL:  I agree with that.

10          MR. HILL:  Okay.

11          MS. CARDINAL:  All right.

12          MR. HILL:  Yeah, that's not my intent to

13       interfere.  And I think Mr. Spader answered all of

14       the questions --

15          MS. CARDINAL:  That's right.

16          MR. HILL:  -- you know, yeah.

17          MS. CARDINAL:  Okay.  So for the -- as I

18       mentioned, Mr. Spader, that's all the questions I

19       have for you today.  I don't know, Gordon, if you

20       have anything.

21          MR. HILL:  I don't have any questions.

22          MS. CARDINAL:  Okay.  And I know you have

23       other folks lined up, so if we want to take another

24       minute off the record while you work that out with

25       them, I'm happy to do that.

```
 1              MR. HILL:  Yeah, let me -- I think we got up next
 2         as I sent an email yesterday.  We've got Shane --
 3              MS. CARDINAL:  Okay.
 4              MR. HILL:  -- Knutson is up next.  So why
 5         don't we go grab him and then we'll invite him to
 6         join the room and I don't know how long that will
 7         take.  But let me reach out to him and try that.
 8              MS. CARDINAL:  That's fine.  Not a problem.
 9         Thank you.
10              MR. HILL:  All right.
11              (Thereupon, the deposition was concluded at
12         11:05 a.m.)
13              (Reading and signing of the deposition
14         transcript was reserved.)
15
16
17
18
19
20
21
22
23
24
25
```

42

1                          CERTIFICATE OF OATH

2        STATE OF FLORIDA

3        COUNTY OF ORANGE

4

5            I, Lorena Agudelo, Court Reporter, Notary

6        Public, State of Florida, certify that Dylan Spader

7        personally appeared before me on the 12th day of

8        September 2024, and was duly sworn.

9            Signed this 23rd day of September 2024.

10

11

12                         *Lorena Agudelo*

13        _____

14        Lorena Agudelo, Court Reporter

15        Notary Public, State of Florida

16        Commission No.: HH 495988

17        Commission Expires: 02/22/28

18

19

20

21

22

23

24

25

43

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA

3    COUNTY OF ORANGE

4

5         I, Lorena Agudelo, Court Reporter, certify

6    that I was authorized to and did report the

7    deposition of Dylan Spader; that a review of the

8    transcript was reserved; and that the transcript is

9    a true and correct record of my notes.

10        I further certify that I am not a relative,

11   employee, attorney, or counsel of any of the

12   parties, nor am I a relative or employee of any of

13   the parties' attorneys or counsel connected with

14   the action, nor am I financially interested in the

15   action.

16        Dated this 23rd day of September 2024.

17

18                         *Lorena Agudelo*

19        _____

20        Lorena Agudelo, Court Reporter

21

22

23

24

25

```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
                        ORLANDO DIVISION


    YOLANDA DELGADO,

        Plaintiff(s),


                       CASE NO:  6:23-CV-1288-RBD-EJK


    v.


    THE EVANGELICAL LUTHERAN
    GOOD SAMARITAN SOCIETY AND
    SANFORD HEALTH,

        Defendant(s),


    ********************************************************
            ZOOM DEPOSITION OF RHONA SNYDER


    DATE:          October 18, 2024

    TIME:          3:35 p.m. - 4:31 p.m.

    LOCATION:      All Locations Remote

    REPORTED BY:   EMONICA ARAYA
                   ESQ Reporting Group
                   Court Reporter
                   Notary Public
                   Commission No.:  HH 228739
                   Expires: March 19, 2026
```

ALL APPEARANCES REMOTE:

MORGAN CARDINAL, ESQUIRE
JOHN MARTINO, ESQUIRE
Community Legal Services
122 East Colonial Drive
Suite 200
Orlando, Florida 32801

    Attorney for Plaintiff


LAUREN AYERS, ESQUIRE
Hill, Ward & Henderson, P.A.
101 East Kennedy Boulevard
Suite 3700
Tampa, Florida 33602

    Attorney for Defendants


ALSO APPEARING:
Collette Matherns, Good Samaritan Society
Nicole Carrero, Community Legal Services

I N D E X

DIRECT EXAMINATION BY MS. CARDINAL          4
CERTIFICATE OF OATH                        31
CERTIFICATE OF REPORTER                     32
SIGNATURE PAGE                              34

1                              EXHIBITS

2       Plaintiff's Exhibit IndexPAGE

3       Exhibit No. 1
        (Residential Handbook)                          10
4
        Exhibit No. 2
5       (FH Policies Documents)                          11

6       Exhibit No. 3
        (FH Complaints and Enforcement Policies)         12
7
        Exhibit No. 4
8       (Steering Policies Documents)                    13

9       Exhibit No. 5
        (LEP Policies)                                   14
10
        Exhibit No. 6
11      (Delgado Termination Documents)                  24

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT REPORTER:  Do you solemnly swear or
 2         affirm that the testimony you give today will be the
 3         truth, the whole truth, and nothing but the truth?
 4              MS. SNYDER: I do.
 5                          RHONA SNYDER,
 6         the deponent herein, being duly sworn under
 7         oath, was examined and testified as follows:
 8              MS. CARDINAL:  Just to confirm, on the call, my
 9         name is Morgan Cardinal with Community Legal
10         Services on behalf of Plaintiff, Yolanda Delgado.  I
11         will be taking the deposition today.  And also on
12         the call are my colleagues John Martino and Nicole
13              Carrero.
14              MS. AYERS:  My name is Lauren Ayers.  I
15         represent the defendant.
16                      DIRECT EXAMINATION
17    BY MS. CARDINAL:
18         Q.   Well, welcome, Ms. Snyder.  Just before we get
19    started, have you ever had your deposition taken before?
20         A.   I have.
21         Q.   You're familiar with the rules that just to
22    keep everybody on the same page, I will try to ask my
23    question fully and completely and allow you to answer
24    without speaking over each other.  Just make sure that
25    you're saying your answers clearly instead of huh-uh,
```

1      uh-uh, a yes or no.

2              And make sure if you nod, you also give a

3      verbal response just for the record today.

4          A.   Okay.

5          Q.   Okay.   Can I have you state and spell your name

6      for the record.

7          A.   R-h-o-n-a, S-n-y-d-e-r.

8          Q.   Is there any reason you wouldn't be able to

9      fully and truthfully testify today?

10         A.   No.

11         Q.   What state do you currently live in?

12         A.   I live in Iowa.

13         Q.   Have you lived in any other states?

14         A.   No.

15         Q.   What's your educational background?

16         A.   I have a bachelor's degree in social work.

17         Q.   Do you hold any other certifications or

18     licenses?

19         A.   I have an assisted living license degree in the

20     state of Minnesota.

21         Q.   Assisted living license?

22         A.   Yes.   Administrative license in the state of

23     Minnesota.

24         Q.   Have you ever been charged with a crime?

25         A.   No.

```
 1        Q.   What did you do to prepare for the deposition

 2    today?

 3        A.   I met with Lauren's team, just a prep meeting.

 4    That's about it.

 5        Q.   Nothing else?

 6        A.   No.

 7        Q.   Who are you currently employed by?

 8        A.   The Good Samaritan Society.

 9        Q.   How long have you worked for Good Sam?

10        A.   About 31 and a half years.

11        Q.   Good for you.  If I refer to Good Samaritan

12    Society or the Evangelical Lutheran, Good Samaritan

13    Society as Good Sam, do you understand?

14        A.   Yes.

15        Q.   It's a mouthful.  I can say the whole thing if

16    you want.

17        A.   No.  That's fine.

18        Q.   What is your current position with Good Sam?

19        A.   Senior living consultant.

20        Q.   Is that the only position you've held with Good

21    Sam over the 31 years?

22        A.   No.

23        Q.   What other positions have you held?

24        A.   I was the social worker in our skilled nursing

25    facility, and then I've also been a senior living health
```

```
 1    director at a facility in Luverne, Minnesota.

 2         Q.    Can you say the second one for me again.

 3         A.    I was a senior living housing director.

 4         Q.    You said that was in Minnesota?

 5         A.    Correct.

 6         Q.    The social worker in the skilled nursing

 7    facility, where was that?

 8         A.    In Canton, South Dakota.

 9         Q.    How long have you held the role of senior

10    living consultant?

11         A.    For about 12 years.

12         Q.    As the senior living consultant, who do you

13    report to?

14         A.    Shane Knutson.

15         Q.    Do you have any direct reports under your role?

16         A.    I do not.

17         Q.    What is the name of the entity that issues your

18    paychecks?

19         A.    The Good Samaritan Society.

20         Q.    Have you ever been employed by Sanford Health?

21         A.    No.

22         Q.    What about Sanford Group?

23         A.    No.

24         Q.    What is your understanding of the relationship

25    between Good Sam, Sanford Health, and Sanford Group?    To
```

1    clarify, I don't need the legal details.  I recognize

2    that can be complicated, but just your general

3    understanding.

4         A.    We are affiliated, I believe, with them.

5    They're one of our parent companies that happened a few

6    years ago -- affiliated with, I would say.

7         Q.    When you say "we," you mean Good Sam?

8         A.    Correct, yes.

9         Q.    They are your parent company, is that Sanford

10   Health or Sanford Group?

11        A.    I believe Sanford Health.

12        Q.    Did Good Sam or any of their related entities

13   provide any training to you on your current role as the

14   senior consultant?

15        A.    Good Samaritan did, yes.

16        Q.    What kind of training?

17        A.    Just shadowing with the people previously in my

18   role and just supervisor going over things with us, is

19   what I remember anyway.

20        Q.    Twelve years ago, right?

21        A.    Yes.

22        Q.    Was that supervisor Shane Knutson?

23        A.    No, not at that time.

24        Q.    Do you remember who it was?

25        A.    Corey Thompson.

Defendants' Objection:
Foundation, Lack of personal
knowledge, Speculation,
Relevance

1      Q.    Is Corey Thompson still with Good Samaritan?

2      A.    She is not.  She retired.

3      Q.    When was the training provided?

4      A.    For the current role I'm in?

5      Q.    Yes, ma'am.

6      A.    It would have been when I started.  It was in

7  June.  I think it was in 2012 or 2010.

8      Q.    Did you ever receive training regarding the

9  Fair Housing Act?

10     A.    Yes.  We get training.  We have a module we

11  have to review every year.

12     Q.    Do you know who's responsible for creating that

13  module that you review?

14     A.    I don't.

15     Q.    That's a no?

16     A.    No.

17     Q.    Do you recall whether that Fair Housing

18  training discusses individuals with limited English

19  proficiency?

20     A.    No.  I don't know.  I don't remember.

21     Q.    You said that it's a module you review every

22  year.  Do you recall when about in the year, the

23  beginning of the year?  The end of the year?

24     A.    I don't.  I don't.

25     Q.    I'm going to pull up an exhibit for you so bear

```
 1    with me.  As I mentioned, Lauren, you have these.  I

 2    will put them up for us to take a look at.  This will be

 3    our first exhibit.

 4            It is up here on the screen.  It is very, very

 5    long so I'm not going to make you go through the whole

 6    thing, I promise.  Just looking at this document, have

 7    you seen this before?

 8        A.   Yes.

 9        Q.   When or why have you seen this before?

10        A.   This is an example of a handbook that we give

11    to each person that moves into our communities.

12        Q.   You give this to the people who move into --

13        A.   Each of our locations has their own and they

14    each get that when they move in.

15        Q.   My understanding is at the senior living line

16    of service -- I believe we heard it referred to as

17    includes independent living, as well as assisted living

18    and as skill of nursing.  Is this given to all three of

19    those branches?

20        A.   They each would have their own, yes.

21        Q.   Would you be able to tell me which of those

22    branches this particular resident handbook would apply

23    to by looking at it?

24        A.   I'm thinking independent living, I think.  Some

25    locations combine theirs just depending.  Each location
```

1    gets to do that on their own a little bit.

2        Q.   Is my understanding correct that this would be

3    specific to the different properties operating at Good

4    Sam?

5        A.   Yes.  They each have their own.

6        Q.   Have you been provided with this Kissimmee

7    Village resident handbook?

8        A.   I have access to all of them for the locations.

9        Q.   How do you have access?

10       A.   On our senior living website that I work from.

11       Q.   This will be Exhibit 2, which is the Fair

12   Housing Act Senior Living and AH, dated -- reviewed

13   revised December 30, 2021.   Are you familiar with or

14   have you seen this policy?

15       A.   Yes.

16       Q.   When would you have seen this policy?

17       A.   When I do training with new leaders, we go over

18   this.

19       Q.   Okay.  How often are you training new leaders?

20       A.   It just depends.  I have several states I

21   support.

22       Q.   What states do you support?

23       A.   I support the state of Nebraska, South Dakota,

24   North Dakota, and Florida.

25       Q.   A big service area.  Okay.  When you're

1    training leaders, you go through this policy with them.

2    What do you mean by leaders?

3         A.    The new senior living managers.

4         Q.    Are you responsible, or have any ownership,

5    over this policy for keeping it updated?

6         A.    I don't.

7         Q.    You just go through it with the new senior

8    living managers?

9         A.    I do.

10        Q.    That's the full three pages.  I just wanted to

11   scroll through and make sure that you saw all of it.  I

12   will go ahead and take this one down.

13             This is the third document, the Fair Housing

14   Complaint and Enforcement Senior Living and AH, also

15   dated 12/30/21.  Is this something that you would also

16   provide training on for new senior managers?

17        A.    I don't pull this one up directly.  It would be

18   in there, obviously, in their policy book.

19        Q.    Is the policy book like a physical book printed

20   out?

21        A.    No, it's online.

22        Q.    Is this a policy that you would have some

23   ownership or responsibility in updating and keeping

24   accurate?

25        A.    I would not be updating it, no.

```
1         Q.    Do you know who updates these documents?

2         A.    I don't know who owns that one specifically.

3         Q.    Is there any role that you're aware of that has

4    responsibility for updating these documents?

5         A.    Our policies are all owned by different people.

6    I just don't know who owns this one.

7         Q.    I'm going to go back up to the top really

8    quickly.  Senior Living and AH, you're not aware of

9    anybody within the senior living team that works on

10   policies?

11        A.    Not directly.  I think my supervisor has

12   ownership of some but I'm not a hundred percent sure.

13        Q.    Your supervisor is Shane Knutson?

14        A.    Knutson, correct.

15        Q.    I will take this one down.  I'm going to share

16   this document, No. 4.  This is the Fair Housing

17   Protected Classes and Steering Senior Living and AH.

18   This one is dated June 1, 2014.  Have you seen this

19   policy before?

20        A.    I've seen it in the past, yes.

21        Q.    Is this a policy that you train new senior

22   living managers on?

23        A.    We train them on -- yes.  We go over this.

24        Q.    This training for new senior living managers,

25   is that something you do in person or virtually?
```

1    A.    Typically, virtually.  If it's nearby, it might

2    be in person.  It just depends.

3    Q.    Do you know who would be responsible for

4    reviewing and revising this policy?

5    A.    I don't.

6    Q.    I'm just scrolling through the complete

7    document.  If you need me to slow down, feel free to let

8    me know.  I wouldn't ask you to recite any details.  I

9    just want to make sure you see the whole document that

10    I'm asking you about.

11    A.    Yes.

12    Q.    Then we will look at one more.  This is the

13    fifth document, Language Assistance or Access for

14    Limited English Proficient LEP Person Senior Living and

15    AH.  This one is dated January 14, 2021.  Have you seen

16    this document before?

Defendants'
objection: Rule 401
and 403

17    A.    I have.

18    Q.    Is this one of the documents you train senior

19    managers on?

20    A.    We touch on this one, yes.

21    Q.    When you say you touch on it, how do you touch

22    on it with new senior living managers?

23    A.    We just discuss the need for translaters if

24    that may be or a material needing to be in a different

25    language.  We have some in different languages, so if

1    they need that or how to obtain them, I should say.

2        Q.    How are they able to obtain them?  Is there a

3    shared document space?

4        A.    We have a language link.  They can go through a

5    language link phone number.  That's what we direct them

6    to do and they can help them.

7        Q.    Is this a document that you would be

8    responsible for revising or updating?

9        A.    No.

10       Q.    Are there any policies that your role is

11   responsible for?

12       A.    No.

13       Q.    I will take that one down.  So in relation to

14   your role as the senior living consultant, have you ever

15   been provided any other policies than the ones I've

16   shown you related to housing discrimination?

17       A.    Can you repeat.  Have I what?

18       Q.    That's okay.  Other than the policies that we

19   just looked through as part of your current role as

20   senior living consultant, are there any other policies

21   you've been provided related to housing discrimination?

22       A.    We may have more.  I don't know right offhand.

23   This looks like most of them.  There could be more.  I'm

24   not sure.

25       Q.    How are the policies and procedures that you --

1   I'm going to say govern your role as senior living

2   consultant?   But that might not be the right phrasing.

3   How are those accessible to you?   Do you have a booklet?

4   Are these all stored somewhere?

5       A.   They're all stored online.   We have all our

6   policies on our web portal.

7       Q.   Are those all available to all employees?

8       A.   Yes.   Yes.

9       Q.   Do all employees receive training on those

10  policies, to your knowledge?

11      A.   I go through them with senior living managers.

12  So as to others, I don't know how that works.

13      Q.   Are there any other policies that you're aware

14  of related to limited English proficient persons?

15      A.   I don't know.

16      Q.   Have you ever received any verbal instruction

17  related to housing discrimination policies or limited

18  English proficiency policies?

19      A.   No.

20      Q.   Were you employed by Good Samaritan during

21  Hurricane Irma in 2017?

22      A.   Yes.

23      Q.   Were you employed by Sanford Health during

24  Hurricane Irma in December of 2017?

25      A.   No.   It was Good Samaritan Society.

```
 1        Q.    During Hurricane Irma of September 2017, what
 2   was your role with Good Sam?
 3        A.    I was a senior living consultant.
 4        Q.    Do you have any personal knowledge how
 5   Hurricane Irma impacted Kissimmee Village?
 6        A.    I was onsite and saw it at that time.  I went
 7   down to assist and clean up.
 8        Q.    What did you see?
 9        A.    Just some of the water.  Just -- yes.  That's
10   probably what I remember.
11        Q.    I heard you said "clean up."  What were you
12   personally involved in in the recovery efforts after
13   Hurricane Irma?
14        A.    I just helped.  If people were throwing things
15   away, I just helped get them to dumpsters.  Basically
16   cleaned up what people wanted to discard, the people
17   that lived there were discarding.
18        Q.    Do you recall whether there was property lost
19   to residents due to flooding?
20        A.    I don't remember.
21        Q.    So the property that people were throwing out,
22   was that damaged by Hurricane Irma?
23        A.    It seemed to be some interior items that maybe
24   had gotten wet.
25        Q.    Do you recall if Good Sam took any action to
```

Defendants' objection:
Rule 401 and 403

1   compensate residents for the loss of their personal

2   property?

3       A.   I don't.

4       Q.   Do you recall if lease termination discussions

5   were taking place with the residents?

6       A.   Not that I'm aware.

7       Q.   Were you aware of any lease termination

8   documents prepared by Good Sam?

9       A.   I was not, no.

10      Q.   Did Good Sam provide any alternative housing

11  arrangements for displaced residents, either temporarily

12  or long term following Irma?

13      A.   I don't know.  I wasn't involved in that level.

14      Q.   Let's go back just to confirm.  I know you said

15  you were onsite after Irma.  How long were you on the

16  Kissimmee Village property after Irma?

17      A.   Maybe three to four days.  We took turns.  I

18  think I'm not exactly sure.

19      Q.   Was that three or four days for one trip, or

20  did you go back multiple times?

21      A.   I believe I just went once.  I'm not quite

22  sure.  I don't quite remember.  I believe it was just

23  once for that trip.

24      Q.   Do you personally know if Sanford Health took

25  any action at Good Samaritan Village to protect

1      residents from flooding after Hurricane Irma?

2          A.   I don't know.

3          Q.   What about Good Sam?  Did they take any action

4      to prevent the flooding?

5          A.   I don't know.

6          Q.   Are you familiar with or did you witness the

7      impact Hurricane Ian had on the Kissimmee Village

8      campus?

9          A.   Yes.

10         Q.   Were you onsite for Hurricane Ian, as well?

11         A.   Yes, I was.

12         Q.   What was your role in responding to Hurricane

13     Ian at Kissimmee Village in September 2022?

14         A.   I helped to evacuate the assisted living

15     residents and the skilled nursing residents from

16     Kissimmee to DeLand and sheltered there with them during

17     the hurricane.

18         Q.   Did you return to the Kissimmee Village

19     property?

20         A.   I did.

21         Q.   Do you recall when about that was?

22         A.   I went back and forth, I think, three times.

23     So it was maybe a week or so after the hurricane hit.

24         Q.   You said you went back three or so times?

25         A.   I think so.  I think it was three times in the

1  course of six to eight weeks.

2      Q.   You stayed down here for six to eight weeks?

3      A.   No.  I went back and forth.  Stayed about maybe

4  five days at a time.  I can't remember.  It varied the

5  days we were there.

6      Q.   When you say, "we," who was with you?

7      A.   Just different colleagues from Good Sam.  We

8  had different groups of people going in.  Just multiple

9  different people.

10      Q.   I was going to ask, were they all part of the

11  senior living team?

12      A.   No.  No.  There were only about three of us.

13      Q.   Do you have a rough idea what other teams were

14  down there?

15      A.   It was a variety, I would say, of team members

16  from our national campus at Good Sam, other senior

17  living managers at different locations that just came to

18  help.  So a variety.

19      Q.   What specific acts by Good Sam employees did

20  you witness to support the residents after Hurricane

21  Ian?

22      A.   What?  Can you repeat that, please.

23      Q.   No problem.  What specific acts by Good Sam

24  employees did you witness to support the residents after

25  Hurricane Ian?

1        A.   We were there more trying to help them locate

2   resources.  An example, we helped if we knew FEMA was

3   going to be at a local -- I think they were at a local

4   library at that time.  We let them know of that

5   resource, or available food stamp type resources.  So

6   things like that, just trying to help them connect them

7   to what was available.

8        Q.   Do you know if residents of Kissimmee Village

9   were offered replacement housing after Hurricane Ian?

10        A.   I don't know.

11        Q.   Do you know who made the decision to demolish

12   buildings at Kissimmee Village after Hurricane Ian?

13        A.   I'm not -- I don't know who had that.  No.

14        Q.   Do you know if residents were provided notice

15   of entry into their units for inspection following

16   Hurricane Ian?

17        A.   I don't.  I don't know.

18        Q.   Are you aware of any remedial actions taken by

19   Good Sam after Hurricane Ian to protect residents from

20   future flooding?

21        A.   I don't know.

22        Q.   Turning to the plaintiff in this specific

23   complaint, have you met Ms. Yolanda Delgado?

24        A.   I don't recall.  But I'm guessing I did if I

25   -- I met so many.  I don't remember her specifically.

1          Q.    So you're aware that Ms. Delgado was a tenant

2     at Good Samaritan Kissimmee Village?

3          A.    Yes.

4          Q.    You're aware that tenants are required to pay a

5     security deposit?

6          A.    Yes.

7          Q.    Do you recall if you met Ms. Delgado on October

8     15, 2022?

9          A.    I don't remember.

10          Q.    Were Kissimmee Village residents, including

11     Ms. Delgado, directed to The Friendship Room following

12     Hurricane Ian?

13          A.    The friendship room was open if they wanted to

14     stop in.  Again, that's where we had the resources of

15     where Fema was located.  We had things like that.  I

16     don't know about directed.  I wouldn't say directed

17     there.  But The Friendship Room was open if they wanted.

18     They knew that's where we were at if they needed to ask

19     questions.

20          Q.    So I'm understanding, The Friendship Room was

21     open to residents who needed to ask questions?

22          A.    I would say that, yes, the doors were open.  We

23     just tried to be there as a resource if they needed

24     something.

25          Q.    So just to be clear, residents, including

1    Ms. Delgado, would not have initiated the meetings in

2    the Friendship Room?

3         A.   No.  Anybody could stop in.

4         Q.   Do you speak Spanish?

5         A.   I do not.

6         Q.   Do you know if translaters or interpreters were

7    present in the Friendship Room?

8         A.   Yes.  We always had someone in the room that

9    could speak Spanish or interpret.

10        Q.   Do you know the name of the interpreters that

11   would have been present on October 15, 2022?

12        A.   I don't know which one.  We had about three or

13   four different people.  I don't know who was there that

14   day.

15        Q.   I'm just pulling this policy back up.  This is

16   the Access for Limited English, which requires the

17   senior living community must make a resident aware that

18   he or she has the option of having an interpreter

19   available to him or her without charge, and that only

20   after having been informed, the resident may choose to

21   rely on a family member or friend in a particular

22   situation."  Were interpreters offered to non-English

23   speaking individuals?

24        A.   Yes.

25        Q.   But you don't know the names of the

1      interpreters available?

2          A.    I know the names.   I just don't know which one

3      was in the room.   Claudia, Carmen, and Maraya, I

4      believe, were their names -- were the ones that I worked

5      with.   I don't know who was in the room on that day.   It

6      would have been one of them at all times.   When we were

7      there, we had somebody that could interpret always be

8      available and be in the room.

9          Q.    If someone had a family member that spoke

10     English with them, would they had been offered an

11     interpreter?

12         A.    If they had a family member there that could

13     interpret, they could use that person.   That was fine.

14     Or they could use -- we offered them Claudia or that

15     group, as well, the interpreters.

16         Q.    This is our document No. 6, Termination of

17     Occupancy Agreement and Abandonment of Personal

18     Property.   Are you familiar with this document?

19         A.    Yes.

20         Q.    When did you first see this document?

21         A.    It was on one of the trips down there.   We were

22     shown this document by our leadership team at Good Sam.

23         Q.    Do you know who prepared this document?

24         A.    I don't know exactly who prepared it, no.

25         Q.    The leadership team that showed you this

 1    document, who was on that team?

 2        A.   It would have been Shane Knutson, and then our

 3    attorneys.   I don't know which one that created it.

 4        Q.   So I understand, this document came from Good

 5    Samaritan?

 6        A.   Yes.

 7        Q.   Do you know when this document would have been

 8    prepared?

 9        A.   It was at the time of the -- I think after the

10    hurricane hit, obviously.   I don't know exact dates, no.

11        Q.   Do you recall if something similar would have

12    been used during Irma?

13        A.   I don't know.   I don't know.

14        Q.   Was this document roughly prepared before or

15    after Hurricane Ian?

16        A.   I think shortly after it hit.   Yeah.

17        Q.   Was it the goal to have Good Sam residents

18    execute this document and sign this document?

19        A.   It was available.   I don't know if it was a

20    goal.

21        Q.   What happened if a resident didn't sign a

22    Termination Agreement?

23        A.   That was fine.   It wasn't mandated.

24        Q.   What is your understanding of the contents of

25    this agreement?

 1      A.    My understanding is it discusses terminating

 2  their occupancy agreement.   Typically, they have to do a

 3  30-day notice but it would be terminating it sooner and

 4  then we were able to get them their security deposit

 5  back a little faster and not have that 30 days.

 6           And the Abandonment of Property, it would give

 7  them until the end of October to go through and take

 8  what they wanted to salvage and save, and then we would

 9  take care of getting rid of what they didn't want at no

10  cost to them.   And then just the last section was just

11  the release.   To me, that was just releasing Good Sam

12  and our other affiliates from future liabilities or

13  claims.   That's how I understood it.

14      Q.    Did you receive any instructions or training on

15  this document?

16      A.    We were shown it by our attorneys and gone over

17  prior to us having it and sitting down with anybody with

18  it to go over it.

19      Q.    Did you read the documents independently?

20      A.    I did, yes.

21      Q.    On the first and second page, it says, "Ian IL

22  Form No. 1."   Do you know what that means?

23      A.    No, I don't.

24      Q.    Were you given any specific instructions

25  related to this document?

```
1        A.    No.   Just what -- we just went over what it was
2   and just the contents.
3        Q.    On Page 2, is this your signature?
4        A.    It is.
5        Q.    Was this document presented during the meeting
6   with Ms. Delgado?
7        A.    Yes.
8        Q.    Who presented it?
9        A.    I would have had it if she would have chosen to
10  want to do this.   I would have had the document and been
11  able to let her have it and go over it.
12       Q.    Was this document available in other languages?
13       A.    No, it was.
14       Q.    What did you tell residents concerning their
15  security deposit?
16       A.    Just that we would be able to get their monies
17  back to them with that terminating agreement.   Again,
18  it's typically a 30-day notice and take longer.   This
19  would get their money back to them quicker.
20       Q.    Here under Paragraph 3, Abandonment and
21  Surrender of Property, in the center we've got,
22  "Thereafter resident does hereby transfer release and
23  abandon all right, title, and interest and to the
24  property to Society and/or its employees and authorized
25  agents, contractors, subcontractors, and
```

```
1    representatives, including without limitation Belfor USA

2    Group Inc."  What is Belfor USA Group Inc?

3        A.   My understanding, they were a group we were

4    working with that were on the campus and they helped us

5    with some of the clean up.

6        Q.   Did you ever interact with anyone from Belfor

7    USA Group Inc.?

8        A.   I did not, no.

9        Q.   Do you know when Good Sam would have engaged

10   Belfor USA Group?

11       A.   I don't, no.

12       Q.   Do you know if Good Sam has worked with Belfor

13   USA Group previous to Ian?

14       A.   I don't know.

15       Q.   Are you aware that Florida law requires written

16   disclosure to all tenants telling them how their

17   security deposit is going to be held?

18       A.   I'm not, no.

19       Q.   Are you aware that Florida law requires written

20   disclosure to all tenants telling them about when a

21   security deposit must be returned?

22       A.   I'm not.

23       Q.   Are you aware if any of those disclosures would

24   have been made to residents of Good Sam?

25       A.   I don't know.
```

```
 1            MS. CARDINAL:  I'm going to take this one down.
 2       And if you will give me about five minutes just to
 3       look through my notes and make sure we're all set
 4       for this afternoon, if that's all right with you,
 5       Ms. Rhona and Lauren.
 6            THE DEPONENT:  That's fine.
 7               (Whereupon, a recess was taken.)
 8   (RESUMED)
 9       Q.   I went back through my notes and, Ms. Snyder,
10   you're in luck.  It's Friday.  I'm all done.
11       A.   Can I clarify one thing?  I was thinking about
12   this.  The question about the Fair Housing training we
13   do.  I think I spoke to it as a module.  It's not like a
14   video module.  It's more of going through the policy.
15   Every year we go through that.  I just wanted to clarify
16   it's not a video like a training module.  It's just
17   going through our Fair Housing policies and information
18   that we give.  I just wanted to clarify that.
19       Q.   Okay.  I appreciate that clarification.  That
20   was something you said that you do every year?
21       A.   Yes.  I go through it every year, yes.
22       Q.   Is that individually, or what you do with the
23   senior living managers?
24       A.   Both.  I go through it myself and then I train
25   my managers when I have new managers on that.
```

1      Q.   Okay.  Just like how I did with the policy up,

2  you go through it?

3      A.   Correct.

4      Q.   Understood.  Thank you for that clarification.

5      A.   You're welcome.

6           MS. CARDINAL:  Lauren, do you have anything?

7           MS. AYERS:  No.  We're going to read.  No

8      questions.

9           MS. CARDINAL:  We'll be ordering a copy.

10           MS. AYERS:  We'd like a copy, then.

11                (OFF THE RECORD AT 4:31 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    CERTIFICATE OF OATH

2    STATE OF FLORIDA

3    COUNTY OF OSCEOLA

4    **************************************

5        I, EMONICA ARAYA, Court Reporter and Notary Public,

6    State of Florida, certify that RHONA SNYDER provided

7    photo identification in the aforesaid remote

8    proceedings, and was duly sworn under oath.

9        WITNESS my hand and official seal this 18th day of

10   October, 2024.

11

12

13

14

15   _____

16                    Emonica Araya
                       Notary Public
17                     State of Florida
                       Commission No.:  HH 228739
18                     Expires:  March 19, 2026

19

20

21

22

23

24

25
```

1                       CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA
     COUNTY OF OSCEOLA
4
         I, EMONICA ARAYA, a Certified Shorthand Reporter,
5
     Notary Public for the State of Florida at large, do
6
     hereby certify I stenographically reported the
7
     remote proceedings at the time and place so indicated
8
     and that my notes were hereinafter reduced to a
9
     computer-generated transcript.
10
         I further certify that I am not a relative,
11
     employee, or attorney to any party, nor to the attorneys
12
     of said action nor in any way interested in the outcome
13
     thereof.
14
                    Dated this 5th day of November, 2024.
15

16

17

18

19                              Emonica L Araya

20                              Emonica Araya
                                Notary Public
                                State of Florida
21                              Commission:  #HH 228739
                                Expires:  March 19, 2026
22

23

24

25

1                          CORRECTIONS AND AMENDMENTS

2       Page No.   Line No.     Change

3       _____

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____

1    I HAVE READ THE FOREGOING TRANSCRIPT OF DEPOSITION OR

2    PROCEEDINGS AND EXCEPT FOR ANY CORRECTIONS AND/OR

3    AMENDMENTS APPENDED HERETO, AND UNDER PENALTY OF

4    PERJURY, I HEREBY SUBSCRIBE TO THE TRANSCRIPT AS AN

5    ACCURATE RECORD OF TESTIMONY.

6

7

8

9                              _____

10                              SIGNATURE OF RHONA SNYDER

11

12

13

14   RETURN TO:       production@integrareporting.com

15   Date:            October 18, 2024

16   Case:            Delgado v The Evangelical Lutheran
                      Good Samaritan Society and Sanford Health
17

18   Deponent:        Rhona Snyder

19

20

21

22

23

24

25

**#hh** 32:21

**&** 2:7

**18th** 31:9

**30day** 26:3 27:18

**5th** 32:5

**623cv1288rbdejk** 5

**abandon** 27:23

**abandonment** 24:17 26:6
27:20

**able** 5:8 10:21 15:2 26:4
27:11,16 (6)

**about** 6:4,10 7:11,22 9:22
14:10 19:3,21 20:3,12 22:16
23:12 28:20 29:2,11,12 (16)

**access** 11:8,9 14:13 23:16 (4)

**accessible** 16:3

**accurate** 12:24 34:5

**act** 9:9 11:12

**action** 17:25 18:25 19:3 32:12
(4)

**actions** 21:18

**acts** 20:19,23

**administrative** 5:22

**affiliated** 8:4,6

**affiliates** 26:12

**affirm** 4:2

**aforesaid** 31:7

**after** 17:12 18:15,16 19:1,23
20:20,24 21:9,12,19 23:20
25:9,15,16 (14)

**afternoon** 29:4

**again** 7:2 22:14 27:17

**agents** 27:25

**ago** 8:6,20

**agreement** 24:17 25:22,25
26:2 27:17 (5)

**ah** 11:12 12:14 13:8,17 14:15
(5)

**ahead** 12:12

**allow** 4:23

**also** 2:11 4:11 5:2 6:25
12:14,15 (6)

**alternative** 18:10

**always** 23:8 24:7

**am** 32:10

**amendments** 33:1 34:3

**andor** 27:24 34:2

**answer** 4:23

**answers** 4:25

**anybody** 13:9 23:3 26:17

**anyone** 28:6

**anything** 30:6

**anyway** 8:19

**appearances** 2:1

**appearing** 2:11

**appended** 34:3

**apply** 10:22

**appreciate** 29:19

**araya** 14 31:5,16 32:4,19 (5)

**are** 4:12 6:7 8:4,9 11:13,19
12:4 13:5 15:2,10,20,25
16:3,4,7,13 19:6 21:18 22:4
24:18 28:15,19,23 (23)

**area** 11:25

**arrangements** 18:11

**ask** 4:22 14:8 20:10 22:18,21
(5)

**asking** 14:10

**assist** 17:7

**assistance** 14:13

**assisted** 5:19,21 10:17 19:14
(4)

**attorney** 2:5,10 32:11

**attorneys** 25:3 26:16 32:11

**authorized** 27:24

**available** 16:7 21:5,7 23:19
24:1,8 25:19 27:12 (8)

**aware** 13:3,8 16:13 18:6,7
21:18 22:1,4 23:17
28:15,19,23 (12)

**away** 17:15

**ayers** 2:7 4:14,14 30:7,10 (5)

**bachelor's** 5:16

**back** 13:7 18:14,20 19:22,24
20:3 23:15 26:5 27:17,19 29:9
(11)

**background** 5:15

**basically** 17:15

**bear** 9:25

**before** 4:18,19 10:7,9 13:19

14:16 25:14 (7)

**beginning** 9:23

**behalf** 4:10

**being** 4:6

**belfor** 28:1,2,6,10,12 (5)

**believe** 8:4,11 10:16 18:21,22
24:4 (6)

**between** 7:25

**big** 11:25

**bit** 11:1

**book** 12:18,19,19

**booklet** 16:3

**both** 29:24

**boulevard** 2:8

**branches** 10:19,22

**buildings** 21:12

**call** 4:8,12

**came** 20:17 25:4

**campus** 19:8 20:16 28:4

**can** 5:5 6:15 7:2 8:2 15:4,6,17
20:22 29:11 (9)

**can't** 20:4

**canton** 7:8

**cardinal** 2:2,4 4:8,9,17 29:1
30:6,9 (8)

**care** 26:9

**carmen** 24:3

**carrero** 2:12 4:13

**case** 5 34:16

**center** 27:21

**certificate** 2:16 31:1 32:1

**certifications** 5:17

**certified** 32:4

**certify** 31:6 32:6,10

**change** 33:2

**charge** 23:19

**charged** 5:24

**choose** 23:20

**chosen** 27:9

**claims** 26:13

**clarification** 29:19 30:4

**clarify** 8:1 29:11,15,18 (4)

**classes** 13:17

**claudia** 24:3,14

**clean** 17:7,11 28:5

**cleaned** 17:16

**clear** 22:25

**clearly** 4:25

**colleagues** 4:12 20:7

**collette** 2:12

**colonial** 2:122

**combine** 10:25

**commission** 32:21

**communities** 10:11

**community** 2:3,12 4:9 23:17

(4)

**companies** 8:5

**company** 8:9

**compensate** 18:1

**complaint** 12:14 21:23

**complaints** 3:12

**complete** 14:6

**completely** 4:23

**complicated** 8:2

**computergenerated** 32:9

**concerning** 27:14

**confirm** 4:8 18:14

**connect** 21:6

**consultant** 6:19 7:10,12 8:14
15:14,20 16:2 17:3 (8)

**contents** 25:24 27:2

**contractors** 27:25

**copy** 30:9,10

**corey** 8:25 9:1

**correct** 7:5 8:8 11:2 13:14
30:3 (5)

**corrections** 33:1 34:2

**cost** 26:10

**could** 15:23 23:3,9
24:7,12,13,14 (7)

**county** 31:3 32:3

**course** 20:1

**court** 1,15 4:1 31:5 (4)

**created** 25:3

**creating** 9:12

**crime** 5:24

**current** 6:18 8:13 9:4 15:19 (4)

**currently** 5:11 6:7

**d** 2:13

**dakota** 7:8 11:23,24

**damaged** 17:22

**date** 34:15

**dated** 11:12 12:15 13:18 14:15 (4)

**dates** 25:10

**day** 23:14 24:5 31:9 32:5 (4)

**days** 18:17,19 20:4,5 26:5 (5)

**december** 11:13 16:24

**decision** 21:11

**defendant** 4:15

**defendants** 9 2:10

**degree** 5:16,19

**deland** 19:16

**delgado** 3 3:11 4:10 21:23 22:1,7,11 23:1 27:6 34:16 (10)

**demolish** 21:11

**depending** 10:25

**depends** 11:20 14:2

**deponent** 4:6 29:6 34:18

**deposit** 22:5 26:4 27:15 28:17,21 (5)

**deposition** 10 4:11,19 6:1 34:1 (5)

**details** 8:1 14:8

**didn't** 25:21 26:9

**different** 11:3 13:5 14:24,25 20:7,8,9,17 23:13 (9)

**direct** 4:16 7:15 15:5

**directed** 22:11,16,16

**directly** 12:17 13:11

**director** 7:1,3

**discard** 17:16

**discarding** 17:17

**disclosure** 28:16,20

**disclosures** 28:23

**discrimination** 15:16,21 16:17

**discuss** 14:23

**discusses** 9:18 26:1

**discussions** 18:4

**displaced** 18:11

**district** 1,1

**division** 2

**document** 10:6 12:13 13:16 14:7,9,13,16 15:3,7 24:16,18,20,22,23 25:1,4,7,14,18,18 26:15,25 27:5,10,12 (25)

**documents** 3:5,8,11 13:1,4 14:18 18:8 26:19 (8)

**does** 27:22

**done** 29:10

**doors** 22:22

**down** 12:12 13:15 14:7 15:13 17:7 20:2,14 24:21 26:17 29:1 (10)

**drive** 2:122

**due** 17:19

**duly** 4:6 31:8

**dumpsters** 17:15

**during** 16:20,23 17:1 19:16 25:12 27:5 (6)

**e** 2:13

**each** 4:24 10:11,13,14,20,25 11:5 (7)

**east** 2:122,8

**educational** 5:15

**efforts** 17:12

**eight** 20:1,2

**either** 18:11

**else** 6:5

**emonica** 14 31:5,16 32:4,19 (5)

**employed** 6:7 7:20 16:20,23 (4)

**employee** 32:11

**employees** 16:7,9 20:19,24 27:24 (5)

**end** 9:23 26:7

**enforcement** 3:12 12:14

**engaged** 28:9

**english** 9:18 14:14 16:14,18 23:16 24:10 (6)

entities 8:12

entity 7:17

entry 21:15

esq 15

esquire 2:2,2,7

evacuate 19:14

evangelical 7 6:12 34:16

ever 4:19 5:24 7:20 9:8 15:14
16:16 28:6 (7)

every 9:11,21 29:15,20,21 (5)

everybody 4:22

exact 25:10

exactly 18:18 24:24

examination 2:4 4:16

examined 4:7

example 10:10 21:2

except 34:2

execute 25:18

exhibit 3:2,3,6,9 9:25 10:3
11:11 (7)

exhibits 3:1

expires 17 31:18

facility 6:25 7:1,7

fair 9:9,17 11:11 12:13 13:16
29:12,17 (7)

familiar 4:21 11:13 19:6
24:18 (4)

family 23:21 24:9,12

faster 26:5

feel 14:7

fema 21:2 22:15

few 8:5

fh 3:5

fifth 14:13

fine 6:17 24:13 25:23 29:6 (4)

first 10:3 24:20 26:21

five 20:4 29:2

flooding 17:19 19:1,4 21:20
(4)

florida 1 2:32801,9 11:24
28:15,19 31:2,6,17 32:3,5,20
(12)

following 18:12 21:15 22:11

follows 4:7

food 21:5

foregoing 34:1

form 26:22

forth 19:22 20:3

four 18:17,19 23:13

free 14:7

friday 29:10

friend 23:21

friendship 22:11,13,17,20
23:2,7 (6)

full 12:10

fully 4:23 5:9

further 32:10

future 21:20 26:12

general 8:2

get 4:18 9:10 10:14 17:15
26:4 27:16,19 (7)

gets 11:1

getting 26:9

give 4:2 5:2 10:10,12 26:6
29:2,18 (7)

given 10:18 26:24

go 10:5 11:17 12:1,7,12
13:7,23 15:4 16:11 18:14,20
26:7,18 27:11 29:15,21,24
30:2 (18)

goal 25:17,20

going 8:18 9:25 10:5 13:7,15
16:1 20:8,10 21:3 28:17
29:1,14,17 30:7 (14)

gone 26:16

good 7 2:12
6:8,9,11,11,12,13,18,20
7:19,25 8:7,12,15 9:1 11:3
16:20,25 17:2,25 18:8,10,25
19:3 20:7,16,19,23 21:19 22:2
24:22 25:4,17 26:11
28:9,12,24 34:16 (39)

got 27:21

gotten 17:24

govern 16:1

group 15 7:22,25 8:10 24:15
28:2,2,3,7,10,13 (11)

groups 20:8

guessing 21:24

half 6:10

hand 31:9

handbook 3:10 10:10,22 11:7

(4)

**happened** 8:5 25:21

**has** 10:13 13:3,11 23:18 28:12 (5)

**having** 23:18,20 26:17

**he** 23:18

**health** 8 6:25 7:20,25 8:10,11 16:23 18:24 34:16 (9)

**heard** 10:16 17:11

**held** 6:20,23 7:9 28:17 (4)

**help** 15:6 20:18 21:1,6 (4)

**helped** 17:14,15 19:14 21:2 28:4 (5)

**henderson** 2:7

**her** 21:25 23:19 27:11

**here** 10:4 20:2 27:20

**hereby** 27:22 32:6 34:4

**herein** 4:6

**hereinafter** 32:8

**hereto** 34:3

**hh** 228739 31:228739

**hill** 2:7

**him** 23:19

**hit** 19:23 25:10,16

**hold** 5:17

**housing** 7:3 9:9,17 11:12 12:13 13:16 15:16,21 16:17 18:10 21:9 29:12,17 (13)

**how** 6:9 7:9 11:9,19 14:21 15:1,2,25 16:3,12 17:4 18:15

26:13 28:16 30:1 (15)

**huhuh** 4:25

**hundred** 13:12

**hurricane** 16:21,24 17:1,5,13,22 19:1,7,10,12,17,23 20:20,25 21:9,12,16,19 22:12 25:10,15 (21)

**i'm** 9:4,25 10:5,24 13:7,12,15 14:6,10 15:23 16:1 18:6,18,21 21:13,24 22:20 23:15 28:18,22 29:1,10 (22)

**i've** 6:25 13:20 15:15

**ian** 19:7,10,13 20:21,25 21:9,12,16,19 22:12 25:15 26:21 28:13 (13)

**idea** 20:13

**identification** 31:7

**il** 26:21

**impact** 19:7

**impacted** 17:5

**inc** 28:2,2,7

**includes** 10:17

**including** 22:10,25 28:1

**independent** 10:17,24

**independently** 26:19

**indexpage** 3:2

**indicated** 32:7

**individually** 29:22

**individuals** 9:18 23:23

**information** 29:17

**informed** 23:20

**initiated** 23:1

**inspection** 21:15

**instead** 4:25

**instruction** 16:16

**instructions** 26:14,24

**interact** 28:6

**interest** 27:23

**interested** 32:12

**interior** 17:23

**interpret** 23:9 24:7,13

**interpreter** 23:18 24:11

**interpreters** 23:6,10,22 24:1,15 (5)

**into** 10:11,12 21:15

**involved** 17:12 18:13

**iowa** 5:12

**irma** 16:21,24 17:1,5,13,22 18:12,15,16 19:1 25:12 (11)

**is** 4:9,14 5:8 6:18,20 7:17,24 8:9,18 9:1,2 10:4,4,10,15,18 11:2,11 12:13,15,19,22 13:3,13,16,18,21,25 14:12,15,18 15:2,7,10 23:15 24:16 25:24 26:1 27:3,4 28:2,17 29:22 (43)

**issues** 7:17

**items** 17:23

**its** 27:24

**january** 14:15

**john** 2:2 4:12

**june** 9:7 13:18

**just** 4:8,18,21,24 5:3 6:3 8:2,17,18 10:6,25 11:20 12:7,10 13:6 14:2,6,9,23 15:19 17:9,9,14,15 18:14,21,22 20:7,8,17 21:6 22:23,25 23:15 24:2 26:10,10,11 27:1,1,2,16 29:2,15,16,18 30:1 (47)

**keep** 4:22

**keeping** 12:5,23

**kennedy** 2:8

**kind** 8:16

**kissimmee** 11:6 17:5 18:16 19:7,13,16,18 21:8,12 22:2,10 (11)

**knew** 21:2 22:18

**know** 9:12,20 13:1,2,6 14:3,8 15:22 16:12,15 18:13,14,24 19:2,5 21:4,8,10,11,13,14,17,21 22:16 23:6,10,12,13,25 24:2,2,5,23,24 25:3,7,10,13,13,19 26:22 28:9,12,14,25 (45)

**knowledge** 16:10 17:4

**knutson** 7:14 8:22 13:13,14 25:2 (5)

**language** 14:13,25 15:4,5 (4)

**languages** 14:25 27:12

**large** 32:5

**last** 26:10

**lauren** 2:7 4:14 10:1 29:5 30:6 (5)

**lauren's** 6:3

**law** 28:15,19

**leaders** 11:17,19 12:1,2 (4)

**leadership** 24:22,25

**lease** 18:4,7

**legal** 2:3,12 4:9 8:1 (4)

**lep** 14:14

**let** 14:7 21:4 27:11

**let's** 18:14

**level** 18:13

**liabilities** 26:12

**library** 21:4

**license** 5:19,21,22

**licenses** 5:18

**like** 12:19 15:23 21:6 22:15 29:13,16 30:1,10 (8)

**limitation** 28:1

**limited** 9:18 14:14 16:14,17 23:16 (5)

**line** 10:15 33:2

**link** 15:4,5

**little** 11:1 26:5

**live** 5:11,12

**lived** 5:13 17:17

**living** 5:19,21 6:19,25 7:3,10,12 10:15,17,17,24 11:10,12 12:3,8,14 13:8,9,17,22,24 14:14,22 15:14,20 16:1,11 17:3 19:14 20:11,17 23:17 29:23 (33)

**local** 21:3,3

**locate** 21:1

**located** 22:15

**location** 13 10:25

**locations** 13 10:13,25 11:8 20:17 (5)

**long** 6:9 7:9 10:5 18:12,15 (5)

**longer** 27:18

**look** 10:2 14:12 29:3

**looked** 15:19

**looking** 10:6,23

**looks** 15:23

**loss** 18:1

**lost** 17:18

**luck** 29:10

**lutheran** 7 6:12 34:16

**luverne** 7:1

**ma'am** 9:5

**made** 21:11 28:24

**make** 4:24 5:2 10:5 12:11 14:9 23:17 29:3 (7)

**managers** 12:3,8,16 13:22,24 14:19,22 16:11 20:17 29:23,25,25 (12)

**mandated** 25:23

**many** 21:25

**maraya** 24:3

**march** 17 31:18 32:19

**martino** 2:2 4:12

**material** 14:24

**matherns** 2:12

**may** 14:24 15:22 23:20

**maybe** 17:23 18:17 19:23 20:3 (4)

**me** 7:2 10:1,21 14:7,8 26:11 29:2 (7)

**mean** 8:7 12:2

**means** 26:22

**meeting** 6:3 27:5

**meetings** 23:1

**member** 23:21 24:9,12

**members** 20:15

**mentioned** 10:1

**met** 6:3 21:23,25 22:7 (4)

**middle** 1

**might** 14:1 16:2

**minnesota** 5:20,23 7:1,4 (4)

**minutes** 29:2

**module** 9:10,13,21 29:13,14,16 (6)

**money** 27:19

**monies** 27:16

**more** 14:12 15:22,23 21:1 29:14 (5)

**morgan** 2:2 4:9

**most** 15:23

**mouthful** 6:15

**move** 10:12,14

**moves** 10:11

**ms** 2:4 4:4,8,14,17,18 21:23

**my** 22:1,7,11 23:1 27:6 29:1,5,9 30:6,7,9,10 (19)

**multiple** 18:20 20:8

**must** 23:17 28:21

**my** 4:8,12,14,22 8:17 10:15 11:2 13:11 26:1 28:3 29:3,9,25 31:9 32:8 (15)

**myself** 29:24

**n** 2:13

**name** 4:9,14 5:5 7:17 23:10 (5)

**names** 23:25 24:2,4

**national** 20:16

**nearby** 14:1

**nebraska** 11:23

**need** 8:1 14:7,23 15:1 (4)

**needed** 22:18,21,23

**needing** 14:24

**new** 11:17,19 12:3,7,16 13:21,24 14:22 29:25 (9)

**nicole** 2:12 4:12

**no** 5,228739 3:3,2,6,4,9,6 5:1,10,14,25 6:6,17,22 7:21,23 8:23 9:15,16,20 12:21,25 13:16 15:9,12 16:19,25 18:9 20:3,12,12,23 21:13 23:3 24:16,24 25:10 26:9,22,23 27:1,13 28:8,11,18 30:7,7 31:228739 33:2,2 (51)

**nod** 5:2

**nonenglish** 23:22

**nor** 32:11,12

**north** 11:24

**notary** 16 31:5,16 32:5,20 (5)

**notes** 29:3,9 32:8

**nothing** 4:3 6:5

**notice** 21:14 26:3 27:18

**november** 32:5

**number** 15:5

**nursing** 6:24 7:6 10:18 19:15 (4)

**oath** 2:16 4:7 31:1,8 (4)

**obtain** 15:1,2

**obviously** 12:18 25:10

**occupancy** 24:17 26:2

**october** 18 22:7 23:11 26:7 31:10 34:15 (6)

**off** 30:11

**offered** 21:9 23:22 24:10,14 (4)

**offhand** 15:22

**official** 31:9

**often** 11:19

**once** 18:21,23

**one** 7:2 8:5 12:12,17 13:2,6,15,18 14:12,15,18,20 15:13 18:19 23:12 24:2,6,21 25:3 29:1,11 (21)

**ones** 15:15 24:4

**online** 12:21 16:5

**only** 6:20 20:12 23:19

**onsite** 17:6 18:15 19:10

**open** 22:13,17,21,22 (4)

**operating** 11:3

**option** 23:18

**ordering** 30:9

**orlando** 2

**osceola** 31:3 32:3

**other** 4:24 5:13,17 6:23
15:15,18,20 16:13 20:13,16
26:12 27:12 (12)

**others** 16:12

**our** 6:24 8:5 10:3,11,13 11:10
13:5 16:5,6 20:16 24:16,22
25:2 26:12,16 29:17 (16)

**out** 12:20 17:21

**outcome** 32:12

**over** 4:24 6:21 8:18 11:17
12:5 13:23 26:16,18 27:1,11
(10)

**own** 10:13,20 11:1,5 (4)

**owned** 13:5

**ownership** 12:4,23 13:12

**owns** 13:2,6

**pa** 2:7

**page** 2:14,17 4:22 26:21 27:3
33:2 (6)

**pages** 12:10

**paragraph** 27:20

**parent** 8:5,9

**part** 15:19 20:10

**particular** 10:22 23:21

**party** 32:11

**past** 13:20

**pay** 22:4

**paychecks** 7:18

**penalty** 34:3

**people** 8:17 10:12 13:5
17:14,16,16,21 20:8,9 23:13
(10)

**percent** 13:12

**perjury** 34:4

**person** 10:11 13:25 14:2,14
24:13 (5)

**personal** 17:4 18:1 24:17

**personally** 17:12 18:24

**persons** 16:14

**phone** 15:5

**photo** 31:7

**phrasing** 16:2

**physical** 12:19

**place** 18:5 32:7

**plaintiff** 2:5 4:10 21:22

**plaintiff's** 3:2

**plaintiffs** 4

**please** 20:22

**pm** 3,3 30:11

**policies** 3:5,12,8,14 13:5,10
15:10,15,18,20,25
16:6,10,13,17,18 29:17 (17)

**policy** 11:14,16
12:1,5,18,19,22 13:19,21 14:4
23:15 29:14 30:1 (13)

**portal** 16:6

**position** 6:18,20

**positions** 6:23

**prep** 6:3

**prepare** 6:1

**prepared** 18:8 24:23,24
25:8,14 (5)

**present** 23:7,11

**presented** 27:5,8

**prevent** 19:4

**previous** 28:13

**previously** 8:17

**printed** 12:19

**prior** 26:17

**probably** 17:10

**problem** 20:23

**procedures** 15:25

**proceedings** 31:8 32:7 34:2

**production@integrareportin
gcom** 34:14

**proficiency** 9:19 16:18

**proficient** 14:14 16:14

**promise** 10:6

**properties** 11:3

**property** 17:18,21 18:2,16
19:19 24:18 26:6 27:21,24 (9)

**protect** 18:25 21:19

**protected** 13:17

**provide** 8:13 12:16 18:10

**provided** 9:3 11:6 15:15,21 21:14 31:6 (6)

**public** 16 31:5,16 32:5,20 (5)

**pull** 9:25 12:17

**pulling** 23:15

**put** 10:2

**question** 4:23 29:12

**questions** 22:19,21 30:8

**quicker** 27:19

**quickly** 13:8

**quite** 18:21,22

**read** 26:19 30:7 34:1

**really** 13:7

**reason** 5:8

**recall** 9:17,22 17:18,25 18:4 19:21 21:24 22:7 25:11 (9)

**receive** 9:8 16:9 26:14

**received** 16:16

**recess** 29:7

**recite** 14:8

**recognize** 8:1

**record** 5:3,6 30:11 34:5 (4)

**recovery** 17:12

**reduced** 32:8

**refer** 6:11

**referred** 10:16

**regarding** 9:8

**related** 8:12 15:16,21 16:14,17 26:25 (6)

**relation** 15:13

**relationship** 7:24

**relative** 32:10

**release** 26:11 27:22

**releasing** 26:11

**rely** 23:21

**remedial** 21:18

**remember** 8:19,24 9:20 17:10,20 18:22 20:4 21:25 22:9 (9)

**remote** 13 2:1 31:7 32:7 (4)

**repeat** 15:17 20:22

**replacement** 21:9

**report** 7:13

**reported** 14 32:6

**reporter** 15 2:32 4:1 31:5 32:1,4 (6)

**reporting** 15

**reports** 7:15

**represent** 4:15

**representatives** 28:1

**required** 22:4

**requires** 23:16 28:15,19

**resident** 10:22 11:7 23:17,20 25:21 27:22 (6)

**residents** 17:19 18:1,5,11 19:1,15,15 20:20,24 21:8,14,19 22:10,21,25 25:17 27:14 28:24 (18)

**resource** 21:5 22:23

**resources** 21:2,5 22:14

**responding** 19:12

**response** 5:3

**responsibility** 12:23 13:4

**responsible** 9:12 12:4 14:3 15:8,11 (5)

**resumed** 29:8

**retired** 9:2

**return** 19:18 34:14

**returned** 28:21

**review** 9:11,13,21

**reviewed** 11:12

**reviewing** 14:4

**revised** 11:13

**revising** 14:4 15:8

**rhona** 10 4:5 5:7 29:5 31:6 34:10,18 (7)

**rid** 26:9

**right** 8:20 15:22 16:2 27:23 29:4 (5)

**role** 7:9,15 8:13,18 9:4 13:3 15:10,14,19 16:1 17:2 19:12 (12)

**room** 22:11,13,17,20 23:2,7,8 24:3,5,8 (10)

**rough** 20:13

**roughly** 25:14

**rules** 4:21

**said** 7:4 9:21 17:11 18:14

19:24 29:20 32:12 (7)

**salvage**  26:8

**sam**  6:9,13,18,21 7:25 8:7,12
11:4 17:2,25 18:8,10 19:3
20:7,16,19,23 21:19 24:22
25:17 26:11 28:9,12,24 (24)

**samaritan**  7 2:12 6:8,11,12
7:19 8:15 9:1 16:20,25 18:25
22:2 25:5 34:16 (14)

**same**  4:22

**sanford**  8 7:20,22,25,25
8:9,10,11 16:23 18:24 34:16
(11)

**save**  26:8

**saw**  12:11 17:6

**say**  6:15 7:2 8:6,7 14:21 15:1
16:1 20:6,15 22:16,22 (11)

**saying**  4:25

**says**  26:21

**screen**  10:4

**scroll**  12:11

**scrolling**  14:6

**seal**  31:9

**second**  7:2 26:21

**section**  26:10

**security**  22:5 26:4 27:15
28:17,21 (5)

**see**  14:9 17:8 24:20

**seemed**  17:23

**seen**  10:7,9 11:14,16 13:18,20
14:15 (7)

**senior**  6:19,25 7:3,9,12 8:14

10:15 11:10,12 12:3,7,14,16
13:8,9,17,21,24 14:14,18,22
15:14,20 16:1,11 17:3
20:11,16 23:17 29:23 (30)

**september**  17:1 19:13

**service**  10:16 11:25

**services**  2:3,12 4:10

**set**  29:3

**several**  11:20

**shadowing**  8:17

**shane**  7:14 8:22 13:13 25:2
(4)

**share**  13:15

**shared**  15:3

**she**  9:2,2 23:18 27:9 (4)

**sheltered**  19:16

**shorthand**  32:4

**shortly**  25:16

**should**  15:1

**showed**  24:25

**shown**  15:16 24:22 26:16

**sign**  25:18,21

**signature**  2:17 27:3 34:10

**similar**  25:11

**sitting**  26:17

**situation**  23:22

**six**  20:1,2

**skill**  10:18

**skilled**  6:24 7:6 19:15

**slow**  14:7

**snyder**  10 4:4,5,18 5:7 29:9
31:6 34:10,18 (9)

**so**  9:25 10:5 14:25 15:13
16:12 17:21 19:23,23,24,25
20:18 21:5,25 22:1,20,25 25:4
32:7 (18)

**social**  5:16 6:24 7:6

**society**  7 2:12 6:8,12,13 7:19
16:25 27:24 34:16 (9)

**solemnly**  4:1

**some**  10:24 12:22 13:12 14:25
17:9,23 28:5 (7)

**somebody**  24:7

**someone**  23:8 24:9

**something**  12:15 13:25 22:24
25:11 29:20 (5)

**somewhere**  16:4

**sooner**  26:3

**south**  7:8 11:23

**space**  15:3

**spanish**  23:4,9

**speak**  23:4,9

**speaking**  4:24 23:23

**specific**  11:3 20:19,23 21:22
26:24 (5)

**specifically**  13:2 21:25

**spell**  5:5

**spoke**  24:9 29:13

**stamp**  21:5

**started**  4:19 9:6

state  5:5,11,20,22 11:23
31:2,6,17 32:3,5,20 (11)

states  1 5:13 11:20,22 (4)

stayed  20:2,3

steering  3:8 13:17

stenographically  32:6

still  9:1

stop  22:14 23:3

stored  16:4,5

subcontractors  27:25

subscribe  34:4

suite  2:4

supervisor  8:18,22 13:11,13
(4)

support  11:21,22,23 20:20,24
(5)

sure  4:24 5:2 12:11 13:12
14:9 15:24 18:18,22 29:3 (9)

surrender  27:21

swear  4:1

sworn  4:6 31:8

take  10:2 12:12 13:15 15:13
19:3 26:7,9 27:18 29:1 (9)

taken  4:19 21:18 29:7

taking  4:11 18:5

tampa  2:9

team  6:3 13:9 20:11,15
24:22,25 25:1 (7)

teams  20:13

tell  10:21 27:14

telling  28:16,20

temporarily  18:11

tenant  22:1

tenants  22:4 28:16,20

term  18:12

terminating  26:1,3 27:17

termination  3:11 18:4,7
24:16 25:22 (5)

testified  4:7

testify  5:9

testimony  4:2 34:5

than  15:15,18

thank  30:4

their  8:12 10:13,20 11:1,5
12:18 18:1 21:15 24:4 26:2,4
27:14,16,19 28:16 (15)

theirs  10:25

them  8:4 10:2 11:8 12:1 13:23
15:1,2,5,6,23 16:11 17:15
19:16 21:1,4,6,6 24:6,10,14
26:4,7,10 27:17,19 28:16,20
(27)

thereafter  27:22

thereof  32:13

these  10:1 13:1,4 16:4 (4)

they're  8:5 16:5

thing  6:15 10:6 29:11

things  8:18 17:14 21:6 22:15
(4)

think  9:7 10:24 13:11 18:18
19:22,25,25 21:3 25:9,16
29:13 (11)

thinking  10:24 29:11

third  12:13

thompson  8:25 9:1

those  10:19,21 16:3,7,9 28:23
(6)

three  10:18 12:10 18:17,19
19:22,24,25 20:12 23:12 (9)

through  10:5 12:1,7,11 14:6
15:4,19 16:11 26:7
29:3,9,14,15,17,21,24 30:2
(17)

throwing  17:14,21

time  8:23 17:6 20:4 21:4 25:9
32:7 (6)

times  18:20 19:22,24,25 24:6
(5)

title  27:23

today  4:2,11 5:3,9 6:2 (5)

took  17:25 18:17,24

top  13:7

touch  14:20,21,21

train  13:21,23 14:18 29:24
(4)

training  8:13,16 9:3,8,10,18
11:17,19 12:1,16 13:24 16:9
26:14 29:12,16 (15)

transcript  32:9 34:1,4

transfer  27:22

translaters  14:23 23:6

tried  22:23

trip  18:19,23

trips  24:21

**truth** 4:3,3,3

**truthfully** 5:9

**try** 4:22

**trying** 21:1,6

**turning** 21:22

**turns** 18:17

**twelve** 8:20

**type** 21:5

**typically** 14:1 26:2 27:18

**uhuh** 5:1

**under** 4:6 7:15 27:20 31:8 34:3 (5)

**understand** 6:13 25:4

**understanding** 7:24 8:3 10:15 11:2 22:20 25:24 26:1 28:3 (8)

**understood** 26:13 30:4

**united** 1

**units** 21:15

**until** 26:7

**up** 9:25 10:2,4 12:17 13:7 17:7,11,16 23:15 28:5 30:1 (11)

**updated** 12:5

**updates** 13:1

**updating** 12:23,25 13:4 15:8 (4)

**us** 8:18 10:2 20:12 26:17 28:4 (5)

**usa** 28:1,2,7,10,13 (5)

**use** 24:13,14

**used** 25:12

**v** 6 34:16

**varied** 20:4

**variety** 20:15,18

**verbal** 5:3 16:16

**very** 10:4,4

**video** 29:14,16

**village** 11:7 17:5 18:16,25 19:7,13,18 21:8,12 22:2,10 (11)

**virtually** 13:25 14:1

**want** 6:16 14:9 26:9 27:10 (4)

**wanted** 12:10 17:16 22:13,17 26:8 29:15,18 (7)

**ward** 2:7

**wasn't** 18:13 25:23

**water** 17:9

**way** 32:12

**we'd** 30:10

**we'll** 30:9

**we're** 29:3 30:7

**we've** 27:21

**web** 16:6

**website** 11:10

**week** 19:23

**weeks** 20:1,2

**welcome** 4:18 30:5

**well** 4:18 10:17 19:10 24:15 (4)

**went** 17:6 18:21 19:22,24 20:3 27:1 29:9 (7)

**wet** 17:24

**what** 5:11 6:1,18,23 7:17,22,24 8:16,19 11:22 12:2 15:5,17 17:1,8,10,11,16 19:3,12 20:13,19,22,23 21:7 25:21,24 26:8,9,22 27:1,1,14 28:2 29:22 (35)

**what's** 5:15

**when** 8:7 9:3,6,22 10:9,14 11:16,17,25 14:21 19:21 20:6 24:6,20 25:7 28:9,20 29:25 (18)

**where** 7:7 22:14,15,18 (4)

**whereupon** 29:7

**whether** 9:17 17:18

**which** 10:21 11:11 23:12,16 24:2 25:3 (6)

**who** 6:7 7:12 8:24 10:12 13:1,2,6 14:3 20:6 21:11,13 22:21 23:13 24:5,23,24 25:1 27:8 (18)

**who's** 9:12

**whole** 4:3 6:15 10:5 14:9 (4)

**why** 10:9

**will** 4:2,11,22 10:2,2 11:11 12:12 13:15 14:12 15:13 29:2 (11)

**within** 13:9

**without** 4:24 23:19 28:1

**witness** 19:6 20:20,24 31:9 (4)

**work** 5:16 11:10

**worked** 6:9 24:4 28:12

| | |
|---|---|
| **worker** 6:24 7:6 | **2014** 13:18 |
| **working** 28:4 | **2017** 16:21,24 17:1 |
| **works** 13:9 16:12 | **2021** 11:13 14:15 |
| **would** 8:6 9:6 10:20,21,22 11:2,16 12:15,17,22,25 14:3 15:7 20:15 22:22 23:1,11 24:6,10 25:2,7,11 26:3,6,8 27:9,9,10,16,19 28:9,23 (32) | **2022** 19:13 22:8 23:11 |
| | **2024** 18 31:10 32:5 34:15 (4) |
| | **2026** 17 31:18 32:19 |
| **wouldn't** 5:8 14:8 22:16 | **3700** 2:3700 |
| **written** 28:15,19 | **32801** 2:32801 |
| **x** 2:13 | **33602** 2:9 |
| **yeah** 25:16 | **123021** 12:15 |
| **year** 9:11,22,22,23,23 29:15,20,21 (8) | **228739** 228739 31:228739 32:21 |
| **years** 6:10,21 7:11 8:6,20 (5) | |
| **yes** 5:1,22 6:14 8:8,15,21 9:5,10 10:8,20 11:5,15 13:20,23 14:11,20 16:8,8,22 17:9 19:9,11 22:3,6,22 23:8,24 24:19 25:6 26:20 27:7 29:21,21 (33) | |
| **yolanda** 3 4:10 21:23 | |
| **you're** 4:21,25 11:25 13:3,8 16:13 22:1,4 29:10 30:5 (10) | |
| **you've** 6:20 15:21 | |
| **your** 4:19,25 5:5,15 6:18 7:15,17,24 8:2,9,13 13:13 15:10,14,19 16:1,10 17:2 19:12 25:24 27:3 (21) | |
| **zoom** 10 | |
| **335** 3 | |
| **431** 3 30:11 | |
| **2010** 9:7 | |
| **2012** 9:7 | |

1

```
1              UNITED STATES DISTRICT COURT CIRCUIT
                    MIDDLE DISTRICT OF FLORIDA
2                        TAMPA DIVISION

3

    YOLANDA DELGADO,
4

5        Plaintiff,
                             CASE NO.: 6:23-CV-1288-RBD-EJK
6    vs.

7

    THE EVANGELICAL LUTHERAN
8    GOOD SAMARITAN SOCIETY
    SANFORD HEALTH,
9

10

         Defendants.
11
    _____/
12

13                    THE DEPOSITION OF

14                     CHAD JUNGMAN

15                     REPORTED BY:
                       PETER DILWORTH
16                     REMOTE VIA ZOOM
                       February 19, 2025
17                     At 10:00 a.m.

18   APPEARANCES:

19          COMMUNITY LEGAL SERVICES
            122 East Colonial Drive, Suite 200
20          Orlando, Florida 32801
            Attorney for Plaintiff
21          BY:  MORGAN MICHELE CARDINAL, ESQUIRE
                 JOHN MARTINO, ESQUIRE
22
            HILL, WARD & HENDERSON, P.A.
23          101 East Kennedy Boulevard, Suite 3700
            Tampa, Florida 33602
24          Attorney for Defendants
            BY:  S. GORDON HILL, ESQUIRE
25               TOM PENISTEN, ESQUIRE
```

2

I N D E X

TRANSCRIPT OF PROCEEDINGS

Deposition held February 19, 2025

TESTIMONY OF **CHAD JUNGMAN**

Direct Examination by Ms. Cardinal                    3

ERRATA SHEET                                          54

SUBSCRIPTION OF DEPONENT                              55

CERTIFICATE OF OATH                                   56

CERTIFICATE OF REPORTER                               57

```
 1   WHEREUPON:

 2              The following proceedings were had:

 3                       CHAD JUNGMAN

 4   having been first duly sworn, was examined and testified

 5   as follows:

 6                    DIRECT EXAMINATION

 7   BY MS. CARDINAL:

 8        Q.    Good morning.  So Mr. Jungman, really quick

 9   before we get started.  Have you ever had your

10   deposition taken before?

11        A.    I have not.

12        Q.    Okay.  Just a couple of ground rules for us.

13   You know, I'm going to ask you a question, and if you

14   can just let me fully, you know, ask the question before

15   you start answering.  I'm sure, you know, Mr. Hill would

16   also ask if you just give him a minute for any

17   objections he might have; and then I'll do the same for

18   you in answering your questions.  That way the Court

19   Reporter can fully hear each of us.  And then I would

20   just ask you also to remember to try to use, you know,

21   oral responses, verbal responses, yes, no, as oppose to

22   uh-huh, uhn-uhn; we can capture that if it does happen,

23   but it makes it a little bit easier for Mr. Dilworth if

24   you just affirmatively state your answer.

25              And then is there -- sorry about that, of
```

1    course there's an emergency behind me.

2              And then finally, just, again, kind of

3    setting the logistics today.  Is there any reason you

4    would be unable to testify completely and truthfully

5    today?

6         A.    No.

7         Q.    Okay.  Got it.  Okay.  Do me a favor and go

8    ahead and state your full name and spell it just for the

9    record.

10        A.    Chad Jungman.  C-H-A-D, J-U-N-G-M-A-N.

11        Q.    And I heard Jungman; is that correct?

12        A.    Correct.

13        Q.    Okay.  Just make sure that I pronounce it

14   correct through it testimony.   And what is your current

15   title?

16        A.    Senior Vice President Legal.

17        Q.    And did you do anything to prepare for your

18   deposition today?

19        A.    Reviewed documents and discussed with

20   counsel.

21        Q.    Okay.  And when you say previewed documents,

22   what sort of documents?

23        A.    The affiliation agreement.

24        Q.    Okay.  Did you look at anything else?

25        A.    Just the documents being identified as part

1    of the discussion today, including the policies.

2        Q.    Got it.   And what is the name of the entity

3    that you work for?

4        A.    Sanford.

5        Q.    Just Sanford?

6        A.    Correct.

7        Q.    And how long have you worked for Sanford?

8        A.    Almost ten years.

9        Q.    Good for you.

10            Have you had any positions with Sanford

11   prior to your role as senior VP of legal?

12       A.    Yes.

13       Q.    And what were those positions?

14       A.    Corporate counsel, senior corporate counsel,

15   executive director, senior executive director, senior

16   services, vice president legal, senior vice president

17   legal.

18       Q.    Okay.   So I'm sensing kind of a pattern,

19   corporate counsel, senior corporate counsel, and then

20   your role as VP of legal.   But can you talk to me about

21   the -- I believe you said executive director?

22       A.    Correct.

23       Q.    And executive director of what?

24       A.    Legal.

25       Q.    I should have guessed.

```
 1        A.      Yeah.    Sorry.
 2        Q.      No, that's okay.
 3                And this was all with Sanford?
 4        A.      The executive director of legal and senior
 5   executive director of legal senior services was with the
 6   Good Samaritan Society.
 7        Q.      And can you kind of take me through, what
 8   are your duties as senior VP of legal?
 9        A.      So I oversee the transactional legal work
10   for the Sanford enterprise, including our subsidiaries.
11   That includes corporation, corporate work, transactional
12   work, mergers and acquisitions, contract review, real
13   estate, regulatory.  Kind of all non-litigation type
14   work.
15        Q.      Gotcha.  Good for you.  I remember my
16   emanate class in law school was challenging to say the
17   least.
18                And as senior VP of legal who do you report
19   to?
20        A.      Sanford's chief administrative officer who
21   is Jennifer Grennan.
22        Q.      Will you spell that for us, please.
23        A.      J-E-N-N-I-F-E-R, G-R-E-N-N-A-N.
24        Q.      And you said she was the chief
25   administrative officer?
```

```
 1        A.      Correct.
 2        Q.      Do you have anyone who reports to you
 3   directly?
 4        A.      Yes.
 5        Q.      And how many direct reports do you have?
 6        A.      I have five direct reports.
 7        Q.      And what are their roles?
 8        A.      One is the general counsel of the Good
 9   Samaritan Society.
10        Q.      Okay.
11        A.      One is vice president of legal, oversees our
12   contracting team.  One is a senior corporate counsel --
13   two -- three are senior corporate counsels with various
14   functions within the organization.
15        Q.      Got it.  So I heard one general counsel, one
16   VP of legal, and three senior corporate counsel?
17        A.      Correct.
18        Q.      And currently what is your relationship to
19   the Good Samaritan Society?  And if I call them Good
20   Samaritan Society, do you understand that that's the
21   Evangelical Lutheran Good Samaritan Society?  Just
22   saving us some time on saying that the whole morning.
23        A.      Yes.  Understood.
24        Q.      Okay.  I can repeat the question if you need
25   me to.
```

1        A.      Please, go ahead.

2        Q.      Yeah.    I was -- so what I'm asking is what

3   is your relationship to Good Samaritan currently?

4        A.      As I mentioned, the general counsel of Good

5   Samaritan Society reports to me.    Otherwise, I don't

6   have a direct relationship with it.

7        Q.      So the general counsel that you mentioned

8   previously is the general counsel with Good Sam?

9        A.      Correct.

10        Q.      And before we were talking about your role

11  as executive director of legal and senior executive

12  director of legal, that was with Good Sam, Good

13  Samaritan?

14        A.      Correct.

15        Q.      Okay.    And are those the only roles that

16  you've ever held with Good Samaritan?

17        A.      Yes.    Other than during that time I was also

18  the secretary of Good Samaritan.

19        Q.      Okay.    Is that, like, secretary of the

20  board?

21        A.      Correct.

22        Q.      Okay.    And so the executive director of

23  legal, senior executive director of legal, secretary of

24  the board.    Any other roles?

25        A.      No.

9

```
 1                MR. HILL:  Objection.  Sorry about that.
 2         Periodically I'll object.  And I think, you know,
 3         won't say much with the objection.  So just raising
 4         an objection for the record.
 5                MS. CARDINAL:  Got it.  And Peter you got
 6         that?
 7                THE COURT REPORTER:  Yes, ma'am.
 8                MS. CARDINAL:  Okay.
 9    BY MS. CARDINAL:
10         Q.     So for approximately how long did you hold
11    those roles at Good Samaritan?
12         A.     I was the legal counsel for Good Samaritan
13    from January of 2019 until February of 2020.  I was the
14    secretary -- I don't have the date exactly correct.  But
15    probably until 2021 or 2022.
16         Q.     From approximately 2019 till 2021, 2022?
17         A.     Correct.
18         Q.     That was probably a very fun time to be in
19    medical services, I am sure.
20                Have you ever been to or visited the
21    property, the Good Samaritan property, in Kissimmee,
22    Florida?
23         A.     No.
24         Q.     Were you provided any training prior to
25    entering your current position?
```

1      A.    No.

2      Q.    What about in any of your other roles with

3  Sanford or Good Samaritan?

4           MR. HILL:  Object to the form of the

5      question.  Maybe this will help, but can you

6      specify what kind of training you're talking about?

7  BY MS. CARDINAL:

8      Q.    On the job training.  Any sort of handbooks

9  or just sit with anybody to learn any systems or

10  processes?  You know, logistical stuff that comes with

11  new jobs.

12      A.    No.

13      Q.    Describe it more as on the job training

14  then?

15      A.    Trial by fire.

16      Q.    I think a lot of lawyers can relate to that.

17           And what's your prior work experience prior

18  to coming to Sanford in Good Samaritan?

19      A.    I was in private practice for almost five

20  years in Sioux Falls, South Dakota.  Prior to that I had

21  a judicial clerkship for one year.  And prior to that

22  was school.

23      Q.    And what was your private practice

24  primarily?

25      A.    Transactional work.

1    Q.    Gotcha.  Do you hold any certifications or

2  licenses?

3    A.    Just my license to practice law in South

4  Dakota and North Dakota.

5    Q.    Have you ever met my client Ms. Yolanda

6  Delgado?

7    A.    No.

8    Q.    Did you ever hear her name before this

9  lawsuit was filed?

10    A.    No.

11    Q.    All right.  If you will bear with me for one

12  second.  I'm going to pull up a document for us to just

13  look at.  And I'm also --

14         MS. CARDINAL:  Gordon, as we've kind of

15      established, I'm going to e-mail that to you now

16      too.

17         MR. HILL:  All right.

18         MS. CARDINAL:  Okay.  So that one is coming

19      at you, Gordon, and for you, Mr. Dilworth, this

20      will be -- Exhibit 1 for today.  I hate when this

21      happens, I lost you guys.

22  BY MS. CARDINAL:

23    Q.    Okay.  Mr. Jungman, can you see my screen

24  okay?

25    A.    Yes.

```
 1        Q.    I'm going to probably blow it up a little
 2  just because it always opens tiny.
 3              Okay.   So really quick I'll just kind of --
 4  it's 22 pages, I, you know, I'll try to go through
 5  everything slowly enough so you can see it, let me know
 6  if you need me to stop at any point.   But generally what
 7  my question is for right now is, have you ever seen this
 8  document?
 9        A.    Not this particular document.
10        Q.    Okay.   Have you ever seen anything similar
11  to this?
12        A.    I have seen the form occupancy agreement
13  template.
14        Q.    Okay.   So you recognize this as a senior
15  occupancy living agreement?
16        A.    Yes.
17        Q.    Okay.   Maybe not this particular version of
18  it, but --
19        A.    Correct.
20        Q.    Do you know, generally, what a senior living
21  occupancy agreement is?   What it's meant to do?
22        A.    Generally, yes.
23        Q.    Okay.   And can you describe that to me in
24  your own words?
25        A.    It's an agreement between the Good Samaritan
```

13

1    Society and our residents to provide the details of a

2    housing agreement in one of the Good Sam's units.

3          Q.     Okay.   Have you ever read one?

4          A.     Long time ago.

5          Q.     Did you happen to create this template?

6          A.     No.

7          Q.     Do you know who did?

8          A.     This was the template Good Samaritan had and

9    used pre-affiliation.

10         Q.     Pre-affiliation.  Okay.  Have you ever, you

11   know, you said a long time ago you read one.  But have

12   you ever had anybody talk to you or give you any

13   training about what's in these documents or in this

14   template, rather?

15         A.     No.

16         Q.     Are you aware of whether any staff received

17   specific training as to what's in this document?

18                MR. HILL:  Objection.

19         A.     I don't know.

20   BY MS. CARDINAL:

21         Q.     Do you know if the person who created this

22   agreement template was licensed to practice law in the

23   State of Florida?

24         A.     I don't know.

25         Q.     And I heard you say before that you have a

14

1    license in South Dakota and North Dakota.  Do you have a

2    license to practice law in the State of Florida?

3         A.    No.

4         Q.    If someone has questions about the content

5    of a senior occupancy agreement, just sort of generally,

6    would you be able to answer those questions?

7              MR. HILL:  Objection.

8         A.    I would refer them to the Good Samaritan

9    Society.

10   BY MS. CARDINAL:

11        Q.    Is there anyone particular at Good Samaritan

12   that you would refer them to?

13        A.    It would depend on the question.

14        Q.    Okay.  Is there a separate legal department

15   at Good Sam?

16        A.    Yes.

17        Q.    Okay.  And so would that be someone you

18   would refer to?

19        A.    If it was a legal question.  If it was an

20   operational question, I would refer them to the senior

21   housing team.

22        Q.    Do you get questions about the occupancy

23   agreement at all?

24        A.    No.

25        Q.    And you mentioned the senior housing -- and

1   I'm sorry if you said team or group.  I don't want to

2   misrepresent how you refer to them.  But for operational

3   questions, do you know who is part of that operation in

4   the Good --

5        A.    Shane Knudson.

6             THE COURT REPORTER:  I'm sorry.  Can you

7        spell that one?

8        A.    S-H-A-N-E, K-N-U-D-S-O-N.

9   BY MS. CARDINAL:

10       Q.    Do you know if an attorney was involved in

11  the drafting of the occupancy agreement?

12       A.    Yes.

13       Q.    And do you know the name of that person?

14       A.    Tom Kapusha.

15       Q.    We're probably going to need to spell that

16  one too.

17       A.    Tom, T-O-M; Kapusha, K-A-P-U-S-H-A.  Tom was

18  the chief legal officer of the Good Samaritan Society

19  pre-affiliation, and I know that Tom, in coordination

20  with outside counsel, prepared the template.  I do not

21  know which outside counsel was involved.

22       Q.    Got it.  Are you familiar with the process

23  for having a resident execute an occupancy agreement?

24       A.    No.

25       Q.    All right.  I'm going to take this one down

1    and bring up another document.  This one is also very,

2    very long.  So I won't make you suffer through page by

3    page, I promise.

4             MS. CARDINAL:  This one might take a minute,

5        Gordon, but it is also coming at you.

6    BY MS. CARDINAL:

7        Q.    Share this one.  And Mr. Jungman, can you

8    see my screen okay?  Yes?

9        A.    Yes.

10       Q.    Okay.  So just a couple of questions, again,

11   I promise -- it's 85 pages, I promise not to take you

12   through all of them.  But just kind of scrolling

13   through.  Have you ever seen this item, and for our

14   Court Reporter this will be Exhibit 2, the Good

15   Samaritan handbook?

16       A.    No, I have not.

17       Q.    Have you ever heard anything about this

18   being a document used at Good Samaritan?

19            MR. HILL:  Objection.

20       A.    Not that I can recall.

21   BY MS. CARDINAL:

22       Q.    Okay.  So you wouldn't know where this comes

23   from or who prepares it?

24       A.    Correct.

25       Q.    All right.  I'll take that one down.  I

1  should have mentioned this at the top with the

2  logistical discussion, Mr. Jungman, but if ever at any

3  point you need to take a break, please don't hesitate to

4  request one.  The only caveat to that I would say is if

5  I've asked a question, I would ask you to answer it

6  before we take the break.

7      A.    Okay.

8      Q.    But free to do so at any time.  I don't, you

9  know, I don't want you sitting there uncomfortably.

10          All right.  Turning sort of to a different

11  topic.  Do you have any personal knowledge about

12  Hurricane Irma hitting -- making landfall in September

13  of 2017 in the Kissimmee area?

14      A.    I'm aware it occurred.

15      Q.    And when you say you're aware that it

16  occurred, what does that mean?

17      A.    Obviously it was a significant event that

18  there were a lot of efforts to, you know, protect the

19  residents on the campus, and a lot of resources that

20  went into that.  I was not personally involved in the --

21  in that process or the subsequent processes.

22      Q.    I see.  When you say significant event, what

23  does that mean?

24          MR. HILL:  Objection.

25      A.    That it required an evacuation of the

1   campus.

2   BY MS. CARDINAL:

3       Q.    Okay.  You said you were not personally

4   involved in any of the recovery efforts?

5       A.    Correct.

6       Q.    Were you involved in any of the discussions

7   about what should or should not happen at the property

8   as a result of Hurricane Irma?

9       A.    No.

10      Q.    Do you recall if there was any discussion

11  about property loss to residents due to flood damage?

12      A.    Not that I was personally involved with.

13      Q.    So, like, maybe through the grapevine you've

14  learned about it?

15      A.    Correct.

16      Q.    Okay.  So 2017, what would your role have

17  been with either Good Samaritan or Sanford at that

18  point?

19      A.    In 2017 I would have been senior corporate

20  counsel with Sanford.

21      Q.    And what was Sanford's relationship to Good

22  Samaritan in 2017?

23      A.    We were unrelated organizations.

24      Q.    Okay.  Can you explain that a little bit to

25  me?  So you were hearing about what was happening at the

1    Kissimmee Village property but Sanford was unrelated to

2    Good Sam?

3         A.    Yeah.  My mistake.  I had the hurricanes

4    confused.

5         Q.    That's okay.

6         A.    Yes.  2017 Hurricane Irma was aware of it,

7    large hurricane, just through the news.  No personal

8    involvement with Good Samaritan or their efforts related

9    to the hurricane.

10        Q.    Got it.  And that -- so that is because

11   Sanford and Good Sam were unrelated at that time?

12        A.    Correct.

13        Q.    Do you know or did you become aware of

14   whether or not Good Sam took any action at Kissimmee

15   Village to protect residents from future flooding?

16             MR. HILL:  Objection.

17        A.    Not that I recall.

18   BY MS. CARDINAL:

19        Q.    Are you aware of any efforts to raise, and I

20   understand that to be sort of a technical term, sort of

21   raise areas of Kissimmee Village to prevent flooding and

22   my understanding is that's like a physical raising of

23   the area?

24        A.    I do recall there being discussion of that

25   being evaluated.  I don't have personal knowledge or

1    personal involvement as to whether or not that occurred.

2         Q.    Do you know as part of those discussions if

3    there were any talks about how that type of work would

4    be funded, where that money would come from?

5         A.    No.

6         Q.    No discussion of grant applications or other

7    resources to try to do something like that?

8         A.    The only specific instance that I recall

9    there being a discussion of is a grant relative to a

10   water treatment plant on the campus.  But not with

11   respect to any of the housing structures.

12        Q.    I see.  And when you say housing structures,

13   I understand that there's different types of housing at

14   Good Sam; is that correct?

15        A.    Correct.

16             MR. HILL:  Objection.

17   BY MS. CARDINAL:

18        Q.    And what's your understanding of the

19   different types of housing at the Good Samaritan

20   property?

21             MR. HILL:  Objection.  Are you talking about

22        Kissimmee Village?  That's really my objection.

23             MS. CARDINAL:  Yes.  Thank you, Gordon.

24   BY MS. CARDINAL:

25        Q.    Kissimmee Village, the Good Samaritan

1   property at Kissimmee Village.  Let me clarify.  These

2   questions are specific to the Kissimmee Village property

3   that we understand is a Good Samaritan property.

4       A.     Yes.  Again, not personally been there, but

5   my understanding is the Kissimmee campus has skilled

6   nursing, assisted living, independent living, and a

7   trailer park.

8       Q.     Okay.  And this may be slightly more

9   technical, but when you say trailer park are we talking

10  like RVs or manufactured homes?

11      A.     I believe they're -- I don't know.

12      Q.     That's fine.

13             Okay.  So earlier I heard you use a term

14  pre-affiliation.   So let's talk a little bit about that.

15  The affiliation, right, what is your understanding today

16  of the current relationship between the entity Good Sam

17  and Sanford?

18      A.     The entity of Good Sam is a subsidiary of

19  Sanford.

20      Q.     Got it.   And what about the relationship

21  between Good Sam and maybe other organizations

22  affiliated or -- I don't want to use that term

23  affiliated, because that's a specific term we're talking

24  about today, but that work with Sanford.   Like Sanford

25  Health which we understand to be an insurance entity.

1  What is the relationship with Good Sam and Sanford

2  Health?

3             MR. HILL:    Object.

4        A.      Sanford Health is not an insurance entity.

5  Sanford Health is a holding company.

6  BY MS. CARDINAL:

7        Q.      Okay.

8        A.      One of its subsidiaries is Sanford Health

9  plan, which is an insurance company.    Good Samaritan

10 has, I would say, minimal connections with the other

11 subsidiaries of Sanford other than through interactions

12 of Good Samaritan's residents, and the rest of the

13 health services and insurance products offered by

14 Sanford.

15       Q.      Okay.    So Sanford Health the holding

16 company, is that also a subsidiary of Sanford?

17       A.      Correct.

18       Q.      And so then your point that Good Sam has

19 minimal contacts with other subsidiaries that would

20 include the Sanford Health holding company?

21       A.      Correct.

22       Q.      Okay.    And so then the subsidiary of the

23 Sanford Health holding company Sanford Health plan is --

24 does Good Sam have a specific relationship to that

25 company?

1    A.    The only relationship would be as a

2  participating provider within Sanford Health plan's

3  network.

4    Q.    You said would be as a participating

5  provider.  Is it your understanding Good Sam is a

6  participating provider of Sanford Health plan?

7    A.    Correct.

8    Q.    Got it.  What is the name that Sanford

9  operates under?

10   A.    Sanford operates under the DBA Sanford

11 Health.

12   Q.    Okay.  But that is separate from the Sanford

13 Health holding company?

14   A.    Correct.

15   Q.    And is there -- so when you say DBA, that's

16 the official doing business as moniker Sanford Health of

17 Sanford?

18   A.    Correct.

19   Q.    And is there any documentation to support

20 that operation as DBA?

21   A.    There would be a number of fictitious name

22 registrations.

23   Q.    Fictitious.  Got it.

24   A.    As well as trademark registrations.

25   Q.    So these would be fictitious name

1  registrations or trademark name registrations specific

2  to the entity Sanford, even though there's a holding

3  company with the same kind of -- so I see you smiling.

4          So I think you're kind of getting ahead of

5  where my question is going.   What's the distinction

6  between those two entities?

7      A.     Right.   Good question.   So Sanford,

8  generally separate from -- the Good Samaritan Society is

9  primarily a hospital and acute care health system.   So

10  Sanford has a number of subsidiaries, dozens, that

11  operate hospitals, clinics, and other acute care health

12  operations primarily in the upper Midwest.   So Sanford

13  is the parent company with a number of subsidiaries that

14  operate those acute care operations in North Dakota,

15  South Dakota, Minnesota, Iowa, the upper Midwest.

16      Q.     Uh-huh.

17      A.     And the brand for aggregated acute care

18  operations is Sanford Health, even though the

19  subsidiaries in Sanford may have a different name to

20  have cohesive branding, the branding is Sanford Health.

21      Q.     Okay.   So I guess that, I mean, that would

22  create a little bit of confusion if there's a legal

23  entity operating under Sanford Health, but then we have

24  a different legal entity using that same brand name.   So

25  which came first?

1        A.        So it's a long story.    Sanford started as

2  Sioux Valley Hospitals and Health Systems.

3        Q.        Uh-huh.

4        A.        That was headquartered to Sioux Falls, South

5  Dakota.    Sioux Valley merged with a health system called

6  Merit Care in North Dakota.    When Merit Care joined, a

7  parent organization was formed, which is now Sanford.

8        Q.        Uh-huh.

9        A.        Shortly thereafter Sanford received a gift

10  from its benefactor, Mr. Benny Sanford, and as part of

11  that gift was -- the system was re-branded as Sanford.

12        Q.        Uh-huh.

13        A.        The -- what was formerly known as Sioux

14  Valley Hospital and Health System, the original entity

15  was renamed Sanford Health.    That is the holding company

16  that is a sister organization to Good Samaritan Society

17  as a direct subsidiary of Sanford.    And underneath

18  Sanford Health are a number of other different

19  subsidiary entities that operate the acute care

20  operations in South Dakota and Southern Minnesota and

21  Iowa.

22        Q.    Thank you for taking the time to explain

23  that.  And so that we are on the same page, the

24  operation that we're talking about here is really

25  Sanford as parent company to the other named Defendant

1    in this matter the Evangelical Lutheran Good Samaritan

2    Society.   I think I messed that up and I apologize.

3    We've been referring to it as Good Sam.

4         A.    Me too.

5         Q.    I don't blame you.   But that's the

6    structure, right, parent and then Good Sam is

7    underneath?

8         A.    Correct.

9         Q.    Got it.   Okay.   And I appreciate that, you

10   taking me through that kind of background, I think that

11   clears up a lot of the questions we had related to those

12   entities.   But I want to go back specifically to the

13   affiliation between Good Sam and Sanford, so the parent

14   company.   Now, have you ever heard about it referred to

15   as a merger?

16        A.    Yes.

17        Q.    Okay.   Is it -- but it sounds like maybe

18   it's not a merger?   Is there a distinction between what

19   actually took place and the term merger?

20        A.    Yes.   What took place was an affiliation.

21        Q.    Okay.

22        A.    Whereby the Good Samaritan Society appointed

23   Sanford as its sole corporate member.

24        Q.    Okay.

25        A.    The term merger affiliation in combination

```
 1    were kind of used interchangeably, just because the

 2    public generally doesn't understand the nuances between

 3    the different legal meanings of those terms.

 4         Q.    Sure.

 5         A.    So what occurred was an affiliation, not a

 6    legal merger.

 7         Q.    Not a legal merger.  Got it.  Do you know

 8    approximately when that affiliation began?

 9         A.    When it closed?  When the discussions began?

10         Q.    Let's start with when the discussions began.

11         A.    The discussions began, I would say, in early

12    2018.  Sometime in Q1, we'll say.

13         Q.    Okay.  And do you have an understanding of

14    sort of what facilitated the bringing of these two

15    parties together to talk about an affiliation or

16    possible relationship?

17         A.    My personal knowledge of it is that it's,

18    you know, both were health systems head quartered in the

19    same city Sioux Falls, South Dakota.  Sanford

20    historically operated hospitals, clinics, Good Samaritan

21    Society historically and continues to operate the entire

22    spectrum of senior services from independent living to

23    assisted living, skilled nursing, home health, hospice,

24    private duty.  That was a set of services that Sanford

25    did not have in a material amount of.  And Sanford's
```

28

1   desire was to be able to bring those services in to its

2   organization to be able to provide a -- coordinate care

3   for a patient that was from birth to death.  And to be

4   able to provide the best care for patients no matter

5   where they're at in their care journey.

6       Q.    Okay.  One thing I wonder, you know, when

7   we're talking about the geography of the entities, South

8   Dakota, North Dakota, Iowa, sort of that middle part of

9   the country, and then we have Florida.  Did Sanford come

10  to Florida?  Was Good Sam already in Florida?  How did

11  we find ourselves doing business in Florida?

12      A.    Good Sam already owned operations in

13  Florida.

14      Q.    Okay.  Prior to 2019?

15      A.    Prior to 2019.

16      Q.    Okay.  So I think you may have touched on

17  some of this, but just to be sure I'm going to pull up

18  another document for us to take a look at?

19           MS. CARDINAL:  That one is sent to you,

20      Mr. Gordon.

21  BY MS. CARDINAL:

22      Q.    And for Mr. Jungman, this is -- let me know

23  if you can see my screen.

24      A.    Yes.

25      Q.    Cool.  Okay.  So this, I think principally,

1    is what we're talking about in terms of the affiliation

2    agreement between the evangelical Lutheran Good

3    Samaritan Society and Sanford, both North Dakota

4    entities.  So can you -- before we get into the

5    document, can you just describe to me in your own words

6    the purpose of this specific agreement, what, you know,

7    what is the intention of this document?

8         A.    The intention of this document was to bring

9    the Good Samaritan Society into the Sanford organization

10   as a subsidiary.

11        Q.    Did you have any role in preparing this

12   agreement?

13        A.    Yes.

14        Q.    And what was that role?

15        A.    I assisted with discussions, drafting,

16   negotiations, and the closing.

17        Q.    Okay.  And how would you describe the

18   obligations of Good Sam under this affiliation

19   agreement?

20        A.    Good Sam's obligations were to amend their

21   articles of incorporation to appoint Sanford as the sole

22   corporate member.  As well as to amend and restate their

23   bylaws to implement a somewhat revised governance

24   structure reflecting being part of a larger

25   organization.

30

1    Q.    Okay.

2    A.    That's the main thing, I would say.

3    Q.    Okay.  And so when you say revise, I don't

4  want to whip through and make everyone motion sick, but

5  I do understand some documents are incorporated into

6  this affiliation agreement and are those the documents

7  that you're referring to, the bylaws and your corporate

8  governance?

9    A.    Correct.

10    Q.    Okay.  Because I do recall, maybe there's a

11  faster way to do this that...

12    A.    I have seen this prior to today.

13    Q.    Thank you.  You sound like you looked at

14  this before.

15          Right.  So kind of walk me through -- so

16  part of the discussion is that Good Sam needs to go

17  through a process of, I heard you say, amending their

18  bylaws and their corporate governance.  So is that

19  something that you kind of -- that you worked with Good

20  Samaritan on in terms of trying to bring into the fold

21  of the Sanford system?

22    A.    Yes.

23    Q.    Okay.  Do you recall what sort of changes

24  needed to be made?

25    A.    Yes.

1      Q.      Were they -- would you describe them ass
2  strictly procedural or were there any substantive
3  changes to the bylaws or corporate governance?
4      A.      There were material changes.
5      Q.      Okay.   What sort of material changes?
6              And I can go to any page if that helps
7  refresh your memory.
8      A.      So the articles of incorporation were
9  amended pre -- maybe, just, for context, preclosing
10  pre-affiliation the Good Samaritan Society had a group
11  of individuals that were the members of the Good
12  Samaritan Society.
13      Q.      Okay.
14      A.      Those individuals were comprised of a number
15  of different roles including senior leadership, former
16  board and current board members, it was a group of about
17  300-some individuals.
18      Q.      Okay.
19      A.      Their role as the membership was to elect
20  directors for the Good Samaritan board of directors.  As
21  part of the affiliation agreement amended and restated
22  articles of incorporation were adapted, which appointed
23  Sanford as the sole corporate member, class A member,
24  and the individuals became the class B members.
25      Q.      Okay.

1          A.      So whereas pre-merger or pre-affiliation

2    what are now class B members would have elected

3    directors.  Post affiliation, the class B members would

4    nominate and recommend directors to be on the Good Sam

5    board.  And then Sanford would approve and confirm those

6    recommendations.  So that's the change to the articles

7    and bylaws.  The Good Sam board remained the fiduciary

8    board of Good Sam, meaning that board was responsible

9    for the oversight and operation of Good Sam.

10          Q.      Uh-huh.

11          A.      Subject to certain reserved powers of

12   Sanford, which are integrated in the bylaws.  And those

13   reserved powers essentially required the approval of

14   Sanford in order for Good Sam to take certain

15   significant actions, such as sale of substantially all

16   of its assets, approval of its annual budget and

17   strategic plan, amendment of its governing documents.

18          Q.      So I would imagine this might be how you

19   found yourself as secretary of the board of directors

20   for Good Sam post affiliation?

21          A.      Yes.  And that was also typically the role

22   of the general counsel of Good Sam.

23          Q.      Oh, okay.  I see.  So class B members can

24   provide board nominations but class A, the corporate

25   member, Sanford, are there any other class A corporate

33

1    members?

2        A.    No.

3        Q.    Okay.  So effectively class A is Sanford and

4    Sanford has the final sort of approval of those

5    nominations?

6        A.    Correct.

7        Q.    Okay.  So in effect this was amending the

8    bylaws and the corporate structure to provide more

9    oversight for Sanford?

10            MR. HILL:  Objection.

11       A.    I don't know if I would say oversight.

12   BY MS. CARDINAL:

13       Q.    Okay.

14       A.    But it would provide -- in the nonprofit

15   world, you don't have stockholders.  So if we compare it

16   to a publicly traded company, you've got stockholders

17   who are the owners of a company along with that, those

18   rights, there's the right to elect directors right to

19   profits share and distributions.  In the nonprofit world

20   you don't have stockholders.  So a member is somewhat

21   equivalent to a stockholder in the fact that it has the

22   ability to appoint the directors.  It does not have the

23   ability to control the organization, other than through

24   its right to appoint directors.

25       Q.    Okay.  That's an interesting comparison,

1    right?  Because, you know, familiarity, somewhat

2    familiar with stockholders and they do have an ownership

3    of the entity that's the purpose.  So does that -- would

4    that translate to Sanford having an ownership entity of

5    Good Sam?

6        A.    Good Sam as a separate legal entity owns all

7    of its assets and revenues.  Sanford does not have,

8    quote, unquote, an equity ownership of Good Samaritan

9    Society.  But, you know, if you ask our auditors Sanford

10   controls Good Sam by virtue of the right to appoint

11   directors.

12       Q.    I see.  And so we've been kind of talking

13   about directors, board of directors, sort of loosely.

14   But is there an amount of directors that they get to

15   appoint or is it the entire board?

16       A.    It's the entire board subject to certain

17   board eligibility criteria that's defined in the bylaws.

18       Q.    I see.  But that would also probably go into

19   their eligibility to even be nominated by the class B

20   members?

21       A.    Correct.

22       Q.    Right.  Okay.  Turning to the other

23   hurricane.  And I'm going to take this document down so

24   we can chat without it in our face s.  Let's talk about

25   Hurricane Ian in September of 2022.

1          Were you personally involved in responding

2    at Kissimmee Village in regard to Hurricane Ian?

3          A.    No.

4          Q.    Okay.  Were you involved in any discussions

5    about the response to Hurricane Ian in '22?

6               MR. HILL:  Objection.

7          A.    Not directly.

8    BY MS. CARDINAL:

9          Q.    Indirectly what were the conversations that

10    you were involved in?

11          A.    I was apprised of, you know, the situation.

12    That's about it.  Just briefings.

13          Q.    Got it.  Do you know who or maybe what roles

14    were involved in the direct response to Hurricane Ian?

15               MR. HILL:  Objection.

16    BY MS. CARDINAL:

17          Q.    At Kissimmee Village.

18          A.    The Good Samaritan Society leadership team

19    called an incident command that included Good Sam's

20    leadership operations teams, emergency preparedness

21    teams.

22          Q.    Okay.  In the briefings that you received,

23    what were the specific acts that Good Samaritan

24    leadership were taking in response to Hurricane Ian?

25          A.    Evacuating the residents.  Making sure

1    everyone was safe.

2         Q.    What about Sanford?

3         A.    Can you clarify?

4         Q.    Sure.  In the briefings that you were

5    receiving, it sounds like Good Sam you were getting

6    updates that Good Sam is evacuating and talking about

7    safety.  What role was Sanford having on the ground at

8    Kissimmee Village, if any?

9         A.    I don't know.

10        Q.    Okay.  Are you familiar with the --

11             MS. CARDINAL:  Oh, and before I ask that, I

12        will just kind of point out for the Court

13        Reporter's sake and everyone on the call.  My

14        colleague John Martino just joined us.  So he is an

15        attorney, Peter, for the Plaintiff, Yolanda

16        Delgado.

17             THE COURT REPORTER:  Thank you.

18             MS. CARDINAL:  You're welcome.  Sorry about

19        that.

20    BY MS. CARDINAL:

21        Q.    So are you familiar with, or a part of those

22    briefings, and discussion about the impact of the storm

23    on the Kissimmee Village campus?

24        A.    To clarify, there weren't formal briefings,

25    so to speak.

1      Q.      Okay.

2      A.      It was more just conversation, hallway

3  discussions, of how's it going down there.

4      Q.      Understood.  And thank you for clarifying.

5              So it wasn't, like, you know, you get a

6  weekly update from a legal team?

7      A.      Correct.

8      Q.      Right.   This was just information you were

9  receiving.   Thank you for clarifying.   So did you

10  receive any information about the impact to the actual

11  campus, the Kissimmee Village campus?

12     A.      Just periodic updates on where water levels

13  are, what damage was looking like, things like that.

14     Q.      When you say water levels, were you told

15  about flooding at the property?

16     A.      Yes.

17     Q.      Do you have any -- did you have or did you

18  receive any information about whether or not the

19  property was going to be habitable as a result of

20  Hurricane Ian?

21     A.      No.

22     Q.      What about any decisions to demolish any of

23  the structures on the Kissimmee Village campus?

24     A.      I was not involved in any of those

25  decisions.

1      Q.      I heard you mention that a Good Samaritan
2  emergency response team was involved in the recovery
3  efforts at the Kissimmee Village campus following
4  Hurricane Ian.   Can you describe what that team is?
5      A.      Just generally, based on my understanding,
6  is that any facility, any campus, there are also
7  policies and procedure needed to be able to deal with
8  natural disasters of this nature.   And there's a team
9  that is responsible for, you know, creating,
10 implementing, and carrying, and executing those
11 procedures.
12     Q.      Okay.   So let me ask you this.   This is
13 occurring in 2022, I understood that the affiliation
14 agreement occurred -- the discussions, at least,
15 occurred beginning in 2018.   So when you're talking
16 about policies and procedures for dealing with natural
17 disasters, are those Sanford policy and procedures that
18 Good Samaritan is now working through or are those Good
19 Samaritan policies?
20     A.      My understanding is they would be Good
21 Samaritan policies.
22     Q.      I've got another document for you so just
23 bear with me.
24             MR. HILL:   Would now be a good time if
25       you're about to pull up another document to take a

```
 1        break?

 2              MS. CARDINAL:  Perfectly fine.  Is that okay

 3        with you Mr. Jungman?

 4              MR. JUNGMAN:  Yes.

 5              MS. CARDINAL:  We'll take a quick break.

 6        I'll pull that up and we can go forward.

 7              (A recess was had.  After which, the

 8    proceedings resumed as follows:)

 9    BY MS. CARDINAL:

10        Q.    Okay.  Mr. Jungman, before the break I was

11    teeing up another document for you to take -- can you

12    see my screen?

13        A.    Yes.

14        Q.    Do you recognize this document?

15        A.    No.

16        Q.    Okay.  So this is termination of occupancy

17    agreement and abandonment of personal property.  Were

18    you aware of this type of document being prepared for

19    residents at Kissimmee Village following Hurricane Ian?

20        A.    Yes.

21        Q.    Okay.  Did you have any involvement in

22    preparing the template of this document?

23        A.    No.

24        Q.    Do you know who might have?

25        A.    The general counsel of Good Samaritan
```

1    Society.

2         Q.    Gotcha.  And I apologize if you told me this

3    before, but can you tell me who the general counsel of

4    Good Samaritan Society would have been in 2022?

5         A.    Michael Rogers, R-O-G-E-R-S.

6         Q.    So when I asked you if you'd seen this

7    document before, is that because it was specific to

8    Ms. Delgado?

9         A.    No.  I've never seen the form.

10        Q.    Okay.  Gotcha.  Understood.  Were you

11   involved in any discussions surrounding the creation of

12   this form?

13        A.    No.

14        Q.    Okay.  And I think you might have answered

15   this for the Hurricane Irma time period, but let me just

16   ask you for this period.  Did you ever visit the

17   Kissimmee Village property during the recovery efforts

18   of Hurricane Ian in 2022?

19        A.    No.

20        Q.    Do you know -- did you receive any

21   information about what the process was for obtaining

22   signatures on these termination of occupancy agreements?

23        A.    No.

24        Q.    Okay.  I'll bring this one down.

25              Do you know if any Sanford companies ever

1  contacted Kissimmee Village residents following

2  Hurricane Ian?

3      A.    I do not, no.

4      Q.    Does Good Samaritan provide professional

5  translation services for residents who made need them?

6      A.    I don't personally know but my understanding

7  is yes.

8      Q.    Does Sanford provide professional

9  translation services for patients who may need them?

10     A.    Yes.

11     Q.    Do you know -- I probably shouldn't have

12 taken that down so soon.  I apologize for that.  But do

13 you know if -- I'll pull it back up really quick just so

14 you can see it.

15         Do you know if this document was ever

16 translated?

17     A.    I do not.

18     Q.    Jumped the gun on that one, but now we can

19 take it down.

20         Do you know what happened to the personal

21 property of residents at the Kissimmee Village property

22 after they signed the termination agreement?

23     A.    I do not.

24     Q.    Do you know if there were residents that

25 chose not to sign the termination agreement?

```
 1        A.    I do not.
 2        Q.    Did you ever have to give anyone specific
 3   instructions related to the termination agreement?
 4        A.    I did not.
 5              MR. HILL:  Objection.
 6   BY MS. CARDINAL:
 7        Q.    Was Sanford involved at all in the
 8   termination agreement, either the creation or execution?
 9        A.    I don't know.  But I do not believe so.
10        Q.    And the general counsel, Mr. Rogers, who was
11   the general counsel of Good Sam; was he only the general
12   counsel of Good Sam, or did he have any position at
13   Sanford?
14        A.    Only the general counsel of Good Sam.
15        Q.    Do you know if residents of the Kissimmee
16   Village had a residents file or any sort of
17   documentation related to their tenancy or residency at
18   Kissimmee Village?
19        A.    I don't personally, but I assume so.
20        Q.    Okay.  Do you know who would have that
21   information?
22              MR. HILL:  Objection.
23        A.    My understanding is resident files are
24   stored in paper records at the local locations.
25   BY MS. CARDINAL:
```

1        Q.     Okay.  You said paper records?

2        A.     That's my understanding.

3        Q.     Okay.

4        A.     Whereas if it was in the skilled nursing

5    facility, there would be an electronic medical record.

6    But my understanding is there's not an electronic record

7    system for senior housing.

8        Q.     Got it.  Do you know what documents would be

9    found in those resident files?

10       A.     No.

11       Q.     And you said they're stored at the location?

12       A.     Yes.

13       Q.     All right.  I've got another document that

14   I'm going to bring up for you.

15              All right.  Let me know when you can see my

16   screen.

17       A.     Yes.

18       Q.     Okay.  So what we're looking at, it's my

19   understanding this an affordable housing -- so assisted

20   living with services affordable housing so it's a sort

21   of multifaceted policy.  It's specifically titled

22   language assistance or assistance for limited English

23   proficient, in parenthesis, LEP person, senior living,

24   and AH.  Okay.  So senior living, is that the

25   independent style living that we've sort of been talking

1    about as one of the types of residents at Kissimmee

2    Village?

3        A.    Housing with services, yes.

4        Q.    Housing with services.  Understood.  So then

5    assisted living would be the traditional kind of nursing

6    home style facility, yes?

7        A.    Assisted living is between independent

8    living and skilled nursing.  Lower level of care, but

9    still a certain level of care provided.

10       Q.    I see.  Okay.  And then affordable housing,

11   what is that in reference to?

12       A.    Affordable housing are residential units

13   that are rented to individuals with low income.  They do

14   not include any medical care services that are offered.

15       Q.    I see.  Is that separate from the trailer

16   park that you described previously?

17       A.    Yes.

18       Q.    All right.  And so language assistance or

19   access, limited English proficient, LEP person.  This is

20   the senior living and AH, affordable housing?  Is that

21   what AH stands for, affordable housing?

22       A.    Correct.

23       Q.    All right.  So establishing where this

24   policy applies I, you know, I do want to just sort of

25   reference here right the scope is for Good Samaritan

1  Society housing with services assisted living and
2  affordable housing.    And, you know, goes through and
3  defines a purpose of the policy different definitions
4  here specifically it says copy right Sanford at the
5  bottom.    So this policy scope is going to apply to Good
6  Samaritan but is copyrighted by Sanford, can you explain
7  that to me?
8        A.      Yes.    So policies are managed throughout our
9  organization including the Good Samaritan Society and
10 the rest of Sanford operations.    Through a centralized
11 policy software called policy tech.    And there's a
12 central team, which is responsible for uploading and
13 managing the policies in that system.    And that Sanford
14 copyright is just part of their way for posting the
15 policies in that software.
16       Q.      So if a policy is housed in, I believe you
17 said policy tech, it's also copyrighted for Sanford?
18       A.      Correct.
19       Q.      But this is a policy at least defined by the
20 scope that applies to Good Samaritan Society housing
21 services assisted living and affordable housing?
22       A.      Correct.
23       Q.      So is it common for Sanford to create
24 policies for Good Samaritan through policy tech?
25              MR. HILL:    Objection.

1    A.      So the -- Sanford doesn't create the

2  policies.

3    Q.      Okay.

4    A.      Good Samaritan creates the policies.

5  Sanford manages the software.   So Shane Knudson, who we

6  referenced earlier, manages the senior housing services

7  line.   Him and his team would have developed the policy,

8  and then they would have sent it to someone within

9  Sanford who is the manager of that policy tech software

10 to upload the policy for use by Good Sam.   And they use

11 a template when they upload it to the system that

12 includes that copyright.

13   Q.      Okay.   So Good Sam creates the policy.

14 Sanford -- when you say managed, what are you -- what do

15 you mean by manage?

16   A.      So puts it in the system and does all the

17 behind the scenes magic to make sure that it's available

18 in the system for everyone to access.

19   Q.     I see.   Okay.   So at what point does that

20 policy become available to other staff?

21   A.     When it's posted.

22   Q.     Okay.   So staff all have access to policy

23 tech?

24   A.     Correct.   And I should also clarify, I

25 believe they also print out binders of policies and

1    procedures for staff that don't have ready access to

2    computers.

3         Q.    Sure.  That's understandable.  So I guess my

4    question kind of goes back to the structure we were

5    talking about before.  So creation of policies, is that

6    part of the duties that remain with Good Sam after the

7    affiliation agreement?

8         A.    Yes.  You can see it at the top box there,

9    formulated by director operation senior living, approved

10   by director of operations senior living.  So that's a

11   Good Sam employee who formulated and approved the

12   policy.  And then they just send it to Sanford to post

13   in policy tech.

14        Q.    And how -- can you tell me how you knew

15   that?  That those were Sanford -- or I'm sorry, not

16   Sanford, Good Sam employees?

17        A.    I believe that's Shane Knudson who we

18   referenced previously.

19        Q.    The director of operations senior living?

20        A.    Right.

21        Q.    Okay.  So I guess my question's maybe a

22   little bit more basic.  If it doesn't list director of

23   operations Good Samaritan, how did you know that it

24   would be Shane Knudson?

25        A.    Just having familiarity with our policy

48

1    procedure.

2         Q.      Uh-huh.

3         A.      It's whoever is -- owns the policy in

4    whichever operating unit it's in is who develops the

5    policy.   There's not a central team of Sanford people

6    that are created policies for business operations that

7    they have no involvement with.

8         Q.      Okay.   So Sanford has no central operations

9    team, and I just want to make sure I heard you

10   correctly.   No central operations team at Sanford to

11   create policies?

12        A.      Correct.

13        Q.      Do they have any oversight or review

14   responsibility for a policy that is created?

15        A.      No.

16        Q.      Okay.   So maybe help me understand that a

17   little bit.   So Sanford as the parent company of the now

18   subsidiary Good Sam, has -- isn't reviewing policies

19   that Good Samaritan is putting in place.   What prevents

20   Good Samaritan from putting a policy in place that's,

21   you know, illegal?

22              MR. HILL:   Objection.

23        A.      Well, I won't speculate as to that.   But for

24   context --

25   BY MS. CARDINAL:

1          Q.      Uh-huh.   That would be great.

2          A.      -- the individuals in this case the director

3     of operations for senior living, is the subject matter

4     expert for senior living, housing with services,

5     assisted living, affordable housing.

6          Q.      Uh-huh.

7          A.      Those -- that subject matter expert is the

8     person that's appropriate to draft, develop, and publish

9     a policy for that specific service line.

10         Q.      Sure.   And that makes sense to me.   I guess

11    what I'm trying to get at, is there any opportunity for

12    Sanford to review these policies and make sure that they

13    are compliant with what the Sanford brand is before

14    they're released to all employees?

15              MR. HILL:   Objection.

16         A.      Maybe restate your question.

17    BY MS. CARDINAL:

18         Q.      Sure.   You know, subject matter expert

19    creates the policy.   Following you there.   Sanford

20    houses the policy in the software policy tech.   And

21    that's when it becomes available to employees.   But what

22    control mechanism is in place to ensure that this policy

23    created by the subject matter expert is compliant with

24    the Sanford brand?

25              MR. HILL:   Objection.

1          A.      There are no formal controls to make sure

2    it's compliant with the Sanford brand.    The policy

3    creator would be obligated and tasked with ensuring that

4    any policies that are published are consistent with law.

5    And they would be required to discuss and/or have it

6    reviewed by counsel, which would be the Good Samaritan

7    counsel, their legal team.

8    BY MS. CARDINAL:

9          Q.     Uh-huh.

10         A.     But Sanford as a whole has tens of thousands

11   of policies.

12         Q.     Uh-huh.

13         A.     So it has to trust its subject matter

14   experts that the policies that they're formulating and

15   implementing are appropriate.

16         Q.    So that's -- so I heard you say implement.

17   So that's the case for the creation of the policy, but

18   that's a similar process for implementation of the

19   policy?

20               MR. HILL:  Objection.

21         A.    Operational implementation, yes.

22   BY MS. CARDINAL:

23         Q.    Okay.  So essentially Sanford may not know

24   if Good Sam is following its own policies?

25               MR. HILL:  Objection.

1          A.    I don't know.

2   BY MS. CARDINAL:

3          Q.    Okay.  Are you aware of any efforts to sell

4   the Kissimmee Village property?

5          A.    Yes.

6          Q.    Is it currently for sale?

7          A.    Yes.

8          Q.    Is it under contract?

9          A.    No.

10         Q.    Do you know if any disclosures have been

11  made about the Kissimmee Village property related to the

12  history of flooding?

13         A.    I do not personally know, but I believe,

14  yes.

15         Q.    Okay.  What about any disclosures related to

16  the property's location in a flood zone?

17         A.    I don't know.

18         Q.    Do you know the demographic make-up of the

19  Good Sam staff?

20         A.    No.

21               MR. HILL:  Objection.

22               MS. CARDINAL:  Sorry.

23  BY MS. CARDINAL:

24         Q.    What about the Sanford staff?

25               MR. HILL:  Objection.

BY MS. CARDINAL:

Q.    Not talking about, like, corporate head
quarters?

A.    No.

MS. CARDINAL:  So Gordon, I think I'm pretty
close to being able to wrap up here.  If it's all
right with you and with Mr. Jungman, if we just
take maybe a five-minute break for me to go through
my notes and get back to you on that.

(A recess was had.  After which, the
proceedings resumed as follows:)

MS. CARDINAL:  I think I have just a couple
more questions and then we can wrap up Mr. Jungman.

BY MS. CARDINAL:

Q.    All right.  Mr. Jungman, just really quick,
are you familiar with the provision of section 83.49 of
Florida statutes requiring written disclosure to all
tenants telling them how their security deposit is going
to be held?

A.    I am not.

Q.    Are you familiar with Florida statute 83.49
subsection 2 subsection D, which requires disclosure of
a security deposit and relevant rules regarding same?

A.    I am not.

Q.    Would you be aware of whether or not any of

1  those disclosures would be made to residents on Florida

2  properties?

3          A.    I am not aware.

4              MS. CARDINAL:  Got it.  Okay.  That wraps it

5          up for me.  Gordon, I don't know if you have

6          anything.

7              MR. HILL:  I don't have any questions.  You

8          know, in terms of reading or waiving, we'll read.

9              MS. CARDINAL:  And we'll take regular

10         deliver of the transcript.

11             MR. HILL:  And we'll take a copy.

12             (Proceedings were concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              ERRATA SHEET

2

3    IN RE:  Yolanda Delgado vs. **Sanford Health, et al.**
     CASE NO:  6:23-CV-1288-RBD-EJK
4    DEPOSITION TAKEN:  February 19, 2025; 10:00 a.m.

5    I, Chad Jungman, do hereby declare that I have read the
     foregoing transcript of my deposition, and that the
6    transcription is in conformity with my testimony with
     the exception of the following corrections, if any:

7
     Page, Line                    REASON FOR CHANGE
8

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21

22

23                                    _____

24                                    **Chad Jungman**

25                                    _____
                                      DATE
                                      NOTARY PUBLIC

```
 1                    SUBSCRIPTION OF DEPONENT

 2

 3    STATE OF FLORIDA

 4    COUNTY OF SEMINOLE

 5

 6

 7

 8           I,_____, DO HEREBY CERTIFY

 9    that I have this day read the foregoing deposition, and

10    do hereby declare that the same is a true and accurate

11    transcript of the proceedings had at the time and place

12    herein designated.

13

14

15           DATED this_____ day of_____, _____.

16

17                    _____

18

19

20

21       Sworn to and subscribed before me this

22    _____day of_____.

23                            _____

24

25
```

```
 1                        CERTIFICATE OF OATH

 2

 3  STATE OF FLORIDA:

 4

 5  COUNTY OF SEMINOLE:

 6

 7

 8      I, Peter Dilworth, certify that **Chad Jungman,**

 9  personally appeared before me and was duly sworn.

10      Witness my hand and official seal this 03/01/2025.

11

14      _____
                Peter Dilworth
15              Stenograph Shorthand Reporter
                NOTARY PUBLIC - STATE OF FLORIDA
16              Commission No: HH 611384
                Commission Expires: December 16, 2028
17

18

19

20

21

22

23

24

25
```

57

1                    CERTIFICATE OF REPORTER

2

3   STATE OF FLORIDA:

4

5   COUNTY OF SEMINOLE:

6

7

8        I, Peter Dilworth, Court Reporter, certify that I
    was authorized to and did report the deposition of
9   **Chad Jungman;** that a review of the transcript was
    requested; and that the transcript is a true and
10  complete record of my stenographic notes.

11       I FURTHER CERTIFY that I am not a relative,
    employee, attorney, or counsel of the parties, nor am I
12  a relative or employer of any of the parties' attorneys
    or counsel connected with the action, nor am I
13  financially interested in the outcome of the action.

14       DATED this 03/01/2025.

15

18       _____
         Peter Dilworth
19       Stenograph Shorthand Reporter

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,                   CASE NO. 6:23-cv-1288-RBD-NWH

vs.

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY,
a foreign not-for-profit corporation,
d/b/a GOOD SAMARITAN
SOCIETY – KISSIMMEE VILLAGE;
SANFORD a/k/a SANFORD HEALTH
a/k/a SANFORD GROUP,

     Defendants.
_____/

<u>JOINTLY PROPOSED VOIR DIRE QUESTIONS</u>

     Plaintiff, Yolanda Delgado ("Plaintiff" or "Ms. Delgado"), and Defendants,

The Evangelical Lutheran Good Samaritan Society and Sanford, by and through

their respective undersigned attorneys, pursuant to the Case Management and

Scheduling Order (CMSO) (ECF 30) and Amended Case Management Order (ECF

44), respectfully provide the below jointly proposed Voir Dire Questions.

     I.       Introductory Questions

1. Have you or someone close to you ever had trouble communicating in English? If so, how did that affect your experience in daily life?

2. Do you speak any language besides English, or have you ever lived or worked in a place where English was not the primary language?

3. Have you ever worked with or lived near someone who spoke limited English? What was that experience like?

II.    Attitudes Toward LEP Individuals

1. Some people believe that people who live in the U.S. should speak English fluently. Others believe language should not be a barrier to equal treatment. Do you have a strong opinion on either viewpoint?

2. Do you think that someone who speaks limited English is less capable of understanding important information or making decisions? Why or why not?

3. The Plaintiff in this case claims she has limited English proficiency. Have you ever felt frustrated when communicating with someone who had limited English skills? Do you believe that you can be fair and impartial towards a person with limited English proficiency?

III.   Knowledge of or Experience with Defendants

1. The Evangelical Lutheran Good Samaritan Society owns and operates a residential community called Kissimmee Village on

Orange Blossom Trail in Kissimmee, Florida. Does anyone currently live there or has anyone lived there in the past?

    i.  If yes, provide dates of residence, circumstances concerning termination of residency, and any personal experience as to whether or not you can be fair and impartial.

2.  Does anyone have a close relative or good friend who lives at Kissimmee Village or has lived there in the past?

    i.  If yes, provide dates of residence, circumstances concerning termination of residency, and any personal experience as to whether or not you can be fair and impartial.

3.  Sanford is a healthcare provider. Has anyone had a previous experience with Sanford? Has anyone had a close relative or good friend who had a previous experience with Sanford?

    i.  If yes, can you tell us the circumstances and whether based on your personal experience with Sanford Health you can be fair and impartial?

4.  Have you, a close relative, or a good friend ever been employed by Good Samaritan Society or Sanford? If yes, please provide the nature of that employment, the circumstances of the ending of that employment, and whether you believe that you could not be fair

3

and impartial either for or against Defendants because of that employment situation.

IV.    Attitudes Toward Christian-based and non-profit organizations

1. The Defendants are Christian-based, non-profit organizations.  Do any of you believe you could not be fair and impartial because a Christian-based organization is a defendant in this case?

2. The Defendants are Lutheran-based, non-profit organizations.  Do any of you believe you could not be fair and impartial because a Lutheran-based  organization is a defendant in this case?

V.    Attitudes Towards Health Care Providers

1. Sanford Health is a healthcare provider. Do any of you believe you could not be fair and impartial because a healthcare provider is a defendant in this case?

VI.    Attitudes Towards Landlords

1. Defendant Good Samaritan Society rented an apartment to the Plaintiff in this case. Does anyone have a prior experience with a landlord such that you believe you could not be fair and impartial towards Good Samaritan Society?

2. Have you or someone close to you (family member or good friend) ever had a dispute with a landlord?

3. Have you or someone close to you (family member or good friend) ever felt mistreated by a landlord?

4. Have you or someone close to you (family member or good friend) ever been evicted from an apartment, condominium, or other residence?

5. What is your understanding of a fiduciary relationship? Do you believe that landlords have a fiduciary relationship with their tenants?

VII.  Views on Fair Housing & Discrimination

1. Have you or someone close to you (family member or good friend) ever been a victim of discrimination on the basis of national origin, race, color, religion, sex/gender, familial status or disability?

2. What does the term 'housing discrimination' mean to you?

3. Have you or someone close to you ever experienced housing discrimination? What happened?

4. Have you or someone close to you (family member or good friend) ever filed a lawsuit, filed an employment discrimination claim, or threatened to file a lawsuit or employment claim for discrimination on the basis of national origin, race, color, religion, sex/gender, familial status or disability? Do you think treating someone

differently because of their English skills could ever be a form of
discrimination? Why or why not?

VIII.   Views on Individuals' National Origin

1.  Have you ever had strong opinions about the role of English in
American society? Would those views affect how you approach this
case?

2.  Do you believe everyone in the U.S., regardless of their background
or language skills, should be treated equally in their housing?

3.  Do you have concerns about people implementing policies on equal
access but not utilizing those policies for everyone? Please explain.

IX.   Exploitation of a Vulnerable Adult

1.  Have you ever heard the term "vulnerable adult"? What does that
mean to you?

2.  Do you believe that people who are elderly, disabled, or have limited
English proficiency need extra protection under the law? Why or why
not?

3.  Florida law defines a "vulnerable adult" as someone over 18 whose
ability to perform the normal activities of daily living or to provide
for his or her own care or protection is impaired due to a mental,
emotional, sensory, long-term physical, or developmental disability

or dysfunction, or brain damage, or the infirmities of aging. Do you
agree with that definition? Do you think it's fair?

4. Do you have any opinion on whether that definition of a "vulnerable
adult," as defined in Florida law, applies only to a permanent status
or whether a person could temporarily qualify under that definition?

5. Have you ever heard the term "exploitation?" What does that term
mean to you? Who or what do you think is capable of exploitation?

X.    Natural Disasters

1. Have you or someone close to you (family member or good friend)
ever had your property or things damaged by a natural disaster?
Hurricane?

2. Have you or someone close to you (family member or good friend)
ever had your property or things damaged because of flooding?

3. Have you or someone close to you (family member or good friend)
ever been displaced from your home due to a natural disaster?

XI.    Contracts

1. Do you believe that, if you sign a contract but you do not read it, you
are not bound by the contract?

2. Do you believe that elderly individuals are generally able to understand the basics of legal documents such as rental contracts, mortgages, and termination of rental contracts?

3. Do you believe that elderly individuals are generally able to sign and be bound by legal documents such as rental contracts, mortgages, and termination of rental contracts?

4. Do you believe that if someone has difficulty understanding English, that they should not be bound by legal documents in English such as rental contracts, mortgages, and terminations of rental contracts?

XII.   Credibility of Witnesses

1. If a witness or party in this case needs an interpreter, would you question their credibility or assume they don't understand what's going on?

2. Would you be able to fairly evaluate someone's testimony if it's presented through an interpreter?

3. Is there anything about a case involving limited English speakers or national origin discrimination that would make it hard for you to be impartial?

XIII.  Miscellaneous

1. Is there anything about the subject matter of this case—national origin, language access, housing discrimination, or exploitation of a vulnerable adult—that makes you feel uncomfortable or unable to serve fairly?

2. Do you have any personal beliefs or life experiences that you think would affect your ability to evaluate the evidence impartially in a case like this?

Page 1

```
 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
 2                  ORLANDO DIVISION
              CASE NO.:  6:23-cv-1288-RBD-EJK
 3

 4    _____

      YOLANDA DELGADO,
 5
           Plaintiff,
 6
      vs.
 7
      THE EVANGELICAL LUTHERAN GOOD
 8    SAMARITAN SOCIETY AND SANFORD HEALTH,
 9         Defendants.
      _____/
10

11       DEPOSITION OF ALEXIS GONZALEZ VALLES, M.D.
12            (Conducted Via Video Conference)
13
              Taken on Behalf of the Defendants
14
15       DATE:       November 12, 2024
16       TIME:       4:05 PM to 4:31 PM
17       PLACE:      Held remotely via Zoom
18       REPORTED BY:  Julie R. B. Agustin, FPR
                       Notary Public - State of Florida
19
20
                 Riesdorph Reporting Group,
21                  A Veritext Company
                 201 East Kennedy Boulevard
22                     Suite 712
                  Tampa, Florida 33602
23
24
                    Pages 1 - 29
25
```

Page 2

```
1              APPEARANCES:
2  FOR PLAINTIFF:
3    NICOLE K. CARRERO, ESQUIRE
     Community Legal Services
4    122 East Colonial Drive
     Suite 200
5    Orlando, Florida 32801
     nicolec@clsmf.org
6
   FOR DEFENDANTS:
7
     S. GORDON HILL, ESQUIRE
8    Hill Ward & Henderson, P.A.
     101 East Kennedy Boulevard
9    Suite 3700
     Tampa, Florida 33602
10   gordon.hill@hwhlaw.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1           I N D E X
2
3  DIRECT EXAMINATION BY MR. HILL        Page 4
4  CERTIFICATE OF OATH              Page 26
5  CERTIFICATE OF REPORTER          Page 27
6  READ & SIGN LETTER              Page 28
7  ERRATA SHEET             Page 29
8
9         E X H I B I T S
10
11 Number      Description    Marked
12 DEFENDANTS EXHIBIT 17            Page 4
   (May 6, 2022 Progress Note)
13
   DEFENDANTS EXHIBIT 18            Page 4
14 (July 6, 2022 Progress Note)
15 DEFENDANTS EXHIBIT 19            Page 4
   (July 27, 2022 Progress Note)
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1      (Defendants' Exhibits 17-19 marked.)
2       THE COURT REPORTER:  Do you swear or affirm
3   the testimony you are about to give will be the
4   truth, the whole truth, and nothing but the truth?
5       THE WITNESS:  Yes, I swear.
6        ALEXIS GONZALEZ VALLES, MD,
7   the witness herein, being first duly sworn on oath
8   remotely, was examined and deposed as follows:
9       MS. CARRERO:  And on behalf of the plaintiff,
10  we object as this deposition is beyond the scope
11  of permissible discovery and our other objections
12  as described in the September 30, 2024, email to
13  defense counsel and subsequent and meet and
14  conferrals.
15      MR. HILL:  Okay.
16          DIRECT EXAMINATION
17  BY MR. HILL:
18  Q.  So, Dr. Gonzalez, I hope you can hear me
19  okay.  My name is Gordon Hill, and I'm an attorney that
20  represents the defendants in this lawsuit.
21      Hopefully this deposition will not take too
22  long today.  I'm going to run through a couple of days
23  of treatment of the plaintiff that you had, and just
24  ask you a couple of questions about that.
25      So before I get started on that, where do you
```

Page 5

```
1  work now?
2   A.  I'm working in Orlando, Osceola County,
3  St. Cloud office.  The county that I work right now,
4  St. Cloud, Osceola County in Florida, yes.
5   Q.  Okay.  And where did you work in the
6  summertime of 2022?  Was it the same place?
7   A.  No.  I was -- for that time I was in Pleasant
8  Hill office around Poinciana County here in Florida
9  also.
10  Q.  Okay.  Was it with the same medical practice,
11  your same employer?
12  A.  Yeah, same company.
13  Q.  Okay.  Briefly walk me through your medical
14  education and training just starting with:  Where did
15  you go to medical school?
16  A.  I went to Dominican Republic, Ivero American
17  University in Santo Domingo in Dominican Republic from
18  2005 to 2010, and I did my transitional year in Puerto
19  Rico -- that's my county -- from 2018 to 2019, my
20  transition residency program.
21  Q.  Okay.  So you did your residency there in
22  Dominican Republic as well --
23  A.  No, no.  The transitional year was in Puerto
24  Rico.
25  Q.  Puerto Rico, I'm sorry.
```

Page 6

1  And did you -- did you have any fellowships
2  that you've done?
3    A.  No.  I'm a primary doctor physician.
4    Q.  Do you have any board certifications?
5    A.  No.
6    Q.  So if you were to describe, what is your
7  basic specialty and what is your basic practice?
8    A.  I'm a general practitioner right now from
9  license in Puerto Rico, accredited here in the State of
10 Florida.  I just take care of primary medicine right
11 now, primary medicine.
12   Q.  Okay.  Do you remember the plaintiff in this
13 case?  Her name is Yolanda Delgado.
14   A.  If I remember -- physically I don't because
15 the last time I saw her was around 2022, so I know --
16 because I have some notes from her, I know I take care
17 of her a few times.  So that's the only thing that I
18 remember right now, is my notes established right here.
19   Q.  Okay.  I'm going to pull up what we'll mark
20 as -- it's already premarked as Exhibit 17 and do a
21 share screen so you can see that.
22       Can you hear me because I can see you're
23 struggling.
24   A.  It's a little bit far away.  It's far away a
25 little bit but --

Page 7

1    Q.  Okay.  I'll get closer to my microphone.
2  Hopefully that helps.
3    A.  No problem.
4    Q.  Can you see the screen now, the document I
5  have pulled up?
6    A.  Yes.
7    Q.  Okay.  So this is page three of what we have
8  marked as Exhibit 17, and I'm going to zoom out a
9  little bit just so you can see it.  It indicates in
10 here the provider is Alexis Gonzalez Valles.  That's
11 you; right?
12   A.  Yes.
13   Q.  Okay.  And the date is -- date of service is
14 May 6, 2022?
15   A.  Yes.
16   Q.  And are you yourself bilingual, speaking
17 Spanish and English?
18   A.  Yes.
19   Q.  Okay.  Do you know if you would have spoken
20 in Spanish to Ms. Delgado?
21   A.  Probably, yes, it was Spanish.
22   Q.  Okay.  So in here it indicates under "chief
23 complaints" that you're conducting an annual health
24 assessment of her as well as a hospital follow-up due
25 to a laceration on her left eye.  Does that help

Page 8

1  refresh your memory as to what was going on that day?
2    A.  The thing that I write right there is the one
3  that I remember because if I state that way, probably
4  was the chief complaint that she established.  For sure
5  I follow up with her that date with -- I follow up with
6  her for that chief complaint for sure.
7    Q.  Okay.  So then I'm going to go down to this
8  section called Mini Mental State Examination, that
9  MMSE.  Tell me just briefly:  What is that MMSE?
10   A.  A Mini Mental State Examination for patient
11 that, of course -- some patient report when they feel
12 depressed, the status -- the condition process of the
13 patient.
14       Most of them is done by the MAs, right, here
15 in the company, the medical assistant, the one that
16 perform those type of Mini State Examination.
17       We have a scale from -- from one, or whatever
18 number it is, in order to deduce or classify the
19 patient condition at the moment of their encounter.
20   Q.  So you're looking at -- among other things,
21 you're looking at whether or not she had depression as
22 well as any cognitive issues?
23   A.  Yeah.
24   Q.  Okay.  And what does that mean, the total
25 score sum score is 30?  Is that passing?

Page 9

1    A.  As I remember -- yes, yes, that -- I mean, if
2  you see the note right there, like I said, that part of
3  the encounter was done by the MA.  In other words, of
4  course I need to review those assessment at the end of
5  the encounter.  But at that level, total score, yes.
6    Q.  Okay.  But a score of 30 is passing those
7  tests; is that right?
8    A.  Yes.
9    Q.  Okay.  And do you have any reason to doubt
10 the information contained in this report is done by
11 your MA?
12   A.  Yes.
13   Q.  Do you have any reason to doubt the accuracy
14 of that information?
15   A.  No.
16   Q.  No, okay.
17       So I'm going to move on to the next page,
18 page -- well, it says page 15 of 137.  It's actually
19 marked Delgado 441 for the record.
20       I'm going to go into the neurologic section.
21 According to that section, just if you can take a
22 second to read it, did Ms. Delgado have any neurologic
23 issues that you're marking down here?
24   A.  Let me see.
25       (Indiscernible) the review of system, what

Page 10

1 else I see, all the -- all the (indiscernible) as you
2 see over there.
3      THE COURT REPORTER:  A little slower, Doctor.
4 All the what that you see over there?
5      THE WITNESS:  The findings in the -- that's
6 the ROS, the review of systems.  All of them I
7 said "denies" over there.
8 BY MR. HILL:
9    Q.   Okay.  So she had no neurologic issues as of
10 that day?
11    A.   At that day -- at that day, the encounter for
12 the May 6, the only one that patient was complaining
13 of, the laceration of the left eye and the diarrhea
14 discussion, and so imaging for diarrhea.  That -- that
15 day she don't complain about any neurologic symptom.
16    Q.   Okay.  And then right below that it has
17 "psychiatric," and in each of those she is indicating
18 "denies" as to all of those.  So did she have any
19 psychiatric issues as of that time?
20    A.   No.  As I remember, everything deny over
21 there is because she don't -- she don't have any past
22 medical history at that moment for psychiatric
23 disorder.
24    Q.   Okay.  I'm going to go to the next page,
25 which was marked as Delgado 432.

Page 11

1    A.   Uh-huh.
2    Q.   And at the top of the page your report and
3 your record says, "General appearance, in no acute
4 distress, well-developed, well-nourished."  What does
5 that mean?
6    A.   No -- no findings in general appearance.
7 What develop is the patient have a good appearance, no
8 acute distress (indiscernible), any heart problem at
9 the moment, and she don't looks (indiscernible).
10      THE COURT REPORTER:  Doctor, you've got to
11 slow down.
12      THE WITNESS:  Sorry.  Sorry.
13      THE COURT REPORTER:  Start again.
14      THE WITNESS:  When I said in the general
15 appearance "no acute distress" is because the
16 patient was not presenting any type of symptoms,
17 for example, respiratory or any heart problems,
18 shortness of breath or something like that.
19      "Well development" is -- mean the patient
20 saying looks healthy at the moment and well
21 nourished is because the patient doesn't look with
22 poor nutrition or something like that.
23 BY MR. HILL:
24    Q.   Okay.  So move down to the neurologic part of
25 that page it says, "nonfocal, motor strength normal

Page 12

1 upper and lower extremities, sensory exam intact."
2 What does that mean?
3    A.   In that -- in that part of the neurologic
4 part, the same.  When I state those, is because the
5 patient don't have -- doesn't have any problem with
6 reflex or his -- or her movement and everything has
7 been stable.  And the assistant told me it's normal
8 from the neurologic symptoms.
9    Q.   Okay.  And then right below that it says --
10 the psych section says, "alert, oriented, cognitive
11 function intact, good eye contact, cooperative with
12 exam."  What does that mean?
13    A.   Totally normal person alert, oriented in
14 place, time and no confusion, she keep eye contact with
15 me, and she was very cooperative with me and answered
16 any type of question that I did.
17    Q.   Okay.  And those are sections, these sections
18 that we just ran through, the general appearance,
19 neurologic, and psych, those are -- those are based on
20 your interactions with her personally; is that right?
21    A.   Uh-huh.
22    Q.   Is that --
23    A.   Yes.
24    Q.   Can you answer yes or no?
25    A.   Yes.  Yes.

Page 13

1    Q.   Okay.  And then down below it, that -- under
2 the assessment part, it shows that, like, the
3 assessment is "depression screening."  Does that just
4 indicate that you gave her that screening?  Is that it?
5    A.   Yes.  That's the test that we do in order to
6 perform the screening test, the question that we did in
7 the previous section.
8    Q.   Okay.  And then Item Number 11 there it says
9 "brain tumor."  It says D49.6.  She never had a brain
10 tumor I don't think, did she?
11    A.   As I remember, because we -- like I said, in
12 this encounter that I did for her, sometime we call
13 brain tumor maybe she have something in the past from
14 other previous PCP and she brought for that time -- she
15 bring other documentation that establish those
16 diagnostic.  And always we have like a backup in the
17 computer in order to diagnose those code.  It doesn't
18 mean that at that moment that I did encounter she was
19 complaining about brain tumor.  Maybe something related
20 to something in the past with a previous doctor in
21 other notes.
22    Q.   Okay.  You don't have any indication in the
23 notes that you reviewed that she had a brain tumor in
24 the summer of 2022; is that right?
25    A.   No.  At that moment that I did encounter,

4 (Pages 10 - 13)

1 just the thing that I state in the notes.

2 Q. Okay. So I'm going to move down to the next
3 page which is Delgado 433, and underneath "preventive
4 medicine," that section, it says, "ADLs scale." What
5 does that mean?

6 A. ADL scale?

7 Q. ADL.

8 A. That's a preventive measure that we always
9 use to acknowledge with the patient in order to follow
10 with the primary doctor, follow the accommodation for
11 our PCP, in case the patient needs something from us,
12 she can contact at any time.

13 But at that moment, that part was also
14 provided by the MA. That's the only information that I
15 have for that right now.

16 Q. Does ADL stand for activities of daily
17 living?

18 A. Yes.

19 Q. Okay. So according to this, she has --
20 Ms. Delgado had no issues with her activities of daily
21 living as of that time; is that right?

22 A. As I state -- as I state over there, yes.

23 Q. Okay. And although you said your MA is the
24 one that did that, you don't have any reason to
25 question or doubt what that -- your document says

1 there, do you?

2 A. No.

3 Q. Okay. I'm going to go through the next
4 exhibit, which is Exhibit 18 --

5 A. Uh-huh.

6 Q. -- starting with Delgado -- Bates labeled
7 Delgado 422.

8 So according to this progress note, you are
9 the provider there for her on that visit which is
10 July 6, 2022; is that correct?

11 A. Yes.

12 Q. Okay. And I'm just going to skip down to the
13 neurologic section there. It says, "dizziness, denies;
14 fainting, denies; headaches, denies." What does that
15 mean?

16 A. At the moment, the patient don't show me or
17 talk to me about anything related to neurologic
18 problem. Like I said, dizziness, she was not
19 complaining about anything related to that part.

20 Q. Okay. And then right underneath that, under
21 "psychiatric," each of those items is denied as well:
22 Anxiety, depressed mood, compulsive appetite, and
23 suicidal thoughts. What does that mean?

24 A. Everything was denied from the patient at
25 the -- at the moment of question related to psychiatric

1 disorder, and she saying no. Everything was denied for
2 her.

3 Q. Okay. Going to do the next page, which is
4 Delgado 423, I'm going to go ahead and ask on the
5 neurologic side similar to what we discussed before.
6 It says, "neurologic: Nonfocal, motor strength normal
7 upper and lower extremities, sensory exam intact."
8 What does that mean?

9 A. The patient -- at that moment if I say
10 everything was normal, the patient doesn't complain
11 about any neurological deficit.

12 Q. Okay. And under the "psych" it says, "also
13 alert, oriented, good eye contact, speech clear." What
14 does that mean?

15 A. Patient was alert in time and place, she made
16 good communication with me, and her speech was clear.

17 Q. Okay. And according to this note, do you see
18 any indication that Ms. Delgado had any cognitive
19 issue?

20 A. No, she don't.

21 Q. I'm going to pull up what we have marked as
22 Exhibit 19, which starts at Delgado 418. And it
23 indicates here you're the provider and the date is July
24 27, 2022. Does that -- is that correct?

25 A. Yes.

1 Q. Do you know if this was the last time that
2 you saw Ms. Delgado?

3 A. I don't -- I don't remember, honestly. If --
4 if this is the last note that we have in file, probably
5 yes.

6 Q. Okay. So in here it shows that you did a
7 depression screening and the total score under the
8 depression screen section was zero. So does that
9 indicate that she had any depression at that time?

10 A. No. She don't have -- if the score is zero,
11 no depression sign like that.

12 Q. Okay. So that's a perfect score?

13 A. It's a perfect score.

14 Q. Okay. I'm going to scroll down still on that
15 same page. At the bottom it says, "psychiatric," and
16 it indicates, "anxiety, denies; depressed mood, denies;
17 loss of appetite, denies; suicidal thoughts, denies."
18 What does that mean?

19 A. Patient deny any type related to psychiatric
20 disorders. Does mean the patient was not having any
21 depressed mood and no suicidal ideas, anything related
22 to psychiatric disorders.

23 Q. Okay. And I'm going to turn -- go to the
24 next page which is marked Delgado 419. Near the bottom
25 of that page under the examination section, similar to

Page 18

1  what we covered before, the neurologic section of that
2  says "nonfocal, motor strength normal upper and lower
3  extremities, sensory exam intact." What does that
4  mean?
5      A. No neurologic deficit at the time.
6      Q. And under the psychiatric section it has
7  "alert, oriented, good eye contact, speech clear."
8  What does that mean?
9      A. Patient was alert all the time, oriented in
10 time and place, she would make good eye contact me, and
11 her speech was clear with me.
12     Q. So according to this medical record, do you
13 see any indication that Ms. Delgado had any cognitive
14 issues at that time?
15     A. Like I state in the notes, nothing.
16     Q. Nothing, okay.
17         So based on the documents that we just ran
18 through that covered May through July of 2022, during
19 that time you never diagnosed Ms. Delgado as having any
20 anxiety or depression or any other emotional,
21 psychological, or psychiatric issues?
22     A. The only diagnose and assessment that I did
23 for those dates is the one that I establish in the --
24 in the notes. Nothing related to neurologic
25 deficits.

Page 19

1      Q. Okay. And did you -- did you see any -- or
2  have any diagnoses for any physical impairments that
3  Ms. Delgado had?
4      A. No. Like I said, I mean, the chief complaint
5  that she bring to our office that day that I saw her is
6  the one that I state in the notes.
7      Q. Okay. So relating to activities of daily
8  living, in the summer of 2022 do you see from your
9  notes any indication that Ms. Delgado was not able to
10 perform the normal activities of daily living?
11     A. No. As I see, all the review system from the
12 neurologic and psychiatric part, everything was denied
13 from herself, so no findings at that moment.
14     Q. Okay. And do you see any indication that
15 Ms. Delgado had a mental, emotional, physical, or
16 developmental disability or dysfunctioning?
17     A. If I don't put it as a diagnose, it's because
18 the patient doesn't have it at the moment.
19     Q. Okay. So you didn't have any diagnoses along
20 those lines; right?
21     A. Uh-huh. Yes.
22     Q. Okay. And do you -- from your notes, do you
23 see any indication that Ms. Delgado was impaired in her
24 ability to provide for her own care and protection?
25     A. If I don't document anything in the

Page 20

1  assessment, like I said, she wasn't having any problem
2  related to that.
3      Q. Okay. And there was no such documentation,
4  so I guess your testimony would be that there was no
5  such impairment; is that correct?
6      A. I'm sorry?
7      Q. So there was no such impairment; is that
8  correct?
9      A. Uh-huh. Nothing.
10     Q. Okay. If you were able to, from July -- this
11 is the last date that you saw her was July 27th of
12 2022, if you were to be able to fast forward to October
13 of 2022, just a few months later, would you expect that
14 Ms. Delgado would have been able to perform the normal
15 activities of daily living at that time?
16         MS. CARRERO: Objection.
17 BY MR. HILL:
18     Q. You can answer.
19     A. For that time, I don't even -- I don't know
20 what to say about that question because I always like
21 to follow my patients constantly, frequent. And the
22 last consult note that I have with her, 2022. I don't
23 know how she's doing after that, after those two years
24 from the last appointment.
25     Q. Well, not two years. Like, two months.

Page 21

1      A. I'm sorry?
2      Q. It's only two months. So your last
3  appointment is July of -- July 27th of 2022. My
4  question goes to what is happening in October of 2022,
5  so just not two years but two months.
6         MS. CARRERO: Objection.
7         THE WITNESS: I would say if she don't ever
8      complain about any physical distress, neurologic
9      symptoms, I would say the same thing that I state
10     in my notes.
11 BY MR. HILL:
12     Q. Okay. Do you know if Ms. Delgado would have
13 had any difficulties or any indication of a mental
14 impairment that would cause her to lack sufficient
15 understanding or capacity to make or communicate
16 decisions regarding herself or any of her property in
17 the summer of 2022 when you saw her?
18     A. Everything was clear, as I state in all the
19 neurologic and psychiatric: Good contact, eye; great
20 and clear speech; alert and oriented. So that's the
21 thing that I document in the file. That is because I
22 see that when I was with her.
23     Q. Okay. So is that your way of answering yes,
24 that there is no -- well, no, there is no indication
25 that Ms. Delgado had a mental impairment that would

6 (Pages 18 - 21)

Page 22

1 cause her to not be able to communicate responsible or
2 make responsible decisions about her person or
3 property?
4      A.   Yes.
5           MS. CARRERO:  Objection.
6 BY MR. HILL:
7      Q.   Would you expect if you were to fast forward
8 just two months later to October of 2022 that you would
9 have the same answer as you just gave for the way she
10 was in the summer of 2022?
11           MS. CARRERO:  Objection.
12           THE WITNESS:  Yes.
13 BY MR. HILL:
14      Q.   The medical records that we just went
15 through, do those medical records reflect statements
16 and information conveyed by Ms. Delgado for the
17 purposes of medical diagnoses and treatment?
18           MS. CARRERO:  Objection.
19 BY MR. HILL:
20      Q.   These medical records that we're showing you,
21 for instance, this Exhibit 19, the statements that she
22 provided that then go into your record, those records
23 reflect statements made by her that were done for the
24 purpose of you giving her medical diagnoses and
25 possible treatment; is that right?

Page 23

1           THE WITNESS:  Yes.
2           MS. CARRERO:  Objection.
3 BY MR. HILL:
4      Q.   And when you're doing these records that
5 we've covered, Exhibit 17, 18, and 19, the medical
6 records we covered, those three, those records are made
7 or prepared at or near the time of your visit with
8 Ms. Delgado; right?
9           MS. CARRERO:  Objection.
10           THE WITNESS:  That was at the moment that I
11 interview her.
12 BY MR. HILL:
13      Q.   Okay.  And creating records like these, these
14 progress notes and initial healthcare assessments, that
15 is a regular part of your medical practice; is that
16 right?
17      A.   Yes.
18      Q.   And then maintaining those records accurately
19 is also a regular part of your medical practice; is
20 that correct?
21      A.   Yes.
22      Q.   Has the testimony you've provided today been
23 based upon a reasonable degree of medical probability?
24           MS. CARRERO:  Objection.
25           THE WITNESS:  What was the question?

Page 24

1 BY MR. HILL:
2      Q.   So has the testimony you've given today, as
3 we've walked through your medical records, the
4 statements that you've made in testifying today, has
5 that been based on a reasonable degree of medical
6 probability?
7      A.   Yes.
8           MS. CARRERO:  Objection.
9           MR. HILL:  And that's all the questions I
10 have.
11           MS. CARRERO:  No questions.
12           MR. HILL:  Okay.
13           THE COURT REPORTER:  Does someone want to
14 explain read or waive?
15           MR. HILL:  So, Doctor, you have the ability
16 to review the deposition transcript to make sure
17 that everything is accurate and translated
18 accurately --
19           THE WITNESS:  Yes.
20           MR. HILL:  -- so you can waive your right to
21 read that and just trust that Ms. Agustin got
22 everything correct.
23           THE WITNESS:  Yes.
24           MR. HILL:  Do you want a chance to read it
25 and make corrections if necessary?

Page 25

1           THE WITNESS:  I can do that.
2           MR. HILL:  Okay.  All right.  We'll do that.
3 And we'll go ahead and order the deposition.
4           THE COURT REPORTER:  Okay.  Copy for you?
5           MS. CARRERO:  We'll let you know.
6           (Deposition concluded at 4:31 PM)

7 (Pages 22 - 25)

Page 26

1        CERTIFICATE OF OATH
         (VIDEOCONFERENCE PROCEEDINGS)
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5
6      I, JULIE R. B. AGUSTIN, FPR, Shorthand Reporter and
7  Notary Public, State of Florida, certify that ALEXIS
8  GONZALEZ VALLES, M.D., appeared before me via
9  videoconference and was duly sworn on November 12, 2024
10 per AOSC20-23.
11
12
13     WITNESS my hand and official seal this date:
14 November 12, 2024.
15
16
17
18     JULIE R. B. AGUSTIN, FPR
       Notary Public - State of Florida
19     My Commission Expires 1/24/2027
       Commission No. HH317674
20
21
22
   Personally known _____
23 Produced Identification   X
   Type of Identification Produced  Driver's License
24
25

---

Page 27

1        CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA
4  COUNTY OF HILLSBOROUGH
5
6      I, JULIE R. B. AGUSTIN, certify that I was
7  authorized to and did stenographically report the
8  foregoing deposition remotely; that a review of the
9  transcript was requested; and that the transcript is a
10 true record of the testimony given by the witness.
11
12     I further certify that I am not a relative,
13 employee, attorney, or counsel of any of the parties,
14 nor am I a relative or employee of any of the parties'
15 attorney or counsel connected with the action, nor am I
16 financially interested in the action.
17
       Dated:  November 24, 2024.
18
19
20
21     _____
       JULIE R. B. AGUSTIN, FPR
22
23
24
25

---

Page 28

1        READ & SIGN LETTER
2  ALEXIS GONZALEZ VALLES, M.D.
   Orlando Family Practice, CT Corporation System
3  1200 South Pine Island Road
   Plantation, Florida 33324
4
   NOVEMBER 25, 2024
5
   RE:    YOLANDA DELGADO VERSUS THE EVANGELICAL LUTHERAN
6          GOOD SAMARITAN SOCIETY AND SANFORD HEALTH
7          NOVEMBER 12, 2024/ALEXIS GONZALEZ VALLES,
          M.D./JOB NO. 7018158
8
       The above-referenced transcript is available
9  for review.  You should read the testimony to
10 verify its accuracy.  If there are any changes,
11 You should note those with the reason
12 on the attached Errata Sheet.
13     You should, please, date and sign the
14 Errata Sheet and email to the deposing attorney as well
15 as to Veritext at Transcripts-fl@veritext.com and
16 copies will be emailed to all ordering parties.
17     It is suggested that the completed errata be
18 returned 30 days from receipt of testimony, as
19 considered reasonable under Federal rules*, however,
20 there is no Florida statute to this regard.
21     If you fail to do so, the transcript
22 may be used as if signed.
23     Yours, Veritext Legal Solutions
24
25 *Federal Civil Procedure Rule 30(e)/Florida Civil
   Procedure Rule 1.310(e).

---

Page 29

1        ERRATA SHEET
2  YOLANDA DELGADO VERSUS THE EVANGELICAL LUTHERAN GOOD
   SAMARITAN SOCIETY AND SANFORD HEALTH
3
   NOVEMBER 12, 2024/ALEXIS GONZALEZ VALLES, M.D.
4  JOB# 7018158
5  PAGE_____ LINE_____ CHANGE_____
6  _____
7  REASON_____
8  PAGE_____ LINE_____ CHANGE_____
9  _____
10 REASON_____
11 PAGE_____ LINE_____ CHANGE_____
12 _____
13 REASON_____
14 PAGE_____ LINE_____ CHANGE_____
15 _____
16 REASON_____
17 PAGE_____ LINE_____ CHANGE_____
18 _____
19 REASON_____
20
21 Under penalties of perjury, I declare that I have
22 read the foregoing document and that the facts stated
23 in it are true.
24 _____  _____
25 ALEXIS GONZALEZ VALLES, M.D.      DATE

8 (Pages 26 - 29)

## &

**&** 2:8 3:6 28:1

## 1

**1** 1:24
**1.310** 28:25
**1/24/2027** 26:19
**101** 2:8
**11** 13:8
**12** 1:15 26:9,14
28:7 29:3
**1200** 28:3
**122** 2:4
**1288** 1:2
**137** 9:18
**15** 9:18
**17** 3:12 6:20 7:8
23:5
**17-19** 4:1
**18** 3:13 15:4
23:5
**19** 3:15 16:22
22:21 23:5

## 2

**200** 2:4
**2005** 5:18
**201** 1:21
**2010** 5:18
**2018** 5:19
**2019** 5:19
**2022** 3:12,14,15
5:6 6:15 7:14
13:24 15:10
16:24 18:18
19:8 20:12,13

20:22 21:3,4,17
22:8,10
**2024** 1:15 4:12
26:9,14 27:17
28:4,7 29:3
**24** 27:17
**24979** 26:17
27:20
**25** 28:4
**26** 3:4
**27** 3:5,15 16:24
**27th** 20:11 21:3
**28** 3:6
**29** 1:24 3:7

## 3

**30** 4:12 8:25 9:6
28:18,24
**32801** 2:5
**33324** 28:3
**33602** 1:22 2:9
**3700** 2:9

## 4

**4** 3:3,12,13,15
**418** 16:22
**419** 17:24
**422** 15:7
**423** 16:4
**432** 10:25
**433** 14:3
**441** 9:19
**4:05** 1:16
**4:31** 1:16 25:6

## 6

**6** 3:12,14 7:14
10:12 15:10
**6:23** 1:2

## 7

**7018158** 28:7
29:4
**712** 1:22

## a

**ability** 19:24
24:15
**able** 19:9 20:10
20:12,14 22:1
**above** 28:8
**accommodation**
14:10
**accredited** 6:9
**accuracy** 9:13
28:10
**accurate** 24:17
**accurately**
23:18 24:18
**acknowledge**
14:9
**action** 27:15,16
**activities** 14:16
14:20 19:7,10
20:15
**actually** 9:18
**acute** 11:3,8,15
**adl** 14:6,7,16
**adls** 14:4
**affirm** 4:2

**agustin** 1:18
24:21 26:6,18
27:6,21
**ahead** 16:4 25:3
**alert** 12:10,13
16:13,15 18:7,9
21:20
**alexis** 1:11 4:6
7:10 26:7 28:2,7
29:3,25
**american** 5:16
**annual** 7:23
**answer** 12:24
20:18 22:9
**answered** 12:15
**answering**
21:23
**anxiety** 15:22
17:16 18:20
**aosc20-23** 26:10
**appearance**
11:3,6,7,15
12:18
**appearances** 2:1
**appeared** 26:8
**appetite** 15:22
17:17
**appointment**
20:24 21:3
**assessment** 7:24
9:4 13:2,3 18:22
20:1
**assessments**
23:14

**assistant** 8:15
12:7
**attached** 28:12
**attorney** 4:19
27:13,15 28:14
**authorized** 27:7
**available** 28:8

**b**

**b** 1:18 3:9 26:6
26:18 27:6,21
**backup** 13:16
**based** 12:19
18:17 23:23
24:5
**basic** 6:7,7
**bates** 15:6
**behalf** 1:13 4:9
**beyond** 4:10
**bilingual** 7:16
**bit** 6:24,25 7:9
**board** 6:4
**bottom** 17:15,24
**boulevard** 1:21
2:8
**brain** 13:9,9,13
13:19,23
**breath** 11:18
**briefly** 5:13 8:9
**bring** 13:15
19:5
**brought** 13:14

**c**

**call** 13:12

**called** 8:8
**capacity** 21:15
**care** 6:10,16
19:24
**carrero** 2:3 4:9
20:16 21:6 22:5
22:11,18 23:2,9
23:24 24:8,11
25:5
**case** 1:2 6:13
14:11
**cause** 21:14
22:1
**certificate** 3:4,5
26:1 27:1
**certifications**
6:4
**certify** 26:7 27:6
27:12
**chance** 24:24
**change** 29:5,8
29:11,14,17
**changes** 28:10
**chief** 7:22 8:4,6
19:4
**civil** 28:24,24
**classify** 8:18
**clear** 16:13,16
18:7,11 21:18
21:20
**closer** 7:1
**cloud** 5:3,4
**clsmf.org** 2:5
**code** 13:17

**cognitive** 8:22
12:10 16:18
18:13
**colonial** 2:4
**commission**
26:19,19
**communicate**
21:15 22:1
**communication**
16:16
**community** 2:3
**company** 1:21
5:12 8:15
**complain** 10:15
16:10 21:8
**complaining**
10:12 13:19
15:19
**complaint** 8:4,6
19:4
**complaints** 7:23
**completed**
28:17
**compulsive**
15:22
**computer** 13:17
**concluded** 25:6
**condition** 8:12
8:19
**conducted** 1:12
**conducting** 7:23
**conference** 1:12
**conferrals** 4:14
**confusion** 12:14

**connected** 27:15
**considered**
28:19
**constantly**
20:21
**consult** 20:22
**contact** 12:11
12:14 14:12
16:13 18:7,10
21:19
**contained** 9:10
**conveyed** 22:16
**cooperative**
12:11,15
**copies** 28:16
**copy** 25:4
**corporation**
28:2
**correct** 15:10
16:24 20:5,8
23:20 24:22
**corrections**
24:25
**counsel** 4:13
27:13,15
**county** 5:2,3,4,8
5:19 26:4 27:4
**couple** 4:22,24
**course** 8:11 9:4
**court** 1:1 4:2
10:3 11:10,13
24:13 25:4
**covered** 18:1,18
23:5,6

**creating** 23:13
**ct** 28:2
**cv** 1:2

**d**

**d** 3:1
**d49.6.** 13:9
**daily** 14:16,20
  19:7,10 20:15
**date** 1:15 7:13
  7:13 8:5 16:23
  20:11 26:13
  28:13 29:25
**dated** 27:17
**dates** 18:23
**day** 8:1 10:10
  10:11,11,15
  19:5
**days** 4:22 28:18
**decisions** 21:16
  22:2
**declare** 29:21
**deduce** 8:18
**defendants** 1:9
  1:13 2:6 3:12,13
  3:15 4:1,20
**defense** 4:13
**deficit** 16:11
  18:5
**deficits** 18:25
**degree** 23:23
  24:5
**delgado** 1:4
  6:13 7:20 9:19
  9:22 10:25 14:3
  14:20 15:6,7

16:4,18,22 17:2
  17:24 18:13,19
  19:3,9,15,23
  20:14 21:12,25
  22:16 23:8 28:5
  29:2
**denied** 15:21,24
  16:1 19:12
**denies** 10:7,18
  15:13,14,14
  17:16,16,17,17
**deny** 10:20
  17:19
**deposed** 4:8
**deposing** 28:14
**deposition** 1:11
  4:10,21 24:16
  25:3,6 27:8
**depressed** 8:12
  15:22 17:16,21
**depression** 8:21
  13:3 17:7,8,9,11
  18:20
**describe** 6:6
**described** 4:12
**description** 3:11
**develop** 11:7
**developed** 11:4
**development**
  11:19
**developmental**
  19:16
**diagnose** 13:17
  18:22 19:17

**diagnosed** 18:19
**diagnoses** 19:2
  19:19 22:17,24
**diagnostic**
  13:16
**diarrhea** 10:13
  10:14
**difficulties**
  21:13
**direct** 3:3 4:16
**disability** 19:16
**discovery** 4:11
**discussed** 16:5
**discussion**
  10:14
**disorder** 10:23
  16:1
**disorders** 17:20
  17:22
**distress** 11:4,8
  11:15 21:8
**district** 1:1,1
**division** 1:2
**dizziness** 15:13
  15:18
**doctor** 6:3 10:3
  11:10 13:20
  14:10 24:15
**document** 7:4
  14:25 19:25
  21:21 29:22
**documentation**
  13:15 20:3
**documents**
  18:17

**doing** 20:23
  23:4
**domingo** 5:17
**dominican** 5:16
  5:17,22
**doubt** 9:9,13
  14:25
**dr** 4:18
**drive** 2:4
**driver's** 26:23
**due** 7:24
**duly** 4:7 26:9
**dysfunctioning**
  19:16

**e**

**e** 3:1,9 28:24,25
**east** 1:21 2:4,8
**education** 5:14
**ejk** 1:2
**email** 4:12
  28:14
**emailed** 28:16
**emotional** 18:20
  19:15
**employee** 27:13
  27:14
**employer** 5:11
**encounter** 8:19
  9:3,5 10:11
  13:12,18,25
**english** 7:17
**errata** 3:7 28:12
  28:14,17 29:1
**esquire** 2:3,7

establish  13:15
  18:23
established  6:18
  8:4
evangelical  1:7
  28:5 29:2
exam  12:1,12
  16:7 18:3
examination  3:3
  4:16 8:8,10,16
  17:25
examined  4:8
example  11:17
exhibit  3:12,13
  3:15 6:20 7:8
  15:4,4 16:22
  22:21 23:5
exhibits  4:1
expect  20:13
  22:7
expires  26:19
explain  24:14
extremities  12:1
  16:7 18:3
eye  7:25 10:13
  12:11,14 16:13
  18:7,10 21:19

**f**

facts  29:22
fail  28:21
fainting  15:14
family  28:2
far  6:24,24
fast  20:12 22:7

federal  28:19,24
feel  8:11
fellowships  6:1
file  17:4 21:21
financially
  27:16
findings  10:5
  11:6 19:13
first  4:7
fl  28:15
florida  1:1,18
  1:22 2:5,9 5:4,8
  6:10 26:3,7,18
  27:3 28:3,20,24
follow  7:24 8:5
  8:5 14:9,10
  20:21
follows  4:8
foregoing  27:8
  29:22
forward  20:12
  22:7
fpr  1:18 26:6,18
  27:21
frequent  20:21
function  12:11
further  27:12

**g**

general  6:8 11:3
  11:6,14 12:18
give  4:3
given  24:2 27:10
giving  22:24
go  5:15 8:7 9:20
  10:24 15:3 16:4

17:23 22:22
  25:3
goes  21:4
going  4:22 6:19
  7:8 8:1,7 9:17
  9:20 10:24 14:2
  15:3,12 16:3,4
  16:21 17:14,23
gonzalez  1:11
  4:6,18 7:10 26:8
  28:2,7 29:3,25
good  1:7 11:7
  12:11 16:13,16
  18:7,10 21:19
  28:6 29:2
gordon  2:7 4:19
gordon.hill  2:10
great  21:19
group  1:20
guess  20:4

**h**

h  3:9
hand  26:13
happening  21:4
headaches
  15:14
health  1:8 7:23
  28:6 29:2
healthcare
  23:14
healthy  11:20
hear  4:18 6:22
heart  11:8,17
held  1:17

help  7:25
helps  7:2
henderson  2:8
hh317674  26:19
hill  2:7,8 3:3
  4:15,17,19 5:8
  10:8 11:23
  20:17 21:11
  22:6,13,19 23:3
  23:12 24:1,9,12
  24:15,20,24
  25:2
hillsborough
  26:4 27:4
history  10:22
honestly  17:3
hope  4:18
hopefully  4:21
  7:2
hospital  7:24
huh  11:1 12:21
  15:5 19:21 20:9
hwhlaw.com
  2:10

**i**

ideas  17:21
identification
  26:23,23
imaging  10:14
impaired  19:23
impairment
  20:5,7 21:14,25
impairments
  19:2

**indicate**   13:4 17:9
**indicates**   7:9,22 16:23 17:16
**indicating**   10:17
**indication**   13:22 16:18 18:13 19:9,14,23 21:13,24
**indiscernible**   9:25 10:1 11:8,9
**information**   9:10,14 14:14 22:16
**initial**   23:14
**instance**   22:21
**intact**   12:1,11 16:7 18:3
**interactions**   12:20
**interested**   27:16
**interview**   23:11
**island**   28:3
**issue**   16:19
**issues**   8:22 9:23 10:9,19 14:20 18:14,21
**item**   13:8
**items**   15:21
**ivero**   5:16

**j**

**job**   28:7 29:4
**julie**   1:18 26:6 26:18 27:6,21

**july**   3:14,15 15:10 16:23 18:18 20:10,11 21:3,3

**k**

**k**   2:3
**keep**   12:14
**kennedy**   1:21 2:8
**know**   6:15,16 7:19 17:1 20:19 20:23 21:12 25:5
**known**   26:22

**l**

**labeled**   15:6
**laceration**   7:25 10:13
**lack**   21:14
**lawsuit**   4:20
**left**   7:25 10:13
**legal**   2:3 28:23
**letter**   3:6 28:1
**level**   9:5
**license**   6:9 26:23
**line**   29:5,8,11,14 29:17
**lines**   19:20
**little**   6:24,25 7:9 10:3
**living**   14:17,21 19:8,10 20:15

**long**   4:22
**look**   11:21
**looking**   8:20,21
**looks**   11:9,20
**loss**   17:17
**lower**   12:1 16:7 18:2
**lutheran**   1:7 28:5 29:2

**m**

**m.d.**   1:11 26:8 28:2,7 29:3,25
**ma**   9:3,11 14:14 14:23
**made**   16:15 22:23 23:6 24:4
**maintaining**   23:18
**make**   18:10 21:15 22:2 24:16,25
**mark**   6:19
**marked**   3:11 4:1 7:8 9:19 10:25 16:21 17:24
**marking**   9:23
**mas**   8:14
**md**   4:6
**mean**   8:24 9:1 11:5,19 12:2,12 13:18 14:5 15:15,23 16:8 16:14 17:18,20 18:4,8 19:4

**measure**   14:8
**medical**   5:10,13 5:15 8:15 10:22 18:12 22:14,15 22:17,20,24 23:5,15,19,23 24:3,5
**medicine**   6:10 6:11 14:4
**meet**   4:13
**memory**   8:1
**mental**   8:8,10 19:15 21:13,25
**microphone**   7:1
**middle**   1:1
**mini**   8:8,10,16
**mmse**   8:9,9
**moment**   8:19 10:22 11:9,20 13:18,25 14:13 15:16,25 16:9 19:13,18 23:10
**months**   20:13 20:25 21:2,5 22:8
**mood**   15:22 17:16,21
**motor**   11:25 16:6 18:2
**move**   9:17 11:24 14:2
**movement**   12:6

| n | | | |
|---|---|---|---|
| **n**  3:1 | 23:14 | 21:23 23:13 | 15:16,24 16:9 |
| **name**  4:19 6:13 | **nourished**  11:4 | 24:12 25:2,4 | 16:10,15 17:19 |
| **near**  17:24 23:7 | 11:21 | **order**  8:18 13:5 | 17:20 18:9 |
| **necessary**  24:25 | **november**  1:15 | 13:17 14:9 25:3 | 19:18 |
| **need**  9:4 | 26:9,14 27:17 | **ordering**  28:16 | **patients**  20:21 |
| **needs**  14:11 | 28:4,7 29:3 | **oriented**  12:10 | **pcp**  13:14 14:11 |
| **neurologic**  9:20 | **number**  3:11 | 12:13 16:13 | **penalties**  29:21 |
| 9:22 10:9,15 | 8:18 13:8 | 18:7,9 21:20 | **perfect**  17:12,13 |
| 11:24 12:3,8,19 | **nutrition**  11:22 | **orlando**  1:2 2:5 | **perform**  8:16 |
| 15:13,17 16:5,6 | | 5:2 28:2 | 13:6 19:10 |
| 18:1,5 19:12 | **o** | **osceola**  5:2,4 | 20:14 |
| 21:8,19 | **oath**  3:4 4:7 | **own**  19:24 | **perjury**  29:21 |
| **neurological** | 26:1 | | **permissible** |
| 16:11 18:24 | **object**  4:10 | **p** | 4:11 |
| **never**  13:9 | **objection**  20:16 | **p.a.**  2:8 | **person**  12:13 |
| 18:19 | 21:6 22:5,11,18 | **page**  3:3,4,5,6,7 | 22:2 |
| **nicole**  2:3 | 23:2,9,24 24:8 | 3:12,13,15 7:7 | **personally** |
| **nicolec**  2:5 | **objections**  4:11 | 9:17,18,18 | 12:20 26:22 |
| **nonfocal**  11:25 | **october**  20:12 | 10:24 11:2,25 | **physical**  19:2,15 |
| 16:6 18:2 | 21:4 22:8 | 14:3 16:3 17:15 | 21:8 |
| **normal**  11:25 | **office**  5:3,8 19:5 | 17:24,25 29:5,8 | **physically**  6:14 |
| 12:7,13 16:6,10 | **official**  26:13 | 29:11,14,17 | **physician**  6:3 |
| 18:2 19:10 | **okay**  4:15,19 | **pages**  1:24 | **pine**  28:3 |
| 20:14 | 5:5,10,13,21 | **part**  9:2 11:24 | **place**  1:17 5:6 |
| **notary**  1:18 | 6:12,19 7:1,7,13 | 12:3,4 13:2 | 12:14 16:15 |
| 26:7,18 | 7:19,22 8:7,24 | 14:13 15:19 | 18:10 |
| **note**  3:12,14,15 | 9:6,9,16 10:9,16 | 19:12 23:15,19 | **plaintiff**  1:5 2:2 |
| 9:2 15:8 16:17 | 10:24 11:24 | **parties**  27:13,14 | 4:9,23 6:12 |
| 17:4 20:22 | 12:9,17 13:1,8 | 28:16 | **plantation**  28:3 |
| 28:11 | 13:22 14:2,19 | **passing**  8:25 9:6 | **pleasant**  5:7 |
| **notes**  6:16,18 | 14:23 15:3,12 | **past**  10:21 13:13 | **please**  28:13 |
| 13:21,23 14:1 | 15:20 16:3,12 | 13:20 | **pm**  1:16,16 25:6 |
| 18:15,24 19:6,9 | 16:17 17:6,12 | **patient**  8:10,11 | **poinciana**  5:8 |
| 19:22 21:10 | 17:14,23 18:16 | 8:13,19 10:12 | **poor**  11:22 |
| | 19:1,7,14,19,22 | 11:7,16,19,21 | |
| | 20:3,10 21:12 | 12:5 14:9,11 | |

**[possible - rico]**                                                                      Page 36

**possible**  22:25
**practice**  5:10
  6:7 23:15,19
  28:2
**practitioner**  6:8
**premarked**  6:20
**prepared**  23:7
**presenting**
  11:16
**preventive**  14:3
  14:8
**previous**  13:7
  13:14,20
**primary**  6:3,10
  6:11 14:10
**probability**
  23:23 24:6
**probably**  7:21
  8:3 17:4
**problem**  7:3
  11:8 12:5 15:18
  20:1
**problems**  11:17
**procedure**
  28:24,25
**proceedings**
  26:1
**process**  8:12
**produced**  26:23
  26:23
**program**  5:20
**progress**  3:12
  3:14,15 15:8
  23:14

**property**  21:16
  22:3
**protection**
  19:24
**provide**  19:24
**provided**  14:14
  22:22 23:22
**provider**  7:10
  15:9 16:23
**psych**  12:10,19
  16:12
**psychiatric**
  10:17,19,22
  15:21,25 17:15
  17:19,22 18:6
  18:21 19:12
  21:19
**psychological**
  18:21
**public**  1:18 26:7
  26:18
**puerto**  5:18,23
  5:25 6:9
**pull**  6:19 16:21
**pulled**  7:5
**purpose**  22:24
**purposes**  22:17
**put**  19:17

**q**

**question**  12:16
  13:6 14:25
  15:25 20:20
  21:4 23:25
**questions**  4:24
  24:9,11

**r**

**r**  1:18 26:6,18
  27:6,21
**ran**  12:18 18:17
**rbd**  1:2
**read**  3:6 9:22
  24:14,21,24
  28:1,9 29:22
**reason**  9:9,13
  14:24 28:11
  29:7,10,13,16
  29:19
**reasonable**
  23:23 24:5
  28:19
**receipt**  28:18
**record**  9:19
  11:3 18:12
  22:22 27:10
**records**  22:14
  22:15,20,22
  23:4,6,6,13,18
  24:3
**referenced**  28:8
**reflect**  22:15,23
**reflex**  12:6
**refresh**  8:1
**regard**  28:20
**regarding**  21:16
**regular**  23:15
  23:19
**related**  13:19
  15:17,19,25
  17:19,21 18:24
  20:2

**relating**  19:7
**relative**  27:12
  27:14
**remember**  6:12
  6:14,18 8:3 9:1
  10:20 13:11
  17:3
**remotely**  1:17
  4:8 27:8
**report**  8:11 9:10
  11:2 27:7
**reported**  1:18
**reporter**  3:5 4:2
  10:3 11:10,13
  24:13 25:4 26:6
  27:1
**reporting**  1:20
**represents**  4:20
**republic**  5:16,17
  5:22
**requested**  27:9
**residency**  5:20
  5:21
**respiratory**
  11:17
**responsible**
  22:1,2
**returned**  28:18
**review**  9:4,25
  10:6 19:11
  24:16 27:8 28:9
**reviewed**  13:23
**rico**  5:19,24,25
  6:9

**[riesdorph - system]**                                                Page 37

**riesdorph**  1:20
**right**  5:3 6:8,10
    6:18,18 7:11 8:2
    8:14 9:2,7 10:16
    12:9,20 13:24
    14:15,21 15:20
    19:20 22:25
    23:8,16 24:20
    25:2
**road**  28:3
**ros**  10:6
**rule**  28:24,25
**rules**  28:19
**run**  4:22

**s**

**s**  2:7 3:9
**samaritan**  1:8
    28:6 29:2
**sanford**  1:8 28:6
    29:2
**santo**  5:17
**saw**  6:15 17:2
    19:5 20:11
    21:17
**saying**  11:20
    16:1
**says**  9:18 11:3
    11:25 12:9,10
    13:8,9 14:4,25
    15:13 16:6,12
    17:15 18:2
**scale**  8:17 14:4
    14:6
**school**  5:15

**scope**  4:10
**score**  8:25,25
    9:5,6 17:7,10,12
    17:13
**screen**  6:21 7:4
    17:8
**screening**  13:3,4
    13:6 17:7
**scroll**  17:14
**seal**  26:13
**second**  9:22
**section**  8:8 9:20
    9:21 12:10 13:7
    14:4 15:13 17:8
    17:25 18:1,6
**sections**  12:17
    12:17
**see**  6:21,22 7:4,9
    9:2,24 10:1,2,4
    16:17 18:13
    19:1,8,11,14,23
    21:22
**sensory**  12:1
    16:7 18:3
**september**  4:12
**service**  7:13
**services**  2:3
**share**  6:21
**sheet**  3:7 28:12
    28:14 29:1
**shorthand**  26:6
**shortness**  11:18
**show**  15:16
**showing**  22:20

**shows**  13:2 17:6
**side**  16:5
**sign**  3:6 17:11
    28:1,13
**signature**  26:17
    27:20
**signed**  28:22
**similar**  16:5
    17:25
**skip**  15:12
**slow**  11:11
**slower**  10:3
**society**  1:8 28:6
    29:2
**solutions**  28:23
**sorry**  5:25 11:12
    11:12 20:6 21:1
**south**  28:3
**spanish**  7:17,20
    7:21
**speaking**  7:16
**specialty**  6:7
**speech**  16:13,16
    18:7,11 21:20
**spoken**  7:19
**st**  5:3,4
**stable**  12:7
**stand**  14:16
**start**  11:13
**started**  4:25
**starting**  5:14
    15:6
**starts**  16:22
**state**  1:18 6:9
    8:3,8,10,16 12:4

14:1,22,22
    18:15 19:6 21:9
    21:18 26:3,7,18
    27:3
**stated**  29:22
**statements**
    22:15,21,23
    24:4
**states**  1:1
**status**  8:12
**statute**  28:20
**stenographica...**
    27:7
**strength**  11:25
    16:6 18:2
**struggling**  6:23
**subsequent**  4:13
**sufficient**  21:14
**suggested**  28:17
**suicidal**  15:23
    17:17,21
**suite**  1:22 2:4,9
**sum**  8:25
**summer**  13:24
    19:8 21:17
    22:10
**summertime**  5:6
**sure**  8:4,6 24:16
**swear**  4:2,5
**sworn**  4:7 26:9
**symptom**  10:15
**symptoms**  11:16
    12:8 21:9
**system**  9:25
    19:11 28:2

| | | | |
|---|---|---|---|
| **systems** 10:6 | **total** 8:24 9:5 | **understanding** | **witness** 4:5,7 |
| **t** | 17:7 | 21:15 | 10:5 11:12,14 |
| **t** 3:9 | **totally** 12:13 | **united** 1:1 | 21:7 22:12 23:1 |
| **take** 4:21 6:10 | **training** 5:14 | **university** 5:17 | 23:10,25 24:19 |
| 6:16 9:21 | **transcript** 24:16 | **upper** 12:1 16:7 | 24:23 25:1 |
| **taken** 1:13 | 27:9,9 28:8,21 | 18:2 | 26:13 27:10 |
| **talk** 15:17 | **transcripts** | **use** 14:9 | **words** 9:3 |
| **tampa** 1:22 2:9 | 28:15 | **used** 28:22 | **work** 5:1,3,5 |
| **tell** 8:9 | **transition** 5:20 | **v** | **working** 5:2 |
| **test** 13:5,6 | **transitional** | **valles** 1:11 4:6 | **write** 8:2 |
| **testifying** 24:4 | 5:18,23 | 7:10 26:8 28:2,7 | **x** |
| **testimony** 4:3 | **translated** | 29:3,25 | **x** 3:1,9 26:23 |
| 20:4 23:22 24:2 | 24:17 | **verify** 28:10 | **y** |
| 27:10 28:9,18 | **treatment** 4:23 | **veritext** 1:21 | **yeah** 5:12 8:23 |
| **tests** 9:7 | 22:17,25 | 28:15,23 | **year** 5:18,23 |
| **thing** 6:17 8:2 | **true** 27:10 29:23 | **veritext.com** | **years** 20:23,25 |
| 14:1 21:9,21 | **trust** 24:21 | 28:15 | 21:5 |
| **things** 8:20 | **truth** 4:4,4,4 | **versus** 28:5 29:2 | **yolanda** 1:4 |
| **think** 13:10 | **tumor** 13:9,10 | **video** 1:12 | 6:13 28:5 29:2 |
| **thoughts** 15:23 | 13:13,19,23 | **videoconferen...** | **z** |
| 17:17 | **turn** 17:23 | 26:1,9 | **zero** 17:8,10 |
| **three** 7:7 23:6 | **two** 20:23,25,25 | **visit** 15:9 23:7 | **zoom** 1:17 7:8 |
| **time** 1:16 5:7 | 21:2,5,5 22:8 | **vs** 1:6 | |
| 6:15 10:19 | **type** 8:16 11:16 | **w** | |
| 12:14 13:14 | 12:16 17:19 | **waive** 24:14,20 | |
| 14:12,21 16:15 | 26:23 | **walk** 5:13 | |
| 17:1,9 18:5,9,10 | **u** | **walked** 24:3 | |
| 18:14,19 20:15 | **uh** 11:1 12:21 | **want** 24:13,24 | |
| 20:19 23:7 | 15:5 19:21 20:9 | **ward** 2:8 | |
| **times** 6:17 | **under** 7:22 13:1 | **way** 8:3 21:23 | |
| **today** 4:22 | 15:20 16:12 | 22:9 | |
| 23:22 24:2,4 | 17:7,25 18:6 | **we've** 23:5 24:3 | |
| **told** 12:7 | 28:19 29:21 | **went** 5:16 22:14 | |
| **top** 11:2 | **underneath** | | |
| | 14:3 15:20 | | |

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under
rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 1

1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                   ORLANDO DIVISION
3
    YOLANDA DELGADO,
4
          Plaintiff,
5
    v.                              CASE NO.
6                                   6:23-CV-1288-RBD-EJK
7
    THE EVANGELICAL LUTHERAN
8   GOOD SAMARITAN SOCIETY AND
    SANFORD HEALTH,
9
          Defendants.
10  --------------------------/
11
              DEPOSITION OF CARMEN ALLENDE, M.D.
12             (Conducted Via Videoconference)
13
14
        DATE:           October 22, 2024
15
16
        TIME:           4:06 p.m. to 4:36 p.m.
17
18
        REPORTED BY:    TRICIA J. MARCH
19                      Notary Public
                        State of Florida
20
21
22
                    Pages 1 - 31
23
24
25

Page 2

```
1   APPEARANCES:
2
    MORGAN CARDINAL, ESQUIRE
3   NICOLE CARRERO, ESQUIRE
    JOHN MARTINO, ESQUIRE
4   Community Legal Services of Mid-Florida
    122 E Colonial Dr
5   Ste 200
    Orlando, FL 32801-1219
6      Attorney for Plaintiff
7
8
    S. GORDON HILL, ESQUIRE
9   Hill Ward Henderson
    101 E Kennedy Blvd
10  Ste 3700
    Tampa, FL 33602-5195
11     Attorney for Defendants
12
13
    ALSO PRESENT:
14
    COLLETTE MATHERN, GOOD SAMARITAN
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1           I N D E X
2
              PAGE
3
    Direct Examination By Mr. Hill        4
4
    Cross-Examination By Ms. Cardinal     24
5
    Redirect Examination          26
6
    Certificate of Oath           28
7
    Reporter's Certificate        29
8
    Read & Sign Letter            30
9
    Errata              31
10
11
12        E X H I B I T S
13
    Exhibit 20  MEDICAL RECORD         10
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1      THE COURT REPORTER:  Doctor, would you raise
2   your right hand for me, please?
3        Do you swear or affirm the testimony you give
4   will be the truth, the whole truth, and nothing but
5   the truth?
6      THE WITNESS:  Yes, I do.
7      THE COURT REPORTER:  Thank you.
8        CARMEN ALLENDE, M.D.,
9   the witness herein, being duly sworn under oath, was
10  examined and testified as follows:
11      DIRECT EXAMINATION
12  BY MR. HILL:
13    Q.  Dr. Allende, this is -- my name is Gordon
14  Hill, and I represent --
15      MS. CARDINAL:  Gordon, just quickly -- sorry
16  to interrupt you.  I thought I would jump in.
17      Are you okay with just having us preserve, on
18  the record, our standing objection to -- to these
19  depositions just so I don't need to object to all
20  questions going forward?
21      MR. HILL:  Oh, gosh, yes.  Yes.
22      MS. CARDINAL:  Okay.
23      MR. HILL:  I don't think that would be
24  necessary.
25      MS. CARDINAL:  Okay.  No problem.  I know -- I
```

Page 5

```
1   know we've written back and forth about it, but just
2   to have it on the record, you know, that we were
3   preserving our objections to the proportionality and
4   relevancy of this -- of this deposition going
5   forward.  But --
6      MR. HILL:  Okay.
7      MS. CARDINAL:  -- go ahead.
8      MR. HILL:  That's fine.  Absolutely.
9   BY MR. HILL:
10    Q.  So -- so, Dr. Allende, I -- my name is Gordon
11  Hill, and I represent the defendants in a lawsuit filed
12  by Yolanda Delgado.
13      Ms. Delgado is a former patient of yours
14  according to medical records we've received, which I will
15  show you.  So we're just going to ask you a few questions
16  today.  I don't think it will take very long.
17      And I will just start with where are you
18  currently employed?
19    A.  Right now I am employed in Sanitas, Chickasaw
20  Trail.
21    Q.  Okay.  Do you mind spelling both of those just
22  for the record?
23    A.  Oh, yes.  Of course.
24      Sanitas is S-A-N-I-T-A-S.
25    Q.  Okay.
```

2 (Pages 2 - 5)

Page 6

1    A.    Chickasaw Trail.  Chickasaw Trail is the --
2  the address.
3    Q.    Okay.  So Chickasaw Trail.  Sanitas -- what
4  is -- what is that?  Is that a medical practice?
5    A.    Yes, it is.  As a matter of fact, it's similar
6  to the one I worked previously.  The thing is that I was
7  at -- working at MedFlorida, but then I decided to retire
8  and -- last year, as a matter of fact, February 3, 2023,
9  because it's about time.  But then after six months of
10  retirement, I -- I got bored, and I came back to work.
11    Q.    Okay.  And what -- what is -- where do you
12  work with -- which office of Sanitas Medical do you work?
13    A.    Chickasaw Trail.
14    Q.    Chickasaw Trail?
15    A.    Yes.
16    Q.    Okay.  So how long have you worked there?
17    A.    About one year and a half now.  I started here
18  August 28, 2023.
19    Q.    And do you recall where you worked in January
20  of 2023?
21    A.    Yes.  MedFlorida.
22    Q.    Okay.  And can you just, very briefly, walk me
23  through your medical education and training, just
24  starting with where you went to medical school?
25    A.    Okay.  I went to medical school back in --

Page 7

1  back in Santo Domingo, Dominican Republic.
2        I finished my medical school there, and then I
3  came to Puerto Rico, and I did my internship and social
4  year.  And I've been working -- my specialty is
5  occupational medicine.  I've been there for ten years,
6  and I have been multiple at offices.
7        And then I -- after that I started doing
8  acupuncture and alternative medicine, integrative
9  medicine.
10        And then I was at my office one day after
11  Hurricane Maria, and some -- a friend came back to my
12  house and told me, "Oh, I need a medical doctor that's
13  Spanish -- Spanish speaker medical doctor because
14  everyone is going to Kissimmee."  So I said yes, and here
15  I am.
16    Q.    Okay.  So unpackaging that a little bit.  I
17  didn't catch what you -- your specialty was when you
18  mentioned your specialty.
19    A.    Yes.  Occupational medicine.
20    Q.    Occupational medicine.  Okay.
21    A.    Uh-huh.
22    Q.    I'm sorry.
23        And what -- what does that mean?
24    A.    That means that -- if I can say an example,
25  here the patient has diseases like diabetes, et cetera.

Page 8

1  And in occupational medicine the patient is not the --
2  the people.  The patient is the factory or the company.
3  And my duty was to identify certain conditions that could
4  hurt the -- the employee and make -- you know, make
5  trouble for the company or the patient.
6    Q.    Okay.  And then at some point you said that
7  Hurricane Maria hit Puerto Rico, and after that you ended
8  up moving to Florida where you practice medicine.  Where
9  did you -- where did you start practicing medicine in
10  Florida after moving here?
11    A.    Yes.  I was at Patient Medical Center of
12  Florida.  The thing is that that company was sold to
13  MedFlorida.  And it's the -- same place but a
14  different owner.
15    Q.    And what did you do for that company?  What
16  was your specialty there?
17    A.    Primary care.
18    Q.    Okay.  I meant to ask you this earlier.
19        You mentioned going to medical school in the
20  Dominican Republic, and it sounds like you did an
21  internship in Puerto Rico.
22        So combined total of medical school,
23  internships -- and we also call it residency, how many
24  years did you spend doing medical school, internship, and
25  residency?

Page 9

1    A.    Okay.  Medical school four years and
2  internship one year and social work was one more year.
3  And then I came back -- I went to private medicine.
4    Q.    Okay.  So do you have any board
5  certifications?
6    A.    They're from Puerto Rico.
7    Q.    And what is your board certification in?
8    A.    It is the -- Reválida is the name.  It's --
9  Reválida is the Board.  For the -- the license, that's
10  what we need, the three parts of the -- the Board in
11  Puerto Rico.
12    Q.    Okay.  But -- but what -- maybe I'm
13  misunderstanding you.
14        What is the -- what are the specialties that
15  you're board certified in?
16    A.    Okay.  No.  No.  No.  The only board that --
17  I'm board certified for the alternative integrative
18  medicine.  That was in Florida.  I -- I don't remember
19  exactly the year, but I think it was about seven -- about
20  ten years ago.
21    Q.    Okay.  Do you remember you seeing a patient
22  named Yolanda Delgado?
23    A.    No.  I really don't remember her.
24    Q.    Okay.  I'm going to show you what we'll mark
25  as Exhibit 20.

3 (Pages 6 - 9)

Page 10

```
1       A.   Uh-huh.
2            (Thereupon, Exhibit Number 20 was marked for
3  purposes of identification.)
4       Q.   Give me one second.  Let me see if I can pull
5  it up.
6            Okay.  Can you -- can you see this is a
7  medical record here?
8       A.   Yes.
9       Q.   Okay.  So are you generally familiar with --
10 and I'll just scroll down very quickly.  I'll zoom out so
11 you can get an overview of it.
12      A.   Uh-huh.
13      Q.   Are you familiar with a medical record that
14 looks like this?
15      A.   Yes.  Yes.  That's my signature.  Yes.
16      Q.   So on Exhibit 20, here -- on page 3 of that,
17 that is your signature at the end?
18      A.   Yes.  That is my signature.  Yes.
19      Q.   Okay.  So I'm going to walk you, just briefly,
20 through this.  Starting, really, at the top.  It looks
21 like the DOS was -- in the upper right-hand corner,
22 1/11/2023.
23           Does that indicate that that's the date that
24 you would have seen --
25      A.   The service -- yes.  Date of service.  Yes.
```

Page 11

```
1       Q.   Okay.  And it indicates in there that you saw
2  Ms. Delgado when she was at the age of 77 years old?
3       A.   Uh-huh.  Yes.
4       Q.   And this is a progress note that has your name
5  on it.  Is that --
6       A.   Yes.
7       Q.   -- correct?
8       A.   That's correct.  Yes.
9       Q.   Okay.  So if you look under "Reason for
10 Appointment" at the top there, it indicates "New patient
11 is here today to establish care."
12           Does this refresh your memory on seeing
13 Ms. Delgado as you read the records here?
14      A.   Okay.  I can see the -- I saw the -- the
15 notes.  And, yes, that's the way I used to -- to write
16 down the -- the reason for the appointment.
17      Q.   Okay.  And it indicates in here, under "New
18 Patient" -- it indicates "77-year-old female presents
19 with C/O initial visit."
20           So what does that mean there?
21      A.   That means that -- that's the -- the -- the
22 objective of the visit.
23      Q.   Okay.  All right.
24      A.   The objective.
25      Q.   And this is a -- this is a record.  So when I
```

Page 12

```
1  read that part -- this is a record that is based upon
2  information you provided and completed and is signed off
3  by you; is that right?
4       A.   Yes.
5       Q.   Okay.  So it indicates in there "Patient
6  presents to establish care with a new provider"?
7       A.   Uh-huh.
8       Q.   And the prior provider was a Dr. Gonzalez --
9       A.   Uh-huh.
10      Q.   -- at Orlando Family Physicians; is that
11 correct?
12      A.   Yes.  That's what it says.
13      Q.   And it indicates in there that she was last
14 seen by a doctor four months ago; is that correct?
15      A.   Uh-huh.
16      Q.   It says -- it indicates in there "Feels well
17 today with no new complaints."
18      A.   Uh-huh.
19      Q.   Is that information that she conveyed to you?
20      A.   Yes.
21      Q.   Okay.  So then it says, "PMHx," and that, I
22 assume, means past medical history?
23      A.   Past medical history.  Yes.
24      Q.   And tell me what the next things mean.  It
25 says "epilepsy, HTN, GERD, osteopenia."
```

Page 13

```
1       A.   Yes.  Epilepsy is a diagnosis, HTN means
2  hypertension, and GERD means that -- reflux.
3       Q.   Okay.  And then what is osteopenia?
4       A.   Osteopenia means that -- the first phase of
5  losing characteristics of the bones after menopause.
6       Q.   Okay.  All right.  And later on at the bottom
7  of that little section there it says "Stress:
8  Occasional."
9            Is that information that Ms. Delgado provided
10 to you?
11      A.   Yes.
12      Q.   Okay.  And if you scroll down -- or I'll
13 scroll down for you -- there's a whole section on
14 depression screening.
15           What -- what did you do to do depression
16 screening for Ms. Delgado?
17      A.   That -- that is a questionnaire that we have,
18 and letter by letter with multiple questions, the way the
19 patient answers, you sum it at the end, and the total
20 score that day is -- it was zero.  That -- that means
21 that she wasn't depressed that day.
22      Q.   So -- so that's based on information
23 that Ms. Delgado provided to you; is that correct?
24      A.   Yes.  That's correct.
25      Q.   Okay.  And -- and you had said that the total
```

4 (Pages 10 - 13)

Page 14

1  score was zero, meaning that she didn't answer that she
2  had any signs --
3      A.   Depression.
4      Q.   -- or symptoms of any kind of depression --
5      A.   Yes.
6      Q.   -- under that screening --
7      A.   Yes.
8      Q.   -- is that correct?
9      A.   That's correct.
10     Q.   So then if -- I'm going to scroll down.
11         Where it says "General," what does that --
12  under the physical examination -- tell me about the
13  physical examination you did of her.
14     A.   Okay.  The -- that -- that's -- you -- you're
15  asking for -- about the general.  It's the impression
16  that we do for the patient.  Usually if the patient is
17  alert, awake, it is -- it -- he seems to be aware where
18  he's at or who -- who he is, who I am, et cetera.
19     Q.   Okay.  So that --
20     A.   He doesn't seem to be acutely ill, that kind
21  of things.
22     Q.   Okay.  Would that indicate and -- and -- and
23  relate to, basically, any kind of cognitive impairment?
24     A.   I'm sorry?
25     Q.   Would -- would -- would that section there,

Page 15

1  where it says that she was normal, alert, awake --
2      A.   Yes.
3      Q.   -- and oriented times three --
4      A.   Yes.  Uh-huh.  Yes.
5      Q.   Does -- does that section in there indicate
6  that she did not have cognitive impairment?
7      A.   Yes.  As a matter of fact, it should be -- if
8  you scroll down --
9      Q.   Okay.
10     A.   -- in the neurological it says "Alert and
11  oriented x 3."  She knows where she is, she knows who
12  is, and she knows where she is doing -- what she is
13  doing.
14     Q.   Okay.  So under that section, "Neurological,"
15  and plus the "General" section above it --
16     A.   Yes.
17     Q.   -- your indication is --
18     A.   Yes.
19     Q.   Okay.  One -- one rule in depositions, if you
20  don't mind, if you can let me finish asking the question
21  before you start answering it --
22     A.   Okay.  Okay.  I'm sorry.
23     Q.   Because the court reporter -- the court
24  reporter has got to take down every word that we say, and
25  we're making her job really hard if we're talking over

Page 16

1  each other.  And I'm -- and I will say I'm going to be
2  guilty of that too, so I apologize.
3         So reasking the question.
4         So the -- the combination of the section in
5  there where it talks about the general -- her being
6  alert, awake, and oriented, as well as under the
7  neurological column, would indicate to you that she did
8  not have cognitive impairment that you saw.  Is that
9  correct?
10     A.   Yes.
11     Q.   So how long did your appointment with her
12  last?
13     A.   For the first visit we usually had about half
14  an hour.
15     Q.   Okay.  So you -- you spent a half hour with --
16     A.   Yes.
17     Q.   -- Ms. Delgado that day?
18     A.   That's -- yes.  That's correct.  Yes.
19     Q.   Okay.  So I'm going to scroll down a little
20  bit more.
21         It -- in the left-hand side of the page there
22  it says "Psychology," and it says "Patient denies" --
23  "The patient does not report depression, sleep
24  disturbance, anxiety, hallucinations, mood swings."
25         Do you see that?

Page 17

1      A.   Yes.  I see.
2      Q.   And -- and is that information that is
3  specifically provided by Ms. Delgado to you when you're
4  asking her these questions and she denies having all of
5  those things -- or any of those things?
6      A.   Yes.
7      Q.   Okay.  So -- and then under the next part of
8  the assessments -- just maybe just walk me through --
9  what are those assessments, Number 1 through 7 that you
10  found?  And -- and I guess that basically means those are
11  your diagnoses.  Is that right?
12     A.   Uh-huh.  Exactly.
13     Q.   So do you mind just walking us through those?
14     A.   Yes.  Of course.
15         "Essential primary hypertension."
16         The second is "Nonintractable epilepsy without
17  status epilepticus, unspecified epilepsy type."
18         Third is "Osteopenia, unspecified location."
19         Four is "Gastroesophageal reflux disease
20  without esophagitis."
21         Five "Smoker in home."
22         Then "Encounter for screening mammogram for
23  malignant neoplasm of breast."
24         And the last one "Body max mass index."
25     Q.   So starting with Number 1, "Essential primary

5 (Pages 14 - 17)

Page 18

1 hypertension," that's basically just high blood pressure.
2 Is that right?
3     A.   Yes.  That is correct.
4     Q.   And the second one, nonintractable epilepsy
5 without status epilepticus -- if I said that correctly --
6 is -- what -- what does that mean?  Does that mean that
7 she had active epilepsy or that she was not having it or
8 what -- what does that mean?
9     A.   That is part of the history that the patient
10 brings in.  And she usually is -- because of the history
11 and the medications she has -- she's using for that
12 condition, then I conclude that that is a -- a diagnosis
13 she has.
14     Q.   Okay.  But is there any part of that diagnosis
15 that would indicate that she was not having active
16 seizures, or is this --
17     A.   Oh, no.  It doesn't say -- no, no, no, no.
18 The patient wasn't with active seizures that day.  Yes.
19     Q.   So -- so -- okay.  So as of that day --
20     A.   That -- that -- that -- huh?
21     Q.   In January of 2023 she was not having active
22 seizures; is that correct?
23     A.   Not that day.  Yes.
24     Q.   Okay.  Do you -- do you know from this record
25 of -- when was the last time she had a seizure?

Page 19

1     A.   No.  I don't know that information.
2     Q.   Okay.  All right.  Then based upon -- and I'll
3 continue to scroll down here, but based upon your review
4 of the medical record, which is dated in January of 2023,
5 would you have any indication that Ms. Delgado would --
6 would not be able to perform the normal activities of
7 daily living?
8     A.   With that -- the information of that day?  No.
9     Q.   Okay.  So she -- she would be able to perform
10 the normal activities of daily living.  Is that correct?
11     A.   Yes.
12     Q.   Okay.
13     A.   I suppose.  Yes.
14     Q.   Do you -- do you show in here in your record
15 any indication that Ms. Delgado had a mental, emotional,
16 physical, or developmental disability or dysfunction?
17     A.   No.
18     Q.   Do you see any indication that Ms. Delgado was
19 impaired in her ability to provide for her own care and
20 protection?
21     A.   No.
22     Q.   And based on this, as you sit -- as this
23 record is here in January of 2023, would you expect that
24 just a few months earlier, in October of 2022, that
25 Ms. Delgado would also be able to perform the normal

Page 20

1 activities of daily living?
2         MS. CARDINAL:  Objection.
3     A.   I wouldn't be able to say that.
4     Q.   Okay.  So you -- you don't know.  You can
5 only --
6     A.   No.
7     Q.   -- listen to what had happened --
8     A.   That -- that was the only day I saw this
9 patient.
10     Q.   Okay.  So you wouldn't be able to look
11 backwards and --
12     A.   No.
13     Q.   -- and opine on whether she could do that or
14 not?
15     A.   No, no, no.
16     Q.   Okay.  Let me ask you this question.
17         Would you expect that Ms. Delgado, in October
18 of 2022, just a few months prior to when you saw her --
19 that she would have a mental, emotional, physical, or
20 developmental disability or dysfunction?
21         MS. CARDINAL:  Objection.
22         You can answer, Doctor.
23     A.   The thing is that I -- that was the first day
24 I saw this -- the first and the only day I saw this
25 patient.

Page 21

1     Q.   Okay.
2     A.   I'm unable to know what happened before or
3 after.
4     Q.   Okay.  All right.  Okay.  So let -- let me
5 take you back to this January of 2023, then.
6         The -- in terms of your assessment of her that
7 day, was there any indication that Ms. Delgado had a
8 mental impairment that caused her to lack sufficient
9 understanding or capacity to make or communicate
10 responsible decisions regarding her person or property?
11         MS. CARDINAL:  Objection.
12     A.   With the knowledge I have, I wouldn't be
13 able -- I don't...
14     Q.   So did you diagnose her with any mental
15 impairment?
16     A.   It seems that she was okay.
17     Q.   Okay.  Well, just -- just a simple question.
18         In January of 2023, did Ms. Delgado have any
19 mental impairment?
20     A.   Because of the notes, I don't find no
21 impairment.
22     Q.   Okay.  And based on what we've gone through in
23 this note, do you -- would you expect that Ms. Delgado
24 had a sufficient understanding to make and communicate
25 responsible decisions about herself?

6 (Pages 18 - 21)

Page 22

1        MS. CARDINAL:  Objection.
2     Q.    You can -- you can answer.
3           Or do you want me to read it back?
4     A.    No.  No.  I'm -- I'm thinking.
5     Q.    Okay.
6     A.    The thing is that I didn't write down that she
7  came and complained by another relative or if -- if
8  she -- she wouldn't be able -- I mean, the patient came
9  alone, so that means that she is able to understand and
10 answer the questions I have.
11    Q.    Okay.  And do you recall if you would have
12 spoken to her in -- I'm assuming you're bilingual.  Is
13 that right?
14    A.    Yes.
15    Q.    You -- you can speak Spanish?
16    A.    Yes.  I do.
17    Q.    Fluently?
18    A.    That's my first language, Spanish.
19    Q.    Okay.  So in encountering Ms. Delgado, if she
20 spoke primarily Spanish, would you have spoken to her in
21 Spanish or in English?
22    A.    In Spanish.
23    Q.    Okay.  Do you -- do you have any indication in
24 here that you spoke to her in Spanish?
25    A.    I don't really know.  I -- I imagine that --

Page 23

1  yes.  But I -- but that is that I image because of -- the
2  name is Latin, so I -- I would say it probably was in
3  Spanish.
4     Q.    Okay.
5     A.    Remember the -- the most patient I -- I
6  usually used to see -- and even today the -- the main
7  population I see is Spanish speakers.
8     Q.    Okay.  So when you see -- as a doctor, when
9  you see a Spanish speaker as a patient, you speak to them
10 in Spanish; is that --
11    A.    Yeah.  In Spanish.
12    Q.    Okay.  So I'm just going to ask you a couple
13 of just basic legal questions here.
14          Does this medical record reflect statements
15 and information that was conveyed to you by Ms. Delgado
16 for the purpose of medical diagnosis and treatment?
17    A.    Can you explain me that question again?
18    Q.    Yeah.  So, basically, the information in here
19 is provided by Ms. Delgado --
20    A.    Yes.
21    Q.    -- to you; is that right?
22    A.    Yes.  That's correct.
23    Q.    And -- and when she's conveying this
24 information to you, she's doing that for the purpose so
25 that you can render a medical diagnosis and treatment, if

Page 24

1  necessary, to her; is that correct?
2     A.    Yes.
3     Q.    Okay.  So were these records -- as you create
4  these medical records after seeing a patient, are these
5  records created either at or near the time when you saw
6  Ms. Delgado?
7     A.    Yes.  The same day.
8     Q.    Same day.  Okay.
9     A.    Yes.
10    Q.    And -- and this record is a record that's kept
11 in, kind of, the normal course of the business of -- of
12 your medical practice back then, which was MedFlorida
13 Medical Centers.  Is that right?
14    A.    Yes.
15    Q.    Okay.  And maintaining those records are an
16 important part of what MedFlorida does; is that right?
17    A.    Yes.
18    Q.    Okay.
19          MR. HILL:  That's all the -- that's all the
20 questions I have.
21              CROSS-EXAMINATION
22 BY MS. CARDINAL:
23    Q.    Dr. Allende, I just -- my name is Morgan
24 Cardinal, and I represent the plaintiff in this matter,
25 Yolanda Delgado, and I just wanted to confirm really

Page 25

1  quickly with you, just to make sure I understood
2  correctly.
3           You said that on average these new patients --
4  new patient appointments last about 30 minutes; is that
5  correct?
6     A.    More or less.  Yes.
7     Q.    Okay.  And did you say you did not recall
8  meeting Ms. Delgado?
9     A.    What do you mean by "recall"?  That -- you
10 mean that I didn't see her again?
11    Q.    No.  I just -- did -- did -- I thought I
12 understood that you didn't remember meeting Ms. Delgado,
13 but I wanted --
14    A.    Yes.  I --
15    Q.    -- to --
16    A.    Yes.  That was about -- more than one year
17 ago.
18    Q.    All right.
19          MS. CARDINAL:  And that was all for me.  I
20 just wanted to clarify that I had heard you
21 correctly.
22          Thank you.
23          THE WITNESS:  You're welcome.
24          MR. HILL:  And just one last question from me.
25

7 (Pages 22 - 25)

Page 26

1          REDIRECT EXAMINATION
2   BY MR. HILL:
3      Q.   Based on your review of the medical record,
4   you did see Ms. Delgado; is that correct?
5      A.   Yolanda Delgado is the -- the name of the
6   patient.
7      Q.   Yes.  Yes, ma'am.
8           So you did -- you did see her, and it was on
9   the date of --
10     A.   Of course.  I'm -- I 'm sorry.  Yes.  Of
11  course.  If I sign it, that means that I saw the patient.
12     Q.   Right.
13          ==And the information in this medical record is==
14  ==accurate to the best of your understanding and ability;==
15  ==right?==
16     A.   ==Yes.  Yes.  That is correct.==
17          MR. HILL:  That -- that's all the questions I
18  have.
19          MS. CARDINAL:  Me too.
20          THE COURT REPORTER:  Read or waive?
21          MR. HILL:  So, Dr. Allende, I'm not your
22  lawyer, but I'll explain a little bit about what
23  that means.
24          Essentially, the question to you is do you
25  want to take the opportunity to read your deposition

Page 27

1   to make sure that everything was captured accurately
2   by our court reporter.
3          THE WITNESS:  Yes.  Of course.
4          MR. HILL:  Okay.  Or you can waive your right
5   to read it, and you don't read it or make
6   corrections.
7          THE WITNESS:  Of course I would like to read
8   it.
9          MR. HILL:  Okay.  All right.  Then we have our
10  answer.
11         THE COURT REPORTER:  And do you need this, or
12  do you want me to hold it for you?
13         MR. HILL:  We would like to order it.
14         THE COURT REPORTER:  And, Ms. Cardinal, do you
15  need a copy?
16         MS. CARDINAL:  Yes, please.  We'll take a
17  copy.
18         (The deposition was concluded at 4:36 p.m.)
19
20
21
22
23
24
25

Page 28

1          CERTIFICATE OF OATH
           (VIDEOCONFERENCE PROCEEDINGS)
2
3   STATE OF FLORIDA)
4
5          I, Trish March, Shorthand Reporter and Notary
6   Public, State of Florida, certify that CARMEN ALLENDE,
7   M.D. appeared before me via videoconference on
8   October 22, 2024 and was duly sworn/affirmed.
9
10         WITNESS my hand and official seal this
11  27th day of October, 2024.
12
13
14
15     Tricia March, Court Reporter
       Notary Public - State of Florida
16     My Commission Expires:  11/6/26
       My Commission No:  HH 328624
17
18
19  FL Drivers License Number
    A453-105-53-890-0
20
21
22
23
24
25

Page 29

1          REPORTER'S CERTIFICATE
2   STATE OF FLORIDA)
3
4          I, Tricia March, certify that I was
5   authorized to and did stenographically report the
6   videoconference deposition of CARMEN ALLENDE, M.D.; and
7   that the transcript is a true and complete record of my
8   stenographic notes.
9          I further certify that I am not a relative,
10  employee, attorney, or counsel of any of the parties, nor
11  am I a relative or employee of any of the parties'
12  attorney or counsel connected with the action, nor am I
13  financially interested in the outcome of the foregoing
14  action.
15
16         DATED this 27th day of October, 2024.
17
18
19
20
21     TRICIA MARCH
22
23
24
25

8 (Pages 26 - 29)

Page 30

```
1   MORGAN CARDINAL, ESQUIRE
     Community Legal Services of Mid-Florida
2   122 E Colonial Dr
     Ste 200
3   Orlando, FL 32801-1219
4   RE:  DELGADO v. GOOD SAMARITAN AND SANFORD HEALTH
          October 22, 2024, CARMEN ALLENDE, M.D.
5
     The above-referenced transcript is available for review.
6
            The witness should read the testimony to
7   verify its accuracy.  If there are any changes, the
8   witness should note those with the reason on the attached
9   Errata Sheet.
10           The witness should,please, date and sign the
11  Errata Sheet and email to the deposing attorney as well
12  as to Veritext at Transcripts-fl@veritext.com and copies
13  will be emailed to all ordering parties.
14           It is suggested that the completed errata be
15  returned 30 days from receipt of testimony, as considered
16  reasonable under Federal rules*, however, there is no
17  Florida statute to this regard.
18           If the witness fails to do so, the transcript
19  may be used as if signed.
20                    Yours,
21                    Veritext Legal Solutions
22  *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e).
23
24
25
```

Page 31

```
1   DELGADO v. GOOD SAMARITAN AND SANFORD HEALTH
     October 22, 2024/CARMEN ALLENDE, M.D.
2
3            E R R A T A   S H E E T
4
5   PAGE_____LINE_____CHANGE_____
6   REASON_____
7   PAGE_____LINE_____CHANGE_____
8   REASON_____
9   PAGE_____LINE_____CHANGE_____
10  REASON_____
11  PAGE_____LINE_____CHANGE_____
12  REASON_____
13  PAGE_____LINE_____CHANGE_____
14  REASON_____
15  PAGE_____LINE_____CHANGE_____
16  REASON_____
17
18           Under penalties of perjury, I declare that I
19  have read the foregoing document and that the facts
     stated in it are true.
20
21
22  _____
23  CARMEN ALLENDE, M.D.              DATE
24
25
```

9 (Pages 30 - 31)

| & | 3 | accuracy 30:7 | appearances 2:1 |
|---|---|---|---|

**&** 3:8

**1**

**1** 1:22 17:9,25
**1.310** 30:22
**1/11/2023** 10:22
**10** 3:13
**101** 2:9
**11/6/26** 28:16
**122** 2:4 30:2
**1288** 1:6

**2**

**20** 3:13 9:25
10:2,16
**200** 2:5 30:2
**2022** 19:24
20:18
**2023** 6:8,18,20
18:21 19:4,23
21:5,18
**2024** 1:14 28:8
28:11 29:16
30:4 31:1
**22** 1:14 28:8
30:4 31:1
**24** 3:4
**24992** 28:14
29:19
**26** 3:5
**27th** 28:11
29:16
**28** 3:6 6:18
**29** 3:7

**3**

**3** 6:8 10:16
15:11
**30** 3:8 25:4
30:15,22
**31** 1:22 3:9
**32801-1219** 2:5
30:3
**328624** 28:16
**33602-5195**
2:10
**3700** 2:10

**4**

**4** 3:3
**4:06** 1:16
**4:36** 1:16 27:18

**6**

**6:23** 1:6

**7**

**7** 17:9
**77** 11:2,18

**a**

**a453-105-53-...**
28:19
**ability** 19:19
26:14
**able** 19:6,9,25
20:3,10 21:13
22:8,9
**above** 15:15
30:5
**absolutely** 5:8

**accuracy** 30:7
**accurate** 26:14
**accurately** 27:1
**action** 29:12,14
**active** 18:7,15
18:18,21
**activities** 19:6
19:10 20:1
**acupuncture**
7:8
**acutely** 14:20
**address** 6:2
**affirm** 4:3
**affirmed** 28:8
**age** 11:2
**ago** 9:20 12:14
25:17
**ahead** 5:7
**alert** 14:17 15:1
15:10 16:6
**allende** 1:11 4:8
4:13 5:10 24:23
26:21 28:6 29:6
30:4 31:1,23
**alternative** 7:8
9:17
**answer** 14:1
20:22 22:2,10
27:10
**answering**
15:21
**answers** 13:19
**anxiety** 16:24
**apologize** 16:2

**appearances** 2:1
**appeared** 28:7
**appointment**
11:10,16 16:11
**appointments**
25:4
**asking** 14:15
15:20 17:4
**assessment** 21:6
**assessments**
17:8,9
**assume** 12:22
**assuming** 22:12
**attached** 30:8
**attorney** 2:6,11
29:10,12 30:11
**august** 6:18
**authorized** 29:5
**available** 30:5
**average** 25:3
**awake** 14:17
15:1 16:6
**aware** 14:17

**b**

**b** 3:12
**back** 5:1 6:10,25
7:1,11 9:3 21:5
22:3 24:12
**backwards**
20:11
**based** 12:1
13:22 19:2,3,22
21:22 26:3
**basic** 23:13

**basically** 14:23
17:10 18:1
23:18
**best** 26:14
**bilingual** 22:12
**bit** 7:16 16:20
26:22
**blood** 18:1
**blvd** 2:9
**board** 9:4,7,9,10
9:15,16,17
**body** 17:24
**bones** 13:5
**bored** 6:10
**bottom** 13:6
**breast** 17:23
**briefly** 6:22
10:19
**brings** 18:10
**business** 24:11

**c**

**c** 11:19
**call** 8:23
**capacity** 21:9
**captured** 27:1
**cardinal** 2:2 3:4
4:15,22,25 5:7
20:2,21 21:11
22:1 24:22,24
25:19 26:19
27:14,16 30:1
**care** 8:17 11:11
12:6 19:19
**carmen** 1:11 4:8
28:6 29:6 30:4

31:1,23
**carrero** 2:3
**case** 1:5
**catch** 7:17
**caused** 21:8
**center** 8:11
**centers** 24:13
**certain** 8:3
**certificate** 3:6,7
28:1 29:1
**certification** 9:7
**certifications**
9:5
**certified** 9:15,17
**certify** 28:6 29:4
29:9
**cetera** 7:25
14:18
**change** 31:5,7,9
31:11,13,15
**changes** 30:7
**characteristics**
13:5
**chickasaw** 5:19
6:1,1,3,13,14
**civil** 30:22,22
**clarify** 25:20
**cognitive** 14:23
15:6 16:8
**collette** 2:14
**colonial** 2:4
30:2
**column** 16:7
**combination**
16:4

**combined** 8:22
**commission**
28:16,16
**communicate**
21:9,24
**community** 2:4
30:1
**company** 8:2,5
8:12,15
**complained**
22:7
**complaints**
12:17
**complete** 29:7
**completed** 12:2
30:14
**conclude** 18:12
**concluded**
27:18
**condition** 18:12
**conditions** 8:3
**conducted** 1:12
**confirm** 24:25
**connected** 29:12
**considered**
30:15
**continue** 19:3
**conveyed** 12:19
23:15
**conveying** 23:23
**copies** 30:12
**copy** 27:15,17
**corner** 10:21
**correct** 11:7,8
12:11,14 13:23

13:24 14:8,9
16:9,18 18:3,22
19:10 23:22
24:1 25:5 26:4
26:16
**corrections** 27:6
**correctly** 18:5
25:2,21
**counsel** 29:10
29:12
**couple** 23:12
**course** 5:23
17:14 24:11
26:10,11 27:3,7
**court** 1:1 4:1,7
15:23,23 26:20
27:2,11,14
28:15
**create** 24:3
**created** 24:5
**cross** 3:4 24:21
**currently** 5:18
**cv** 1:6

**d**

**d** 3:1
**daily** 19:7,10
20:1
**date** 1:14 10:23
10:25 26:9
30:10 31:23
**dated** 19:4
29:16
**day** 7:10 13:20
13:21 16:17
18:18,19,23

19:8 20:8,23,24
21:7 24:7,8
28:11 29:16
**days** 30:15
**decided** 6:7
**decisions** 21:10
21:25
**declare** 31:18
**defendants** 1:9
2:11 5:11
**delgado** 1:3
5:12,13 9:22
11:2,13 13:9,16
13:23 16:17
17:3 19:5,15,18
19:25 20:17
21:7,18,23
22:19 23:15,19
24:6,25 25:8,12
26:4,5 30:4 31:1
**denies** 16:22
17:4
**deposing** 30:11
**deposition** 1:11
5:4 26:25 27:18
29:6
**depositions** 4:19
15:19
**depressed** 13:21
**depression**
13:14,15 14:3,4
16:23
**developmental**
19:16 20:20

**diabetes** 7:25
**diagnose** 21:14
**diagnoses** 17:11
**diagnosis** 13:1
18:12,14 23:16
23:25
**different** 8:14
**direct** 3:3 4:11
**disability** 19:16
20:20
**disease** 17:19
**diseases** 7:25
**district** 1:1,1
**disturbance**
16:24
**division** 1:2
**doctor** 4:1 7:12
7:13 12:14
20:22 23:8
**document** 31:19
**doing** 7:7 8:24
15:12,13 23:24
**domingo** 7:1
**dominican** 7:1
8:20
**dos** 10:21
**dr** 2:4 4:13 5:10
12:8 24:23
26:21 30:2
**drivers** 28:19
**duly** 4:9 28:8
**duty** 8:3
**dysfunction**
19:16 20:20

**e**

**e** 2:4,9 3:1,12
30:2,22,22 31:3
31:3,3
**earlier** 8:18
19:24
**education** 6:23
**either** 24:5
**ejk** 1:6
**email** 30:11
**emailed** 30:13
**emotional** 19:15
20:19
**employed** 5:18
5:19
**employee** 8:4
29:10,11
**encounter** 17:22
**encountering**
22:19
**ended** 8:7
**english** 22:21
**epilepsy** 12:25
13:1 17:16,17
18:4,7
**epilepticus**
17:17 18:5
**errata** 3:9 30:9
30:11,14
**esophagitis**
17:20
**esquire** 2:2,3,3
2:8 30:1
**essential** 17:15
17:25

**essentially**
26:24
**establish** 11:11
12:6
**et** 7:25 14:18
**evangelical** 1:7
**exactly** 9:19
17:12
**examination** 3:3
3:4,5 4:11 14:12
14:13 24:21
26:1
**examined** 4:10
**example** 7:24
**exhibit** 3:13
9:25 10:2,16
**expect** 19:23
20:17 21:23
**expires** 28:16
**explain** 23:17
26:22

**f**

**fact** 6:5,8 15:7
**factory** 8:2
**facts** 31:19
**fails** 30:18
**familiar** 10:9,13
**family** 12:10
**february** 6:8
**federal** 30:16,22
**feels** 12:16
**female** 11:18
**filed** 5:11
**financially**
29:13

**find** 21:20
**fine** 5:8
**finish** 15:20
**finished** 7:2
**first** 13:4 16:13
  20:23,24 22:18
**five** 17:21
**fl** 2:5,10 28:19
  30:3,12
**florida** 1:1,19
  2:4 8:8,10,12
  9:18 28:3,6,15
  29:2 30:1,17,22
**fluently** 22:17
**follows** 4:10
**foregoing** 29:13
  31:19
**former** 5:13
**forth** 5:1
**forward** 4:20
  5:5
**found** 17:10
**four** 9:1 12:14
  17:19
**friend** 7:11
**further** 29:9

**g**

**gastroesophag...**
  17:19
**general** 14:11
  14:15 15:15
  16:5
**generally** 10:9
**gerd** 12:25 13:2

**give** 4:3 10:4
**go** 5:7
**going** 4:20 5:4
  5:15 7:14 8:19
  9:24 10:19
  14:10 16:1,19
  23:12
**gonzalez** 12:8
**good** 1:8 2:14
  30:4 31:1
**gordon** 2:8 4:13
  4:15 5:10
**gosh** 4:21
**guess** 17:10
**guilty** 16:2

**h**

**h** 3:12 31:3
**half** 6:17 16:13
  16:15
**hallucinations**
  16:24
**hand** 4:2 10:21
  16:21 28:10
**happened** 20:7
  21:2
**hard** 15:25
**health** 1:8 30:4
  31:1
**heard** 25:20
**henderson** 2:9
**hh** 28:16
**high** 18:1
**hill** 2:8,9 3:3
  4:12,14,21,23
  5:6,8,9,11 24:19

  25:24 26:2,17
  26:21 27:4,9,13
**history** 12:22,23
  18:9,10
**hit** 8:7
**hold** 27:12
**home** 17:21
**hour** 16:14,15
**house** 7:12
**htn** 12:25 13:1
**huh** 7:21 10:1
  10:12 11:3 12:7
  12:9,15,18 15:4
  17:12 18:20
**hurricane** 7:11
  8:7
**hurt** 8:4
**hypertension**
  13:2 17:15 18:1

**i**

**identification**
  10:3
**identify** 8:3
**image** 23:1
**imagine** 22:25
**impaired** 19:19
**impairment**
  14:23 15:6 16:8
  21:8,15,19,21
**important** 24:16
**impression**
  14:15
**index** 17:24
**indicate** 10:23
  14:22 15:5 16:7

  18:15
**indicates** 11:1
  11:10,17,18
  12:5,13,16
**indication** 15:17
  19:5,15,18 21:7
  22:23
**information**
  12:2,19 13:9,22
  17:2 19:1,8
  23:15,18,24
  26:13
**initial** 11:19
**integrative** 7:8
  9:17
**interested** 29:13
**internship** 7:3
  8:21,24 9:2
**internships** 8:23
**interrupt** 4:16

**j**

**j** 1:18
**january** 6:19
  18:21 19:4,23
  21:5,18
**job** 15:25
**john** 2:3
**jump** 4:16

**k**

**kennedy** 2:9
**kept** 24:10
**kind** 14:4,20,23
  24:11

kissimmee 7:14
know 4:25 5:1,2
  8:4 18:24 19:1
  20:4 21:2 22:25
knowledge
  21:12
knows 15:11,11
  15:12

**l**

lack 21:8
language 22:18
latin 23:2
lawsuit 5:11
lawyer 26:22
left 16:21
legal 2:4 23:13
  30:1,21
letter 3:8 13:18
  13:18
license 9:9
  28:19
line 31:5,7,9,11
  31:13,15
listen 20:7
little 7:16 13:7
  16:19 26:22
living 19:7,10
  20:1
location 17:18
long 5:16 6:16
  16:11
look 11:9 20:10
looks 10:14,20
losing 13:5

lutheran 1:7

**m**

m 26:10
m.d. 1:11 4:8
  28:7 29:6 30:4
  31:1,23
ma'am 26:7
main 23:6
maintaining
  24:15
make 8:4,4 21:9
  21:24 25:1 27:1
  27:5
making 15:25
malignant
  17:23
mammogram
  17:22
march 1:18 28:5
  28:15 29:4,21
maria 7:11 8:7
mark 9:24
marked 10:2
martino 2:3
mass 17:24
mathern 2:14
matter 6:5,8
  15:7 24:24
max 17:24
mean 7:23
  11:20 12:24
  18:6,6,8 22:8
  25:9,10
meaning 14:1

means 7:24
  11:21 12:22
  13:1,2,4,20
  17:10 22:9
  26:11,23
meant 8:18
medflorida 6:7
  6:21 8:13 24:12
  24:16
medical 3:13
  5:14 6:4,12,23
  6:24,25 7:2,12
  7:13 8:11,19,22
  8:24 9:1 10:7,13
  12:22,23 19:4
  23:14,16,25
  24:4,12,13 26:3
  26:13
medications
  18:11
medicine 7:5,8,9
  7:19,20 8:1,8,9
  9:3,18
meeting 25:8,12
memory 11:12
menopause 13:5
mental 19:15
  20:19 21:8,14
  21:19
mentioned 7:18
  8:19
mid 2:4 30:1
middle 1:1
mind 5:21 15:20
  17:13

minutes 25:4
misunderstan...
  9:13
months 6:9
  12:14 19:24
  20:18
mood 16:24
morgan 2:2
  24:23 30:1
moving 8:8,10
multiple 7:6
  13:18

**n**

n 3:1 5:24
name 4:13 5:10
  9:8 11:4 23:2
  24:23 26:5
named 9:22
near 24:5
necessary 4:24
  24:1
need 4:19 7:12
  9:10 27:11,15
neoplasm 17:23
neurological
  15:10,14 16:7
new 11:10,17
  12:6,17 25:3,4
nicole 2:3
nonintractable
  17:16 18:4
normal 15:1
  19:6,10,25
  24:11

**notary**  1:19 28:5,15
**note**  11:4 21:23 30:8
**notes**  11:15 21:20 29:8
**number**  10:2 17:9,25 28:19

**o**

**o**  11:19
**oath**  3:6 4:9 28:1
**object**  4:19
**objection**  4:18 20:2,21 21:11 22:1
**objections**  5:3
**objective**  11:22 11:24
**occasional**  13:8
**occupational**  7:5,19,20 8:1
**october**  1:14 19:24 20:17 28:8,11 29:16 30:4 31:1
**office**  6:12 7:10
**offices**  7:6
**official**  28:10
**oh**  4:21 5:23 7:12 18:17
**okay**  4:17,22,25 5:6,21,25 6:3,11 6:16,22,25 7:16 7:20 8:6,18 9:1

9:4,12,16,21,24 10:6,9,19 11:1,9 11:14,17,23 12:5,21 13:3,6 13:12,22,25 14:14,19,22 15:9,14,19,22 15:22 16:15,19 17:7 18:14,19 18:24 19:2,9,12 20:4,10,16 21:1 21:4,4,16,17,22 22:5,11,19,23 23:4,8,12 24:3,8 24:15,18 25:7 27:4,9
**old**  11:2,18
**opine**  20:13
**opportunity**  26:25
**order**  27:13
**ordering**  30:13
**oriented**  15:3,11 16:6
**orlando**  1:2 2:5 12:10 30:3
**osteopenia**  12:25 13:3,4 17:18
**outcome**  29:13
**overview**  10:11
**own**  19:19
**owner**  8:14

**p**

**p.m.**  1:16,16 27:18
**page**  3:2 10:16 16:21 31:5,7,9 31:11,13,15
**pages**  1:22
**part**  12:1 17:7 18:9,14 24:16
**parties**  29:10,11 30:13
**parts**  9:10
**past**  12:22,23
**patient**  5:13 7:25 8:1,2,5,11 9:21 11:10,18 12:5 13:19 14:16,16 16:22 16:23 18:9,18 20:9,25 22:8 23:5,9 24:4 25:4 26:6,11
**patients**  25:3
**penalties**  31:18
**people**  8:2
**perform**  19:6,9 19:25
**perjury**  31:18
**person**  21:10
**phase**  13:4
**physical**  14:12 14:13 19:16 20:19
**physicians**  12:10

**place**  8:13
**plaintiff**  1:4 2:6 24:24
**please**  4:2 27:16 30:10
**plus**  15:15
**pmhx**  12:21
**point**  8:6
**population**  23:7
**practice**  6:4 8:8 24:12
**practicing**  8:9
**present**  2:13
**presents**  11:18 12:6
**preserve**  4:17
**preserving**  5:3
**pressure**  18:1
**previously**  6:6
**primarily**  22:20
**primary**  8:17 17:15,25
**prior**  12:8 20:18
**private**  9:3
**probably**  23:2
**problem**  4:25
**procedure**  30:22,22
**proceedings**  28:1
**progress**  11:4
**property**  21:10
**proportionality**  5:3

**protection**
19:20
**provide** 19:19
**provided** 12:2
13:9,23 17:3
23:19
**provider** 12:6,8
**psychology**
16:22
**public** 1:19 28:6
28:15
**puerto** 7:3 8:7
8:21 9:6,11
**pull** 10:4
**purpose** 23:16
23:24
**purposes** 10:3

**q**

**question** 15:20
16:3 20:16
21:17 23:17
25:24 26:24
**questionnaire**
13:17
**questions** 4:20
5:15 13:18 17:4
22:10 23:13
24:20 26:17
**quickly** 4:15
10:10 25:1

**r**

**r** 31:3,3
**raise** 4:1

**rbd** 1:6
**read** 3:8 11:13
12:1 22:3 26:20
26:25 27:5,5,7
30:6 31:19
**really** 9:23
10:20 15:25
22:25 24:25
**reasking** 16:3
**reason** 11:9,16
30:8 31:6,8,10
31:12,14,16
**reasonable**
30:16
**recall** 6:19
22:11 25:7,9
**receipt** 30:15
**received** 5:14
**record** 3:13
4:18 5:2,22 10:7
10:13 11:25
12:1 18:24 19:4
19:14,23 23:14
24:10,10 26:3
26:13 29:7
**records** 5:14
11:13 24:3,4,5
24:15
**redirect** 3:5
26:1
**referenced** 30:5
**reflect** 23:14
**reflux** 13:2
17:19

**refresh** 11:12
**regard** 30:17
**regarding** 21:10
**relate** 14:23
**relative** 22:7
29:9,11
**relevancy** 5:4
**remember** 9:18
9:21,23 23:5
25:12
**render** 23:25
**report** 16:23
29:5
**reported** 1:18
**reporter** 4:1,7
15:23,24 26:20
27:2,11,14 28:5
28:15
**reporter's** 3:7
29:1
**represent** 4:14
5:11 24:24
**republic** 7:1
8:20
**residency** 8:23
8:25
**responsible**
21:10,25
**retire** 6:7
**retirement** 6:10
**returned** 30:15
**review** 19:3
26:3 30:5
**reválida** 9:8,9

**rico** 7:3 8:7,21
9:6,11
**right** 4:2 5:19
10:21 11:23
12:3 13:6 17:11
18:2 19:2 21:4
22:13 23:21
24:13,16 25:18
26:12,15 27:4,9
**rule** 15:19 30:22
30:22
**rules** 30:16

**s**

**s** 2:8 3:12 5:24
5:24 31:3
**samaritan** 1:8
2:14 30:4 31:1
**sanford** 1:8 30:4
31:1
**sanitas** 5:19,24
6:3,12
**santo** 7:1
**saw** 11:1,14
16:8 20:8,18,24
20:24 24:5
26:11
**says** 12:12,16,21
12:25 13:7
14:11 15:1,10
16:22,22
**school** 6:24,25
7:2 8:19,22,24
9:1
**score** 13:20 14:1

**screening** 13:14
  13:16 14:6
  17:22
**scroll** 10:10
  13:12,13 14:10
  15:8 16:19 19:3
**seal** 28:10
**second** 10:4
  17:16 18:4
**section** 13:7,13
  14:25 15:5,14
  15:15 16:4
**see** 10:4,6 11:14
  16:25 17:1
  19:18 23:6,7,8,9
  25:10 26:4,8
**seeing** 9:21
  11:12 24:4
**seem** 14:20
**seems** 14:17
  21:16
**seen** 10:24
  12:14
**seizure** 18:25
**seizures** 18:16
  18:18,22
**service** 10:25,25
**services** 2:4
  30:1
**seven** 9:19
**sheet** 30:9,11
**shorthand** 28:5
**show** 5:15 9:24
  19:14

**side** 16:21
**sign** 3:8 26:11
  30:10
**signature** 10:15
  10:17,18 28:14
  29:19
**signed** 12:2
  30:19
**signs** 14:2
**similar** 6:5
**simple** 21:17
**sit** 19:22
**six** 6:9
**sleep** 16:23
**smoker** 17:21
**social** 7:3 9:2
**society** 1:8
**sold** 8:12
**solutions** 30:21
**sorry** 4:15 7:22
  14:24 15:22
  26:10
**sounds** 8:20
**spanish** 7:13,13
  22:15,18,20,21
  22:22,24 23:3,7
  23:9,10,11
**speak** 22:15
  23:9
**speaker** 7:13
  23:9
**speakers** 23:7
**specialties** 9:14
**specialty** 7:4,17
  7:18 8:16

**specifically** 17:3
**spelling** 5:21
**spend** 8:24
**spent** 16:15
**spoke** 22:20,24
**spoken** 22:12,20
**standing** 4:18
**start** 5:17 8:9
  15:21
**started** 6:17 7:7
**starting** 6:24
  10:20 17:25
**state** 1:19 28:3,6
  28:15 29:2
**stated** 31:19
**statements**
  23:14
**states** 1:1
**status** 17:17
  18:5
**statute** 30:17
**ste** 2:5,10 30:2
**stenographic**
  29:8
**stenographica...**
  29:5
**stress** 13:7
**sufficient** 21:8
  21:24
**suggested** 30:14
**sum** 13:19
**suppose** 19:13
**sure** 25:1 27:1
**swear** 4:3

**swings** 16:24
**sworn** 4:9 28:8
**symptoms** 14:4

**t**

**t** 3:12 5:24 31:3
  31:3
**take** 5:16 15:24
  21:5 26:25
  27:16
**talking** 15:25
**talks** 16:5
**tampa** 2:10
**tell** 12:24 14:12
**ten** 7:5 9:20
**terms** 21:6
**testified** 4:10
**testimony** 4:3
  30:6,15
**thank** 4:7 25:22
**thing** 6:6 8:12
  20:23 22:6
**things** 12:24
  14:21 17:5,5
**think** 4:23 5:16
  9:19
**thinking** 22:4
**third** 17:18
**thought** 4:16
  25:11
**three** 9:10 15:3
**time** 1:16 6:9
  18:25 24:5
**times** 15:3
**today** 5:16
  11:11 12:17

23:6
**told**  7:12
**top**  10:20 11:10
**total**  8:22 13:19
  13:25
**trail**  5:20 6:1,1
  6:3,13,14
**training**  6:23
**transcript**  29:7
  30:5,18
**transcripts**
  30:12
**treatment**  23:16
  23:25
**tricia**  1:18 28:15
  29:4,21
**trish**  28:5
**trouble**  8:5
**true**  29:7 31:19
**truth**  4:4,4,5
**type**  17:17

**u**

**uh**  7:21 10:1,12
  11:3 12:7,9,15
  12:18 15:4
  17:12
**unable**  21:2
**under**  4:9 11:9
  11:17 14:6,12
  15:14 16:6 17:7
  30:16 31:18
**understand**
  22:9
**understanding**
  21:9,24 26:14

**understood**
  25:1,12
**united**  1:1
**unpackaging**
  7:16
**unspecified**
  17:17,18
**upper**  10:21
**used**  11:15 23:6
  30:19
**using**  18:11
**usually**  14:16
  16:13 18:10
  23:6

**v**

**v**  1:5 30:4 31:1
**verify**  30:7
**veritext**  30:12
  30:21
**veritext.com**
  30:12
**videoconferen...**
  1:12 28:1,7 29:6
**visit**  11:19,22
  16:13

**w**

**waive**  26:20
  27:4
**walk**  6:22 10:19
  17:8
**walking**  17:13
**want**  22:3 26:25
  27:12

**wanted**  24:25
  25:13,20
**ward**  2:9
**way**  11:15 13:18
**we've**  5:1,14
  21:22
**welcome**  25:23
**went**  6:24,25
  9:3
**witness**  4:6,9
  25:23 27:3,7
  28:10 30:6,8,10
  30:18
**word**  15:24
**work**  6:10,12,12
  9:2
**worked**  6:6,16
  6:19
**working**  6:7 7:4
**write**  11:15 22:6
**written**  5:1

**x**

**x**  3:1,12 15:11

**y**

**yeah**  23:11,18
**year**  6:8,17 7:4
  9:2,2,19 11:18
  25:16
**years**  7:5 8:24
  9:1,20 11:2
**yolanda**  1:3
  5:12 9:22 24:25
  26:5

**z**

**zero**  13:20 14:1
**zoom**  10:10

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,                    CASE NO. 6:23-cv-1288-RBD-NWH

vs.

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY,
a foreign not-for-profit corporation,
d/b/a GOOD SAMARITAN
SOCIETY – KISSIMMEE VILLAGE;
SANFORD a/k/a SANFORD HEALTH
a/k/a SANFORD GROUP,

     Defendants.

_____/

## PROPOSED JOINT JURY INSTRUCTIONS[1]

**Preliminary Instructions omitted, per the Case Management and Scheduling Order**

**2.1 Stipulations**

     Sometimes the parties have agreed that certain facts are true. This agreement is called a stipulation. You must treat these facts as proved for this case.

## ANNOTATIONS AND COMMENTS

11th Circuit Pattern Jury Instructions.

---

[1] These proposed instructions are joint, except for where indicated otherwise.

1

**2.2 Use of Depositions**

A deposition is a witness's sworn testimony that is taken before the trial. During a deposition, the witness is under oath and swears to tell the truth, and the lawyers for each party may ask questions. A court reporter is present and records the questions and answers.

The deposition of [name of witness], taken on [date], [is about to be/has been] presented to you [by a video/by reading the transcript]. Deposition testimony is entitled to the same consideration as live testimony, and you must judge it in the same way as if the witness was testifying in court.

[Do not place any significance on the behavior or tone of voice of any person reading the questions or answers.]

**ANNOTATIONS AND COMMENTS**

11th Circuit Pattern Jury Instructions.

2

**3.1 Introduction**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,

v.                           Case No. 6:23-CV-1288-RBD-EJK

THE EVANGELICAL LUTHERAN
GOOD SAMARITAN SOCIETY AND
SANFORD HEALTH,

     Defendants.
_____/

## COURT'S INSTRUCTIONS TO THE JURY

Members of the jury:

It's my duty to instruct you on the rules of law that you must use in deciding

this case.

When I have finished you will go to the jury room and begin your

discussions, sometimes called deliberations.

## ANNOTATIONS AND COMMENTS

11th Circuit Pattern Jury Instructions.

### 3.2.2 The Duty to Follow Instructions – Corporate Party Involved

Your decision must be based only on the evidence presented here. You must not be influenced in any way by either sympathy for or prejudice against anyone.

You must follow the law as I explain it – even if you do not agree with the law – and you must follow all of my instructions as a whole. You must not single out or disregard any of the instructions on the law.

The fact that a corporation is involved as a party must not affect your decision in any way. A corporation and all other persons stand equal before the law and must be dealt with as equals in a court of justice. When a corporation is involved, of course, it may act only through people as its employees; and, in general, a corporation is responsible under the law for the acts and statements of its employees that are made within the scope of their duties as employees of the company.

**ANNOTATIONS AND COMMENTS**

11th Circuit Pattern Jury Instructions.

### 3.3 Consideration of Direct and Circumstantial Evidence;
###     Argument of Counsel; Comments by the Court

As I said before, you must consider only the evidence that I have admitted in the case. Evidence includes the testimony of witnesses and the exhibits admitted. But, anything the lawyers say is not evidence and isn't binding on you.

You shouldn't assume from anything I've said that I have any opinion about any factual issue in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision about the facts.

Your own recollection and interpretation of the evidence is what matters.

In considering the evidence you may use reasoning and common sense to make deductions and reach conclusions. You shouldn't be concerned about whether the evidence is direct or circumstantial.

"Direct evidence" is the testimony of a person who asserts that he or she has actual knowledge of a fact, such as an eyewitness.

"Circumstantial evidence" is proof of a chain of facts and circumstances that tend to prove or disprove a fact. There's no legal difference in the weight you may give to either direct or circumstantial evidence.

### ANNOTATIONS AND COMMENTS

11th Circuit Pattern Jury Instructions.

## 3.4 Credibility of Witnesses

When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter.

To decide whether you believe any witness I suggest that you ask yourself a few questions:

1. Did the witness impress you as one who was telling the truth?

2. Did the witness have any particular reason not to tell the truth?

3. Did the witness have a personal interest in the outcome of the case?

4. Did the witness seem to have a good memory?

5. Did the witness have the opportunity and ability to accurately observe the things he or she testified about?

6. Did the witness appear to understand the questions clearly and answer them directly?

7. Did the witness's testimony differ from other testimony or other evidence?

## ANNOTATIONS AND COMMENTS

11th Circuit Pattern Jury Instructions.

### 3.5.1 Impeachment of Witnesses Because of Inconsistent Statements

You should also ask yourself whether there was evidence that a witness testified falsely about an important fact. And ask whether there was evidence that at some other time a witness said or did something, or didn't say or do something, that was different from the testimony the witness gave during this trial.

But keep in mind that a simple mistake doesn't mean a witness wasn't telling the truth as he or she remembers it. People naturally tend to forget some things or remember them inaccurately. So, if a witness misstated something, you must decide whether it was because of an innocent lapse in memory or an intentional deception. The significance of your decision may depend on whether the misstatement is about an important fact or about an unimportant detail.

## ANNOTATIONS AND COMMENTS

11th Circuit Pattern Jury Instructions.

### 3.6.1 Expert Witness

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

### <u>ANNOTATIONS AND COMMENTS</u>

11th Circuit Pattern Jury Instructions.

### 3.6.2 Expert Witness – When Expert Fees Represent a Significant Portion of the Witness's Income

When scientific, technical or other specialized knowledge might be helpful, a person who has special training or experience in that field is allowed to state an opinion about the matter.

But that doesn't mean you must accept the witness's opinion. As with any other witness's testimony, you must decide for yourself whether to rely upon the opinion.

When a witness is being paid for reviewing and testifying concerning the evidence, you may consider the possibility of bias and should view with caution the testimony of such witness where court testimony is given with regularity and represents a significant portion of the witness's income.

### ANNOTATIONS AND COMMENTS

11th Circuit Pattern Jury Instructions.

### 3.7.1 Responsibility for Proof – Plaintiff's Claims– Preponderance of the Evidence

In this case it is the responsibility of the Yolando Delgado to prove every essential part of her claims by a "preponderance of the evidence." This is sometimes called the "burden of proof" or the "burden of persuasion."

A "preponderance of the evidence" simply means an amount of evidence that is enough to persuade you that Yolando Delgado's claim is more likely true than not true.

If the proof fails to establish any essential part of a claim or contention by a preponderance of the evidence, you should find against the Yolanda Delgado.

When more than one claim is involved, you should consider each claim separately.

In deciding whether any fact has been proved by a preponderance of the evidence, you may consider the testimony of all of the witnesses, regardless of who may have called them, and all of the exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential part of Yolanda Delgado's claims by a preponderance of the evidence, you should find for The Evangelical Lutheran Good Samaritan Society and Sanford as to that claim.

### ANNOTATIONS AND COMMENTS

11th Circuit Pattern Jury Instructions.

10

### 3.7.2 Responsibility for Proof – Affirmative Defense
### Preponderance of the Evidence

In this case, the Evangelical Lutheran Good Samaritan Society and Sanford asserts the affirmative defenses of release, waiver, and failure to mitigate damages. Even if the Yolando Delgado proves her claims by a preponderance of the evidence, the Evangelical Lutheran Good Samaritan Society and Sanford can prevail in this case if it proves an affirmative defense by a preponderance of the evidence.

When more than one affirmative defense is involved, you should consider each one separately.

I caution you that the Evangelical Lutheran Good Samaritan Society and Sanford do not have to disprove the Yolando Delgado's claims, but if the Evangelical Lutheran Good Samaritan Society and Sanford raises an affirmative defense, the only way it can prevail on that specific defense is if it proves that defense by a preponderance of the evidence.

### ANNOTATIONS AND COMMENTS

11th Circuit Pattern Jury Instructions.

### 3.8.1 Duty to Deliberate When Only the Plaintiff Claims Damages

Of course, the fact that I have given you instructions concerning the issue of Plaintiff's damages should not be interpreted in any way as an indication that I believe that the Plaintiff should, or should not, prevail in this case.

Your verdict must be unanimous – in other words, you must all agree. Your deliberations are secret, and you'll never have to explain your verdict to anyone.

Each of you must decide the case for yourself, but only after fully considering the evidence with the other jurors. So you must discuss the case with one another and try to reach an agreement. While you're discussing the case, don't hesitate to reexamine your own opinion and change your mind if you become convinced that you were wrong. But don't give up your honest beliefs just because others think differently or because you simply want to get the case over with.

Remember that, in a very real way, you're judges – judges of the facts. Your only interest is to seek the truth from the evidence in the case.

<u>ANNOTATIONS AND COMMENTS</u>

11th Circuit Pattern Jury Instructions.

12

**3.9 Election of Foreperson Explanation of Verdict Form**

When you get to the jury room, choose one of your members to act as foreperson. The foreperson will direct your deliberations and speak for you in court.

A verdict form has been prepared for your convenience.

[Explain verdict]

Take the verdict form with you to the jury room. When you've all agreed on the verdict, your foreperson must fill in the form, sign it and date it. Then you'll return it to the courtroom.

If you wish to communicate with me at any time, please write down your message or question and give it to the court security officer. The court security officer will bring it to me and I'll respond as promptly as possible – either in writing or by talking to you in the courtroom. Please understand that I may have to talk to the lawyers and the parties before I respond to your question or message, so you should be patient as you await my response. But I caution you not to tell me how many jurors have voted one way or the other at that time. That type of information should remain in the jury room and not be shared with anyone, including me, in your note or question.

## JURY INSTRUCTIONS – FAIR HOUSING ACT – PLAINTIFF'S

## PROPOSED INSTRUCTIONS – CONTESTED

### Plaintiff's 3604(b) Claim

The Plaintiff has alleged Defendants violated section 3604(b) of Title 42 (The Fair Housing Act) of the United States Code which provides, in relevant part, that it shall be unlawful:

> "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

Specifically, Plaintiff alleges discrimination based on her national origin where, "national origin" includes the country from which a person or their ancestors came and may also include closely related characteristics such as language or limited English proficiency, where those traits are closely tied to one's origin.

### Standard

To sustain Plaintiff's claim of discrimination against one or both of Defendants, Plaintiff must prove the following four essential elements by a preponderance of the evidence:

1. Plaintiff, Yolanda Delgado, is a member of a protected class by her national origin;

2. Plaintiff enjoyed the use of a dwelling unit provided by Defendants on certain terms, conditions and privileges;

3. That the Plaintiff was subject to different terms, conditions or privileges associated with the use and services of the dwelling unit; and

4. No apparent reason other than the national origin of the Plaintiff exists to explain the different treatment by Defendants regarding the dwelling unit.

If you determine that the Plaintiff's national origin was a factor motivating or contributing in whole or in part to the Defendants' different treatment of Plaintiff, then you must consider any other reason given by the Defendants for the act. If you determine that the Defendants proved the same actions would have been taken regardless of Plaintiff's national origin, then you must decide this claim in favor of the Defense.

It is not necessary for the Plaintiff to prove that the Plaintiff's national origin was the sole or exclusive reason for the Defendants' actions. It is sufficient if the Plaintiff proves that national origin was a determinative consideration that made a difference in the outcome.

## Damages

If you find in favor of the Plaintiff, that one or both of the Defendants violated the Fair Housing Act, then you must determine the amount of damages, if any, that will reasonably compensate the Plaintiff for the harm caused.

You may consider:

- Emotional distress, humiliation, and embarrassment;

- Loss of housing opportunity;

- Increased cost or burden in obtaining alternative housing; and

- Loss of social and medical services previously provided.

### Punitive Damages

If you find for the Plaintiff, you may, but are not required to, award punitive damages in addition to compensatory damages. The purposes of punitive damages are to punish a Defendant and to deter a Defendant and others from committing similar acts in the future.

The Plaintiff has the burden of proving that punitive damages should be awarded, and the amount, by a preponderance of the evidence. You may award punitive damages only if you find that a Defendant's conduct was malicious, or in reckless disregard of the Plaintiff's rights. Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring another. Conduct is in reckless disregard of the Plaintiff's rights if, under the circumstances, it reflects complete indifference to the Plaintiff's safety, rights, or the Defendant acted in the face of a perceived risk that its actions will violate the Plaintiff's rights under federal law.

If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purposes but should not reflect bias, prejudice or sympathy toward any party. In considering punitive damages, you may consider the degree of reprehensibility of the Defendant's conduct and the relationship of any award of punitive damages to any actual harm inflicted on the plaintiff.

## PLAINTIFF'S ANNOTATIONS AND COMMENTS

See, 42 U.S.C. § 3604; 3C Fed. Jury Prac. & Instr. § 169:170 (6th ed.); *López v. City of Lawrence*, 823 F.3d 102, 110 (1st Cir. 2016); Jackson v. Okaloosa Cnty., Fla., 21 F.3d 1531,1543 (11th Cir. 1994) ("[w]e have held that the Fair Housing Act prohibits "not only direct discrimination but practices with racially discouraging effects ..."; thus, a showing of a significant discriminatory effect suffices to demonstrate a violation of the Fair Housing Act."); HUD Guidance, 72 Fed. Reg. 2732 (Jan. 22, 2007); Federal Jury Practice and Instructions for Federal Civil Cases, Housing Discrimination, § 169.160, 169.180, 169.211 & 169.212 at pp. 75 79 & 85 - 86; 42 U.S.C.A. §§ 3602(e), 3604(b) & 3606.

## Plaintiff's 3617 Claim

The Plaintiff separately claims a violation of 42 U.S.C. § 3617 (The Fair Housing Act) which makes it unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of any right granted or protected by the Federal Fair Housing Act.  Specifically, Plaintiff alleges that on October 15, 2022, Defendants, by and through their agents, did coerce and/or intimidate Plaintiff resulting in the loss and enjoyment of her housing rights.  Defendants deny plaintiffs' claims.

## Standard

It is a discriminatory housing practice to coerce, intimidate, or interfere with any person in the exercise or enjoyment of any right granted or protected by the Fair Housing Act.  Prohibited conduct includes:

1.  Subjecting a person to harassment, where the harassment has the effect of imposing different terms, conditions, or privileges relating to the rental of housing;

2.  Interfering with persons in their enjoyment of housing, or

3.  Coercing a person, either orally, in writing, or by other means, to deny or limit the sale or rental benefits provided to that person.

If you find by a preponderance of the evidence that one or both of the Defendants engaged in coercion, intimidation, or interference with the Plaintiff's housing rights then you must find that they violated the Fair Housing Act.

## Damages

If you find in favor of the Plaintiff, that one or both of  the Defendants violated the Fair Housing Act, then you must determine the amount of damages, if any, that will reasonably compensate the Plaintiff for the harm caused. You may consider:

•      Emotional distress, humiliation, and embarrassment;

•      Loss of housing opportunity;

18

- Increased cost or burden in obtaining alternative housing; and

- Loss of social and medical services previously provided.

## Punitive Damages

If you find for the Plaintiff, you may, but are not required to, award punitive damages in addition to compensatory damages. The purposes of punitive damages are to punish a Defendant and to deter a Defendant and others from committing similar acts in the future.

The Plaintiff has the burden of proving that punitive damages should be awarded, and the amount, by a preponderance of the evidence. You may award punitive damages only if you find that a Defendant's conduct was malicious, or in reckless disregard of the Plaintiff's rights. Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the purpose of injuring another. Conduct is in reckless disregard of the Plaintiff's rights if, under the circumstances, it reflects complete indifference to the Plaintiff's safety, rights, or the Defendant acted in the face of a perceived risk that its actions will violate the Plaintiff's rights under federal law.

If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purposes but should not reflect bias, prejudice or sympathy toward any party. In considering punitive damages, you may consider the degree of

19

reprehensibility of the Defendant's conduct and the relationship of any award of

punitive damages to any actual harm inflicted on the plaintiff.

## PLAINTIFF'S ANNOTATIONS AND COMMENTS

See, U.S.C. §3617, Modeled after Eleventh Circuit Pattern Jury Instruction (Civil)
5.7 – Fair Housing Act (§ 3604) and 5.8 – Interference (§ 3617). See also, O'Malley,
Grenig, & Lee, Fed. Jury. Prac. & Instr. Civil Comp HB § 13:1.

## Defendants' Argument and Authorities in Opposition to Plaintiff's FHA Instructions

Defendants submit that Plaintiff's proposed Jury Instruction on her
Federal Fair Housing Act ("FHA") claims are neither premised on applicable
law nor tailored to the specific facts of the case and therefore should not be
presented to the jury. Defendants instead request that the Court provide the
jury with their alternative FHA instruction.

Plaintiff alleges in her Complaint that Defendants have violated
§§ 3604(b) and 3617 of the FHA in connection with the execution of the
Termination Agreement. Specifically, Plaintiff alleges that Defendants
discriminated against her on the basis of national origin under § 3604(b) of the
FHA by failing to provide translation services in connection with her execution
of the Termination Agreement. Plaintiff further alleges that Defendants
violated § 3617 of the FHA by coercing her into signing the Termination
Agreement in return for an expedited refund of her security deposit.

Plaintiff's proposed jury instruction, however, completely omits the
factual allegations underlying her FHA claims. Defendants' proposed jury
instruction, in contrast, sets forth the factual allegations underlying Plaintiff's
§§ 3604(b) and 3617 FHA claims, and addresses the legal elements of the §§
3604(b) and 3617 claims by reference to those allegations.

Specifically, Defendants' proposed jury instruction advises that Plaintiff
must prove by a preponderance of the evidence that Defendants <u>intentionally</u>

discriminated against her on the basis of national origin by failing to provide her with translation services during the execution of the Termination Agreement in order to prevail on her § 3604(b) claim. *See Bonasera v. City of Norcross,* 342 F. App'x 581, 583 (11th Cir. 2009) ("A plaintiff can establish a violation under the FHA by proving (1) intentional discrimination, (2) discriminatory impact, or (3) a refusal to make a reasonable accommodation."). Plaintiff's instruction omits the required intent element.

Defendants' instruction further advises that a "service" within the meaning of § 3604(b) means a "housing-related service that is directly connected to the sale or rental of a dwelling," and that Plaintiff must establish that translation services are "essential to the habitability" of a dwelling or are "required in order to obtain housing" in order to prevail on her § 3604(b) claim. *See, e.g., Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 634 (11th Cir. 2019) ("A service within the meaning of § 3604(b) must be a housing-related service that is directly connected to the sale or rental of a dwelling"); *Truesdale v. Venice Arms, Inc.*, 713 F. Supp. 3d 1350, 1356 (S.D. Fla. 2024) (Sections 3604(a) and (b) are limited to conduct that directly impacts the accessibility to housing because of a protected classification"); *Warner v. School Board of Hillsborough County, Florida*, 2024 WL 3315627, at *7 (M.D. Fla. 2024) ("The Eleventh Circuit has rejected an 'expansive view of services covered by § 3604(b)' and instead holds that 'a service within the meaning of § 3604(b) must be a housing-related service that is directly connected to the sale or rental of a dwelling.'").

With regard to Plaintiff's § 3617 claim, Defendants' proposed jury instruction advises that Plaintiff must prove by a preponderance of the evidence that Defendants "coerced, intimidated, threatened, or interfered with her exercise of a right under §§ 3603-3606 because of discriminatory animus, or that Defendants engaged in discriminatory conduct so severe or pervasive, such as violence or threats of violence, that had the effect of causing Plaintiff to abandon the exercise of her housing rights." *See, e.g., Truesdale*, 713 F. Supp. 3d at 1357 ("Under the 11th Circuit's interpretation, it appears that liability exists if a plaintiff can demonstrate that: (1) a defendant coerced, intimidated, threatened, or interfered; (2) with a: (a) plaintiff's exercise of a right under

sections 3603-3606; (b) plaintiff's enjoyment of a housing right after exercise of that right; or (c) plaintiff's aid or encouragement to a protected person to exercise or enjoy a housing right; (3) because of discriminatory animus.").

Finally, Plaintiff's proposed instruction seeks damages for the "loss of housing opportunity" and "increased cost or burden in obtaining alternative housing" which are not recoverable damages under the allegations of the Complaint, which center on the execution of the Termination Agreement, not damage caused by the hurricane. Defendants' proposed instruction, in contrast, accurately advises the jury that Plaintiff is limited to actual damages she has suffered, if any, that are the direct result of her signing the Termination Agreement, and that she is not entitled to damages relating to flooding or damage from Hurricane Ian, or having to move out of Kissimmee Village as a result.

In summary, because Plaintiff's proposed FHA instruction omits any reference to the facts underlying her claims, misstates the elements of her §§ 3604(b) and 3617 claims, and asserts entitlement to damages that are not recoverable under the allegations of her Complaint, Defendants submit that the Court should reject Plaintiff's proposed instruction and provide the jury with their proposed instruction on Plaintiff's FHA claim.

## JURY INSTRUCTIONS – FAIR HOUSING ACT – DEFNENDANTS'

## PROPOSED INSTRUCTIONS – CONTESTED

Ms. Delgado claims that Good Sam discriminated against her on the basis of national origin in violation of sections 3604(b) and 3617 of the federal Fair Housing Act ("FHA") by failing to provide translation services during the execution of the Termination Agreement, and by coercing her into signing the document in return for an expedited refund of her security deposit. Ms. Delgado claims she has been damaged as a result because she now lives in more expensive and inconvenient housing.

The FHA permits an "aggrieved person," defined to mean a person who "claims to have been injured by a discriminatory housing practice," to bring a housing-discrimination lawsuit.

Section 3604(b) of the FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

Section 3617 of the FHA makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

Ms. Delgado claims that Good Sam discriminated against her on the basis of national origin under § 3604(b) of the FHA by failing to provide translation services in connection with her execution of the Termination Agreement. A "service" within the meaning of § 3604(b) is defined to mean a "housing-related service that is directly connected to the sale or rental of a dwelling." An action that affects housing in some remote manner is not sufficient under the statute. Rather, the FHA requires a closer "causal link" between the "availability of housing and the disputed action." For example, services such as water, gas, and electricity which are "essential to the habitability of" a dwelling fall within the meaning of § 3604(b), while services that are "not required in order to obtain housing" do not.

23

Therefore, in order to prevail on her § 3604(b) claim, Ms. Delgado must prove by a preponderance of the evidence that Good Sam intentionally discriminated against her on the basis of national origin by failing to provide her with a service that was essential to the habitability of her dwelling or that was required in order to obtain housing. Ms. Delgado claims that Good Sam violated § 3604(b) by intentionally failing to provide her with "translation services" during the execution of the Termination Agreement. Therefore, you must determine whether translation services are "essential to the habitability" of a dwelling, or are "required in order to obtain housing," as required to fall within § 3604(b) of the FHA.

If you determine that translation services are essential to the habitability of a dwelling or are required in order to obtain housing, you must next determine whether Ms. Delgado has waived her right to assert a claim of discrimination by failing to request translation services or by utilizing her daughter as her translator.

If you find that translation services are not "services" that are "essential to the habitability" of a dwelling or "required in order to obtain housing" under § 3604(b), and/or that Ms. Delgado has waived her right to claim a violation of § 3604(b) by failing to request such services or by utilizing her daughter as her translator, then you must find for Defendants on Ms. Delgado's § 3604(b) claim.

If you find that translation services are "services" that are "essential to the habitability" of a dwelling or "required in order to obtain housing" under § 3604(b), and that Ms. Delgado did not waive her right to claim a violation of § 3604(b), then you must determine whether Defendants intentionally violated Ms. Delgado's § 3604(b) rights.   If you find that Defendants did not act intentionally, then you must find for Defendants on Ms. Delgado's § 3604(b) claim. If you find that Defendants did act intentionally, then you must find for Ms. Delgado on her § 3604(b) claim and then will proceed to assessing whether actual or punitive damages are appropriate.

To prevail on her alternative § 3617 FHA claim, Ms. Delgado must prove by a preponderance of the evidence that Good Sam coerced, intimidated, threatened, or interfered with her exercise of a right under sections 3603-3606 of the FHA, or of her enjoyment of a housing right after exercise of that right because of discriminatory animus. Absent proof of conduct interfering with Ms. Delgado's exercise of a housing right under sections 3603-3606 of the FHA, Ms. Delgado must prove that Good Sam engaged in discriminatory conduct so

severe or pervasive, such as violence or threats of violence, that had the effect of causing Ms. Delgado to abandon the exercise of her housing rights.

Under either scenario, Ms. Delgado must prove by a preponderance of the evidence that Good Sam "coerced, intimidated, threatened, or interfered" with Ms. Delgado's exercise of a right under §§ 3603-3306 because of discriminatory animus, or that Good Sam engaged in discriminatory conduct so severe or pervasive, such as violence or threats of violence, that had the effect of causing Ms. Delgado to abandon the exercise of her housing rights.

If you find that Ms. Delgado has established the elements of her §§ 3604(b) and/or 3617 claims, you must decide the issue of damages. If you find that Ms. Delgado has not established the elements of her claims, then you must find for Defendants.

On the issue of damages, Ms. Delgado is entitled under the FHA to seek actual damages if she is able to establish, by a preponderance of the evidence, that she has been injured by a discriminatory housing practice, and also a direct relation between the injury asserted and the alleged conduct. Ms. Delgado's claimed injury is that she has been forced to live in more expensive and less convenient housing as a result of Good Sam's conduct in failing to provide her with a translator during the execution of the Termination Agreement, and in coercing her to sign the document in return for an expedited refund of her security deposit.

However, Ms. Delgado is limited to actual damages she has suffered, if any, that are the direct result of her signing the Termination Agreement, not the result of flooding or damage from Hurricane Ian or her having to move out of Kissimmee Village as a result. In other words, you must not consider any emotional distress or other harm or damages Ms. Delgado experienced because of Hurricane Ian and its flooding.  For instance, if you find that the higher expenses (like her mortgage payment) and inconvenience Ms. Delgado has incurred and experienced in moving into a new house away from Kissimmee Village was a result of the Hurricane Ian flooding her unit and was not because she signed the Termination Agreement, then Ms. Delgado is not entitled to actual damages for those items.  Or stated differently, if you find that that Ms. Delgado would have had to leave Kissimmee Village and secure alternate housing as a result of Hurricane Ian, regardless of whether she signed the Termination Agreement, then Ms. Delgado is not entitled to actual damages for those items.  As another example, if you find that any mental or emotional distress Ms. Delgado has experienced was a result of the flooding of her unit

25

and the destruction of her personal items and valuables caused by the flooding, and was not caused by her signing the Termination Agreement, then Ms. Delgado that mental or emotional distress cannot be considered or awarded as damages.

If you determine that Ms. Delgado's claimed injury was the direct result of discriminatory conduct on the part of Good Sam in connection with her signing the Termination Agreement and not Hurricane Ian, and that Ms. Delgado is entitled to actual damages, you must also consider whether Ms. Delgado is entitled to punitive damages as punishment to Good Sam and as a deterrent to others. In other words, you will only reach the issue of punitive damages if you find that Ms. Delgado has satisfied the elements of her §§ 3604(b) and/or 3617 claims, and also that she is entitled to an award of actual damages.

Punitive damages may be awarded under the FHA only where a defendant's conduct is motivated by evil motive or intent, or shows a reckless or callous disregard of, or indifference to, the federally protected rights of others. Evil motive or intent, and reckless indifference to the rights of others, focuses on the actor's state of mind and knowledge that he or she may be acting in violation of federal law. For punitive damages to be available, the defendant must discriminate in the face of a perceived risk that his or her actions will violate federal law.

Therefore, to be entitled to an award of punitive damages, Ms. Delgado must prove by a preponderance of the evidence that Good Sam intentionally acted with either an evil motive or intent, or with reckless indifference toward Ms. Delgado's federally protected rights under the FHA, in failing to provide translation services in connection with the execution of the Termination Agreement, and in coercing Ms. Delgado to sign the contract in return for an expedited refund of her security deposit.

There is no single factor that determines whether a particular defendant has acted with malice or with reckless indifference to an individual's federally protected rights. In determining whether to award Ms. Delgado punitive damages, you may consider factors such as: (1) whether Defendants engaged in a pattern of discrimination toward the tenants; (2) whether Defendants acted spitefully or malevolently; (3) whether Defendants showed a blatant disregard for the federal civil rights of tenants; or (4) whether Defendants failed to take

corrective action concerning discriminatory acts or comments by their employees or agents.

If you find that punitive damages are warranted against one or both Defendants under Ms. Delgado's Fair Housing Act claims, the trial will continue into a second phase where you will receive additional evidence and argument for consideration of what amount of punitive damages to award (if any).

<u>DEFENDANTS' ANNOTATIONS & COMMENTS</u>

These instructions are based upon the relevant portions of the FHA and authorities and arguments cited in opposition to Plaintiff's proposed jury instructions on Plaintiff's FHA claim. *See Bonasera v. City of Norcross*, 342 F. App'x 581, 583 (11th Cir. 2009) ("A plaintiff can establish a violation under the FHA by proving (1) intentional discrimination, (2) discriminatory impact, or (3) a refusal to make a reasonable accommodation."). Plaintiff's instruction omits the required intent element; *Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 634 (11th Cir. 2019) ("A service within the meaning of § 3604(b) must be a housing-related service that is directly connected to the sale or rental of a dwelling"); *Truesdale v. Venice Arms, Inc.*, 713 F. Supp. 3d 1350, 1356 (S.D. Fla. 2024) (Sections 3604(a) and (b) are limited to conduct that directly impacts the accessibility to housing because of a protected classification"); *Warner v. School Board of Hillsborough County, Florida*, 2024 WL 3315627, at *7 (M.D. Fla. 2024) ("The Eleventh Circuit has rejected an 'expansive view of services covered by § 3604(b)' and instead holds that 'a service within the meaning of § 3604(b) must be a housing-related service that is directly connected to the sale or rental of a dwelling.'"); *Truesdale*, 713 F. Supp. 3d at 1357 ("Under the 11th Circuit's interpretation, it appears that liability exists if a plaintiff can demonstrate that: (1) a defendant coerced, intimidated, threatened, or interfered; (2) with a: (a) plaintiff's exercise of a right under sections 3603-3606; (b) plaintiff's enjoyment of a housing right after exercise of that right; or (c) plaintiff's aid or encouragement to a protected person to exercise or enjoy a housing right; (3) because of discriminatory animus.").

## JURY INSTRUCTIONS – ADULT PROTECTIVE SERVICES ACT
## CLAIM – PLAINTIFF'S PROPOSED INSTRUCTIONS – CONTESTED

Plaintiff also seeks damages for exploitation of a vulnerable adult under Florida's Adult Protective Services Act. Specifically, Plaintiff claims that Defendants violated Florida Statute §415.1111 on October 15, 2022, by exploiting her in the execution of the termination agreement.

To find that one or both of the Defendants violated this statute you must find by a preponderance of the evidence, that:

1. Plaintiff was a vulnerable adult on October 15, 2022,

2. Defendants stood in a position of trust or confidence with Plaintiff, and

3. Defendants did on October 15, 2022:

   a. by deception or intimidation, obtain or use, or endeavor to obtain or use, Plaintiff's funds, assets, or property with the intent to temporarily or permanently deprive Plaintiff of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the Plaintiff;

   OR

   b. Knew or should have known that the Plaintiff lacked the capacity to consent, and obtained or used, or endeavored to obtain or use, the Plaintiff's funds, assets, or property with the intent to temporarily or

permanently deprive Plaintiff of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the Plaintiff.

**"Vulnerable adult"** means a person 18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging.

**"Exploitation"** means a person who:

Stands in a position of trust and confidence with a vulnerable adult and knowingly, by deception or intimidation, obtains or uses, or endeavors to obtain or use, a vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive a vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult; or

Knows or should know that the vulnerable adult lacks the capacity to consent, and obtains or uses, or endeavors to obtain or use, the vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive the vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult.

29

**"Exploitation"** may include, but is not limited to:

1.  Breaches of fiduciary relationships, such as the misuse of a power of attorney or the abuse of guardianship duties, resulting in the unauthorized appropriation, sale, or transfer of property;

2.  Unauthorized taking of personal assets;

3.  Misappropriation, misuse, or transfer of moneys belonging to a vulnerable adult from a personal or joint account; or

4.  Intentional or negligent failure to effectively use a vulnerable adult's income and assets for the necessities required for that person's support and maintenance.

**"Fiduciary relationship"** means a relationship based upon the trust and confidence of the vulnerable adult in the caregiver, relative, household member, or other person entrusted with the use or management of the property or assets of the vulnerable adult. The relationship exists where there is a special confidence entrusted in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the vulnerable adult. For the purposes of this part, a fiduciary relationship may be formed by an informal agreement between the vulnerable adult and the other person and does not require a formal declaration or court order for its existence. A fiduciary relationship includes, but

is not limited to, court-appointed or voluntary guardians, trustees, attorneys, or conservators of a vulnerable adult's assets or property.

**"Lacks capacity to consent"** means a mental impairment that causes a vulnerable adult to lack sufficient understanding or capacity to make or communicate responsible decisions concerning person or property, including whether or not to accept protective services.

**"Obtains or uses"** means any manner of:

    (a)  Taking or exercising control over property;

    (b)  Making any use, disposition, or transfer of property;

    (c)  Obtaining property by fraud, willful misrepresentation of a future act, or false promise; or

    (d)  Conduct otherwise known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud, or deception; or

    (e)  Other conduct similar in nature.

If the preponderance of the evidence does support the Plaintiff's claim, then your verdict should be for the Plaintiff. If the preponderance of the evidence does not support the Plaintiff's claim against either of the Defendants, then your verdict should be for Defendants.

**Damages**

If you find in favor of the Plaintiff, that one or both of the Defendants violated the Florida Adult Protective Services Act, then you must determine the amount of damages that will reasonably compensate the Plaintiff for the harm caused.

## Punitive Damages

Under Florida's Adult Protective Services Act, a vulnerable adult who has been exploited, may recover punitive damages for such exploitation. If you find for Plaintiff and against one of both of Defendants on Plaintiff's claim under Florida's Adult Protective Services Act, you must decide whether punitive damages are warranted as punishment to any Defendant found to be liable and as a deterrent to others.

Plaintiff  claims that punitive damages should be awarded against Defendants  for their conduct in exploiting her as a vulnerable adult. Punitive damages are warranted against Defendants if you find by clear and convincing evidence that one of both of the Defendants were guilty of intentional misconduct or gross negligence, which was a substantial cause of loss, injury, or damage to Plaintiff. Under those circumstances, you may in your discretion award punitive damages against one or both of the Defendants. If clear and convincing evidence does not show Defendants' conduct rose to the level of intentional misconduct or gross negligence, punitive damages are not warranted.

"Intentional misconduct" means that Defendants had actual knowledge of the wrongfulness of the conduct and that there was a high probability that injury or damage to Plaintiff would occur and, despite that knowledge, they intentionally pursued that course of conduct, resulting in injury or damage. "Gross negligence" means that Defendants' conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.

"Clear and convincing evidence" differs from the "greater weight of the evidence," also known as preponderance of the evidence, in that it is more compelling and persuasive. As I have already instructed you, "greater weight of the evidence" means the more persuasive and convincing force and effect of the entire evidence in the case.

If you decide that punitive damages are warranted against one or both of Defendants then you must decide the amount of punitive damages, if any, to be assessed as punishment against them and as a deterrent to others. This amount would be in addition to the damages, if any, you have previously awarded. In making this determination, you should consider the following:

The nature, extent and degree of misconduct and the related circumstances, including the following:

33

(I)  Whether the wrongful conduct was motivated solely by unreasonable financial gain;

(2)    Whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by Defendants;

(3)    Whether, at the time of the loss, injury, or damage to Plaintiff, Defendants had a specific intent to harm Plaintiff  and the conduct of Defendants did in fact harm Plaintiff.

You may in your discretion decline to assess punitive damages against Defendants. You may also assess punitive damages against one of the Defendants and not the other, or against both Defendants. Punitive damages may also be assessed against Defendants in different amounts.

## PLAINTIFF'S ANNOTATIONS AND COMMENTS

There is no Florida Standard Jury Instruction for this cause of action. Instruction based upon statutory construction and *Grasso v. Grasso*, Middle District of Florida, Case No. 8: 13-cv-3186-T-33AEP.

## Defendants' Argument and Authorities in Opposition to Plaintiff's APSA Instructions

Defendants submit that Plaintiff's proposed Jury Instruction on her claim under the Florida Adult Protective Services Act ("APSA" or "Act") is not tailored to the specific facts of the case and is legally incomplete and therefore should not be given to the jury. Defendants instead request that the Court provide the jury with their alternative APSA instruction.

34

Plaintiff's proposed instruction, which asserts that Defendants are in violation of the APSA by "exploiting her in the execution of the Termination Agreement," is not tailored to the specific factual allegations of her Complaint, *i.e.*, that Defendants are in violation of the APSA by coercing her into signing the Termination Agreement in return for an expedited refund of her security deposit.

Moreover, aside from reciting various definitions from the statute, Plaintiff's proposed jury instruction does not advise the jury that she has the burden of proving by a preponderance of the evidence that she qualifies as a "vulnerable adult" within the meaning of the statute, that Defendants occupy the type of "legal or fiduciary relationship" required to establish a claim of "exploitation" under the Act, and that Defendants "exploited" Plaintiff's "vulnerability" within the meaning of the Act by coercing her into signing the Termination Agreement in return for an expedited refund of her security deposit.

Defendants submit that their proposed jury instruction on Plaintiff's APSA claim is more specifically tailored to the facts of the case, ties those facts to the below-referenced statutory definitions and case law, and advises the jury regarding Plaintiff's burden of proof under the Act. Defendants therefore request that the Court instruct the jury using their proposed instruction on Plaintiff's APSA claim. *See* § 415.101(2), Fla. Stat. (acknowledging that the APSA was enacted in recognition of the fact that "there are many persons in this state who, because of age or disability, are in need of protective services."); § 415.102(22), Fla. Stat. (defining "protective services" to mean "services to protect the vulnerable adult from further occurrences of abuse, neglect, or exploitation."); § 415.102(28), Fla. Stat. (defining a "vulnerable adult" entitled to "protective services" to mean a person "18 years of age or older whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging."); § 415.102(8)(a), Fla. Stat. (defining "exploitation" within the meaning of the Act); *see also Cordero v. Transamerica Annuity Service Corp.*, 71 F.4th 843, 846 (11th Cir. 2023) (affirming dismissal where allegations of

complaint establish no "exploitation" as defined in the Act); *Mac-Gray Servs.,
Inc. v. DeGeorge,* 913 So. 2d 630, 633 (Fla. 4th DCA 2005) (fiduciary relationship
does not exist for parties who deal at arm's length and where no duty is
imposed on either party to protect or benefit the other).

## JURY INSTRUCTIONS – ADULT PROTECTIVE SERVICES ACT

## CLAIM – DEFENDANTS' PROPOSED INSTRUCTIONS – CONTESTED

Ms. Delgado also claims Defendants are in violation of Florida's Adult
Protective Services Act, which was enacted by the Florida legislature to protect
"vulnerable adults" who, because of age or disability, are in need of protective
services, and to protect such individuals from abuse, neglect, and exploitation.
Ms. Delgado asserts that she falls within the definition of a "vulnerable adult"
under the Act and that Good Sam "exploited" her within the meaning of the
Act by coercing her into signing the Termination Agreement in return for an
expedited refund of her security deposit.

To succeed on her claim, Ms. Delgado must prove that she falls within
the definition of a "vulnerable adult" under the Act. To qualify as a "vulnerable
adult" under the Act, Ms. Delgado must prove by a preponderance of the
evidence that her "ability to perform the normal activities of daily living or to
provide for her own care or protection is impaired due to a mental, emotional,
sensory, long-term physical, or developmental disability or dysfunction, or
brain damage, or the infirmities of aging." "Activities of daily living" are
"functions and tasks for self-care, including ambulation/walking, bathing,
dressing, eating, grooming, toileting, and other similar tasks." A "disability or
dysfunction, or brain damage, or the infirmities of aging" under the Act must
be of some lengthy duration, rather than short-term like a number of hours,
days, or even weeks.

If you find that Ms. Delgado has not satisfied her burden of proving by
a preponderance of the evidence that she qualifies as a "vulnerable adult"
under the Act, then you must find for Defendants on Ms. Delgado's claim. If
you find that Ms. Delgado has satisfied her burden of proving by a
preponderance of the evidence that she qualifies as a "vulnerable adult" under
the Act, then you must determine whether she has carried her burden of

36

proving by a preponderance of the evidence that one or both of the Defendants "exploited" her within the meaning of the Act.

"Exploitation" under the Act is defined to mean that a "person who . . . stand[s] in a position of trust and confidence with a vulnerable adult . . . knowingly, by deception, or intimidation, obtains or uses, or endeavors to obtain or use, a vulnerable adult's funds, assets, or property with the intent to temporarily or permanently deprive a vulnerable adult of the use, benefit, or possession of the funds, assets, or property for the benefit of someone other than the vulnerable adult."

A person who stands in a "position of trust and confidence" with a vulnerable adult is a person who "has a legal or fiduciary relationship, including, but not limited to, a court-appointed or voluntary guardian, trustee, attorney, or conservator." A "fiduciary relationship" means a "relationship based upon the trust and confidence of the vulnerable adult in the caregiver, relative, household member, or other person entrusted with the use or management of the property or assets of the vulnerable adult."

"Deception" means a "misrepresentation or concealment of a material fact relating to services rendered, disposition of property, or the use of property intended to benefit a vulnerable adult."

"Intimidation" means "the communication by word or act to a vulnerable adult that such person will be deprived of food, nutrition, clothing, shelter, supervision, medicine, medical services, money, or financial support or will suffer physical violence."

"Obtains or uses" means "(a) taking or exercising control over property; (b) making any use, disposition, or transfer of property; (c) obtaining property by fraud, willful misrepresentation of a future act, or false promise; or (d) conduct otherwise known as stealing; larceny; purloining; abstracting; embezzlement; misapplication; misappropriation; conversion; or obtaining money or property by false pretenses, fraud or deception; or other conduct similar in nature."

If you find that Ms. Delgado has not satisfied her burden of proving that Defendants "exploited" her within the meaning of the Act, then you must find in favor of the Defendants under this claim. If you find that Ms. Delgado has satisfied her burden of proving by a preponderance of the evidence that she qualifies as a "vulnerable adult" within the meaning of the Act and that the

Defendants "exploited" her within the definition of the Act, then Ms. Delgado is entitled to seek actual and punitive damages, if warranted.

Ms. Delgado claims she is entitled to actual and punitive damages under the Act as a result of her execution of the Termination Agreement. Therefore, as with her Fair Housing Act claim, you must determine whether Ms. Delgado suffered injury or damage because she signed that contract. In making this determination, you may not consider any mental pain or anguish, or emotional distress, Ms. Delgado has suffered because of Hurricane Ian and the flooding it caused, or financial injuries she has suffered as a result of having to move out of Kissimmee Village and having to pay more money for her home mortgage. Ms. Delgado's damages are limited to injuries having a direct relationship – i.e., directly caused by –her signing the Termination Agreement, if any.

If you find that Ms. Delgado did not suffer injuries as a direct result of her signing the Termination Agreement, then you must find in favor of Defendants on this claim. If you find that Ms. Delgado has satisfied her burden of proving by the preponderance of evidence that she has suffered injuries as a direct result of her signing the Termination Agreement, you may award Ms. Delgado her actual damages as well as punitive damages if Ms. Delgado has satisfied the standard for an award of punitive damages under Florida law.

Specifically, the Florida Legislature has authorized an award of punitive damages as a form of extraordinary relief for acts and omissions so egregious as to jeopardize not only the particular plaintiff in the lawsuit, but the public as a whole, such that a punishment — not merely compensation — must be imposed to prevent similar conduct in the future. Punitive damages in Florida are reserved for truly culpable conduct akin to the conduct involved in criminal manslaughter.

When a plaintiff seeks punitive damages against an entity based on the conduct of an employee or agent, as in this case, the plaintiff is subject to an even higher standard. Specifically, the plaintiff must present clear and convincing evidence of either "intentional misconduct" or "gross negligence" on the part of the employee or agent, and also that the entity (a) actively and knowingly participated in such conduct; or (b) officers, directors, or managers of the entity knowingly condoned, ratified, or consented to such conduct.

"Clear and convincing evidence" differs from the "preponderance of the evidence" or "greater weight of the evidence" in that it is more compelling and persuasive. "Preponderance of the evidence" means the more persuasive and

convincing force and effect of the entire evidence in the case. "Clear and convincing evidence" is evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue.

"Intentional misconduct" is defined to mean "actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursu[ing] that course of conduct, resulting in injury or damage." "Gross negligence" is defined to mean conduct "so reckless or wanting in care that it constitutes a conscious disregard or indifference to the life, safety, or rights of persons exposed to its conduct."

Therefore, Ms. Delgado not only must prove by clear and convincing evidence conduct by an employee or agent that rose to the level of "intentional misconduct" or "gross negligence" under Florida's punitive damages statute, but also that the Defendants "actively and knowingly participated" in the misconduct, or that "officers, directors, or managers" of the Defendant entities "knowingly condoned, ratified, or consented to such conduct."

If you find that Ms. Delgado has not satisfied her burden of proving by clear and convincing evidence "intentional misconduct" or "gross negligence" on the part of an employee or agent of the Defendants, and that the Defendant entities actively and knowingly participated" in the misconduct or that their "officers, directors, or managers" "knowingly condoned, ratified, or consented to such conduct," then you may not award punitive damages in Ms. Delgado's favor. If you find that Ms. Delgado has satisfied her burden of proving entitlement to punitive damages by clear and convincing evidence, the trial will continue into a second phase where you will receive additional evidence and argument for consideration of what amount of punitive damages to award (if any).

DEFENDANTS' ANNOTATIONS & COMMENTS

These instructions are based upon the relevant portions of the APSA and authorities and arguments cited in opposition to Plaintiff's proposed jury instructions on Plaintiff's APSA claim. *See* § 415.101(2), Fla. Stat. (acknowledging that the APSA was enacted in recognition of the fact that "there are many persons in this state who, because of age or disability, are in

need of protective services."); § 415.102(22), Fla. Stat. (defining "protective
services" to mean "services to protect the vulnerable adult from further
occurrences of abuse, neglect, or exploitation."); § 415.102(28), Fla. Stat.
(defining a "vulnerable adult" entitled to "protective services" to mean a
person "18 years of age or older whose ability to perform the normal activities
of daily living or to provide for his or her own care or protection is impaired
due to a mental, emotional, sensory, long-term physical, or developmental
disability or dysfunction, or brain damage, or the infirmities of aging.");
§ 415.102(8)(a), Fla. Stat. (defining "exploitation" within the meaning of the
Act); *see also Cordero v. Transamerica Annuity Service Corp.*, 71 F.4th 843, 846 (11th
Cir. 2023) (affirming dismissal where allegations of complaint establish no
"exploitation" as defined in the Act); *Mac-Gray Servs., Inc. v. DeGeorge,* 913 So.
2d 630, 633 (Fla. 4th DCA 2005) (fiduciary relationship does not exist for parties
who deal at arm's length and where no duty is imposed on either party to
protect or benefit the other).

## JURY INSTRUCTIONS – DECLARATORY JUDGMENT CLAIM –
## PLAINTIFF'S PROPOSED INSTRUCTIONS – CONTESTED

Plaintiff, Yolanda Delgado, seeks declaratory judgment under 28 U.S.C §2201(a) holding the Termination Agreement between the parties is invalid. This declaratory judgment can find the Termination Agreement *void ab initio*, which means the contract was never legally valid from the beginning, or *voidable*, meaning the contract should now be rescinded.

Under federal law, a jury may declare the rights and legal relations of parties to a contract or legal controversy. You are asked to determine whether the Termination Agreement in question is valid under the law, based on the facts you find.

To decide whether the contract is invalid, you must determine whether any of the following conditions existed at the time the contract was formed:

1. Lack of Mutual Consent. The parties did not mutually agree to the same essential terms of the Termination Agreement.

2. Fraud in the Execution. One party was misled, through deception or false statements, about the very nature or content of the document signed.

3. Illegality. The purpose or subject matter of the Termination Agreement was illegal at the time of execution.

4. Lack of Capacity. One or more parties lacked the legal capacity to enter the Termination Agreement (for example, due to age or mental incapacity).

5. Mutual Mistake. Both parties were mistaken about a basic and material fact that goes to the heart of the Termination Agreement.

If you find that any of these conditions existed and make the Termination Agreement void from the beginning, then you must find in favor of the Plaintiff and declare that the contract is *void ab initio*. If you find that Termination Agreement may be valid, but facts support rescinding it, then you must find in favor of the Plaintiff and declare the contract is voidable.

If you find that none of these conditions existed and the contract is valid, then you must find in favor of the Defendants and determine that the contract is not *void ab initio* or voidable.

The Plaintiff has the burden to prove, by a preponderance of the evidence, that the contract is invalid. This means the Plaintiff must show that it is more likely true than not true that the contract is invalid.

## <u>ANNOTATIONS AND COMMENTS</u>

28 U.S.C. §2201(a); See *Olin's, Inc. v. Avis Rental Car System of Fla.,* 131 So.2d 20 (1961); 17A C.J.S. Contracts § 184.

## **Defendants' Argument and Authorities in Opposition to Plaintiff's Instructions as to Count II (Declaratory Relief)**

There should be no jury instructions for this Count.  Count II of the operative Complaint pleads a claim for Declaratory Relief pursuant to 28 U.S.C. § 2201(a). Such claims present issues of law for the Court to determine, not questions for the jury.  For example, Plaintiff claims that she is entitled to declaratory relief on the ground that the Termination Agreement is not valid and enforceable and there was no valid consideration.  *See DiMauro v. Martin*, 359 So. 3d 3, 6-7 (Fla. Dist. Ct. App. 2023) (whether a contract is valid and enforceable is an issue of law for the court); *Ashby v. Ashby*, 651 So. 2d 246, 247 (Fla. Dist. Ct. App. 1995) (whether there is valid consideration is also an issue of law for the court).

## JURY INSTRUCTIONS – CLAIMS AGAINST SANFORD – PLAINTIFF'S

## PROPOSED INSTRUCTIONS – CONTESTED

Plaintiff, Yolanda Delgado, claims Defendant Sanford is the alter ego of Good Samaritan. This is a claim that those parties should be treated as being one and the same entity or person under the law so that the separate corporate existence of Good Samaritan should be disregarded, and Defendant Sanford should be held directly liable for Good Samaritan's acts and obligations.

With respect to that issue, you are instructed that a corporation, generally, is a separate legal entity authorized under the law to do business in its own right and on its own credit as distinguished from the credit and assets of other persons or corporations. Also, the mere fact one or two parties own and control the stock structure of a corporation, or that two corporations have common officers or directors, or both, does not mean the corporation may be regarded as the alter ego of its stockholders.

The existence of a corporate entity may be disregarded where it is proven that the corporation was created as a mere device or sham to accomplish some ulterior purpose or is a mere instrumentality or agent of another corporation or individual owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.

Where a party is the principal stockholder of one or more corporations and directly conducts their business or manages their assets, that party may be found directly liable for the corporate obligations if it is proven that this party has consistently engaged in a course of conduct ignoring the existence of the corporate entity or entities and has, in fact, conducted business directly by exercising such paramount and direct control over the operations of the corporation or corporations that the corporate existence has been disregarded and the business interests of the controlled entity and the party's own business interests cannot be reasonably separated.

## PLAINTIFF'S ANNOTATIONS AND COMMENTS

Based on: 3 Fed. Jury Prac. & Instr. § 108:05 (7th ed.). See also, *In re Parton*, 137 B.R. 902, 905 (Bankr. S.D. Ohio 1991).


## Defendants' Argument and Authorities in Opposition to Plaintiff's "Sanford" Jury Instructions

Plaintiff's proposed Jury Instruction should not be given to the jury, as Plaintiff did not plead that Good Samaritan is the "alter ego" of Sanford or that it is a "sham" corporation. Defendants merely pleaded that Sanford is the parent company of Good Sam. (ECF 45 ¶8) ("Defendant, SANFORD is a South Dakota non-profit corporation and upon information and belief is the parent company of GOOD SAM"). The jury should not be given an instruction on a principle that Plaintiff did not plead.

## JURY INSTRUCTIONS – CLAIMS AGAINST SANFORD – PLAINTIFF'S PROPOSED INSTRUCTIONS – CONTESTED

Plaintiff, Yolanda Delgado, claims that Defendant Sanford should held directly liable for Good Samaritan's acts and obligations because it is Good Samaritan's parent company.

With respect to that issue, you are instructed that a corporation, generally, is a separate legal entity authorized under the law to do business in its own right and on its own credit as distinguished from the credit and assets of other persons or corporations. Generally, a parent company cannot be held liable for the acts of its subsidiary simply by virtue of ownership or parent relationship. A parent company also generally cannot be held liable for issues related to a contract entered into by its subsidiary.

However, a corporate entity may be held liable for the acts of another entity where it is proven that the purpose of the corporation is to evade some statute or to accomplish some fraud or illegal purpose. If you find that Good Samaritan's corporate purpose is to evade some statute or to accomplish some fraud or illegal purpose, then you must find for Plaintiff against Sanford. If you do not find that Good Samaritan's corporate purpose is to evade some statute or to accomplish some fraud or illegal purpose, then you must find for Sanford.

## DEFENDANTS' ANNOTATIONS AND COMMENTS

*See Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1120–21 (Fla. 1984) (citing *Roberts' Fish Farm v. Spencer*, 153 So.2d 718 (Fla.1963) (Holding that a corporation cannot be personally liable for the conduct of its subsidiary "unless it be shown that the corporation is formed or used for some illegal, fraudulent or other unjust purpose which justifies piercing of the corporate veil." ); *Cohen's Org. v. Premier Fire Alarms & Integration Sys., Inc.*, 318 So. 3d 573 (Fla. 4th DCA 2021); *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) ("It goes without saying that a contract cannot bind a nonparty.").

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

YOLANDA DELGADO,

     Plaintiff,                         Case No. 6:23-cv-1288-RBD-EJK

v.

THE EVANGELICAL
LUTHERAN GOOD SAMARITAN SOCIETY,
a foreign not-for-profit corporation
d/b/a GOOD SAMARITAN SOCIETY –
KISSIMMEE VILLAGE; SANFORD GROUP
 a/k/a SANFORD a/k/a SANFORD HEALTH,
 a foreign not-for-profit corporation,

     Defendants.

_____/

## <u>VERDICT FORM</u>

### <u>Federal Fair Housing Act Claims (Count 1)</u>

**We, the jury unanimously find the following by a preponderance of the evidence:**

1.  One or both Defendants[1] discriminated against Plaintiff Yolanda Delgado

under § 3604(b) of the Fair Housing Act by failing to provide her with translation

services in connection with the execution of the Termination Agreement (specify each)?

    Defendant Good Samaritan     Yes _____     No _____

    Defendant Sanford          Yes _____     No _____

---

[1] It is Defendants' position that the word "intentionally" must be included before "discrimination", as "intentional discrimination" is a required element of the claim. *Bonasera v. City of Norcross,* 342 F. App'x 581, 583 (11th Cir. 2009) ("A plaintiff can establish a violation under the FHA by proving (1) intentional discrimination, (2) discriminatory impact, or (3) a refusal to make a reasonable accommodation."). It is Plaintiff's position that "intentionality" is not required when a significant discriminatory effect demonstrates a violation of the FHA. *See Jackson v. Okaloosa Cnty., Fla.*, 21 F.3d 1531, 1543 (11th Cir. 1994).

1

*If your answer to question 1 is "No," your verdict is for Defendants on Plaintiff Yolanda Delgado's claim under § 3604(b) Fair Housing Act. If you answer to Question 1 is "Yes," proceed to Question 2 below.*

2.  Plaintiff Yolanda Delgado voluntarily waived her right to assert a claim of discrimination in connection with Defendants' failure to provide translation services in connection with the execution of the Termination Agreement by failing to request such services and by utilizing her daughter as a translator instead?

YES _____     NO _____

*If your answer to question 2 is "No," your verdict is for Plaintiff Yolanda Delgado on her claim under § 3604(b) of the Fair Housing Act and you should proceed to question 3 below. If your answer to question 2 is "Yes," your verdict is for Defendants on Plaintiff Yolanda Delgado's claim under § 3604(b) of the Fair Housing Act and you should proceed to question 3 below.*

3.  One or both Defendants coerced, intimidated, threatened, or interfered with Plaintiff Yolanda Delgado's exercise of a right under sections 3603-3606 of the FHA, or of her enjoyment of a housing right after exercise of that right because of discriminatory animus, or alternatively, engaged in discriminatory conduct so severe or pervasive, such as violence or threats of violence, that had the effect of causing Yolanda Delgado to abandon the exercise of her housing rights (specify each)?

Defendant Good Samaritan     Yes _____     No _____

Defendant Sanford     Yes _____     No _____

*If your answer to question 3 is "No," your verdict is for Defendants on Plaintiff Yolanda Delgado's claim under § 3617 of the Fair Housing Act, and your foreperson should sign and date the last page of this verdict form. If your answer to question 3 is "Yes," your verdict is for Plaintiff Yolanda Delgado on her § 3617 claim. If you have entered a verdict in favor of Plaintiff Yolanda Delgado on either her § 3604(b) or § 3617 claims, then you should proceed to question 4.*

2

4. Plaintiff Yolanda Delgado is entitled to actual damages against one or both Defendants (specify each)?

Defendant Good Samaritan        Yes _____        No _____

Defendant Sanford               Yes _____        No _____


*If your answer to Question 4 is "Yes," please answer question 4a, and then proceed to Question 5.*

4a. State the total amount of actual damages sustained by Plaintiff Yolanda Delgado as a result of Defendants' violations of §§ 3604(b) and/or 3617 of the Fair Housing Act.

$_____

5. One or both Defendants were motivated by evil motive or intent, or a reckless or callous indifference to Ms. Delgado's federally protected rights, and Plaintiff Yolanda Delgado should be awarded punitive damages against Defendants (specify each)?

Defendant Good Samaritan        Yes _____        No _____

Defendant Sanford               Yes _____        No _____


*If your answer to Question 5b is "Yes," the trial will proceed to a separate phase where the parties will put on evidence concerning punitive damages and the amount of such punitive damages to be awarded (if any) and will complete Section 6 below.*


**Florida Adult Protective Services Act Claim (Count 3)**

3

**We, the jury unanimously find the following by a preponderance of the evidence:**

1. Plaintiff Yolanda Delgado falls within the definition of a "vulnerable adult" under the Florida Adult Protective Services Act, meaning that, in the Fall of 2022, Ms. Delgado's ability to perform the normal activities of daily living (functions and tasks for self-care, including ambulation/walking, bathing, dressing, eating, grooming, toileting, and other similar tasks) or to provide for her own care or protection was impaired due to a mental, emotional, sensory, long-term physical, or developmental disability or dysfunction, or brain damage, or the infirmities of aging?

YES_____    NO_____

*If your answer to question 1 is "No," your verdict is for Defendants and this ends your deliberations, and your foreperson should sign and date the last page of this verdict form. If your answer to question 1 is "Yes," proceed to question 2 below.*

2. One or both Defendants stood in a position of trust and confidence with Ms. Delgado – i.e., had a legal or fiduciary relationship, including, but not limited to, a court-appointed or voluntary guardian, trustee, attorney, or conservator (specify each)?

Defendant Good Samaritan        Yes _____        No _____

Defendant Sanford        Yes _____        No _____

*If your answer to question 2 is "No," your verdict is for Defendants and this ends your deliberations, and your foreperson should sign and date the last page of this verdict form. If your answer to question 2 is "Yes," proceed to question 3 below.*

3. One or both Defendants knowingly, by deception (i.e., "misrepresentation or concealment of a material fact relating to services rendered, disposition of property, or the use of property intended to benefit Ms. Delgado") or by intimidation (i.e., "the

4

communication by word or act to Ms. Delgado that she would be deprived of food, nutrition, clothing, shelter, supervision, medicine, medical services, money, or financial support or will suffer physical violence"), obtained or used, or endeavored to obtain or use, Ms. Delgado's funds, assets, or property with the intent to temporarily or permanently deprive her of the use, benefit, or possession of those funds, assets, or property for the benefit of someone other than Ms. Delgado (specify each)?

| | | | |
|---|---|---|---|
| Defendant Good Samaritan | Yes _____ | No _____ |
| Defendant Sanford | Yes _____ | No _____ |

*If your answer to question 3 is "No," your verdict is for Defendants and this ends your deliberations, and your foreperson should sign and date the last page of this verdict form. If your answer to question 3 is "Yes," proceed to question 4 below.*

4. The conduct of one or both Defendants conduct caused Plaintiff Yolanda Delgado actual damages (specify each)?

| | | | |
|---|---|---|---|
| Defendant Good Samaritan | Yes _____ | No _____ |
| Defendant Sanford | Yes _____ | No _____ |

*If your answer to question 4 is "No," this ends your deliberations, and your foreperson should sign and date the last page of this verdict form. If your answer to question 4 is "Yes," proceed to questions 5 and 6 below*

5. State the total amount of actual damages sustained by Plaintiff Yolanda Delgado:

$_____

6. Plaintiff Yolanda Delgado has proven by clear and convincing evidence that she should be awarded punitive damages against one or both Defendants (specify each)?

5

Defendant Good Samaritan          Yes _____          No _____

Defendant Sanford               Yes _____          No _____


*If your answer to Question 6 is "Yes," the trial will proceed to a separate phase where the parties will put on evidence concerning punitive damages and the amount of such punitive damages to be awarded (if any) and will complete Section 7 below.*


SO SAY WE ALL.

_____
                                            Foreperson's Signature

DATE: _____

6